## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| MARY DOE and NANCY ROE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 4:18-cv-00089 |
| | ) | |
| PURDUE UNIVERSITY and ALYSSA | ) | |
| ROLLOCK and KATIE | ) | |
| SERMERSHEIM, in their official and | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AS TO PLAINTIFF NANCY ROE

William P. Kealey (Attorney No. 18973-79)
Joseph H. Harrison III (Attorney No. 35248-53)
STUART & BRANIGIN LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN  47902-1010
Telephone:  765-423-1561
Facsimile: 765-742-8175
E-Mail:  wpk@stuartlaw.com
              jhh@stuartlaw.com
***Attorneys for Defendants***

<u>TABLE OF CONTENTS</u>

Table of Authorities ......................................................................................................... ii

I.  Introduction ............................................................................................................... 1

II. Statement of Issues ................................................................................................... 1

III. Summary of Pending Allegations ............................................................................ 2

IV. Statement of Material Facts Not in Dispute ........................................................... 3

    A.   Roe's allegations to Purdue in 2017 ................................................................ 3

    B.   Purdue's response to Roe's allegations ............................................................. 4

    C.   Purdue investigators' reliance on the audio recording and the inconsistencies in .....
        Roe's story ...................................................................................................... 6

    D.   Final Determination and Appeal ....................................................................... 9

IV. Law and Argument ................................................................................................... 15

    A.   Summary Judgment Standard ........................................................................... 15

    B.   The text of the False Statement Rule does not offend Title IX ......................... 16

    C.   The False Statement Rule was applied to Roe due to her conduct, not her gender ... 17

    D.   Fact-based application of the False Statement Rule is not retaliation for .................
        protected activity under Title IX ...................................................................... 21

    E.   Roe's Section 1983 official capacity claims against Sermersheim and Rollock ........
        fail ................................................................................................................. 24

    F.   Roe's Section 1983 individual capacity claims against Sermersheim and Rollock ...
        fail ................................................................................................................. 26

        1.  No Equal Protection or Due Process offense ........................................... 26

        2.  Sermersheim and Rollock have qualified immunity .............................. 27

V. Conclusion ................................................................................................................ 28

TABLE OF AUTHORITIES

Cases

*Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998)................................. 16

*Alexander v. Sandoval*, 532 U.S. 275 (2001)........................................................... 18

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)....................................................... 24

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ............................................ 15

*Anderson v. Trs. Of Dartmouth Coll.*, Case No. 19-cv-109-SM, 2020 U.S. Dist.................
LEXIS 227543 (D.N.H. 2020)................................................................................ 21

*Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986 (7th Cir. 1993)......................... 15

*Archer v. Chisholm*, 870 F.3d 603 (7th Cir. 2017) ................................................. 27

*Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725 (N.D. Ill. 2017).......................... 18

*Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690 (7th Cir. 2017).............. 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................... 15,16

*City of L.A. v. Lyons*, 461 U.S. 95 (1983) ........................................................... 24

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012)................................................. 20

*Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13 (1st Cir. 1989) ................................. 20

*Doe v. Brown Univ.,* No. 17-191-JJM-LDA, 2020 U.S. Dist. LEXIS 175102 (D.R.I. 2020)    20

*Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939 (N.D. Ill. 2017) .......................................19,20,22

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849 (7th Cir. 2019)....................................................18,19,21,22

*Doe v. Marian Univ.*, No. 19-CV-388-JPS, 2019 U.S. Dist. LEXIS 222842........................
(E.D. Wis. 2019) ...........................................................................................18,20,22

*Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017) ......................................... 20

*Doe v. Ohio State Univ.,* 323 F. Supp. 3d 962 (S.D. Ohio 2018) ......................................... 20

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ...........................................................18,24,25,26,27

*Doe v. Purdue Univ.*, No. 4:19-CV-84-JVB-JEM, 2020 U.S. Dist. LEXIS 168097 (N.D. Ind. 2020) .......................................................................................................................... 19, 25

*Doe v. Univ. of Denver*, 952 F.3d 1182 (10th Cir. 2020) ....................................... 21

*Doe v. Univ. of Neb.*, No. 4:18CV3142, 2021 U.S. Dist. LEXIS 22999 (D. Neb. 2021)...... 20

*Does 1-2 v. Regents of the Univ. of Minnesota*, No. CV 18-1596 (DWF/HB), ................... 2019 U.S. Dist. LEXIS 105651 (D. Minn. 2019) ................................................... 20

*Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist.* 163, 315 F.3d 817 ................ (7th Cir. 2003)........................................................................................................ 16

*Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019) ........................... 18

*Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569 (7th Cir. 2014)............................ 17,18

*Hiatt v. Colo. Seminary*, 858 F.3d 1307 (10th Cir. 2017)................................................ 18

*Hinrichs v. Whitburn*, 975 F.2d 1329 (7th Cir. 1992) ......................................... 24,25

*Holland v. Methodist Hosps.*, No. 2:14-CV-88-PRC, 2016 U.S. Dist. LEXIS 135164 ........ (N.D. Ind. 2016)..................................................................................................... 15

*Howell v. Smith*, 853 F.3d 892 (7th Cir. 2017)................................................... 28

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) .................................. 17,22

*King v. Ford Motor Co.*, 872 F.3d 833 (7th Cir. 2017) ...................................... 21

*Kuttner v. Zaruba*, 819 F.3d 970 (7th Cir. 2016)................................................ 20

*Lauth v. Covance, Inc.*, 863 F.3d 708 (7th Cir. 2017) ..........................................18,21,22

*Lee v. Univ. of New Mexico*, 449 F. Supp. 3d 1071(D.N.M. 2020)........................ 18

*Magin v. Monsanto Co.*, 420 F.3d 679 (7th Cir. 2005) ........................................ 15

*Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201 (S.D. Ind. 2016) ............................ 20

*Matney v. County of Kenosha*, 86 F.3d 692 (7th Cir. 1996)................................... 16

*Mitchell v. Forsyth*, 472 U.S. 511(1985) .......................................................... 27

*Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996)................................................ 25

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)...................................................... 18

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)...................................................... 16

*Pearson v. Callahan*, 555 U.S. 223 (2009)...................................................... 27

*Pogorzelska v. Vandercook Coll. of Music*, 442 F. Supp. 3d 1054 (N.D. Ill. 2020) ............. 22

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000)...................................................... 20

*Rabin v. Flynn*, 725 F.3d 628 (7th Cir. 2013)...................................................... 27

*Ross v. Ball State Univ.*, No. 118CV01258JRSTAB, 2020 U.S. Dist. LEXIS 37241 (S.D. Ind. 2020) ...................................................... 18

*Rossley v. Drake Univ.*, 979 F.3d 1184 (8th Cir. 2020)...................................................... 17

*Sebesta v. Davis*, 878 F.3d 226 (7th Cir. 2017) ...................................................... 28

*Senner v. Northcentral Tech. College*, 113 F.3d 750 (7th Cir. 1997)...................................................... 16

*White v. Pauly*, 137 S. Ct. 548 (2017) ...................................................... 27,28

*Word v. City of Chicago*, 946 F.3d 391 (7th Cir. 2020) ...................................................... 25

*Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015) ...................................................... 20

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994)...................................................... 19

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ...................................................... 28

<u>Other</u>

Fed. R. Civ. P. 56(c) ...................................................... 15

Fed. R. Civ. P. 56(e) ...................................................... 16

# I.     INTRODUCTION

While enrolled at Purdue University, Plaintiff Nancy Roe alleged that a fellow student sexually assaulted her. After an investigation, Purdue determined that the evidence did not support the allegation and, further, that Roe engaged in sanctionable conduct for multiple knowingly false statements. As a sanction, Purdue suspended Roe pursuant to Purdue's published rule on false statements.

Roe alleges that Purdue's decision to suspend her violated Title IX and deprived her of Due Process and Equal Protection.

Roe has not come forward with evidence that Purdue's application of its False Statement Rule was gender discrimination. Nor has Roe come forward with evidence that the false-statement sanction was retaliation for protected activity under Title IX.

On each of these allegations, because the evidence is lacking to make a showing sufficient to establish the existence of one or more elements on which Roe would bear the burden of proof at trial, summary judgment of dismissal is required.

# II.     STATEMENT OF ISSUES

Roe cannot show Title IX gender-bias in the text or application of Purdue's False Statement Rule because no facts raise the inference that Purdue acted at least partly on the basis of sex in Roe's particular case. Serious inconsistences between Roe's account and the evidence, together with compelling video and audio evidence showing Roe's competency and intent, convinced Purdue decision-makers that Roe's account of events was threaded with false statements. In addition, Roe has conceded that Purdue decisionmakers sanctioned her because they believed that she had made false statements. As a result, Purdue had a reasonable, non-

discriminatory basis to find that Roe was a knowing participant with C.L. and falsely reported a consensual encounter as an assault.

Roe cannot show that her false statements were protected activity under Title IX or that Purdue possessed a retaliatory intent when applying the False Statement Rule to her statements.

Roe cannot show deprivation of any protected interest in life, liberty, or property and therefore cannot establish any Due Process violation under Section 1983.

Roe's Section 1983 Equal Protection claim has the same defects as her Title IX claims.

The Section 1983 claims also fail due to standing defects, flawed reasoning, failure to name one of the decisionmakers as a defendant, and the qualified immunity afforded to Defendants Sermersheim and Rollock.

### III.    SUMMARY OF PENDING ALLEGATIONS

Plaintiff Nancy Roe was a junior at Purdue University until she was suspended on October 17, 2017. Compl. at ¶ 8 (ECF No. 1). Roe alleges that she was sexually assaulted in her dorm room by a male undergraduate student on April 17, 2017. *See id.* at ¶¶ 30, 34. Roe alleges that Purdue retaliated against her for failing to prove her allegation of sexual assault, and the retaliation violated Title IX. *See id.* at ¶¶ 56-58.

In the course of this case, Roe has conceded that her complaint in this Court is directed to her suspension, not the determination whether she was sexually assaulted: "I can understand if someone didn't feel there was sufficient evidence to support my claim, I can understand that." Ex. L, 109:1-3.

Roe alleges a policy of retaliation; in her words, "Purdue University has implemented a policy, either written or unwritten, wherein women who cannot prove their claims to the satisfaction of Purdue decisionmakers face discipline up to expulsion at Purdue." Compl. at ¶ 3

(ECF No. 1). Roe alleges that application of this alleged "policy" violated Title IX and her

constitutional Due Process and Equal Protection rights. *See id.* at ¶¶ 62-64. Roe alleges that Dean

of Students Katherine Sermersheim and Vice President for Ethics and Compliance Alysa

Christmas Rollock "knowingly or recklessly implemented and managed a sexual assault

complaint process that deprived" Roe of her constitutional right to due process and equal

protection of the law. *Id.* at ¶¶ 65–68. Roe alleges that Purdue's decision to suspend her for false

reporting was a punishment for making a protected Title IX complaint. *See id.* at ¶ 6.

## IV.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.     Roe's allegations to Purdue in 2017.

On April 22, 2017, Roe texted Resident Assistant Skiba that she attended a party on April

17, 2017 where she drank alcohol. Ex. A at p. 1. After the party, she walked back to her dorm

with a few people. *Id.* When she arrived back to her dorm room around 2:00 a.m. she realized

that she did not have her room key with her and that she was locked out of her room. *Id.* Roe

went to Skiba's room to see if she could unlock her door. *Id.* Skiba told Roe that she could not do

that, and that she had to go to the dorm hall front office to request a spare key. *See id.* Roe agreed

and headed downstairs alone. *Id.*

On April 22, 2017, Roe texted Skiba, "So Monday night, after I knocked on your door I

was sexually assaulted by the guy who walked me back from a party." *Id.* at p. 3. Roe later also

told Skiba:

> From this point on, she said that she does not remember what happened probably
> due to the alcohol she had consumed at the party earlier that night. But, she said
> after she got her spare key from the office, one of the boys that walked back [to
> her dorm] with her after the party that night raped her.

3

*Id.* at p. 1. According to Roe, she woke up the next day with bruises on her body, and she got a

rape kit at some point after the rape Roe alleged to have occurred on the early morning of April

18, 2017. *See id.*

On April 25, 2017, Roe and her then-boyfriend met with Resident Assistant Anantharam

and Roe told Anantharam "about how she had been sexually assaulted the previous Monday late

night/Tuesday early morning (04/18)." Ex. B at p. 1. Roe told Anantharam that she had gone to a

fraternity party that night and afterwards she came back to her dorm room with the student she

alleges that raped her. *See id.* Roe's reports to the resident assistants were received by the Office

of Institutional Equity[1] ("OIE"). *See* Ex. E, ¶ 7.

### B.   Purdue's response to Roe's allegations.

Purdue OIE Title IX Specialist Karen Meyers contacted Roe on April 23, 2017 to request

an opportunity to speak with Roe in response to her allegations of sexual assault. Ex. C at p. 1.

On May 3, 2017, Karen Meyers contacted Roe after Purdue "received additional information

regarding the identity of the male involved in the incident" and to request a "meeting to discuss

[Roe's] perspective on the University moving forward with an investigation into the incidents

that were shared with my office." Ex. D.

On May 17, 2017, Dr. Katherine Sermersheim, Dean of Students, formally advised Roe

that Purdue had been made aware of her allegations against C.L. and elected to exercise its right

to investigate these allegations. Ex. E, ¶ 4; Ex. G at p. 1. Purdue acted pursuant to the relevant

University policies when it initiated the investigation based upon Roe's statements to the resident

assistants and to Purdue investigators. Ex. E, ¶ 5; *see also* Ex. H (the "Anti-Harassment Policy")

at p. 4 and Ex. I (the "Procedures") at p. 2.

---

[1] Among other responsibilities, Purdue's OIE investigates potential violations of the University Anti-Harassment Policy. Ex. F, 15:24-16:1.

The Procedures state:

> The University has an obligation to respond to information of which it becomes aware, whether received directly or indirectly. That is, the University's obligation may be triggered by a direct disclosure by those who have experienced potential discrimination or harassment or by gaining indirect knowledge of such information. For this reason, the University may initiate an investigation of circumstances that involve potential discrimination and/or harassment even where no complaint, formal or informal, has been filed. In those circumstances, the University may elect to investigate and, if warranted, impose disciplinary sanctions pursuant to these or other established University procedures.

Ex. I at p. 2.

Dr. Sermersheim notified Roe that, pursuant to the Procedures, she was appointing Karen Meyers and OIE Investigator Christie Wright to investigate Roe's allegations. Ex. E, ¶ 6; Ex. G at p. 1. The scope of the Anti-Harassment Policy includes "Relationship Violence", defined as: "Any physical, sexual and/or psychological harm against an individual by a current or former intimate or romantic partner. Intimate or romantic partners may be dating, cohabitating, married, separated or divorced, and may be of the same or opposite sex." Ex. H at p. 9.

Dr. Sermersheim provided Roe with written notice of the allegations forming the basis of the University-Initiated Investigation. Ex. G at p. 5. The Notice of Allegations prepared by the University Investigators stated that:

> It is alleged that on or about the evening of April 17, 2017, [Roe] attended a party at the fraternity at which [C.L. is] a member, Acacia Fraternity. [C.L.] served as the bartender during the party and later joined a group of people who were playing a drinking game. This group, which included [Roe] and her boyfriend, drank for two to three hours. [C.L.] joined them and drank with them. [C.L.] and [Roe] then walked back to her dorm room in Harrison Hall. While [Roe] was incapacitated and unable to consent to sexual activities, [C.L.] forced her to perform oral sex on [him], vaginally penetrated her with [his] penis, and inserted [his] penis into her anus. It is further alleged that [C.L.] recorded all or a portion of this sexual encounter with [Roe] without her knowledge or consent.

*Id.* On May 30, 2017, Dr. Katherine Sermersheim also provided Roe with a copy of C.L.'s written response to Roe's complaint. Ex. J.

As part of Purdue's University-Initiated Investigation, Roe, like all Purdue students, faculty, and staff, was required to comply with the Anti-Harassment Policy and the Procedures which prohibit making false reports to Purdue. Ex. E, ¶ 8; *see also* Ex. H at p. 5 and Ex. I at p. 8. The Anti-Harassment Policy includes the following rule:

> This policy may not be used to bring knowingly false or malicious charges against any faculty, staff, students or recognized student organizations, including fraternities, sororities and/or cooperatives. Disciplinary action will be taken against any person or group found to have brought a charge of Harassment in bad faith or any person who, in bad faith, is found to have encouraged another person or group to bring such a charge.

Ex. H at p. 5. The Procedures that accompany the Anti-Harassment Policy state:

> All University community members are expected to provide truthful information in any report or proceeding under these Procedures. Any person who knowingly makes a false statement in connection with the resolution of a complaint under these Procedures may be subject to appropriate discipline. Making a good faith report of discrimination or harassment that is not later substantiated is not considered a false statement.

Ex. I at p. 8. Both the Procedures and the Anti-Harassment Policy warn that persons who make false reports will be subject to disciplinary actions. Ex. E, ¶ 9. These two texts in the Policy and Procedures are referred to collectively in this brief as the "False Statement Rule".

University investigators interviewed twelve people, including Roe, the respondent C.L., and ten other witnesses. *See* Ex. K at 3–4. The investigators focused on an audio recording, interviews of Roe and C.L. and other witnesses, text messages, dorm hall videos and photos showing Roe and C.L. walking and making decisions near the time of the alleged sexual assault, and C.L.'s response to Roe's complaint. *Id.*

### C.    Purdue investigators' reliance on the audio recording and the inconsistencies in Roe's story.

C.L. provided investigators with an audio recording that C.L. secretly made of

conversation between Roe and C.L in Roe's dorm room after the alleged sexual assault. Ex. E, ¶ 11; Ex. E-1 ("filed manually"); *see* also Ex. F., 39:20-24; 40:14-16; 40:23-41:3. It is undisputed that the audio recording is of Roe and C.L. and was recorded in Roe's dorm room on the early morning of April 18, 2017. *See* Ex. L, 97:15-22, 98:3-12. Roe does not dispute the contents of the audio recording. *Id.*, 97:23-24. Roe admitted that she listened to the audio recording with investigators. *Id.*, 97:4-10. The recorded dialog includes Roe's discussion that she and C.L. were trysting behind the back of her then-boyfriend and intending to continue the tryst the next day. *See* Ex. E-1; *see also* Ex. F, 63:16-25. As they had planned during the early morning hours of April 18, 2017 in Roe's dorm room, Roe admitted to having sex with C.L. on the afternoon of April 18, 2017. *See* Ex. L, 100:11-23; *see also* Ex. K at pp. 14–15.

Investigators noted that for the next two days following the alleged sexual assault, Roe described her initial sexual encounter with C.L. to her friends in terms that reflected awareness and consent to sex with C.L. which was inconsistent with the information Roe provided to investigators. *See* Ex. K at pp. 15–16, 20; *see also* Ex. F., 62:20-23. Roe's friend I.O. reported to investigators that on the night of April 19, 2017 Roe told her "that she and [C.L.] had hooked up on Monday night and Tuesday afternoon" and Roe gave no indication that either occasion was nonconsensual. Ex. K at pp. 15–16. Roe admitted that she told I.O. that she and C.L. "hooked up" the night of the alleged sexual assault. *See* Ex. L, 58:4-8, 58:22-24; 112:5-8. "According to [I.O.], [Roe] expressed guilt (because [Roe] thought [I.O.] had a 'thing' for [C.L.]) as well as concern that [Roe's then-boyfriend] would break up with her." Ex. K at p. 16. Roe told I.O. that she wanted to make it right and that she was going to tell her then-boyfriend what happened. *Id.* Roe's then-boyfriend reported to investigators that on the night of April 19, 2017 Roe told him that "We need to talk" and then stated, "I cheated on you with [C.L.]. [C.L.] and I had sex

Monday night"—the night of the alleged sexual assault. *See id.* at p. 16. Roe admitted that she

told her then-boyfriend that she cheated on him with C.L. during the encounter with C.L. in her

dorm room on early morning of April 18, 2017. *See* Ex. L, 111:2-8.

On July 3, 2017, investigator Meyers notified Roe of her right to review the investigators'

Preliminary Report and to submit written feedback. Ex. M at p. 1. Roe declined the opportunity

to review the preliminary report and to submit feedback. Ex. K at p. 5. Investigators Meyer and

Wright issued their final report on July 24, 2017. Ex. K at p. 1.

Purdue investigators concluded that Roe was not incapacitated at the time she alleges she

was sexually assaulted by C.L., and that her overnight encounter with C.L. was consensual, not

assault. *See* Ex. F, 45:1-17; Ex. K at p. 22. During deposition investigator Wright affirmed the

investigators' belief that the evidence established Roe was not incapacitated on the night of the

alleged sexual assault:

> Based on statements provided by witnesses and parties in the matter, reviewing
> the audio recording, video footage and still photos of her interactions in the
> residence hall immediately prior to the encounter, we determined that she had the
> ability to understand the who, what, where, why and how. She was able to engage
> in pretty high-level functioning of navigating the residence hall and was able to
> make plans for the next day.

Ex. F, 45:1-17; *see also* Ex. K. at pp. 10–11. Investigators noted that the dorm hall video showed

Roe and C.L. walking across the lobby toward a secure door and as they were walking, Roe

reached over to touch C.L. with her arm and they stopped to embrace and kiss. Ex. K at p. 10.

Roe then swiped them into the secured area and appeared to be walking fine without stumbling

or swaying. *Id.*

In addition to evaluating whether there has been a violation of the Anti-Harassment

Policy, investigators are tasked with evaluating whether the complainant made a false report. *See*

Ex. F, 49:5-10. Here, investigators made a recommendation to Dr. Sermersheim that Roe "made

a knowingly false and malicious complaint." *Id.*, 49:11-16. In addition to the evidence cited in

their report, "[a] large portion" of the investigators' recommendation was based on the audio

recording. *Id.*, 49:17-25. Investigators believed that the audio recording established that Roe was

an "active participant, a willing participant" in the overnight encounter with C.L. *Id.*, 63:16-21.

The audio recording captured how Roe "made plans to engage in intercourse with [C.L.] again

the next day, which suggests a high level of functioning and ability to formulate thoughts and

know what was going on in that encounter." *Id.*, 63:21-25. Roe admitted that during her first

meeting with investigators she did not tell them that she had sex with C.L. on the afternoon of

April 18, 2017. *See* Ex. L, 101:21-102:10. Investigators noted that the audio recording:

> undermines [Roe's] contention that she was incapacitated while she and [C.L.]
> were in her dorm room and that the sexual conduct between the two was non-
> consensual. [Roe] was exhibiting clear thinking during the recorded discussion,
> including concern that [her then-boyfriend] not find out about her encounter with
> [C.L.].

Ex. K at p. 20. Investigators believed the audio recording and other evidence obtained during the

investigation established by a preponderance of the evidence that Roe consented to the sexual

encounter with C.L. *See id.* at p. 22. Investigators stated that Roe:

> initiated the conduct and stated on the recording that she not only enjoyed it but
> wanted to engage in sexual conduct with [C.L.] in the future. Her consent was
> affirmative and clear, and there would be no reasonable cause for [C.L.] to have
> questioned whether she was consenting to the conduct.

*Id.*

### D.     Final Determination and Appeal.

On July 26, 2017, Dr. Sermersheim notified Roe that she planned to meet with the three-

member Advisory Committee on Equity[2] (the "panel") on August 7, 2017 to advise her regarding

---

[2] The "Advisory Committee on Equity" is "The committee composed of faculty and staff appointed by the Vice President for Ethics and Compliance … to advise the Chancellors, Director and Dean of Students pursuant to Section I of these Procedures." Ex. I at p. 3.

the university's investigation into Roe's allegations against C.L., and that Roe had the opportunity to meet with the panel and Dr. Sermersheim. Ex. E, ¶ 12; *see* Ex. N. Roe appeared before the panel and Dr. Sermersheim on August 7, 2017. Ex. E, ¶ 13.

Dr. Sermersheim relied on the information provided by Roe, C.L., and the university investigators, her consultation with the three-person panel, and her twenty-eight years of experience in higher education to find, by a preponderance of the evidence, that:

> (a) C.L. was credible;
> (b) Roe was not incapacitated during the sexual encounter with C.L. that Roe reported as sexual assault;
> (c) Roe consented to the sexual encounter but did not consent to the audio recording; and
> (d) C.L. violated the Anti-Harassment Policy's bar on sexual exploitation when he recorded the sexual encounter with Roe.

*See* Ex. O at pp. 1–3 and Ex. P at pp. 2–3; *see also* Ex. E, ¶ 14–15. At the panel hearing, Roe was asked why she invited/allowed/participated in sexual intercourse with C.L. a second time and Roe answered that it was her way of gaining control over the person who had controlled her previously. Ex. O at p. 2; Ex. P[3] at p. 2. Roe's consensual sexual encounter hours after the alleged sexual assault, "coupled with text messages that suggested remorse on [Roe's] part for having sexual intercourse with [C.L.] while [Roe] had boyfriend," led Dr. Sermersheim "to surmise that [Roe] was looking for a way out of [her] decision to have sex with [C.L.] and that way out was to suggest you were incapacitated and couldn't remember." *Id.*

Dr. Sermersheim cited to the video investigators obtained of Roe walking in the residence hall lobby at 2:19 a.m. on April 18, 2017 and how investigators noted that Roe walked through the lobby without any problems and that she swiped herself into a secured area of the residence

---

[3] Dr. Sermersheim's letter titled "AMENDED Final Determination" is incorrectly dated August 14, 2017. Ex. P at p. 1. Dr. Sermersheim sent the "AMENDED Final Determination" on September 29, 2017. *See* Ex. R at p. 1.

hall. *Id.*; *see* Ex. Q., 74:14-18. Dr. Sermersheim noted that once Roe realized she did not have

her dorm room key, she hid C.L. in a restroom, spoke with her resident assistant, and obtained a

key to her dorm room from the clerk in the residence hall. Ex. O at p. 2; Ex. P at p. 2. Dr.

Sermersheim then cited to the audio recording and stated:

> [T]he audio recording demonstrates that you were able to think of the potential
> consequences of your actions and were concerned that your boyfriend would learn
> of the encounter with [C.L.]. The audio also demonstrates that you were able to
> make plans with [C.L.] for the following day.

*Id.* Dr. Sermersheim further found that:

> The preponderance of the evidence demonstrates that you pursued [C.L.], initiated
> sexual activity with him, and consented to the sexual activity. The audio recording
> captured by [C.L.] immediately after the alleged assault demonstrates that you
> were a full and active participant in the sexual activity.

Ex. O at p. 2; Ex. P at p. 3. In response to her findings, Dr. Sermersheim informed Roe that she

had concerns about whether Roe engaged in sanctionable conduct for knowingly making a false

report to Purdue regarding her allegations of sexual assault against C.L and referred Roe to the

Office of Student Rights and Responsibilities. *See* Ex. O at p. 3. Dr. Sermersheim informed Roe

of her right to appeal her determination to Vice President of Ethics and Compliance, Alysa

Christmas Rollock. *Id.*

Roe timely appealed Dr. Sermersheim's August 15, 2017 determination and submitted

additional information to VP Rollock as part of her appeal. Ex. P at p. 1. VP Rollock upheld Dr.

Sermersheim's finding that the preponderance of the evidence (1) substantiated that C.L.

engaged in Sexual Exploitation in violation of the Anti-Harassment Policy, and the sanction

imposed for that misconduct; and (2) did not substantiate any additional finding of violations of

the Anti-Harassment Policy by him. *Id.* VP Rollock revoked Dr. Sermersheim's referral of Roe

to the Office of Student Rights and Responsibilities and directed her to make a specific finding

whether Roe knowingly made a false statement or statements in connection with the resolution of

Roe's allegations against C.L., and what discipline, if any, should be imposed for such

misconduct. *Id.* VP Rollock gave Roe the opportunity to provide additional information to

investigator Wright and to supplement her appeal to VP Rollock and the right to appeal Dr.

Sermersheim's revised determination rendered on September 29, 2017. *Id.*

Dr. Sermersheim found by a preponderance of the evidence that Roe knowingly provided

false statements regarding her accusations against C.L. Ex. E, ¶ 15; Ex. P at p. 3. She testified

that she relied on the "totality of the facts presented in the Investigators' Report," the audio

recording, the text messages and the underlying evidence considered by investigators, her

meeting with the three-person panel that questioned Roe and C.L., and her twenty-eight years of

experience in higher education to find that Roe made false statements. *See* Ex. Q., 29:15-22;

36:18-22; 71:9-20. Dr. Sermersheim cited the following facts to support her false-statement

determination:

> You spoke on the phone with your boyfriend during the alleged assault; made
> plans to see [C.L.] – the alleged assailant – immediately following the occurrence
> of the alleged incident; indeed met with and engaged in sexual intercourse with
> [C.L.] again the day after the alleged incident; and returned to the fraternity where
> [C.L.] lived at least two nights in a row following the alleged incident.

Ex. P at p. 3. After listening to the audio recording, Dr. Sermersheim found:

> [Roe was] a full, active participant in the sexual activity, that you participated in
> the planning of a second sexual encounter, and that you did so on your own
> volition and were not incapacitated. A preponderance of the evidence suggests
> that all sexual activity was consensual.

*Id.* Dr. Sermersheim concluded that a reasonable person would believe the audio recording was

evidence of consensual sexual activity between Roe and C.L. *See* Ex. Q, 33:15-18. Dr.

Sermersheim cited to Roe's answer at the panel hearing where she justified her decision to have

sex with C.L. for a second time as Roe's "way of gaining control over the person who had

controlled you previously" and judged that a reasonable person would not draw the same

conclusion. Ex. P at p. 3. Dr. Sermersheim concluded that Roe's consensual sexual encounter

hours after the alleged sexual assault, "coupled with text messages that suggested remorse on

your part for having sexual intercourse with someone other than your boyfriend" led her "to

surmise that [Roe was] looking for a way out of [her] decision to have sex with [C.L.] and that

way out was to suggest you were incapacitated and could not remember." *Id.* Dr. Sermersheim

affirmed her conclusion at deposition and stated: "I believe [Roe] lied about the sexual encounter

that she had with [C.L.] to cover up the encounter with someone else that was not her boyfriend."

Ex. Q, 29:7-10.

Dr. Sermersheim determined that Roe violated the Anti-Harassment Policy by knowingly

making false statements regarding C.L. and directed that Roe be expelled. Ex. E, ¶ 17; Ex. P at p.

4. Dr. Sermersheim informed Roe of her right to appeal her sanction determination to VP

Rollock. *Id.*

Roe appealed Dr. Sermersheim's false-statement determination and the resulting

expulsion. Ex. R at p. 1. VP Rollock presided over the appeal. *Id.* VP Rollock reviewed Purdue's

Notice of Allegations, C.L.'s response to the Notice of Allegations, the report of the University

Investigators, Roe's appeal materials, and Dean Sermersheim's letters to Roe and C.L. dated

August 15, 2017 and September 29, 2017, to uphold and modify Dean Sermersheim's false-

statement determination. *Id.* VP Rollock upheld Dean Sermersheim's findings that (1) Roe

knowingly provided false statements regarding her accusations against C.L and (2) C.L. violated

the Anti-Harassment Policy's bar on sexual exploitation when he recorded the sexual encounter

with Roe. *Id.* VP Rollock also upheld Dean Sermersheim's findings that Roe was not

incapacitated during the sexual encounter with C.L. that Roe reported as sexual assault; Roe

consented to the sexual encounter but did not consent to the audio recording; and C.L. was more credible than Roe. *See id.*; *see also* Ex. S, 40:8-13; 43:20-23.

VP Rollock testified that the audio recording, Roe's plan to have sex with C.L. the next day (as stated on the audio recording), and the fact that Roe followed through with that next-day plan were factors that led VP Rollock to uphold Dean Sermersheim's finding of false reporting. *See* Ex. S, 37:20-38:7; 41:1-5. VP Rollock supported the false-statement determination by citing to evidence of Roe's functioning before and after the alleged sexual encounter:

> By having listened to the audiotape, and other indicia of [Roe's] capacity, such as her ability to plan future events, her ability to walk, her ability to exercise fine motor control, her interactions with her RA, an office desk clerk, her ability to enter and return to a secured area on multiple occasions, to hide [C.L.] in a restroom, and along with the audio.

*Id.*, 41:18-42:4. Roe admitted that before the alleged sexual assault she had the capacity to talk to people, to ask for help getting into her dorm room, to bring C.L. into her dorm hall and eventually into her dorm room. *See* Ex. L, 94:3-4, 94:10-18. VP Rollock testified that the "audiotape suggests that she was open and willing to such behavior" Roe later reported as sexual assault. Ex. S, 45:12-14. VP Rollock reduced Roe's sanction for making knowingly false statements from a permanent expulsion to a two-year suspension. Ex. R at p. 2.

Roe has conceded that Purdue decisionmakers sanctioned her because they believed that she "had made false statements." *See* Ex. L, 74:11-13. Roe agreed that Dr. Sermersheim's false-statement determination letter contains an accurate description of Dr. Sermersheim's reasoning process in determining that Roe made false statements. *See id.*, 144:22-145:4, 145:8-10; *see also* Ex. P at pp. 3–4. Roe does not dispute the reasonableness of Purdue's consideration of the audio recording as part of the evidence for its investigation and its false-statement determination. *See*

14

Ex. L, 101:15-20. Roe does not attribute any anti-female bias to the university investigators. *See id.*, 103:7-8, 104:1-6.

Roe admitted that she was aware that Purdue had procedures that applied to Roe's allegations against C.L. *See id.*, 83:16-84:1. Roe admitted that throughout Purdue's investigation of her allegations against C.L, she was familiar with Purdue's expectation that persons will provide truthful information and its requirement that persons make a "good-faith report." *See id.*, 85:13-86:4.

## V.    LAW AND ARGUMENT

### A.  Summary Judgment Standard.

"Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005) (quoting Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "A fact is material only if [a fact] might affect the outcome of the case under the governing law." *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986, 990 (7th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Holland v. Methodist Hosps.*, No. 2:14-CV-88-PRC, 2016 WL 5724355, at *1 (N.D. Ind. 2016) (quoting *Celotex*, 477 U.S. at 322). Accordingly, "a complete failure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Once the moving party meets its initial burden, "the non-moving party must come forward with evidence to show the existence of each element of its case on which it will bear the burden at trial" rather than simply relying "on mere conclusory allegations." *Matney v. County of Kenosha*, 86 F.3d 692, 695 (7th Cir. 1996) (citations omitted). "[A] party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). Plaintiff must come forward with "*specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *See Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist.* 163, 315 F.3d 817, 822 (7th Cir. 2003) (emphasis in original). The nonmoving party cannot rely "'upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (quoting Fed. R. Civ. P. 56(e)). "A party needs more than a scintilla of evidence [ ] to defeat summary judgment." *Senner v. Northcentral Tech. College*, 113 F.3d 750, 757 (7th Cir. 1997).

**B.  The text of the False Statement Rule does not offend Title IX.**

Roe alleges that Purdue has a policy to discipline "women who cannot prove their claims to the satisfaction of Purdue decisionmakers". In the abstract, this allegation begs the relevant Title IX questions. Requiring proof of an assault allegation does not offend Title IX. Barring false statements about assault does not offend Title IX. Disciplining persons who make such false statements does not offend Title IX.

16

The False Statement Rule is gender-neutral on its face. It applies to all claimants regardless of their gender. The False Statement Rule specifies that "Disciplinary action will be taken against <u>any person</u> or group found to have brought a charge of Harassment in bad faith …" and "<u>Any person</u> who knowingly makes a false statement in connection with the resolution of a complaint under these Procedures may be subject to appropriate discipline." Ex. H at p. 5, Ex. I at p. 8 (emphasis added).

Whether claims are proved "to the satisfaction of Purdue decisionmakers" misses the plain meaning of the False Statement Rule. The "False Statement Rule" provides: "Making a good faith report of discrimination or harassment that is not later substantiated is not considered a false statement." This safe harbor excludes only students such as Roe whose claims are not genuine because they resort to falsehoods. Whether a perjurer fails to prove a claim is secondary; perjury is perjury, regardless of the ultimate weight of the evidence.

For these reasons, the text of the False Statement Rule does not offend Title IX. *See, e.g., Rossley v. Drake Univ.*, 979 F.3d 1184, 1193 (8th Cir. 2020) (policy stated in "gender-neutral language" is not reflective of gender bias).

The only remaining possible interpretations of Roe's allegation are that the False Statement Rule (i) was applied to her because of her gender, (ii) is generally applied selectively to only one gender (women) and/or (iii) was applied to protected activity by Roe with retaliatory intent.

### C.  The False Statement Rule was applied to Roe due to her conduct, not her gender.

A private right of action under Title IX requires the claimant to show intentional gender discrimination.[4] There is no private right of action under Title IX for disparate impact.[5] To show

---

[4] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination."); *Hayden v. Greensburg Comm. Sch.*

Title IX gender-bias, Roe would need to show "facts raising the inference that Purdue acted at least partly on the basis of sex in [her] particular case." *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019).[6] Roe can attempt to meet that standard under either a direct or indirect method.[7]

Here, there is no evidence to establish that Purdue decisionmakers sanctioned Roe because she was a female, rather than because she was found to have made false statements. Sermersheim and Rollock sanctioned Roe based on a genuinely held, evidence-based conclusion that Roe violated the False Statement Rule. After Roe reported to Purdue that C.L. sexually assaulted her, Purdue initiated an investigation into Roe's allegations. The investigation revealed the audio recording and other evidence that supports a reasonable, non-discriminatory finding that Roe was a knowing participant with C.L. and falsely reported a consensual encounter as an assault.

Roe has conceded that Purdue decisionmakers sanctioned her because they believed that she "had made false statements." *See* Ex. L, 74:11-13. This concession is dispositive because it

---

*Corp.*, 743 F.3d 569, 583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX."); *Doe v. Marian Univ.*, No. 19-CV-388-JPS, 2019 U.S. Dist. LEXIS 222842, at \*25–26 (E.D. Wis. 2019) ("Merely demonstrating a discriminating outcome falls short of demonstrating a discriminatory intent.").

[5] *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 283 (2001) (holding that there is no private right of action for disparate-impact discrimination under the similarly worded Title VI) and stating, "We have never recognized a private right of action for disparate-impact discrimination under Title IX."); *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738-39 (N.D. Ill. 2017).

[6] *See Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019); *Ross v. Ball State Univ.*, No. 118CV01258JRSTAB, 2020 U.S. Dist. LEXIS 37241, \*26 (S.D. Ind. 2020) (granting summary judgment for the university on plaintiff's Title IX discrimination claim).

[7] At summary judgment, the *McDonnell Douglas* burden-shifting framework can be employed to evaluate the alleged inference of gender bias. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) ("The *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims."). *See, e.g., Lee v. Univ. of New Mexico*, 449 F. Supp. 3d 1071, 1141 (D.N.M. 2020). Such evidence must be evaluated as a whole. *Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016)).

shows that Purdue did not act on the basis of sex in Roe's particular case. This concession closes the door to a pretext argument.

When evaluating a structurally similar complaint brought by the same counsel who represents Roe, this Court has previously determined that merely alleging that Purdue has "a policy wherein women who cannot prove their claims to the satisfaction of Purdue University decisionmakers face discipline up to expulsion" fails even to state an equal protection claim. *Doe v. Purdue Univ.*, No. 4:19-CV-84-JVB-JEM, 2020 U.S. Dist. LEXIS 168097, *10 (N.D. Ind. 2020) (dismissing with prejudice plaintiff's official capacity and individual capacity claims against Dr. Sermersheim and Ms. Rollock). In that case, the Court found:

> [The] complaint fails to allege that Plaintiff, as a class member, was treated differently from members of the unprotected class. She fails even to identify what class membership she is relying on in bringing this claim. She alleges a Purdue University policy regarding female complainants of sexual assault, but she makes no allegations, for example, regarding the policy that is applied to male complainants of sexual assault or complainants (whether male or female) of non-sexual assaults.

*Id*.

In any event, there is no evidence that Purdue chooses to apply the False Statement Rule only to female offenders and not to male offenders. Such a claim is sometimes referred to in Title IX jurisprudence as a "selective enforcement" claim.[8] "A selective enforcement claim 'asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'" *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 957 (N.D. Ill. 2017) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). "To support a claim of selective enforcement, a [female] plaintiff must demonstrate that a [male] was in circumstances sufficiently similar to [her] own and was treated more

---

[8] The term "selective enforcement" is a description, not a separate Title IX test or category. Like other Title IX claim descriptions, a "selective enforcement" claim is evaluated as a claim of discrimination on the basis of sex. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854-55 (7th Cir. 2019).

favorably by the University." *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d at 957 (quoting

*Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015)). "'The [female]

plaintiff must show that the University's actions against the [female] plaintiff were motivated by

[her] gender and that a similarly situated [man] would not have been subjected to the same

disciplinary proceedings.'" *Id.*

The inquiry asks whether there are "enough common features between the individuals to

allow a meaningful comparison"; whether the similarly situated individual is "directly

comparable to the plaintiff in all material respects"; and whether the differences between the

plaintiff and his comparator "are not so significant that they render comparison effectively

useless[.]" *Coleman v. Donahoe*, 667 F.3d 835, 841 & 847 (7th Cir. 2012). In other words, a

valid comparator is someone who was "subject to the same standards[] and had engaged in

similar conduct without such differentiating or mitigating circumstances as would distinguish

their conduct or the [university's] treatment of them." *Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th

Cir. 2016) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).[9]

To even attempt such a showing, Roe would have to identify males who could not "prove

their claims to the satisfaction of Purdue University decisionmakers" due to reliance upon false

statements yet did not "face discipline up to expulsion." Roe has not done so. Without evidence

---

[9] Formulations of Title IX "selective enforcement" comparators include: "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.... [T]he cases must be fair congeners. In other words, apples should be compared to apples." *Doe v. Brown Univ.,* No. 17-191-JJM-LDA, 2020 U.S. Dist. LEXIS 175102, at *24 (D.R.I. 2020) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). Under a theory of selective enforcement, a Title IX plaintiff must "identify a comparator of the opposite sex who was treated more favorably when facing similar disciplinary charges." *Does 1-2 v. Regents of the Univ. of Minnesota*, No. CV 18-1596 (DWF/HB), 2019 U.S. Dist. LEXIS 105651, at *5 (D. Minn. 2019). *See also Doe v. Univ. of Neb.*, No. 4:18CV3142, 2021 U.S. Dist. LEXIS 22999, at *17-19 (D. Neb. 2021); *Marian Univ.*, 2019 U.S. Dist. LEXIS 222842, at *31; *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1067-68 (S.D. Ohio 2017), *upheld in relevant part by Doe v. Ohio State Univ.*, 323 F. Supp. 3d 962, 966-68 (S.D. Ohio 2018); *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1210 (S.D. Ind. 2016).

of what comparator received unequal protection of the laws, there is no issue of fact for a

selective enforcement claim. *See, e.g., Anderson v. Trs. Of Dartmouth Coll.*, Case No. 19-cv-

109-SM, 2020 U.S. Dist. LEXIS 227543, *43-45 (D.N.H. 2020) (plaintiff's lack of admissible

comparator evidence results in no triable issue of fact on selective enforcement).

Even if Roe had identified comparators, "for evidence of this nature to raise an inference

of gender bias [Roe] must eliminate, obvious, non-discriminatory explanations for the

disparity."[10] Because there is no evidence for such a gender "disparity", the analysis does not

even progress to the question whether Roe can eliminate the obvious, nondiscriminatory

explanation that each such imposition of discipline was evidence-based.[11]

### D.    Fact-based application of the False Statement Rule is not retaliation for protected activity under Title IX.

For a prima facie Title IX retaliation claim, Roe must establish that: (1) she engaged in a

statutorily protected activity; (2) Purdue took a materially adverse action against her; and (3)

there is a causal link between the protected activity and the adverse action.[12] Thus, the first issue

of fact is whether Roe was engaged in protected activity when she reported sexual assault and

provided supporting statements. Conduct that offends the False Statement Rule is not a protected

activity under Title IX. Roe has conceded that she made false statements to Purdue. As a result,

she cannot prove protected activity for those statements, and her Title IX retaliation claim must

fail.

---

[10] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1199 (10th Cir. 2020).

[11] The lack of comparators also narrows Roe's retaliation claim. *See King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (where employee failed to show other employees were similarly situated, different treatment of those employees offered no support for a finding of retaliatory treatment).

[12] *See, e.g.*, *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019); *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017); *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 697 (7th Cir. 2017) ("Both Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 permit plaintiffs to bring causes of action for retaliation.").

The False Statement Rule protects "a good faith report of discrimination or harassment that is not later substantiated." Roe's retaliation argument begins from the premise that her false statements were due to incapacitation, and therefore unintentional and in good faith, and therefore protected. That argument does not cohere. A false statement is an affirmative assertion of capacity and recollection.

Even if Roe were able to show a factual question whether her statements were made in good-faith and therefore protected, she would also need to come forward with evidence that Purdue intended to retaliate against her for those statements.[13] There is no such evidence. A Title IX retaliation claim fails where there is no "retaliatory motive" underlying the adverse action. *Pogorzelska v. Vandercook Coll. of Music*, 442 F. Supp. 3d 1054, 1064-65 (N.D. Ill. 2020) (quoting *Doe v. Columbia College*, 299 F. Supp. 3d 939, 960 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019)).

The record shows the opposite of retaliatory intent. Purdue initially took Roe's statements at face value and diligently investigated them. Purdue did not turn to application of the False Statement Rule until the investigation revealed evidence of false statements. By following the evidence where it led, Purdue was doing nothing more than complying with its own policy. Compliance with an established policy is not a retaliatory act.

"The only question that matters is whether [Purdue decisionmakers] actually believed [they] had a legitimate basis to [sanction Roe]."[14] The overwhelming undisputed evidence answers that question in the affirmative. In addition to the audio recording, Roe's own admission

---

[13] *See Jackson*, 544 U.S. at 173–74 (for a Title IX retaliation claim, "Retaliation is, by definition, an intentional act."); "Conclusory statements [of gender retaliation] are not evidence and are not enough to survive a motion to dismiss let alone summary judgment." *Marian Univ.*, 2019 U.S. Dist. LEXIS 222842, at *32.

[14] *See Lauth*, 863 F.3d at 717 (affirming summary judgment for defendant on plaintiff's age retaliation claim).

to her then-boyfriend that she cheated on him during the overnight encounter with C.L. and Roe's admission to her friend I.O. that she and C.L. "had hooked up on Monday night and Tuesday afternoon" were evidence. On that evidence, Purdue decisionmakers could reasonably conclude that Roe's overnight encounter with C.L. was consensual and that Roe made a false report when she alleged that C.L. raped her.

As noted above, Roe has conceded that Purdue decisionmakers sanctioned her because they believed that she "had made false statements." Sermersheim testified that she relied on the "totality of the facts presented in the Investigators' Report," the audio recording, the text messages and the underlying evidence considered by investigators, her meeting with the three-person panel that questioned Roe and C.L. and her conversations with investigators, and her twenty-eight years of experience in higher education to make her determination that Roe was not sexually assaulted by C.L., and that Roe lied when she alleged sexual assault by C.L.. Sermersheim's deposition testimony corroborated the findings cited in her false-statement determination letter to Roe.

Rollock testified that the audio recording, Roe's plan to have sex with C.L. the next day (as stated on the audio recording), and the fact that Roe followed through with that next-day plan were factors that led Rollock to uphold Sermersheim's finding of false reporting. Rollock supported Sermersheim's false-statement determination by citing to specific evidence of Roe's functioning before and after the alleged sexual encounter. Rollock's deposition testimony corroborated the findings cited in her appeal determination letter.

The evaluations by Sermersheim and Rollock show a straightforward application of the False Statement Rule. Although Roe disagreed with Sermersheim's decision to sanction her, Roe

conceded that Sermersheim's false-statement determination letter contained an accurate description of her reasoning process in determining that Roe made false statements.

For these reasons, Roe's retaliation claim fails.

**E.  Roe's Section 1983 official capacity claims against Sermersheim and Rollock fail.**

On the same contentions as her Title IX claims, Roe also asserts an *Ex parte Young* claim that she is entitled to injunctive relief against Sermersheim and Rollock in their official capacity. Such a claim is limited to address current or prospective denial of equal protection and deprivation of protected interests without due process.[15] Roe's injunctive relief request is for reinstatement to Purdue University and the removal of discipline from her record.[16]

Roe's *Ex parte Young* claim for official-capacity Section 1983 claim has multiple fatal defects: (i) lack of standing for an order of reinstatement; (ii) lack of any issue of fact on reinstatement or expungement; (iii) lack of deprivation of any interest protected under Fourteenth Amendment Due Process analysis; and (iv) no evidence of a current or prospective harm attributable to unequal protection of the law.

Roe has no standing to seek injunctive relief for reinstatement. Her two-year suspension is over, she does not allege any obstacle to re-enrollment at Purdue, and she has not alleged or shown any intention to return to Purdue. As a result, there is no actionable controversy between Roe and Purdue officials regarding reinstatement of Roe to the status of an enrolled Purdue student. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 97 (2013); *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983) (no standing for claim based "conjectural" or "hypothetical" event); *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) ("John doesn't have standing" for injunctive relief because "[h]e has not alleged that he intends to re-enroll at Purdue . . ."); *Hinrichs v.*

---

[15] *See* ECF No. 26 at pp. 3–5.

[16] *See* ECF No. 1, Section XII Request for Relief at p. 8.

*Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992) ("[F]ederal courts may only adjudicate 'cases or controversies' and may not render advisory opinions.").

For injunctive relief relating to Purdue's internal disciplinary record, there is no issue of material fact. There is no evidence that any transcript or other public record bears any disciplinary indication. There is no evidence that Purdue's continuing possession of its internal records from the investigation and suspension harm Roe.

On Roe's Section 1983 Due Process claim, there is no issue of fact as to whether Roe is currently suffering from any deprivation of life, liberty or property. There is no need to reach the question of required due process because Roe cannot show any material issue of fact on deprivation. Roe does not allege that she is facing any current or prospective deprivation of life or liberty. Her suspension is over. She is not currently experiencing any current or prospective deprivation of property. She is not barred from enrollment at Purdue and, in any event, the Seventh Circuit does not recognize a property interest in a Purdue education. *See Doe v. Purdue Univ.*, 928 F.3d at 659. As a result, there is no material issue of fact on deprivation of an interest that is eligible for Due Process protection. *Doe v. Purdue Univ.*, 2020 U.S. Dist. LEXIS 168097, *7-8.

On Roe's Section 1983 Equal Protection claim, there is no issue of fact as to whether Roe is suffering any current or prospective denial of equal protection. Roe does not attempt to show any current or prospective action by Sermersheim or Rollock toward Roe in which Sermersheim or Rollock would "act[] with a nefarious discriminatory purpose and discriminate[] against [Roe] based on [her] membership in a definable class.'" *Word v. City of Chicago*, 946 F.3d 391, 396 (7th Cir. 2020) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996)).

For these reasons and the reasons previously cited above, Roe's official capacity claims against Sermersheim and Rollock (Count VI) fail.

### F. Roe's Section 1983 individual capacity claims against Sermersheim and Rollock fail.

#### 1. No Equal Protection or Due Process offense.

For the reasons discussed above, there is also no issue of fact on Roe's allegation that Sermersheim and Rollock are liable for damages for past events implicating constitutional Equal Protection.

In her Section 1983 Due Process damage claim against Sermersheim and Rollock in their individual capacity, Roe does not specify the deprivation or the lack of process. In the context of university-student discipline, the Seventh Circuit has recognized only one form of Due Process deprivation, known as a "stigma plus" deprivation of "occupational liberty". *Doe v. Purdue Univ.*, 928 F.3d 652, 662–63 (7th Cir. 2019). "[T]he publication requirement of the stigma-plus test" involves disclosure of a disciplinary suspension to the plaintiff's "current and prospective employers." *Id*. at 662. Roe has not alleged or come forward with evidence of any such deprivation of occupational liberty and, more particularly, has not alleged any disclosure to current or prospective employers.

On the process element of a stigma-plus claim, there is no issue of fact because Roe has not alleged any lack of notice of the False Statement Rule or lack of access to the evidence on which Purdue relied in applying the False Statement Rule to her. Roe has not contended or shown that she lacked sufficient opportunity to prove the truth of the statements that were found to offend the False Statement Rule. Further, Sermersheim informed Roe of her right to appeal her false-statement determination and sanction to Rollock. Roe exercised her right to appeal, and Rollock afforded Roe an opportunity to be heard on the false-statement violation. Rollock

reviewed Roe's appeal materials and the underlying evidence to uphold the finding of a violation of the False Statement Rule, while modifying the sanction for that violation.

### 2. Sermersheim and Rollock have qualified immunity.

The qualified-immunity doctrine blocks any individual-capacity section 1983 liability for damages where, as here, plaintiff is seeking to hold individual university actors personally liable on a theory of relief that is not clearly established "specifically in the university setting." *Doe v. Purdue Univ.*, 928 F.3d at 665. "Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once defendants raise it." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) (citing *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013)).

To the extent that Roe is seeking Section 1983 damages on a Due Process theory other than the stigma-plus claim endorsed in *Doe v. Purdue Univ*. *Doe*, 928 F.3d at 662–63, and discussed above, Sermersheim and Rollock are entitled to qualified-immunity in this case, under the same qualified-immunity rubric that the court used to find qualified immunity for Sermersheim and Rollock to in that case.

To the extent that Roe is seeking Section 1983 damages against Sermersheim and Rollock on an Equal Protection theory, the burden is on Roe to show that she is alleging an Equal Protection theory of relief that is clearly established specifically in the university setting.[17]

---

[17] Qualified immunity presents an intentionally heightened bar:

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. While this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

Roe must come forward with authorities that meet the specificity criteria established by the Supreme Court, a showing Roe cannot make.[18] Roe is required to "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law."[19] While Roe is not required to point to a case "on all fours" with Sermersheim's and Rollock's alleged actions, Roe must provide "settled authority that would cause [Sermersheim and Rollock] to understand the illegality" of those actions.[20]

For these reasons, Roe's individual capacity claims against Sermersheim (Count VII) and Rollock (Count VIII) fail.

## VI.    CONCLUSION

Plaintiff Nancy Roe's claims cannot overcome dispositive evidentiary gaps and contrary evidence, and are meritless as a matter of law. Therefore, Defendants respectfully request that the Court grant summary judgment in their favor and against all of Plaintiff Nancy Roe's claims against Defendants and for all other just and proper relief.

---

[ . . . ]
As this Court explained decades ago, the clearly established law must be particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (internal citations and alterations omitted).

[18] *Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017).

[19] *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (citation omitted).

[20]"[I]f a reasonable [official] might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

28

Dated: March 4, 2021.                    Respectfully submitted,

                                         /s/ William P. Kealey
                                         William P. Kealey (Attorney No. 18973-79)
                                         Joseph H. Harrison III (Attorney No. 35248-53)
                                         STUART & BRANIGIN LLP
                                         300 Main Street, Suite 900
                                         P.O. Box 1010
                                         Lafayette, IN  47902-1010
                                         Telephone:  765-423-1561
                                         Facsimile: 765-742-8175
                                         E-Mail:  wpk@stuartlaw.com
                                         **_Attorneys for Defendants_**

#1363622