Page 6

A. Christina Wright, who is the Director of the Office of Institutional Equity. And Rob -- I'm sorry -- Ryan Wynkoop, who is our Education Coordinator; again, may not be his exact title.

Q. Okay. And -- and what are your duties as Vice President of Ethics and Compliance?

A. I'm the university's chief compliance officer and ethics officer. I'm also the system-wide Title IX coordinator. I'm the university's equal opportunity officer. And you can pull my job description and find the other --

Q. Okay. That's on -- that's online?

A. I have no idea.

Q. Okay. Okay. And when you mention compliance, what are we -- you've mentioned ethics and EEO. Any other obligations, you know, in terms of compliance that you are responsible for?

A. I'm responsible for the university's compliance with federal/state laws and university policies, laws and regulations, et cetera.

Q. Okay. In your role as a vice president responsible for compliance with these various obligations, are you involved in the development of Purdue University's Title IX procedures?

A. Yes.

Page 7

Q. Okay. Is there a committee that meets to discuss, I don't know, university procedures and -- and any updates that need to be made?

A. There are two committees who are part of the process for approving policies within the university.

Q. Okay. And what are those committees?

A. There's a university policy committee and there's an executive policy review group.

Q. And are you on both committees?

A. Yes, I am.

Q. And how many members are on the university policy committee?

A. I don't know.

Q. Is it more than ten?

A. I really don't recall. We've got a policy that sets forth the existence of the committee. And I just don't recall how many people are on the committee.

Q. Okay. And how often does that committee meet?

A. The university policy committee meets -- has -- generally monthly, although it tends to meet less frequently during the summer or during a university break.

Q. And what -- what is the purview of that committee?

Page 8

A. It's set forth in the policy on policies. And if you show me it, I can confirm its charge.

Q. Okay. So it's -- there's a document that lays this out?

A. Yes.

Q. Okay. And who does -- do you know who created the document?

A. I was involved in its creation, yes.

Q. Okay. Were you involved in the creation of the university policy committee?

A. I was responsible for establishing that committee as part of my overall oversight of university policies.

Q. And that just brings to mind another question. Was there a Vice President of Ethics and Compliance at Purdue prior to you assuming that role?

A. Not to my knowledge --

Q. Okay.

A. -- no.

Q. So you're the first that we know of --

A. Yes.

Q. -- Vice President of Ethics and Compliance.

A. For Ethics and Compliance.

Q. For -- sorry.

A. No problem.

Page 9

Q. I'm gonna put it in caps.

Okay. The executive policy review group, how many members does that group have?

A. That one I can come closer to if you count them. That's a committee comprised of the chancellors of the regional campuses; so that's two individuals. The provost of the university, the chief financial officer of the university, the vice president for human resources, the chair of the university senate. And I am -- we are -- I am a member. And we are voting members of the committee.

We're joined by the -- Jessica Teets, who's my direct report and director of university -- coordinator of policies, whatever title, and counsel. And occasionally the provost or the chief financial officer can send a designee to act in their stead, as can the chancellors.

Q. Okay. Does that executive policy review group review policies formulated by the universal -- university policy committee?

A. That's not quite how it goes.

Q. Okay. How does it go?

A. So policies are proposed or -- by an executive officer of the university who has mission purview. That policy is typically reviewed by stakeholders

3 (Pages 6 - 9)

Page 10

and is part of the further review. It would be reviewed by the university policy committee. The policy committee would provide -- may provide feedback and/or suggestions and recommend that it be adopted by or not adopted by the executive policy review group.

To the extent that a policy is within the jurisdiction of the executive policy review group, that group can approve the policy, not approve the policy. If it is a policy that requires approval from the president and/or the board of trustees, it would make a recommendation to the president that the president approve it and forward it on, if it needs to be approved by the trustees, or that the president approved the policy.

Procedures do not require approval from either the -- the university policy committee or the executive policy review group.

Q. Okay.

A. So there are certain things that require approval and certain things that don't. And the university's policy on policies, for lack of a better word, sets forth that process.

Q. Okay, okay. There are two -- I think, just -- there are two policies -- or, no -- one set of

Page 11

procedures and one policy that have been referred to here. I'm gonna show you what's been marked as Exhibit 1, if you -- take a copy.

And you'll see that this is a University Investigators' Report. In the first paragraph it -- it mentions that these were the appointments of the investigators was -- the appointment was done pursuant to the formal resolution process of the procedures for resolving complaints of discrimination and harassment.

Are you familiar with those procedures? Not to the extent I'm gonna quiz you on them but just their existence.

A. Yes.

Q. Okay. And then it also refers to the university's Anti-Harassment Policy.

A. Yes.

Q. And are you familiar with the Anti-Harassment Policy?

A. Yes.

Q. And are those two separate things, the procedures to resolve --

A. Yes.

Q. Okay. The procedures for -- to resolve, were they -- I think you had mentioned that not

Page 12

everything needs to be approved by policy committees.

A. Correct.

Q. Okay. Do you know who developed the procedures to resolve the complaints of discrimination and harassment?

A. Yes, I do.

Q. Okay. Who did that?

A. That -- those were developed -- the version here were developed in consultation with counsel and myself and others who were involved in the process of investigating and resolving such compliance.

Q. Okay. So the -- the count -- are we talking about Ms. Trice? Or --

A. She may have been involved.

Q. Okay. And I think this is obvious, but I just want to make sure. Is the -- is your office responsible -- not directly you, but the reporting tree, the Office of Institutional Equity -- responsible for the development of these --

A. No, it is not.

Q. -- procedures? Okay. Who is responsible --

A. I am responsible.

Q. Okay. You are?

A. Yes.

Page 13

Q. Okay, okay. And how about the Anti-Harassment Policy? Did that go through the larger policy?

A. It did.

Q. Okay, okay. Do you -- if you know, do you know how often that Anti-Harassment Policy is reviewed?

A. It's continually reviewed.

Q. Since 2007 do you know how many times it's been changed?

A. Offhand, no. But that's a knowable answer.

Q. Okay, okay. Is it -- does -- is it something that there's continual revisions to? Or is it more of a, you know -- or have there been just very discreet times when that Anti-Harassment Policy was changed?

A. I don't understand what you're saying.

Q. Yeah. So you don't know how often it's been done.

A. It is knowable. I can look in the archives and I can --

Q. Okay.

A. -- determine --

Q. Okay. But you don't --

A. -- how many times -- offhand, no.

Q. Okay. How about those procedures, the resolution procedures for the discrimination and harassment?

A. I'm sorry. I thought you were talking about --

4 (Pages 10 - 13)

Page 14

Q. Oh, that's what you were talking about. Okay. Let's -- I'll assume then, your answer that it's knowable, but you don't know now as it applies to the procedures?

A. Correct.

Q. How about the policy?

A. The policy -- if I could have a copy of the policy, I can tell you.

Q. I'm gonna ask them for one after the deposition. Okay. 'Cause the policy --

A. The changes that were made to the policy are set forth in the policy.

Q. Okay. And every time it's changed, it indicates what's been changed, the policy itself?

A. One can go to the archives and find the exact changes. But in the policy it gives a brief description of the changes that were made.

Q. Okay, okay. That is helpful. Okay. Title IX. You mentioned your obligation is to comply with federal law, correct, on Title IX?

A. I didn't say that.

Q. Oh. Is your obligation to --

A. University's obligation --

Q. University's --

Page 15

A. -- yes.

Q. -- obligation? And yours as an agent of the university?

A. Yes.

Q. Okay. So the sources of that law are the statute itself, correct?

A. Yes. That's the law.

Q. Okay. And there are implementing regulations for Title IX, correct?

A. Yes.

Q. And the Department of Education -- the United States Department of Education also monitors Title IX compliance, correct?

A. I'm not sure that I'd call it monitoring. But they have enforcement authority with respect to Title IX.

Q. They don't do any sort of independent audits. But they receive complaints.

A. They may.

Q. They may. And they issue guidance? By that meaning the Department of Education issue guidance for universities in connection with Department of Education's enforcement responsibilities, correct?

A. Yes.

Q. Okay. And since you took over in 2007, there have

Page 16

been at least three different Secretaries of Education.

A. I'm sorry. What do you mean by "took over"?

Q. I'm sorry. Since you, I guess, took the job, created the job as Vice President for Ethics and Compliance at Purdue, there have been at least three Secretaries of Education, correct?

A. I have no idea.

Q. Well, let's see. When you took over, that was the second-to-last year of the George W. Bush administration, correct?

A. I could look that up.

Q. And then in 2009 there's the -- Obama administration takes over, correct?

A. I would have to check.

Q. Okay. And I think his first secretary was Arne Duncan. Do you remember that?

A. I believe Arne Duncan was a Secretary of Education, but I can't confirm that.

Q. Okay. And then a new administration took over in 2017, correct?

A. The current administration.

Q. Current administration.

A. Yes.

Q. Okay. Now, in your role as Vice President for

Page 17

Ethics and Compliance, did you -- I guess, were you notified of a difference between the way that the Department of Education under President Obama intended to enforce Title IX than President Obama's predecessor, President Bush?

A. Could you repeat that question for me?

Q. Yeah, that was a long --
Were you notified of a change in the way that President Obama intended to or his department intended to enforce the Title IX in contrast with his predecessor, President Bush?

A. No. We certainly receive Dear Colleague letters that address those issues.

Q. Okay. And those were Dear Colleague letters issued by the Department of Education, correct?

A. Correct.

Q. And did you make changes with regards to the procedures for resolving complaints of discrimination and harassment in response to the Dear Colleague letters issued by the Obama administration's Secretary of Education or Department of Education?

A. Can you be specific as to which Dear Colleague letter or letters you're referring to.

Q. Well, did you make -- in response to any Dear

5 (Pages 14 - 17)

Page 18

Colleague letters?

A. During the Obama --

Q. Yes.

A. -- Obama administration, yes.

Q. Okay. And which -- which Dear Colleague letters led to a change in the procedures for resolving complaints of discrimination and harassment?

A. The 2011 Dear Colleague letter. And there was a followup letter and FAQs, which I believe was in 2014.

Q. And what changes did you make in response to the 2011 Dear Colleague letter?

A. I don't recall. Although, if I had them in front of me, I could --

Q. Okay.

A. -- certainly outline those for you.

Q. So the procedures themselves will show -- there's an archive showing --

A. There's an archive of the procedures. And the policy would provide a description, and the archive would show differences.

Q. Okay, okay. And that's for each change, going all the way back even to 2011?

A. Oh, certainly.

Q. Okay, okay. Now, was that 2011 Dear Colleague

Page 19

letter rescinded by the current administration?

A. It was withdrawn --

Q. Withdrawn?

A. -- I believe.

Q. Okay. And, again, I'm gonna -- I'll ask for the documents later. But just while I have you here, did you make any changes in response to the withdrawal of that letter in terms of the procedures for resolving complaints of discrimination and harassment?

A. I don't believe so, but I would need to see archive --

Q. Okay.

A. -- copies of the procedures. So --

Q. Okay. I forgot to ask this earlier. Who does the Dean of Students report to?

A. I believe the Dean of Students reports to the Vice Provost for Student Affairs.

Q. Okay. Vice President Rollock, how much of your time is spent on compliance with -- with Title IX issues?

A. Over what period of time and when and -- if you could be more specific.

Q. Okay. How about in the last -- the last two years.

A. I don't know.

Page 20

Q. Sometimes it's more and sometimes it's less; is that how --

A. Yes. It varies.

Q. Okay, okay. In addition to your role governing compliance, although I guess maybe it's the same role, you also hear appeals from determinations of discipline under the Anti-Harassment Policy?

A. I hear appeals of determinations made under the policy.

Q. Okay. So that -- that's -- if a student is accused of violating the policy, and I guess the Dean -- Dean of Students would be responsible for making a finding about whether or not the student did what he or she was accused of -- is that correct? That's generally how it goes?

A. I hear all appeals from wherever they may come --

Q. Okay.

A. -- under the policy, whether they're a student, staff member, faculty member, complainant or respondent.

Q. Okay. So every -- everything under this -- this harassment policy you hear the appeal.

A. If there's an appeal, I hear it.

Q. Okay.

A. Unless I'm accused.

Page 21

Q. Okay. How many -- how many a year is that? How many appeals a year do you hear?

A. I don't recall.

Q. Is it --

A. It's knowable; I don't -- just don't recall.

Q. Well, let's see if we can -- I -- honestly I have no idea if it's five or if it's 200. Which -- is it closer to five or closer to 200?

A. It's closer to five than to 200.

Q. Okay, okay. When an appeal is made to you, what standard of review do you apply to the appeal?

A. I'm not understanding your question.

Q. Yeah. Do you review all the information sort of in a first instance? Or do you --

A. No.

Q. Okay. How do you -- how do you approach the appeal?

A. I'm -- I'm not sure what you mean by "approach."

Q. In terms of the -- the information. My understanding is that somebody makes a finding. And let's just -- let's just take it out of the realm of hypothetical. Okay?

(Exhibit 12 was marked for identification.)

QUESTIONS BY MR. MACEY:

Q. I'm gonna show you in Exhibit 12 is a determination

6 (Pages 18 - 21)

Page 22

by the Associate Dean Kelley Stier. Or is that Kelley Stier? I'm not sure how you pronounce that.

A. I believe it's Stier.

Q. Stier? Okay. Are you familiar with this document at all?

A. Yes.

Q. Okay, okay. On the last page you'll see that it says, Please note that your appeal, if any, must be received by Vice President Rollock. Okay. And you -- the -- either party may appeal my determination to the Vice President for Ethics and Compliance. And that's you, correct?

A. Yes.

Q. Okay. So when a student appeals from a finding like this, how deep do you go in the underlying record to make a determination of the merits of the appeal?

A. In my decision I outline what I reviewed and considered.

Q. Okay, okay. Do you defer to the findings, just -- just as a matter of course, do you -- is there a level of deference to the findings of the -- the dean or -- or whoever made the determination that's being appealed?

A. The point of the appeal is to have me consider

Page 23

whether it should be upheld or not.

Q. Okay. Okay. So in the -- in the -- okay. Do you ever reinterview witnesses as part of the appeal process?

A. I don't, no.

Q. Okay. Do you ever ask -- is it possible to ask other people to reach out and reinterview witnesses?

A. It is possible for me to direct that, whatever I deem appropriate --

Q. Okay.

A. -- happen, which could include that.

Q. Okay. I mean, have you ever done so?

A. I have had folks reconsider and receive additional information and -- as the result of an appeal.

Q. Do you feel constrained in any way from investigating the actual underlying facts that form the basis of the determination?

A. I'm not the investigator.

Q. Okay.

A. But I can direct that an investigation take place.

Q. Okay. Okay.

(Exhibit 13 was marked for identification.)

QUESTIONS BY MR. MACEY:

Q. Show you what's been marked Exhibit 13. It's a --

Page 24

it's a stack of documents. If you look at Purdue University Doe 0491 --

A. (Witness complies.)

Q. -- you'll see that it's regarding case number or the appeal of ▆▆▆▆▆ And it lists six documents. Are you -- are you familiar with this -- this appeal, these documents?

A. Not in this order. But I am familiar with ▆▆▆▆▆ appeal.

Q. Okay. And in connection with the appeal, ▆▆▆▆▆ submitted an affidavit from her mom. Her mom's attached a bunch of research she had done and statements, correct? And then there were sort of letters.

A. This is --

Q. Oh, go ahead.

A. There was a statement from ▆▆▆▆▆ yes.

Q. And then a statement from the -▆▆▆▆▆ ROTC, I guess, supervisor or a supervisor at ROTC.

A. I don't know what his role is, but there was a letter from an ROTC person.

Q. Okay. And then there was a statement from ▆▆▆ herself, correct?

A. Yes. There was a statement --

Q. Okay.

Page 25

A. -- from her.

Q. And did you review all of this in connection with her appeal?

A. I reviewed her appeal.

Q. Okay.

A. Whether this stack in this order represents it --

Q. Okay. But you did -- you did review her appeal.

A. Yes, I did.

Q. Okay.

(Exhibit 14 was marked for identification.)

QUESTIONS BY MR. MACEY:

Q. And do you recognize document 13 here, Exhibit 13?

A. I believe it's Exhibit 14.

MR. MACEY: Oh, is it 14?

THE REPORTER: Yes.

QUESTIONS BY MR. MACEY:

Q. Exhibit 14?

A. Yes.

Q. And this is an e-mail that you sent to ▆▆▆▆▆

A. It's a letter that I sent --

Q. Okay.

A. -- to ▆▆▆▆▆

Q. Okay. And it's the result of her appeal. It's your -- your determination of her appeal, correct?

A. Yes.

7 (Pages 22 - 25)

Page 26

Q. Okay. If you turn to Page 4 --

A. (Witness complies.)

Q. -- in this section you -- you directly address ███████ contention that she did not have the opportunity to respond to the investigators' allega -- you know, allegations that she had made false statements.

A. I'm responding to her statement that not only did the investigation overlook facts, but it also never notified me that the investigation had turned on to me and I was now the one being investigated, closed quote.

Q. Yeah. And is it your understanding that ██████ was aware that she was being investigated?

A. My letter speaks for itself.

Q. Okay. Well, I might be slow because I'm confused about your letter.

In the letter you indicate that ██████ had an opportunity to respond. But you refer to communication from the investigators that there are text messages that we would like to discuss with you, and we would like to talk to you about other inconsistencies in your story versus ████ story.

Was it your position in adjudicating this appeal that that was sufficient to put ██████

Page 27

on notice?

A. Again, my letter speaks for itself. And I provided a number of -- beginning with, In your appeal you state that, and continuing through the end of that section. All of those were designed to address both the notice to her and an opportunity for her to respond.

Q. Is this -- does this reflect the current policy of Purdue University that a student who makes a false statement -- well, I guess, let me start that over.

Does this reflect the current policy at Purdue University that a student is on notice that providing a false statement in the investigation may lead to their discipline?

MR. KEALEY: Object to form.

QUESTIONS BY MR. MACEY:

Q. I mean, is that -- is that the -- is that the policy?

A. The policy -- the procedures which were quoted state that all university community members are expected to provide truthful information in any report or proceeding under these procedures. A person who knowingly makes a false statement in connection with the resolution of a complaint under these procedures may be subject to appropriate

Page 28

discipline. Making a good faith report of discrimination or harassment that is not later substantiated is not considered a false statement.

Proced -- procedures provide exactly what was stated in the letter.

Q. And which false statements -- you listed in here the false statements you believe that ████ made.

A. I provided examples of materially false statements that she made.

Q. If you look at Page 3 of 4, which is Page 6 of 7 --

A. (Witness complies.)

Q. -- you go through a list of evidence that I -- I guess is mitigating for Miss -- for ██████ correct?

A. Some is mitigating, yes.

Q. And some of that evidence included, you know, the phone call with her mother, her mother's testimony about the court records.

A. Number three --

Q. Yeah. Three --

A. -- or number four?

Q. -- three and four.

A. Yes, I considered --

Q. Okay.

A. -- those.

Page 29

Q. And was it the consideration of those that led you to modify the sanction of expulsion?

A. I might have modified it because those were some of the factors that I considered. And I considered the appropriateness of the -- of the sanction. And I was modifying the sanction, reducing the sanction.

Q. Okay.

A. Excuse me.

Q. After your review of your -- the evidence, did you come to a conclusion about the mental state of ██████ when she made these complaints about ██████

A. I don't understand what you mean by "mental state."

Q. Well, did you consider the -- did you consider her reasoning for -- for the complaint?

A. What do you mean by "reasoning"?

Q. Why do you think -- did you come to a conclusion about why she made the statements that she did?

A. No.

Q. Did you make a determination about whether ██████ did indeed threaten her or -- or grab her?

A. Yes.

Q. Okay. Did you believe that he did?

8 (Pages 26 - 29)

Page 30

A. The evidence provided here, and as I stated in my letter, I believe that she fabricated the event.

Q. Did you form an opinion about why she fabricated that?

A. No.

Q. Based on your experience in your -- in your role, do victims of assault sometimes intentionally omit details, embarrassing details of their own behavior in connection with their complaint of assault?

MR. KEALEY: Object to form.

THE WITNESS: She was not the victim of an assault.

QUESTIONS BY MR. MACEY:

Q. And what do you base that contention on?

A. As I set forth in my determination, the information provided in this matter clearly indicates that the incidents that she said occurred in her dorm room could not possibly have occurred when she said they occurred based upon the witnesses who were present in the room and her own timeline with respect to her travels.

Q. And that's the information contained in Exhibit 5, which lists the witness statements. Is that -- is that the information you're referring to?

A. The investigators' report and -- yes. Exhibit 5

Page 31

and the appeal, which is Exhibit 13, and the determination of Associate Assistant Dean Stier, Exhibit 12.

Q. Okay. But back to my original questions: In your experience, do victims of assault, bracket ████████ for now, sometimes omit or make false statements about embarrassing details regarding their sexual history?

MR. KEALEY: Objection to form.

THE WITNESS: Some do; some don't.

QUESTIONS BY MR, MACEY:

Q. And just so I'm not making this -- doesn't seem like I'm making this up. I mean, it's a com -- it's a occurrence that a investigator of a Title IX complaint should be aware of, correct, that some victims are not forthcoming about their sexual history?

MR. KEALEY: Object to form.

THE WITNESS: That some may not be. An investigator shouldn't presume, one way or another, in terms of information that would be presented by a particular person, no.

QUESTIONS BY MR. MACEY:

Q. Frankly, doing some of this work, this case, other circumstances, rarely have I ever, from a plaintiff

Page 32

are or a defendant, gotten the entire story from somebody about an event the first time I talk to them. Is that -- is that your experience as well?

A. That's not my experience; I'm not an investigator.

Q. Okay.

A. I don't know what your experience is.

Q. I'd like to turn your attention to Exhibit 1. And this is an investigators' report regarding ████████ Are you familiar with this --

A. Yes. I've seen it.

Q. -- this -- now, the circumstances of ████████ interaction with your office are a little different than ████████ And I wanted to ask you about it. After ████████ received her initial determination from Dean Sermersheim -- well, let's back up. Dean Sermersheim initially referred ████████ to the Office of Student Rights and Responsibilities because of Dean Sermersheim's belief that ████████ had made false statements in connection --

A. Yes.

Q. Okay. And then ████████ appealed that to you, correct?

A. Correct.

Page 33

Q. Okay. And then you directed Dean Sermersheim to revoke that and then Dean -- asked Dean Sermersheim to make a finding about whether ████████ knowingly made a false statement; is that correct?

A. If you can show me my --

Q. Okay.

A. -- I'd be more than happy to confirm that.

MR. MACEY: I'm not trying to trick you.

(Exhibit 15 was marked for identification.)

QUESTIONS BY MR. MACEY:

Q. So if you look at Exhibit 15, this is --

A. Uh-huh.

Q. -- what I'm talking about.

A. Uh-huh.

Q. And if you look at the dates between this letter and the other -- the ████████ one, we're talking about like a sort of five-month difference between the determination from your -- your instruction to Dean Sermersheim to revoke the referral to the determination of ████████ appeal. Approximately five -- five months, correct?

A. From September 1 to February 22nd.

Q. Okay. Six -- six months. I'm asking about this because it seems like

9 (Pages 30 - 33)