Page 22

students and faculty as well as making sure it complied with, kind of, what the Title IX standards were at the time.

Q  Have you reviewed Purdue University's policies with respect to the case in ████ matters we're here about today?

A  I did not get the opportunity to review, certainly, all the policies. I did in particular look at their -- how they define incapacitation.

Q  Did you look at anything other than the definition of incapacitation?

A  No. I mean honestly, actually, I actually had some difficult finding some of the things on their website. Also I recall in the couple days doing this report that there were -- there were -- I kept encountering a broken link to the policy I wanted to look at, and there was a broken link.

Q  What policy was it that you wanted to look at but didn't?

A  I think it was -- I think I was kind of really looking at kind of what -- what their procedures were for -- I think it was their -- well, I think it was their harassment policy is what I -- what I was trying to access.

Q  Did you look at any Purdue University policy

Page 23

regarding the obligation to refrain from false statements in the course of the -- making of an allegation of harassment or the investigation of an allegation of harassment?

A  No, I did not. I just saw the wording referred to in some of the documents in particular. So I'm assuming that's taken from code -- their student code of conduct.

Q  The September 29, 2020 correspondence that you provided to Mr. Macey lists four topics you referred to as topics under which you organized, quote, "my findings," unquote. And I'm going to be referring to those four topics as your "four opinions" categories.

One of the organizations specifies the training that university on Title IX investigators and decision makers need to undergo in order to carry out campus sexual assault investigations and determinations.

A  Okay. So I think there's a number of things you could look at -- other ways you could look at this. So the first thing, if I think there's -- think about the Department of Education through the 2011 Dear Colleague Letter, which of course I do realize it's been rescinded since then.

Page 24

It does mention that everyone, kind of, handling these student grievances should have training or experience in handling sexual harassment/sexual violence. So that's, kind of, one place that I drew from as well.

The 2014 Campus Safe Act also talks about how they need to be trained as well. Other places I didn't -- I did not mention that's in here because of lack of time, but there is a national, NASPA, which is the National Association of Student Personal Administrators, has also put out some kind of standards as well.

I couldn't access those because I'm not a -- I'm not a member of that NASPA, but it is -- NASPA is the biggest student affairs professional organization which is -- you're probably not aware of that as well, but that's really what I kind of -- that's really what I kind of drew from.

The other places, from ATIXA, which is the association of Title IX administrators, which is also a membership organization, which a lot of different schools rely on because ATIXA, it's a membership organization, but they also give so much of their material -- makes their material available for free.

Page 25

So it's a great resource for schools, you know. People at a school doesn't have a lot of resources to use at their disposal, but ATIXA also talks of, you know, also has some kind of standards about what you should be training, how you should be training folks on how to investigate, how to work with survivors, how to work with the accused as well, also -- also really important to train folks on that as well.

Q  My question is a little -- a little narrower, a little more black and white.

Is there some organization that publishes a roster or list of trainings that somebody should go through before they're given the responsibility of investigating or deciding a campus nonstudent sexual assault allegation?

A  Sure. That I would say ATIXA does -- now, of course, ATIXA is a -- is a private paid organization, but they do offer, kind of, what they say should be the suggested training that folks go through. So that certainly is one route. But other than that, no.

There's not kind of another organization. There's not an organization that, kind of, mandate, you know, this, per se, in a way except for these,

7 (Pages 22 - 25)

Page 26

kind of, federal, broad federal guidelines.

Q    Did you ask Mr. Macey for any information on what trainings the various personnel involved in the ███ and ███ matter had?

A    I did not. I really -- based on, kind of, just basically what I've read in depositions in terms of -- in terms of the training. So -- and of course -- so that's really kind of where I base my opinion from, is on what I saw, to some of the responses in depositions. I found that some of them were troubling.

Q    So your opinion is not about the trainings that they, in fact, had received or not. It's about things they said in a deposition?

A    That is correct. That is correct. I mean, I think we all knew that sometimes we can put individuals through training, and they may not always retain the information in the way that they want them to. And that can certainly play out in how they investigate cases and how they work with students and then, of course, certainly how they would then respond in a deposition.

Q    So with respect to the individuals listed under your Topic 1 in your report, you don't know, in fact, what the training history was for any of

Page 27

those listed individuals?

A    No, I do not.

Q    I want to talk for a moment again about the concept of intimate partner violence/intimate partner harassment. Have you work on an assumption or formed a view as to whether ███ is in a category of somebody claiming intimate partner violence?

A    So ███ case, I would say, would not fall under the definition of intimate partner violence because she was not in really an intimate -- she was not in a relationship with -- I can't -- sorry. I can't recall the name of the Respondent in the case.

Q    Mr. (Unintelligible.)

A    Pardon?

Q    Christopher Lanza (phonetic).

A    Okay. Mr. Lanzo (phonetic). Because I don't think they were -- they in an intimate relationship. She was in -- and actually at her boyfriend's. So in her case, you would then refer to it as sexual assault or sexual violence instead of using the term "intimate partner violence." So it would be -- the more correct term would be either "sexual assault" or "sexual violence" in that case.

Page 28

Q    So you would not use the term "intimate partner violence" for ███

A    No, I would not. I would -- I think the proper terminology would either be "sexual assault" or "sexual violence."

Q    Would you use the term "intimate partner violence" in connection with ███

A    Yes, that would be more correct terminology there because it's -- that you were in a relationship.

Q    Was it proper for people to inquire of them whether they were in a relationship?

A    Are we speaking about Ms. -- I think it -- is her last name pronounced as ███

Q    Yes.

A    I think it's proper to inquire if they were in a relationship. I do not think it was proper to inquire if they were in a sexual relationship.

Q    So it was important to know whether they were in an intimate partner relationship. It would not be appropriate to raise that question?

A    No, it's not appropriate because the thing is you can be in an intimate partner relationship without actually engaging in a sexual relationship. And the thing is we know that with acts about sexual history that very often witnesses -- and at that

Page 29

point ███ was, you know, a witness to, you know, what should happen to her, a potential victim, when you start asking questions about sexual activity, sexual experience, because, again, the way society looks at, kind of, sexual activity consensual, even consensual activity, it's even shameful.

And so when those questions are being asked, victims very often either sometimes won't tell the truth because they're feeling -- they're feeling ashamed. We are also particularly -- we're talking about someone who, I believe, was 18 or 19 years old at the time.

So I think it's very reasonable that they would kind of -- the way they'd react to that, but the thing is to find out the nature of, kind of, the best of -- the harm that happened. You didn't specifically need to know if they're engaged in sexual activity. You just need to know if they -- it was a stranger kind of situation or if they were in some type of relationship, but needing to know their actual sexual activities was not necessary.

Q    Can you point me to a professional standard that says that evaluating whether somebody is in an intimate partner relationship, it's not appropriate

8 (Pages 26 - 29)

Page 30

to inquire that they were in a sexually intimate relationship?

A  Sure. The first thing I would just say that I think we kind of had it wrong, you know, for a number of years, and this was really reenforced by some of the wording. And the Violence Against Women Act back in the '90s that we don't ask -- we don't ask people -- we don't ask witnesses or victims questions about sexual history.

So that's really kind of been a longstanding thing. I mean including -- I know in your -- in your State of Indiana, it's against the -- it's, kind of, Rule Evidence 412 as well. We have a similar standard here in North Carolina.

So it's kind of really -- kind of going from there. It's, kind of, been pretty long established that we don't need to ask questions about sexual history because really all they do is to shame. The point of asking questions about sexual history is ultimately about shaming the victim or witness, not about relevance.

Q  You've gone to law school. I assume you're familiar with the concept of opening the door?

A  Sure.

Q  What do you understand it to mean?

Page 31

A  Well, a lot of times that you open a door, it's kind of -- of if the witness brings up a question themselves, brings up an idea itself, then the opposing counsel can then, kind of, probe further in that area.

And so while I'm familiar with that concept, again, considering that I believe at this point all 50 states have rape shield laws on the books, I don't think opening the door is really -- is really at issue here with that. I think it's such a long-established standard that those questions are really just not --

Q  My question to you was simpler. It was just whether you were familiar with the concept of open --

A  Yeah, I am familiar. Yes.

Q  The Rape Shield laws apply in non-rape cases?

A  I think it depends on the states. Some. I know in some states, they do. Again, I don't -- certainly not an expert on Rape Shield laws, but I think it's the principle behind it, with that, and thinking about why we've enacted Rape Shield laws in the first place, what we're trying to protect with that as well.

And probably should I mean we probably should

Page 32

explicitly say that they do apply to non-rape and to non-rape cases as well.

Q  Well, for the moment I'm asking about your expert --

A  Uh-huh.

Q  -- knowledge. And so as an expert in Rape Shield laws, do you know whether Indiana's Rape Shield Law applies to non-rape cases?

A  I don't believe it does. I did not look at it really thoroughly, but it's still there, and I think it's still -- it's still an important principle.

Q  Would it be important, in looking at the█████ ████ matter, to know, number one, whether she was alleging rape and, number two, whether Indiana's Rape Shield Law applies to allegation of nonsexual assault. Right?

A  Uh-huh. Well, the first thing, I'm not -- I -- I guess I'm -- if I missed something. I don't recall ████████ ever alleging she was raped. Okay. Unless I missed something. So my --

Q  That's the point of my question.

A  Yeah. So my understanding is certainly that she was alleging physical -- she was alleging kind of a physical assault had occurred. So you're right.

Page 33

You're absolutely right. The Rape Shield Law may not explicitly -- I think it's more kind of the principle.

My -- I would turn that question on its head and say why did anyone need to know if the two of them were having -- were having sexual activity?

Q  Can you think of some reasons why it might become relevant?

A  I really can't. So I really actually thought -- I actually really thought about this question quite a bit. And, certainly, I do think it was obviously important the police needed to know, you know, if they were in a relationship. Right?

But to know exactly what they were doing in the bedroom, I don't really understand where that relevance -- where that relevance would lie.

Q  In any event, in making your -- forming your opinion about the████████ file, you didn't look into circumstances under which anybody inquired of her sexual history with████████ (phonetic)?

A  Could you repeat the question? I'm not -- quite understood it.

Q  Did you try to find out the circumstances under which anybody inquired of████████ sexual

9 (Pages 30 - 33)