Q Have you been deposed before?
A No, I haven't.
Q I'll briefly review the procedure. So the testimony that you're giving today is under oath, being transcribed by the court reporter. When we're on the record, everything said by you and me and the other attorneys in the room is transcribed. We will take breaks periodically to go off the record.
A Okay.
Q Because we're being transcribed, it's important that we not speak over one another, so please wait until I finish posing a question. But sometimes it might come out a little slowly just because I'm trying to be precise, and I'll do my best to let you finish your answer. If you haven't finished your answer and I start in on the next question, just tell me and you'll have an opportunity to finish your answer.
There is a process for your counsel to make objections for the record for later reference between the question and the answer so it's also a good idea to wait a beat before you start the answer to a question.
You'll have an opportunity to review the



transcript after it's prepared primarily for proofreading, but if you need to clarify or correct something that you said today, I'd ask that you let me know that you want to revisit something you've said earlier and I'll give you an opportunity to add to your answer to a question. Do you have any questions about this process?
A No, I do not.
Q You said you have not been deposed before. Have you been a party to any other lawsuit?
A No, I have not.
Q Do you currently use any social media websites?
A Yes, I do.
Q What websites do you use?
A I have a Facebook, an Instagram, and a Twitter.
Q And what is your Facebook name?
A [redacted]
Q And your Instagram ID?
A [redacted]
Q And your Twitter name?
A I'm not sure my -- like, my user name for it, but it would be under [redacted]
Q Have you had any other names on any of those three services?



A I don't believe so.
Q Do you use Snapchat?
A Oh, I do have Snapchat.
Q What's your name there?
A I honestly don't remember. It would be under [redacted] but I don't remember the user name for it, so I'm not entirely sure. I can check it out, though.
Q I'd like to walk through your educational history starting from your high school graduation. Where did you graduate from high school?
A I went to Carmel High School. I graduated in 2015.
Q Where did you go to school after that?
A I went to Ball State for a year after that.
Q Did you ever enroll at IU?
A In high school I did -- I forget what it was called, but it was, like, dual enrollment. So basically you take a class in high school, but it's through a university, so I was enrolled there, but not like an actual student, if that makes sense.
Q So you did not enroll at any time post-high school at IU?



A No, it was just, like, the courses, like, through my high school that I took classes through there.
Q What was your reason for leaving Ball State?
A I originally went there to do journalism, and after I realized I wanted to change my major, that was one reason that I didn't want to stay there. And I was also sexually assaulted there, so it didn't feel like a positive environment for me, so I wanted to transfer schools.
Q You were at Ball State during the 2015-2016 school year?
A Yes.
Q And when during that school year was the assault you just referenced?
A It was within the first few weeks of class, sorry, so that would have been August, early September, I believe.
Q And you stayed at Ball State for the remainder of that semester and the next semester?
A Yes.
Q Any other reasons for leaving Ball State?
A No.
Q You were studying, intending to study journalism at Ball State?

A I added a double major of journalism and political science, so after my first term, I dropped the journalism and was just doing political science.
Q So you enrolled at Purdue in the fall of 2016?
A Yes.
Q Where were you living at Purdue when you enrolled?
A I lived in Harrison Hall, but, like, my permanent residence was with my mom. She lives in Noblesville.
Q And during the fall of 2016, did you have any sexual relationships?
A I had a boyfriend at that time, so yes, I was having sex with him.
Q Who was the boyfriend?
A [redacted]
Q Did you meet Mr. [redacted] at Purdue?
A Yes.
Q Does he pronounce his name [redacted] or [redacted]?
A [redacted].
Q When did you start seeing Mr. [redacted]?
A I met him through orientation, but I believe we started dating in September.
Q Did you date him continuously that school year?



A Uh-huh.
Q When did you stop dating him?
A We broke up the -- I believe October of the next year.
Q October of 2017?
A Yes. I believe so.
Q Was there a precipitating event for the breakup?
A I felt that with my suspension at Purdue that I was going to be not able to focus on a relationship and felt that it was best for both of us.
Q So the breakup was your initiative?
A (Nods head up and down.)
Q I meant to mention for the reporter --
MR. MACEY: Yeah.
Q -- you'll need to say yes or no for the record.
A Oh, yes, I'm sorry.
Q While you were at Purdue University as a student, did you have any other sexual relationships?
A Yes.
Q With whom?
A I had sex with a few different guys, like, a one-night stand, so there were three different ones, I believe.



Q Who were they?
A [redacted] and I had gone on a break in -- I don't remember which month, but I had sex with -- his name was [redacted] And then -- I'm sorry, I can't remember the other two names right now. One, his first name was [redacted] and the other one, his first name was also [redacted] I believe.
Q And in which semesters were those three?
A I believe it was -- it would have been 2017 the, like, spring semester.
Q All three during the spring?
A Yes.
Q When were you taking a break from Mr. [redacted]?
A It was that same semester.
Q What part of the semester?
A I honestly don't remember right now. I'm sorry.
Q You don't remember whether it was January or May or somewhere in between?
A It was later in the term, I believe.
Q In the April/May period?
A Yes, I think so.
Q So April/May 2017, somewhere in that period, you and Mr. [redacted] had agreed to take a break?
A I believe so, yeah. I think it was that period of time. I honestly don't remember exactly. I



just know it was that semester.
Q How long was the break?
A I think we were on a break for a week or two. Actually, I think it was closer to March.
Q Do you remember whether it was before or after spring break?
A I think it was before spring break.
Q Was there something that caused the two of you to decide to take a break?
A I just didn't feel like we had the same, like, priorities or life goals. He was doing ROTC, and at that time I wasn't really sure I wanted to have a relationship with someone who was going to be in the military, that was something that I felt would be difficult for me and I felt like that maybe we weren't the best for each other.
Q Was there something that caused a resumption of the relationship that semester?
A I'm sorry, could you repeat that?
Q Sure. Did the relationship resume --
A Yes.
Q -- at some point that semester?
A Yes.
Q And what caused the relationship to resume?

Page 14

A We kind of talked about, like, how we would be able to, like, move forward, like, in the future and kind of both of us agreed that it was worth continuing the relationship even if we had to be, like, long distance once we both graduated. So we both decided that it would be better for us to be together and then we could, like, work it out.
Q And was that resumption of the relationship sometime after spring break of 2017?
A We went on spring break together, so it would have been before that that we were back together.
Q You traveled somewhere together?
A Yeah. We went to Chicago.
Q I want to focus on the time period from the end of your high school career, your high school graduation through the end of your Ball State enrollment for a moment.
During that time period, did you have any psychological or medical diagnoses that involved getting any therapeutic care, whether prescription care or healthcare provider services?
A Can you repeat the time period?

Page 15

Q From when you graduated from high school to the time you left Ball State.
A I don't believe that I had any medical care for, like, any mental health issues at all. Can you ask the question again? I'm sorry.
Q Sure. Let's work backward.
A Okay.
Q Have you ever received a depression diagnosis?
A Yes, I have.
Q When did you receive your first depression diagnosis?
A That was in high school. It was either my sophomore or junior year of high school.
Q And were you treated for depression at that time?
A Yes, I was.
Q Treated with pharmaceutical therapy or other therapy?
A Yes, I had therapists at the time, I think I saw two different ones, and then I was prescribed Lexapro for a while in high school.
Q Did there come a time when you stopped experiencing depression symptoms?
A No. There would be periods where it might be, like, more or less intense, but I had the

Page 16

symptoms fairly consistently.
Q So from the time in high school when you were first diagnosed with depression, have you suffered recurrent depression periodically ever since?
A Yes, I have.
Q Have you been under healthcare for depression regularly ever since?
A Not necessarily regularly. I've had, like, the symptoms, but with, like, moving and being in different places, I didn't necessarily have, like, constant, like, therapy just because I'd have to find, like, a new therapist that, like, worked with me, so...
Q Other than your diagnosis and treatment for depression, have you had any other psychological or medical diagnoses during or since high school?
A I had to go to the hospital for, like, a kidney infection my freshman year, so I received medical care for that.
Sometime during that period of time, I don't remember exactly when, I was also diagnosed with anxiety. That might have been in high school that I was diagnosed with that as

Page 17

well. And I've had eating -- like, eating issues during that time as well, that's continued on to today.
Q When did you first have the anxiety diagnosis?
A I think it was my senior year of high school. I had issues with, like, a lot of, like, chest pain that was resulting in anxiety, and I noticed that while I was playing sports and at some time during my senior year, that's when I was diagnosed with that because that was affecting my physical health as well.
Q Has your anxiety diagnosis remained part of your care regularly since high school?
A Yes. And I was also, like, later diagnosed with PTSD, so that kind of got -- the anxiety kind of got looped in with that, kind of.
Q When did you receive the PTSD diagnosis?
A That would have been, I believe, in the fall of 2016.
Q And to what was the PTSD attributed?
A That was during my -- I had an inpatient stay the fall semester, and I was diagnosed with PTSD then as a result of my previous sexual assault.
Q The one you referred to occurring at Ball State?
A Yes.

Page 26

Q And since ending the therapy in Lafayette in 2018 and moving to Oregon, have you undergone any additional therapy?
A Yes, I have.
Q But you're not claiming any additional therapy as damages in this case?
A So that would have been -- my insurance had covered another -- actually, the inpatient stay that's on here, that was an inpatient stay that I had while at Oregon. We didn't claim the other one because that was prior to my assault at Purdue. But I had an inpatient stay the spring of this year, so that would have been that one referenced there.
In addition to that, I met with a counselor a few times after that, and then I have an advocate on campus that I work with that I talk to about once a week, once every two weeks. That one I don't have to pay for so...
Q Where was the 2019 inpatient stay?
A That was at -- I'm trying to remember that hospital name. I can't remember the hospital name, like, off the top of my head, but it's in Eugene. It's near school, campus.
Q What caused you to be inpatient there?

Page 27

A I was having suicidal thoughts, and -- prior to that, and I told -- I expressed those thoughts to a member of my sorority, and I went to the counseling center the next day with her, and they thought it would be best for me to go to inpatient for that.
Q Was that during the spring of 2019?
A Yes.
Q How long were you inpatient?
A I believe it was a week to 10 days, I believe. I'd have to double-check, though.
Q Did you have a suicide attempt?
A At that time I did not. I was close to attempting, but I called my friend at that time before I had taken anything.
Q So you've referred to an inpatient in Lafayette in the fall of 2016 and an inpatient in Eugene in the spring of 2019. Have you had any other inpatient psychological care stays?
A No, I have not.
Q Have you had any suicide attempts other than the suicide attempt in the fall of 2016?
A Yes, I have.
Q When were those?
A I had one -- it would have been the week after I

Page 28

got my suspension letter. I don't remember the exact date, but it would have been late October, I believe. I had attempted -- and I had suicidal thoughts in high school as well and I had taken pills at that time. It wasn't for, like, the express thought of, like, a suicide attempt, but looking back, it probably was.
Q Where were you at the time of the late October 2017 suicide attempt?
A I was in my apartment in West Lafayette.
Q Were you residing there alone?
A I had a roommate.
Q Who was that?
A Her name was [redacted]
Q Were you transported by ambulance for that suicide attempt?
A No, she was away from the apartment, and I, that night, had taken a variety of pills and no -- no one was with me, but I didn't tell anyone about it until the next week, but I did not receive medical attention for that.
Q You were able to emerge from that suicide attempt without getting any medical attention?
A I should have gotten medical attention. I was extremely sick, I was vomiting and, like, coming

Page 29

in and out of it the next few days to the point that, like, my vomit was, like, bright green because I had nothing in my system. But I kind of isolated myself after everything had happened. But once I told my friends, they wanted me to go to the hospital, but I didn't think I could afford it, so I did not receive medical attention for that.
Q In Item 6, under (c) you list "Intensive outpatient therapy in Indiana." When was that?
A That was the spring of -- or not spring -- summer of 2017, and that was at the Stress Center in Indianapolis, St. Vincent.
Q Were you living in Indianapolis at the time?
A I was living with my mom. She lives in Noblesville.
Q You state here "Cost to be determined." What is to be determined?
A I was under my mom's insurance at that time so -- and she was the one who paid for it, so I would have to get those records from her. And I've asked her for that yesterday, so once I get that, I'll share it.
(Deposition Exhibit 4 marked for identification.)

Page 30

Q [redacted] I'm handing you Deposition Exhibit 4. This is a document on Ball State letterhead dated October 7 of 2017. Look at this document and tell me whether you recognize it.
A Yes, I do.
Q What do you recognize it to be?
A It was the letter from -- I forget what his title was, but the letter after they did an appeal hearing for my Ball State sexual assault, it was, like, the letter describing their determination.
Q At the top of page 2 of Exhibit 4, it refers to your right to appeal. Do you see that?
A Yes.
Q So this document was prior to any appeal?
A So the way that it works is that they had made an original decision, and then the respondent had made an appeal, but I, as the -- I forget what the term is, but as me, like, wanting to pursue that investigation, I had a right to appeal that decision that they had made.
So there had been an appeal, but it was not one requested by me, it was the one requested by the respondent.
Q Did you appeal the determination shown in

Page 31

Exhibit 4?
A No, I did not.
Q So in the month of October 2017, you received determinations from both Purdue and Ball State on two separate allegations that you'd made and those two separate schools, each determination rejecting your allegation of sexual assault; correct?
A Yes.
Q Did you ever have any flashbacks to the incident that was the subject of your Ball State allegation?
A Immediately after, yes. More recently, not as much. Occasionally I will, but...
Q Do you remember the incident that was the subject of your Ball State allegation?
A I remember portions of that night but not the entirety.
Q Did you file any legal claim against the individual who you accused of sexual assault at Ball State?
A No, I did not.
Q Did you consider doing so?
A No, I did not.
Q Did you file any legal claim against the

Page 32

individual who you accused of sexual assault at Purdue?
A No, I did not.
Q Did you consider doing so?
A For a little bit I had.
Q Why did you choose not to do so?
A I, at the time, did not think I could handle that level of -- having that investigation while also doing the Title IX investigation. I thought it would be too much for me to handle.
Q In the therapeutic care that you've received since the summer of 2017, are you receiving therapeutic care for trauma from sexual assault?
A Currently, I'm meeting with my advocate on campus and she's helping me find therapy options in Eugene, so recently I have not, but I'm pursuing that.
Q What I mean by therapeutic care for sexual assault is, in your view, are you needing therapy because of your recollections of the sexual encounters that were the subject of your allegations at Ball State or Purdue?
A I do believe that I require therapy dealing with those.
Q Do you recall that you require therapy dealing

Page 33

with anything else?
A Yes. I have eating issues that are heightened by my PTSD and my previous depression diagnosis as well.
Q Continuing to refer to Deposition Exhibits 3 and 4, the allegations that are addressed in Exhibits 3 and 4 were filed by you with Ball State and Purdue respectively; correct?
A Yes.
Q And you filed those allegations with those two schools during the same week in 2017?
A I believe it was the same week.
Q Why did you file those two allegations in the same week?
A I had discussed with Kasey Richardson, who is my advocate on campus, at the time with Purdue, I had met with her prior to that week to discuss filing a Title IX complaint or whatever to Ball State. So it was something that we had already discussed. And we had -- I think we had already possibly talked to Ball State before that week, I don't remember exactly, but it was that week that I had done, like, a phone call with them with Kasey where we talked about, like, the details of it, it was, like, my initial, like,

Page 34

interview with them. That was already scheduled for -- I believe it was that Tuesday, could have been that Wednesday.
So -- and then I had decided to pursue the investigation at Purdue because I had regretted not filing sooner with Ball State, and to me, I felt like I would regret not filing with Purdue earlier if I had not done that at that time.
Q Did you file something with the Ball State police while you were still a Ball State student?
A No.
Q Did you ever consider doing so?
A No.
Q Did you file anything with the Purdue University police while you were a Purdue student?
A No.
Q Did you consider doing so?
A I briefly did, but, as I said earlier, I didn't think that I would be able to handle all of that at once considering I was already handling these two at the same time.
Q What was your objective in filing the allegation at Ball State after you were no longer a student at Ball State?

Page 35

A I felt that it was important to me to be heard, and it felt like it was the right thing to do.
Q Did you not have those views prior to April 2017 about Ball State?
A After I was assaulted at Ball State, I didn't really want to think about, to be honest, like, what had happened, and I kind of just tried to ignore it at that time, despite me knowing that I was having a lot of issues kind of related to it. I just didn't want to think about it. And getting out of Ball State, like, getting out of there and kind of reflecting on what had happened, I felt like I was ready to pursue that.
I don't think I was ready prior to that to pursue an investigation. And it felt like it was the right time to do it once I felt like I was in a place that I could do that and be ready for it.
Q And you were encouraged by Ms. Richardson to do so?
A I wouldn't say "encouraged" necessarily. She kind of talked me through what she knew about their process and gave me options and gave me support in looking into those options.

Page 36

Q And she assisted you in making the filing at Ball State?
A Yes. She was, like, my support person in that.
Q When you left Purdue University, did you consider enrolling at a school in Indiana such as Indiana University?
A I had not applied to IU, but I did consider and I had applied to two other schools.
Q What other schools did you apply to?
A I applied to IUPUI and Butler University.
Q Were you admitted at either of them?
A No, I was not.
Q Do you have any understanding as to why you were not admitted?
A I was explicitly told by both of them that because of my suspension at Purdue, that they would reject me until my suspension was over.
Q Did you disclose your suspension to the University of Oregon?
A Yes, I did.
Q Did you receive any response from the University of Oregon on that topic?
A No. I was admitted, and I had not heard from anyone anything related to that, and they didn't follow up with me about it, but when you apply,

Page 37

you have to talk about any prior, like, disciplinary actions from any university and explain it, so I did it on my application, but nobody asked me to explain it any further.
Q What did you tell the University of Oregon about your disciplinary status?
A I gave them a brief overview about the fact that I had been assaulted there and that I received a Title IX investigation with Purdue for that assault and that the decision was to find him not responsible other than for the sexual exploitation. And that in their decision-making, they thought that I had lied to a university official, and that they initially expelled me and then suspended me after an appeal, so I basically just outlined that to them.
Q You have not sued Ball State; correct?
A No, I have not.
Q Do you have any grievance with Ball State about their handling of your allegation?
A No, I do not.
Q You consider it to have been appropriately investigated?
A Yes, I do.

Q Do you consider the decision that was made on the evidence to be appropriate?
A I did not necessarily agree with it, but I understood that it was -- it was an understandable decision.
Q What about the decision at Ball State was understandable to you?
A The original decision was to suspend him, and he decided to appeal that, and during the appeal process, one of his friends had lied, and that helped me in the end. And because that they found out that one of his friends had lied that was a witness, they decided to overturn the decision. So I understood that because one of the witnesses was not truthful that they would change the decision.
Q If I understand you correctly, you remain strongly of the view today that you were sexually assaulted by that individual at Ball State?
A Yes.
Q But you agree with Ball State's determination that the evidence as to whether the encounter was a sexual assault was inconclusive?
A I don't personally agree with it, but I could



understand that with what happened during the appeal process, that it was unclear.
Q Let's take a look at Deposition Exhibit 4 for a minute. I'm looking at the middle of the first page of Exhibit 4. The first finding is that "Both parties attended a 'house party' and consumed alcohol." Do you see that?
A Yes.
Q Did you agree with that conclusion?
A Yes.
Q The next finding is that "The volume of alcohol consumed by either party was inconclusive and did not rise to meet the standard of incapacitation for either party." Did you agree with that conclusion?
A I did not.
Q In what sense did you disagree with that?
A I understood that since the investigators weren't there, they wouldn't know the exact amount for sure that we had drank, but in my understanding, I was incapacitated at the time.
Q On the evidence that was available to the investigators, did you agree with their determination that the evidence was inconclusive?



A Yes.
Q Because, as you said, they weren't there at the time?
A I could agree with them that they didn't know the exact amount, and I did not know the exact amount that I had drank, so I could understand how they came to that conclusion.
Q Why was it that you did not know the exact amount that you drank?
A Because I had got to the point that I blacked out, and, according to witnesses, I continued to drink, so I don't know the exact amount that I drank.
Q The next statement by the author of the letter is that the panel members found that the parties engaged in sexual intercourse at the house party. Would you agree with that conclusion?
A Yes.
Q The next statement is that "Verbal consent was not exchanged by the parties at the time of the intercourse." Did you agree with that conclusion?
A Yes.
Q The next statement is that "The parties participated in homecoming events at IU



approximately three weeks after the 'house party,' traveling to and from Bloomington together." Did you agree with that conclusion?
A Yes.
Q And the next statement is that "The parties engaged in mutual social activities for the remainder of the semester following the incident but maintained a status of mutual avoidance where possible." Do you agree with that conclusion?
A Yes.
Q What was the evidence available to Ball State that, in your view, supported a determination that the sexual intercourse referred to in this document was assault?
A During the interview of the respondent, they asked him if verbal consent was given, and he said no, and basically asked him what made him think that I wanted to have sex with him. And he didn't really have a reason to do so, and he described a sexual incident that we -- like, the things that had happened. So during that time, they came to the conclusion that he had not asked for consent and that it was not given.
Q Did any witness, to your understanding, tell the

investigators that consent was refused?
A There were no other people in the room that we were in so there wouldn't have been, like, actually at the incident.
Q So you were one of the witnesses who was in the room.
A Yes. So I had told them that I did not remember a lot of what happened during that night, and I don't know if I explicitly said no, but I did not say yes, and that's what consent is.
Q So my question was whether any witness available to the investigators provided information showing a refusal of consent. My understanding, your answer is no witness provided evidence of refusal of consent.
A When you were asking me witness, I did not know you included myself so --
Q Well, including yourself, no witness testified to the investigators that there was a refusal of consent; correct?
A I don't remember exactly what happened, so I don't know if I explicitly said no, so I'm not sure what your definition of refusal is. If you can clarify that for me.
Q Sure, I'll get to that in a moment. First,



though, I'm just -- let's focus on what you told the investigators. Did you tell the investigators that you refused consent?
A If you mean by "refused," I did not give it, so --
Q No, I mean did you tell the investigators --
A No, I didn't --
Q -- that you had refused consent?
A I'm not exactly sure what you mean. Like, when I talked to them about what happened, I explained to them what I remembered and that I did not give consent for what had happened, and I told them that I was incapacitated and highly intoxicated and that I was not actively engaging in sexual behavior with him, it was being done to me. That is what I told them.
Q So your testimony today is that you told the investigators that you were a passive participant in the sexual encounter?
A That was my testimony then as well, so yes, it's not changed.
Q So your description of the encounter to the Ball State investigators was that you did not verbally consent, did not verbally refuse, and did not actively participate in the encounter?



A Yes, I believe so.
Q And your description of the Ball State incident was that you were blacked out that evening?
A Yes.
Q And when did the blackout begin?
A It was while we were at the house party. The majority of the party was, like, in the basement of the house that we were in. And we were drinking in the basement, and it was sometime during that time when we were drinking that I stopped remembering things.
Q When did you first begin to experience blackouts while drinking?
A That was the first time I had blacked out.
Q Ever?
A Yes.
Q Early in the first semester of your freshman year at Ball State?
A Yes.
Q How often after that time did you experience blackouts while drinking?
A After that period of time, I started to heavily drink, so I don't know an exact number, but I would black out a few times a month while I was at Ball State, and then since that point, I



blacked out during the time that I blacked out once, I know, during my -- the fall semester that I had enrolled in Purdue, and then I had also blacked out the spring semester, and that was when I had been assaulted. And since that point, I blacked out on, like, my 21st birthday. And then I -- yeah, that was the only other time.
Q When was your 21st birthday?
A [redacted] of last year, so that would have been 2019? Yeah.
Q What's your birthday?
A [redacted]
Q So I want to recap what you just said in approximate terms.
During the fall semester of your Ball State year, you started to drink heavily --
A Yes.
Q -- experiencing blackouts?
A Yes.
Q Approximately how many blackouts during that semester?
A I honestly am not sure. That was a long time ago. So maybe one or two more times that semester. I'm not entirely sure.

Page 46

Q And then approximately that same rate of blackouts in subsequent semesters?
A At Ball State, yes, that next semester I drank heavily, so that one, like I said earlier, probably, like, a few times a month.
Q So you've now used that phrase more than once. A few times a month would be more often than once or twice a semester.
A Well, I had said earlier that when I -- I would do it, like, once every, like, one or two weeks the other terms, but I -- like, during -- I didn't really black out until that -- I didn't black out until when I had been assaulted at Ball State, so that was a few weeks into the term. And then after that, it was one or two times because the term had already started. So the next term was a longer period of time. So it would have been more than one or two times.
Q When did you start experiencing blackouts a few times a month?
A That was probably, like, my spring semester at Ball State just because I was going out more often. But I had also blacked out probably a few more times that fall term.
Q Fall of 2016?

Page 47

A Fall of 2015, whenever I started at Ball State.
Q Did you continue to experience blackouts a few times a month during your fall semester at Purdue?
A I did a few times, but not as often. I didn't go out as often at Purdue as I did at Ball State.
Q How much alcohol did you come to associate with blacking out?
A To be honest, a lot of the times, like, I wouldn't know the exact amount. I would be drinking straight from a bottle so -- or, like, several different bottles. But for me to black out, when I was heavily drinking, I'm not entirely sure. Probably like eight shots. Like, if I was drinking, like, just hard alcohol, it probably was equivalent to, like, six, eight shots.
Q Describe to me, for a typical blackout, when you were experiencing them a few times a month, what your realization would be the following morning.
A I would realize how much I drank and that I didn't remember portions of the night. Sometimes I wouldn't realize I didn't remember those portions until I spoke to other people

Page 48

that I was hanging out with. But it was that I couldn't recall certain parts of the night.
Q Things you'd done during certain parts of the night?
A Yes.
Q Can you give me an example of something that your friends would tell you had occurred that you didn't remember?
A I wouldn't remember coming home. I wouldn't remember drinking more alcohol. Yeah.
Q Would there be occasions when you'd go from one party to another and not remember being at the second party?
A Yeah, I would say so, that probably happened.
Q Would there be occasions when you interacted with friends or acquaintances and not remember those interactions?
A Yes.
Q So some of these blackouts were blackouts relating to evenings that were continuing on with you active in the evening socially; right?
A Yes.
Q So, in other words, a blackout when you weren't incapable of, say, conversing with people?
A I would be able to talk, but generally I

Page 49

wouldn't be able to understand what people were saying as well. My speech would be more slurred. The pitch of my voice would be different. So I would be able to talk to people, but I might not understand what they're saying or understand exactly what I was saying.
Q Would they express to you, the next day, surprise that you didn't remember a particular interaction?
A Sometimes, but sometimes they also could tell that I wasn't fully there. That's usually the case, that they were, like, yeah, we could tell that you were extremely drunk. So they weren't necessarily surprised that I didn't remember it.
Q So one of the features of your blackouts was that, on occasion, you would continue to be a social participant in the evening while blacked out?
A Yes.
Q Have you sought support from Alcoholics Anonymous?
A For a brief period of time, yes.
Q When was that?
A That was after my suspension from Purdue. So that would have been late fall of 2017 and, I

Page 50

believe, early winter of, like, the next year.
Q This was while you were in Lafayette?
A Yes.
Q Did you self-diagnosis as an alcoholic?
A I had blamed what had happened to me partially on the fact that I was unable to remember things and I wasn't able to, like, I don't know, protect myself when I drank. So at the time I thought that being sober, like, that was going to be something that helped me.
My grandpa was also -- is a recovering alcoholic, so I knew that there was -- I, to me, seen how it had helped him in his life. I thought it was something that would help me. And I at least wanted to explore it as an option, to see if it was something that I felt could kind of give me stability in my life.
Q What did you conclude?
A Well, in my therapy and talking to, like, my family, I was not an alcoholic. It was a way that I used to cope with a lot of the things that I went through, but it wasn't necessarily something that I couldn't control. It was just something that I would have to just be aware that that was one of my coping mechanisms.

Page 51

(Deposition Exhibit 5 marked for identification.)
Q [redacted] I'm handing you Deposition Exhibit 5 which is a document entitled "Withdrawal Statement." Please tell me whether you recognize this document.
A Yes, I do.
Q What is it?
A It's my withdrawal statement for the year, fall of '16 semester.
Q And this was following a suicide attempt in November of 2016?
A Yes.
Q This is following your inpatient care after that suicide attempt?
A Yes.
Q And was your request for a withdrawal from Purdue for the fall semester of 2016 granted?
A Yes, it was.
Q In this document, Exhibit 5, at the end of the first paragraph, you refer to a diagnosis "with post-traumatic stress disorder from being raped last fall."
Has the PTSD from the Ball State incident ever gone away?

Page 52

A No. It's been compounded, but it has not gone away. It's something I still deal with.
(Deposition Exhibit 6 marked for identification.)
Q I'm handing you Deposition Exhibit 6. Please tell me whether you recognize this document.
A Yes, I do.
Q What do you recognize it to be?
A It was a request that I had made with the help of Kasey to partially withdraw from some of my classes.
Q And what is the date of this document?
A I'm not -- oh, April 19th.
Q Of 2017?
A Yes.
Q The paragraph that's in bold in the middle of the page that begins "I was the victim of sexual violence at a different institution," do you see that?
A Yes, I do.
Q Did you write that paragraph?
A I know that Kasey had helped me write it, so I don't know if she's the one that actually wrote it, but it was something that both of us wrote.
Q So you participated --

Page 53

A Yes.
Q -- in the drafting of it?
A Yes, yes.
Q So you would adopt this as your own firsthand statement?
A Yes.
Q So the stated reason for your request in Deposition Exhibit 6 is focused on the Ball State incident and the Ball State process; correct?
A Yes.
Q Is there any mention in Exhibit 6 of any incident at Purdue?
A No, I had not reported it at that time.
Q For the moment I'm just asking whether there was any mention.
A No, there was not.
Q The encounter with [redacted] that is the subject of your allegation in this pending case against Purdue was an encounter that occurred in the early morning of April 18th, 2017; correct?
A Yes.
Q So the day before you prepared this statement in Deposition Exhibit 6?

A Yes.
Q And you, by that date, April 19th, were working with Kasey Richardson?
A I had been working with her prior to that, but I had worked with her on that morning on this specific thing.
Q On the morning of April 19th?
A Yes.
Q When did you start working with Ms. Richardson?
A I don't remember exactly when I started meeting with her, but it was early in that semester that I had reached out to her or reached out to someone in CARE to talk about my options with Ball State and receive support.
Q Is the statement in Deposition Exhibit 6 an accurate description of your reason for request for academic accommodation on April 19, 2017?
A Yes.
Q It was shortly after you made the statement in Deposition Exhibit 6 that you filed your allegation with Ball State; correct?
A It might have been that day. I think it might have been, but, yes, it was that week, I know.
Q So the focus of your attention on April 19, 2017, was the assault that you alleged had



occurred in October of 2015; right?
A Like, the nature of the visit that I had with her or this specific document?
Q So if we look at Deposition Exhibit 4, Deposition Exhibit 4 says that your Ball State complaint was "against a student stemming from a reported incident that took place on or around October 2nd, 2015"; right?
A Yes.
Q So that October 2nd, 2015 incident is the incident that you are referring to in Deposition Exhibit 6?
A Yes.
Q And that October 2015 incident is the incident that was the subject of the complaint that you filed at or near the time of Deposition Exhibit 6; right?
A Yes.
Q And that was your complaint with Ball State?
A Yes.
MR. KEALEY: Let's go off the record.
(A recess was taken between 10:44 a.m. and 10:47 p.m.)
Q [redacted] your encounter with [redacted] was in the early morning hours of April 18, 2017;



correct?
A Yes.
Q That was a Monday night into early Tuesday morning?
A Yes.
Q On that Tuesday, did you encounter Isabella [redacted]?
A Yes, I believe so.
Q Where?
A I think I had texted her that day at some point, and we might have hung out that night, I don't remember.
Q On that Tuesday, did you have any discussion with Ms. [redacted] about [redacted]
A Possibly. I don't remember specifically, though.
Q How did the subject come up?
A I don't remember if we had talked about him, so I don't know exactly why he would have been come up, but she -- they were both anthropology majors and worked research together, so she might have talked about him then. Or I know that we were wanting to go to Acacia throughout that week for stuff for Grand Prix, so it might have come up in relation to that since he's a



member of Acacia.
Q You and Ms. [redacted] were planning to continue going to Acacia that week of November 17th?
A That was our plan before that week, so we were probably going to continue that.
Q Why was it that you were planning to go to Acacia in particular?
A My boyfriend, [redacted], at the time, was planning on rushing them or joining them, so he wanted to be able to meet a lot of the guys before their recruitment events to get to know them. So that's kind of how it was for me. And because he had a few friends already in Acacia and then [redacted] wanted to go because she wanted to go out with us, and then since she already knew [redacted] she might have known some of the other brothers. I don't remember specifically, but since she knew him, she wanted to go with us.
Q So the plan was for the three of you -- [redacted], [redacted], and yourself -- to go to the Acacia fraternity throughout the week of April 17th?
A She wasn't for sure going to go, like, every night, and we weren't sure we were going to go there every night, but we wanted to go there a

Page 58

few different times. She wasn't there on Monday, though. But she had wanted to go a few times throughout the week.
Q Did there come a time that week when you talked with Ms. [redacted] about sleeping with [redacted]
A Yes.
Q When and where was that?
A I believe that was Wednesday night.
Q How did that subject come up?
A I had been thinking about talking to her about it, and while we were at a party at their house, I took her aside and told her.
Q What did you tell her?
A I told her that we had slept together.
Q Why did you tell her?
A Because she -- one of the reasons was she was romantically interested in him, and I felt that was something I should tell her, and it was also -- I didn't remember a lot of that night, and I wanted someone to be able to talk to about that.
Q Did you tell her that you and [redacted] had hooked up?
A Yes, I believe that's what I said.
Q Those were your words?

Page 59

A At the time, I think. I don't remember exactly what I said, though.
Q Words to that effect?
A I believe so, yeah.
Q And what was Ms. [redacted]s reaction to your disclosure that you and [redacted] had hooked up?
A She was very surprised and asked me further questions about it and exactly what had happened. And as that conversation went on, she became more concerned about it, considering that I didn't remember most of that night. So mostly surprise and concern. She was a little bit angry at him as well.
Q What did you remember about the early Tuesday morning encounter with [redacted] that caused you to describe it to Ms. [redacted] as a hookup?
A I had remembered that I had performed oral sex on him, and I remembered him being behind me at one point and having sex with me. And I saw that we might also have had anal sex, I kind of recalled a little bit of that, so that would mean hooking up, to me.
Q So when you used the description "hooking up" to describe that early Tuesday morning encounter with [redacted] you recalled oral sex and

Page 60

vaginal sex from behind and possibly anal sex all under the heading of hooking up?
A Yes, I would say hooking up would be having sex with someone else.
Q I want to spend a few more minutes with Deposition Exhibit 2. You testified earlier to not being admitted to Butler and to IUPUI. Did you not apply to any other instate schools?
A Those were the two that I applied to.
Q And not any others?
A No.
Q Did you apply to any other schools in the Midwest?
A No, I did not.
Q What caused you to look all the way to the west coast for a school?
A I was born on the west coast, and all my extended family lives out there. I spent the first eight years of my life out there. And I had been admitted to University of Oregon, like, I was accepted to the University of Oregon when I was first applying to schools in high school. And considering I got into their honors college and got a decent amount of scholarships, I thought that I would hopefully be able to get

Page 61

into there again. And I wanted to move out to the west coast, again, anyway after graduation, so I thought I would take a chance and at least apply.
Q Are you happy there?
A I like going to school there; I've built a life out there.
Q Plan to make it your permanent residence?
A I'm pretty sure. I'm planning to go to law school most likely in Oregon, possibly Washington, so I'm planning on staying there for a while.
(Deposition Exhibit 7 marked for identification.)
Q [redacted] I'm handing you Deposition Exhibit 7. Do you recognize this document?
A Yes, I do.
Q What is it?
A I believe it's the initial complaint that my lawyer had filed to start this lawsuit.
Q Did you participate in the preparation of the complaint?
A Yes, I did and, like, working with my lawyer.
Q Did you review it before it was filed?
A Yes, I did.

Page 62

Q And are your allegations against the defendants in this case fully and accurately stated in Deposition Exhibit 7?
A The only one that I might want to clarify further was on page 5, line 37. When we had reviewed it, I wanted to make it more clear that the bruising was one of my concerns when I had noticed that on my neck, but there were other concerns as well that prompted me to receive medical attention, including knowing later that we had not used a condom. So pregnancy was also a concern of mine in addition to -- I don't know if this would be included in the bruising part, I was not really able to eat that entire week because my throat was very damaged from the oral sex that had occurred that night.
So it wasn't just the bruising on my neck that made me concerned about what had happened, there were other parts as well, so I did want to clarify that.
Q Anything else?
A That's the only other thing.
Q You have a co-plaintiff in this case. Have you met that person?
A Yes.

Page 63

Q When did you meet?
A I met her, it would have been, I believe, 2018 earlier in that year.
Q How did you meet?
A I had gotten a text from Kasey, and once I had gotten my suspension, I let Kasey know that if this happened -- if anyone else who had filed a Title IX complaint at Purdue was sanctioned in any way, that if they needed someone to give them emotional support, that I would be more than happy to do so. So I got a text from Kasey letting me know that another victim had been sanctioned for -- after reporting to the university.
And in that time she asked me if I would still be okay with talking to her, and I said yes, and then she gave the other woman my contact information, and then she texted me, and then from there we had texted.
Q Did you actually ever meet?
A Uh-huh, yes, after -- I think we had met, the first time we met was maybe, like, a week after I told her that if she wanted someone to be there that day, that I could, but she wanted some time to be alone, but I believe within a

Page 64

week or two we had met up in person.
Q How many times did you meet?
A I have no clue, honestly. I was still living in West Lafayette at the time, so we were still, like, fairly, like, close to each other proximity-wise, so I'm -- I'm not sure.
Q Did you e-mail with each other?
A No.
Q What did she tell you about her case?
MR. MACEY: Object, I think the communications are protected by the common interest privilege, so anything after that they discussed participating in litigation together I think is privileged. But prior to that I think anything is relevant. So that's what I would instruct, when you answer, as to -- once we started working on the case together, that's privileged.
MR. KEALEY: Statements of a party about the events in litigation are party admissions if they're not communications with somebody who is a privileged communication partner, and both of the people that I'm asking about are parties, so two parties talking to each other about their claims I don't think is privileged.

Page 65

MR. MACEY: I think discussing litigation and litigation strategy is definitely privileged. The privilege exists between them as a common interest in the litigation.
MR. KEALEY: No.
MR. MACEY: We raised this objection in our discovery responses as well.
MR. KEALEY: Are you instructing the witness not to answer?
MR. MACEY: I'm saying anything after we started working on litigation and from the moment we met and communications about the litigation, that's all privileged.
MR. KEALEY: I haven't asked any questions about you.
MR. MACEY: Okay, but even their communications together about communications, it's privileged.
MR. KEALEY: I haven't asked about anything except what they discussed when they met.
MR. MACEY: So I guess what I'm instructing is when we met at Applebee's in Lafayette, put on the record, when we met and started talking about the case, anything going forward on the case and preparing litigation strategy that we

Page 66

talked about together in our claims is privileged, and I'm going to object and instruct you not to answer those questions. Anything prior to that or not related to that, you can answer.

BY MR. KEALEY:

Q Did you meet with [redacted] at any time without counsel present?

A I apologize, I'm, like, thinking so -- no, we've never met without Jeff being there, without my lawyer being there in person.

Q Did you ever speak on the phone, one-to-one, without counsel present?

A Yes.

Q How many times?

A I am not sure. We talk about things not related to the case maybe on, like, a daily basis, so I talk to her fairly frequently.

Q Has that been true throughout the time from your first acquaintance up to the present?

A It kind of like ebbs and flows based on how busy we are. We generally keep in contact with each other, but it might not be on a daily basis consistently.

Q Please take a look at Paragraph 3 of Deposition

Page 67

Exhibit 7. Are you familiar with the allegation in Paragraph 3?

A Yes. Yes, I am.

Q Is that your allegation today?

A Yes, it is.

Q What, in your words, is the policy that you're alleging?

A I believe that if two investigators or whoever's working on a Title IX case, that if, to their minds, there are -- there's insufficient evidence that whatever had happened happened, whether that be an assault or maybe harassment or other cases, that not only does that mean that the respondent should be non- -- found not responsible, but that should result in some type of sanctioning against the complainant as well.

Q Who is the person you're referring to when you use the word "should"?

A Can you clarify that for me?

Q You started to refer to investigators. Are you saying that the investigators have a policy or that the investigators reach a conclusion? Who is it that you're saying has a policy of making the decision you're describing?

A I would say that considering that the

Page 68

investigators are being trained by Purdue and that the person -- I'm assuming that the person that decides that training, that decides the final decision would most likely be the university as a whole, or I'm not exactly sure who makes the decision of what the Title IX policy is specific to Purdue, but it would be that person specifically and whoever made the decision to either uphold those sanctions or create them. So in this case that would be Katherine Sermersheim or Alysa Rollock, but I believe since they create the policies and uphold them, that it would be them.

Q So you're referring to a policy originating from Defendants Sermersheim and/or Rollock?

A I don't know who exactly makes those decisions at a university, but from my understanding, that from the fact that I had to appeal everything to them, that, yes, it would be them.

Q You're alleging that the policy exists; correct?

A Whether written or unwritten, yes.

Q You're alleging that it exists?

A Yes.

Q Have you ever seen the policy?

A As I said, it's either written or unwritten. I

Page 69

understand what the official university policy is, but they also did not follow policy per my investigation because I should have been referred to OCR and had a separate investigation for what happened and that was not what occurred.

Q I'll ask you to answer the question I asked. Have you ever seen the policy that you're alleging in Paragraph 3?

A No, I have not.

Q Has anybody ever told you that there's a written policy of the type alleged in Paragraph 3?

A No, I have not [sic].

Q Has anybody at Purdue University ever referred to the existence of a policy of the type alleged in Paragraph 3?

A No.

Q On what evidence did you reach the conclusion that such a policy exists?

A Because that is what has seemed to be the case considering that I am not the only one that this has happened to and that it's a pattern of behavior and not an isolated incident. So that would, to me, considering I was given the same expulsion and then a two-year suspension, the

Page 70

consistency of those would make me think that there has to be some type of policy related to that.
Q In Paragraph 3 you've alleged that the policy may be written; right?
A Yes.
Q Do you have some basis for alleging the existence of a written policy?
A From my understanding of how investigations work, there is written communication between the investigators, the dean of students, Alysa Rollock, other members of the investigation that are involved, because it was most likely through e-mail that, yes, there would be a written explanation of why they believed I or other complainants should possibly receive some type of sanction. So that would be written if it was through e-mail or other correspondence like that.
Q Please take a look at Deposition Exhibit 3. Are the statements made by Ms. Rollock in Deposition Exhibit 3 descriptions of the policy that you're alleging?
A What specific portions are you referring to? Are you referring to when they -- when she is

Page 71

talking about the sanction that was imposed on me or -- can you be more specific?
Q Let's talk particularly about Paragraph 2 on the first page. Are Ms. Rollock's statements in Paragraph 2 statements of the policy that you're alleging?
A I believe that it is a result of the policy that I'm alleging is that I would be sanctioned.
Q Is there any difference between Ms. Rollock's statements in Deposition Exhibit 3 and the policy that you're alleging in Paragraph 3 of your complaint?
A Could you possibly, like, clarify that for me? Because when you're saying -- like, in the Exhibit 3, are you referring to, like, the result of it or are you saying that, is this the exact policy that I'm alleging is word for word what she has written? If you could just clarify that for me.
Q You testified a few minutes ago that you speculated that the policy alleged in Paragraph 3 might be somewhere in writings by the decision-makers in your case. And so I'm pointing to Deposition Exhibit 3 as a writing by one of the decision-makers, Ms. Rollock --

Page 72

A Uh-huh.
Q -- and asking you if Deposition Exhibit 3 is a description of the policy that you're alleging.
A As I said, I don't think it's necessarily a description of their policy, but I think it is a result of the policy, that because of the policy that they have adopted, that I would be sanctioned. So this might not be exactly how it's written or spoken about, but it is a result of that that I'm alleging the other piece of it.
Q So the suspension described in Deposition Exhibit 3 is a result of the policy that you're alleging in Paragraph 3 of your complaint?
A Not necessarily. The original sanction that I received was an expulsion, and I believe that part of the policy is an eventual suspension, but I believe that the policy, as I understand it and as I've seen with other people, is that you're initially expelled, and then once you appeal to Rollock, then you're granted a two-year suspension because, to me, that has been what I have seen. So yes and no because we stated up to expulsion, so yes.
Q In others you've seen, you're referring to [redacted]

Page 73

A That is one, yes.
Q Are you referring to any others?
A I was made aware of another person who had filed a Title IX complaint who was also faced -- faced sanctions and she was given her expulsion letter the same day as mine, so I was made aware of her as well. I'm not sure after she appealed what her sanction was, though, but I know that she was initially expelled.
Q And what's her name?
A Her name is [redacted] I don't remember her last name.
Q So my question to you was whether the suspension described and imposed in Deposition Exhibit 3 is a result of the policy that you're alleging in Paragraph 3 of your complaint.
A Yes.
Q In Deposition Exhibit 3, Ms. Rollock attributes her suspension decision to, in her words, in Paragraph 2, "a preponderance of the information presented in this matter substantiates a finding that you knowingly made false statements in connection with your allegations." Do you see that?
A Yes.

Page 74

Q Do you believe that Ms. Rollock is accurately describing in Paragraph 2 of her letter marked as Deposition Exhibit 3 the basis for her suspension decision?
A Do I agree that that was the basis of her decision or do I agree that that was correct in her decision, like, that she should --
Q Whether she's accurately describing to you in Paragraph 2 the basis for her suspension decision.
A As far as I know, that -- yes, her basis for suspension was because she believed that I had made false statements.
Q In Paragraph 3 of your complaint, you refer to "women who cannot prove their claims to the satisfaction of Purdue decision-makers." Do you see that?
A Yes.
Q What did you mean by that phrase?
A That if, to the investigators and other people involved in a Title IX investigation, if they did not believe that there was, like -- how to word it? -- like, there wasn't a huge amount of evidence to be able to come to the conclusion that the respondent was responsible, then that

Page 75

meant that the complainant was, therefore, being, like, dishonest about what had happened and not necessarily that maybe there just wasn't enough evidence to find the respondent responsible.
Q Are you referring in Paragraph 3 to your own allegation when you use the phrase "women who cannot prove their claims to the satisfaction of Purdue decision-makers"?
A I'm referring to myself and then the two other women that I was aware of that the same thing happened.
Q So you are one of the women who cannot prove their claims to the satisfaction of Purdue decision-makers?
A To my understanding, what I had produced to them was not to the satisfaction of them, so yes.
Q And a moment ago you referred to insufficient evidence; right?
A In their minds, insufficient evidence.
Q Did you think that you had sufficient evidence of sexual assault?
A I do believe that I did.
Q What was, in your mind, the sufficient evidence of sexual assault?

Page 76

A That [redacted] had admitted that we had had sex that night and the witness testimony from not only myself, my boyfriend at the time, [redacted] and many other peoples at the fraternity party describing me as being extremely intoxicated and describing the amount of alcohol that I drank that night. So combining those two things, that I would not be able to give consent because of the fact that I was highly intoxicated/incapacitated.
I also believed that the evidence that came from my -- my kit that I got, like my rape kit that I got at Purdue supported that I had been assaulted and the injuries that I had had, in addition to the fact that I was still intoxicated the next day, which my professor of my class saw that, and Purdue decided not to question my professor despite me giving them my professor's contact information. And also the fact that on numerous occasions [redacted] was dishonest in his testimony and even admitted that he was dishonest in his testimony.
So to my mind, I felt that my evidence and my testimony and the other witnesses' testimony showed my preponderance of evidence that he

Page 77

should be found responsible, and he was found responsible for sexual exploitation because of the recordings that he made, so...
Q Anything else?
A I don't think so, I don't believe so.
Q In the description you just gave me, you did not refer to any recollection you have of your encounter with [redacted]
A I actually said witness testimony including myself so I did refer to that.
Q You did not describe yourself as capable of giving consent, you described yourself as incapacitated.
A I said highly intoxicated and incapacitated to the point that I would not be able to give consent, so I did say that.
Q So describe for me everything you recall about the sexual touching by [redacted]
A While we were still at the fraternity house, I remembered briefly being behind the bar in their basement, and I remember [redacted] having his arms around me and him kissing me, so I remember that happening.
And then the next thing that I remembered that would have been sexual was when we were in

20 (Pages 74 - 77)

Page 78

my dorm room, and I remember him forcing me to give him oral sex and pushing my head down on top of him.

I remember him being behind me and choking me while being inside of me vaginally. And I remember him being on top of me and him having anal sex with me. But that's what I remember from that day.

Q Do you remember any of your communications with [redacted] in the course of your sexual contact with him in your dorm room?

A I don't.

Q You don't remember anything at all that was said by either one of you?

A I think -- actually, at one point, I think he asked me if I had any, like, lube. I don't remember what I said back to him, though. And then he might have asked about a condom, but I'm not a hundred percent sure right now, but I think that's the only thing I remember verbally that would have happened.

Q Do you recall any other statements you made?

A No, I do not.

Q In this lawsuit you have not named the investigators as defendants.

Page 79

A No, I have not.

Q Why not?

MR. MACEY: Object to the extent that that calls for a legal conclusion, but you can answer.

A I did not believe that -- well, I disagreed with their findings and I felt like the investigation was very superficial and biased against me. I don't -- I believe that the -- the blame, I guess is the best word, would be on the people who created those policies, created the training for the Title IX process and the ones that had decided to initially expel me and then suspend me. And I would say that the investigators are an extension of Purdue, so they are being still -- like, it's still a Purdue employee, so by naming Purdue, I feel like it's not necessarily excluding them from it.

Q In Paragraph 3 of your complaint where you refer to women who cannot prove their claims to the satisfaction of Purdue decision-makers, are you comparing one group of women who cannot prove their claims to another group of women who can prove their claims?

A Can you, like, clarify that question for me?

Page 80

Q Well, it's your allegation, so I'm trying to understand --

A When you mean compare, like --

Q Are you saying that Purdue has a different policy for women who can prove their claims?

A I would say they have an overarching policy related to Title IX investigations, and I think within that policy, if, to their satisfaction, a woman is proving their claims, there's no reason for sanctions on their part because they obviously, in that case, believe the woman who is bringing up those allegations. So I think within that same policy, it's that if someone is not able to, to their satisfaction, prove their claim, then they would face sanctions. So I think it's within the same overarching policy of how they deal with Title IX investigations.

Q So you're not suggesting and trying to allege in Paragraph 3 that all women who bring sexual assault allegations face a possible odds of proving their claims to the satisfaction of Purdue decision-makers?

A I believe that with how the process is set up, it makes it very difficult for anyone to prove their claims, but I don't think it is impossible

Page 81

to do that.

Q What makes it difficult for anyone to prove their claims?

A I think it's very difficult when people don't get back to you on certain things or -- like, I had issues having access to my report after the fact, to, like, be able to reference my report for my appeal. And I think that by having it be difficult in those cases to be able to access your report, that would make it difficult for anyone to be able to go through this process.

And I think that the lack of -- in my mind, the lack of training for those who sit on the panel for these investigations, I think that would make it very difficult for someone who has been sexually assaulted because they are not trauma-informed and they are not, to my mind, properly educated on how to interview people in those cases.

And I think that in not only my case, but other people's cases as well, the investigations seem to be very superficial and not granting the people going through it due process, and I think that can be on either side.

Q What do you mean "on either side"?

Page 82

A There have been cases where Purdue has also been named in a lawsuit because they did not grant a respondent due process, so I think the process itself is flawed.
Q Is there any evidence that you thought existed that was not collected by the investigators looking into your allegation?
A Yes.
Q What was that evidence?
A I had told the investigators about the rape kit that I had done, and it was, to my mind, because I had gotten it at, like, Purdue's PUSH, that they would get that. They never asked for it or looked into it further, I had to produce it myself.
I had submitted evidence of a different time that I had been intoxicated in which I sounded pretty much the exact same as I did on the recording and that could have been verified by my ex- -- or [redacted]'s RA, who was an employee of the university. They said that it was not relevant.
And phone records that [redacted] had produced that proved that I had not had a phone conversation with [redacted] during or after the time

Page 83

of the assault, that was also not collected, and I had put that in my appeal letter.
They also had not talked to my professor of my class that I had the next morning despite me giving her name and contact information.
Q Anything else?
A That I can think of right now, no.
(Deposition Exhibit 8 marked for identification.)
Q [redacted] I'm handing you Deposition Exhibit 8 which is a document printed out yesterday from Purdue's website. Do you recognize this document?
A I might have looked at it with Kasey, but I'm not entirely sure if it was this exact document.
Q Do you recall looking with Ms. Richardson at the procedures for the process that you were instigating with your allegation?
A She had it in a different form. There was, like, a booklet that she had given me, so it might have been the same information. I'm guessing it most likely was, it was just in a different -- it wasn't from the website, but...
Q Did you read through those procedures that Ms. Richardson provided to you?

Page 84

A Yes, I did.
Q So, for example, if we look at page 5 of Deposition Exhibit 8, under "General Provisions," there's a heading "Delegation." Do you see that?
A Yes.
Q And then a heading "Requests for Anonymity or No Action." Do you see that?
A Yes.
Q Section entitled "Interim Measures"?
A Yes.
Q Are any of these sections familiar to you so far?
A Yes.
Q Section entitled "Advisor or Support Person"?
A Yes.
Q Was Ms. Richardson your adviser or support person?
A Yes, she was.
Q A section entitled "Time Frames"?
A Yes.
Q As we look through these, are you generally recalling being aware of this document or looking at it?
A Yes. Kasey had described to me the general time

Page 85

frames of when things would happen.
Q Turning to the next page, the heading is "Expectations Regarding Participation by the Parties."
A Yes.
Q At the bottom of page 9 of Exhibit 8 is a paragraph that begins "All university community members are expected to provide truthful information." Do you see that?
A Uh-huh, yes.
Q Can you please read that paragraph for the record?
A "All university community members are expected to provide truthful information in any report or proceeding under these procedures. Any person who knowingly makes a false statement in connection with a resolution of a complaint under these procedures may be subject to appropriate discipline. Making a good-faith report of discrimination or harassment that is not later substantiated is not considered a false statement."
Q Have you read that paragraph before today?
A I don't remember if it was the exact paragraph, but I was familiar with the idea of making a

Q Possibly more than five?
A Possibly.
Q Possibly more than 10?
A I don't think so. I don't know how many times we had sex that month.
Q You had been with Mr. [redacted] in Chicago on spring break in March of 2017; correct?
A I don't remember when spring break was, but if that's when it was, then, yes.
Q Purdue spring break is in the second week of March every year.
A I think, I don't remember.
Q And so from the time you were with him in Chicago on spring break in March of 2017 through the end of the semester, you were seeing Mr. [redacted] all the way through; right?
A Yes, I believe so.
Q And you were sexually active with him during that entire period?
A I think after what had happened in April, I'm not sure if it was as consistent as we had had sex. But we did, I'm sure, have sex in between that time, just don't know how frequently it was after that.
Q Had you had sex with Mr. [redacted] on the weekend



before your first encounter with [redacted]
A It's possible; I don't remember.
Q Please describe Mr. [redacted] just by physical appearance, approximate height, weight.
A I don't know what he currently looks like, but I believe he's 5'10", around. When we had dated, he was about 160, 170 pounds, I believe. Dark brown hair. He's half El Salvadoran, half white. I don't know what else --
Q Was he active in the military at that time?
A He was doing Air Force ROTC during that time.
Q So he's physically fit?
A I would say so, yes.
Q Strong?
A Yes.
Q Prior to your visit to PUSH late in the week of April of '17, did anybody tell you that they noticed any bruises on you?
A No. Wait, can you resay that question, please? I don't know if I understood it.
Q During the week of April 17, 2017, prior to your visit to have A SANE exam conducted, did anybody tell you that they noticed any bruising on you?
A Yes. I'm sorry, I misunderstood your question. [redacted] and one of my friends had noticed that I



was -- I had bruising on my neck and had a few on, like, my shins, but I don't know if it was from that, necessarily.
Q Why do you say that you don't know if it was from that, necessarily?
A I was working out, like, actively, so it might have been I hit my shin on something, but I know that my bruising on my neck was from the assault that happened.
Q One of your contentions during the investigation process on your allegation against [redacted] was that you were incapacitated with -- by your reconstruction, of a blood alcohol above .40; correct?
A From what I was told and what I remember drinking and the amount of time, that is what my blood alcohol content would have been.
Q Were you contending that you were capable of walking across campus with a blood alcohol of .40?
A I don't remember how I walked home, so I don't know how much assistance I needed.
Q Well, I wanted to -- this question is not about your recollection, it's about your contention. Were you contending that you were incapacitated



from walking?
A Well, incapacitation can mean mental incapacitation as well, so I believe that I was able to walk with the assistance of someone else, but I believe that mentally I was incapacitated.
Q And when you say mentally you were incapacitated, what do you mean?
A I would not be able to make decisions that -- like, I would not be able to give consent, I would not be in the mental ability to understand what was going on around me or to necessarily recall what was happening because I wasn't able to because of the intoxication level.
Q You're aware that there's evidence that you interacted with the dorm staff when you went back to the dorm with [redacted] correct?
A Yes.
Q You weren't incapacitated from having that interaction; correct?
A I would say that I don't remember those events, so incapacitation, like I said, was me not being able to remember those events and me not understanding what was going on around me which, as when I talked to my RA, she later described

Page 94

me as being kind of confused and not really understanding what was going on.

So I would say that I was able to talk to someone, but I wouldn't be able to recall those events or necessarily make rational decisions in that state of mind, so I don't...

Q So you're equating incapacitation with lack of memory?

A I think that it could be part of it.

Q You had the capacity to ask for help getting into your dorm; correct?

A Yes.

Q You had the capacity to bring [redacted] with you into the dorm; correct?

A With his assistance, yes.

Q You had the capacity to bring [redacted] into your dorm room; correct?

A With his assistance, yes.

Q I want to reconstruct some of the details from that evening beginning earlier in the evening. There came a time during the Acacia party on Monday evening, April 17, 2017, when Mr. [redacted] left the party; right?

A At what time are you referencing, like --

Q You said there came a time. At some point in

Page 95

the evening he left the party; right?

A Yes, my understanding.

Q To your understanding at the time?

A No. Well, I mean that I found out later that he had gone home, found out the next day. I wasn't -- he was still at the party when I had left. Like, he didn't stay the night there.

Q So Mr. [redacted] was still at the party when you left the party with [redacted]

A Yes.

Q Mr. [redacted] didn't walk you home?

A No, he did not.

Q Why not?

A From what people told me after, because he was getting -- he was throwing up in the bathroom, they didn't think that he would be able to walk home, so they had someone else take me home. But he was also not told that someone else was taking me home, from what he told me later.

Q When you left the party, you left with [redacted] correct?

A Yes.

Q Prior to leaving the party, you had sought out [redacted] in his bedroom; correct?

A I don't recall that so I don't know if that's

Page 96

what happened. That is what some of the witnesses said had happened, but I don't remember it.

Q There's no witness saying it didn't happen, is there?

A To my knowledge, I don't know of any, but I cannot say since I don't remember, I can't say for sure if it happened or not.

Q All the evidence that was gathered by the investigators was consistent with you going to find [redacted] in his bedroom; correct?

MR. MACEY: I'm going to object that that's asking for speculation. To the extent that you know, you can answer.

A From what I was told by the investigators, that is the conclusion that they came to.

Q And when you went to [redacted] bedroom, he was already in bed?

A I don't remember so I can't say yes or no.

Q You weren't incapacitated from making the decision to go to [redacted] bedroom and seek him out, were you?

A I don't remember so I can't -- I don't -- someone can make a decision when they're incapacitated, but it's usually not one based in

Page 97

rational thought or it's something that they wouldn't do normally. So I don't know, I don't remember, so I can't say yes or no.

Q I have provided, prior to today's deposition, an audio file that you referred to a couple of times already today. I understand that you listened to it maybe in the past and maybe yesterday in preparation for today's deposition?

A I had listened to it when the investigators played it for me, so I didn't listen to it yesterday but my lawyer did.

Q When was the last time you listened to it?

A When the investigators played it for me and that was the only time I had.

MR. KEALEY: Are you stipulating to the authenticity of the audio file that I provided you?

MR. MACEY: Yeah, we're not disputing that that's -- that's a fact, just for the record, we don't have any idea -- we know that's her voice on it, we know that's [redacted] voice, so we're stipulating to that. We're stipulating she's listened to it. We're not going to dispute the contents of that file. What we reserve the right to dispute is when -- how it

Page 98

was put together by [redacted] It's unclear from the file, we can't tell.
MR. KEALEY: Are you disputing that it was a file recorded in [redacted] dorm room on the night of April 17, '18?
MR. MACEY: No, we're not disputing that, except I think from listening to it, it might be more than one record- -- it might be pieced together. It repeats weirdly.
MR. KEALEY: But the origin of the audio file from that moment in time is not disputed?
MR. MACEY: No, no.
BY MR. KEALEY:
Q [redacted] having listened to the audio file, you're aware that the audio file is a dialogue between you and [redacted] correct?
A Yes.
Q You're aware that it's an audio file that refers to sexual activity between you and [redacted]
A Can you, like, define "refer"? Like, that we're discussing it or that it is during sexual activity?
Q You're referring to sexual activity.
A Yeah, yes.
Q That it refers to the appearance of your

Page 99

genitals and [redacted] genitals?
A I'll be honest that I don't remember all the contents of it. There are certain portions that I remember specifically. But I honestly don't remember.
Q You're aware that the audio file refers to plans to continue to have sexual interactions with [redacted]
A I think I remember that.
Q You've testified that you don't have complete memory of your time with [redacted] in your dorm room. Do you have a memory of when in your dorm room the interactions on the audio file occurred?
A I'm not sure when he had started recording. I don't know -- I don't remember saying those things, so I don't remember when everything happened that was on the audio recordings. I just know that it was in my room sometime during that night.
Q You're aware that there is in the audio file no expression by you of negative emotion toward [redacted]
A I don't think I remember there being any.
Q You don't, in the audio file, tell him that any

Page 100

type of sexual contact between you and him is unwelcome; correct?
A I don't believe so.
Q You don't refer to any past unwelcome sexual conduct between you and [redacted] correct?
A I don't believe so.
Q And you describe plans for having further sexual conduct with [redacted] the next day?
A I don't remember all the contents of the file, but I think that was on there.
Q So while with [redacted] in your dorm room overnight from Monday to Tuesday, you had a conversation with him about having future sexual contact and then when you woke up the next morning, you texted him; correct?
A Yes, I believe so.
Q And in your text you didn't express any negative emotion about any sexual contact between you and [redacted] he night before; correct?
A I don't think I did.
Q And then you did, in fact, go ahead that Tuesday afternoon and have sex with [redacted]
A Yes, I did.
Q And that sex was consensual?
A I think that there were portions of it that I

Page 101

did not want, and I think that certain things that he did with me were not things that I had wanted to do.
Q It was sexual contact with [redacted] in your dorm room; right?
A Yes.
Q You invited him there?
A Yes.
Q For that purpose?
A Yes.
Q You did not ever allege that [redacted] sexually assaulted you on Tuesday afternoon in your dorm room; correct?
A I never alleged that.
Q In this lawsuit you're not disputing the reasonableness of Purdue's consideration of that audiotape as part of the evidence for its investigation and decision of your allegation, are you?
A No, I'm not.
Q When Purdue investigators initially spoke with you, you did not disclose to them that you had had sex with [redacted] on Tuesday afternoon, did you?
A I don't believe so. I -- because I was making a

Page 102

complaint for that night before, I didn't tell them about it because that was not what I was making a complaint for.
Q You considered it information that Purdue wasn't entitled to have?
A I had talked to them later about it, so in the initial interview I did not disclose it to them but I did later.
Q After they brought it up to you?
A Yes.
Q After they found out about it from [redacted]
A I'm assuming so, yes.
Q Ms. [redacted] are you contending in this case that Purdue would have investigated your encounter with [redacted] differently if you were a male accuser and the respondent was female?
A I don't know how they handle male accusers, so I cannot speak to that.
Q So you're not contending that?
A I don't believe so.
Q Do you recall the investigators who performed the investigation in your case?
A Yes, I believe I remember all of them.
Q Were they women?
A There was -- I think there was a man involved.

Page 103

I never spoke with him, I forget his name. But the two main people that I spoke with were women.
Q Two of the lead investigators?
A From my understanding both were lead investigators, yes.
Q Did either of the investigators ever express to you anything that you took as antifemale bias?
A When they interviewed me, I do not believe that there was anything they said. But I believe that in their report, their characterization of me was a stereotype, it was unfounded based on the evidence given by myself and given by other witnesses, and I believe, like, that characterization was negative.
Q I'm referring specifically to antifemale bias.
A The two investigators that I met with, I -- I feel -- can you define what you feel that antifemale bias is?
Q Well, I believe, in this case you're alleging antifemale bias.
A I just want to know what your understanding is so I'm on the same page as you.
Q I'm trying to parse your allegation, so it's whatever you contend in your complaint.

Page 104

A I believe when they asked me questions during the investigation that the questions were normal questions, but considering that time, I don't think there was anything from the questions that they asked me that would have been antifemale. I don't use that term, so...
Q Did anybody at the panel hearing on your allegation do or say anything that you interpreted as showing antifemale bias?
A I would say so, yes.
Q What was that?
A There were questions related to if I had been attracted to my accuser; there were questions related to what I was wearing that would not be asked to a male victim or complainant; there were questions about my -- if I was doing this to cover up cheating on my partner, which is not a question generally asked to men.
Q Who asked you what you were wearing?
A I don't know the names of the panel members so...
Q Man or woman?
A It was a woman.
Q What did she ask you exactly?
A She asked me what I was wearing the night that

Page 105

everything happened.
Q At the fraternity party?
A Yes.
Q While you were at the party or while you were back at the dorm?
A While I was at the party, which is the same thing I wore throughout the night.
Q Was there anything in the investigation report about what you wore?
A I honestly don't remember.
Q You don't recall seeing anything about that?
A I don't think so.
Q Anything else that you allege as a statement or conduct by anybody at the panel hearing showing antifemale bias?
A I think that there were other things that were biased, but not necessarily antifemale, it just would have been biased against any witness.
Q Male or female?
A In those cases, yes, they were questions that are not appropriate for those types of hearings. It wasn't related to the case.
Q What were those questions?
A If I had sought help for what they believed was alcohol abuse. They asked me why I would

Page 118

text.

Q So toward the end of this paragraph, the description is "She said that she woke up the next day with bruises on her body, and she got a rape kit at some point after Monday night." Do you see that?

A Yeah, I do.

Q Did you tell Megan Skiba that you woke up Tuesday morning with bruises on your body?

A I probably did. I don't remember specifically what I told her about what had happened but -- I don't remember.

Q When is the first time you ever recall telling anybody that you woke up with bruises on your body?

A It was possibly [redacted]. I think I might have said something to her about that, about my bruises on my throat, but I couldn't be for sure who was the first person I was talking to about it.

Q When you had sex with [redacted] on Tuesday afternoon, did you discuss with him any bruises on your body?

A Not that I remember.

Q Before you went in for a SANE exam on Thursday, did anybody discuss with you bruises on your

Page 119

body?

A Yes, I believe so.

Q Who was that?

A Like I said, I think I talked to [redacted] about it and I think I talked to [redacted] about it. I don't remember when I had told my sister-in-law about what had happened, but I know that we eventually had discussed that and some of my friends who were -- kind of stayed with me that week, we would have discussed it, so -- I don't know whether that would have been before or after the exam.

Q When did you first provide Purdue evidence of bruises on your body?

A Like, when did I, like, provide them with the kit that I had or --

Q Either a statement by yourself or pictures from your SANE examination.

A Well, I had my SANE examination that week, and it was done at Purdue, and in doing that, I had to give, like, a statement about what had happened, so in that statement I gave to the nurse, and that would have been the first instance.

Q Let me be more precise. When did you first

Page 120

provide the Purdue investigation with any statement or evidence of bruises?

A I'm pretty sure during my first interview, I think. I'm not entirely sure, though. Like, my interview was, like, the investigators.

Q When did you provide them with pictures?

A I didn't provide them with pictures at that time because it was in my SANE kit which the university had, so I did not give them to them. I thought that since it's -- it was done at Purdue and since I told them about the fact that I had gotten a kit done and that I had bruises, that they had access to that.

Q Taking a look at Deposition Exhibit 10, will you show me where in the investigation report there's a reference to you disclosing your bruising?

A I described pain in my throat on page 16, and they characterized other things that were not normal. And then page 11, "She described the bruising she received on her neck." That is Paragraph 3, I guess I'd say, at the very end.

And then previously in that paragraph there's also "He was on top of her choking her, and she reported that there was bruising on her

Page 121

neck the next day and she had difficulty eating and swallowing the next day."

Q Let's stay with the statement on Paragraph 11.

MR. MACEY: I'm going to object. I'm not sure she's done finding --

MR. KEALEY: Oh.

THE WITNESS: I'm still checking.

MR. KEALEY: Okay.

MR. MACEY: -- all the instances that bruising in the neck is mentioned in the investigation report.

A And then on page 18, in my message to [redacted], towards the end, in the text message portion, it says "[redacted] messaged [redacted] and told her she got a rape kit, and that she had bruising on her neck and in her throat. Their conversation continued."

And also previously it talks about my SANE exam saying, "She told him she" -- I think it was talking about -- "She told him she had bruises on her neck that she had not realized she had. She told him her throat was swollen and she could not eat solid foods."

And I believe those were all of the ones.

Q So on page 18, the passage you were just reading

Page 122

from, the paragraph begins '[redacted] had a SANE exam performed the evening of Thursday, April 20th." Do you see that?
A Yes.
Q So that is somewhere between 60 and 72 hours after your encounter with [redacted]
A [redacted]
Q Excuse me, [redacted]
A It was Tuesday morning, this was Thursday, so yes.
Q So between the time you woke up Tuesday morning and the time of your SANE exam on Thursday night, you did not realize you had bruises on your neck?
A That was the first time that I had, like, talked about it. I didn't realize the extent of it. I had noticed some discoloration on my neck, but I didn't necessarily think they were bruises. I just mostly noticed the pain I had in my throat.
Q Is this an accurate description of your statement: "[redacted] told the SANE nurse she had bruises on her neck that she had not realized that she had"?
A Like I said, I noticed I had discoloration on my neck; I did not realize they were bruises.

Page 123

Q Let's turn back to page 11 of Deposition Exhibit 10. The investigators write that there's a dispute about what occurred in [redacted] room and who initiated the sexual conduct. Do you see that?
A Yes.
Q Then the next paragraph summarizes the investigators' recap of what you told them; correct?
A Yes.
Q Please read that paragraph all the way through and tell me when you've reread it.
A I've read it.
Q Everything that is attributed to you in this paragraph is from the time period that you have said both to the investigators and today. Your blood alcohol was above .40; correct?
A From -- yeah, from the amount that I drank, that's what I would think it would be.
Q And this comes from the time period that you've described as a time period that you were blacked out?
A I remember certain portions of it. The parts that I've described before, but not all of it. Like, what I described here is what I remember.

Page 124

Q How did it come to be that [redacted] was in your room?
A From what I remember and then from reading what he said happened, my understanding was that I was able to get a, like, replacement key for my room, and once I was able to do that, he was able to come into my room.
Q I didn't ask you how he was able to come into your room, I asked you how it came to be that he was in your room. With your permission?
A Yes.
Q You recall that?
A I don't, but I'm assuming that it was with my permission.
Q Why do you assume that?
A Because from -- I understand what I -- I don't think I told him anything else, like, from my understanding, from what he said that I let him into my room.
Q You actually took steps to facilitate getting him into your room that night; right?
A I took steps into getting myself into my room, I didn't have a key, so if he was going to go into my room or not, I still needed to gain access to my room.

Page 125

Q And the only way he could gain access to your room is with your key?
A Yes.
Q So you never contended that [redacted] was in your room without your permission?
A I don't remember giving him that permission.
Q You never told any investigator or any of the decision-makers that [redacted] was in your room without your permission?
A I never said that I gave him permission, but I also never -- I don't remember giving him permission because I don't remember what happened.
Q I'm just asking you to confirm that you've never made the contention to anybody at Purdue who considered your allegation that [redacted] was in your room without your permission?
A They never asked me, so no.
Q That's not the question I'm asking you.
A So I would say that I've never said that.
Q You've never asserted in the course of your allegation and the investigation and decision of that allegation that you were involuntarily disrobed, have you?
A I don't remember, so I never said either way

Page 126

what happened.
Q You've never made a contention that you were involuntarily disrobed?
A I never talked about how my clothes came off, so no, I didn't say that because I didn't remember what happened.
Q It's just a simple question. You never made any contention that you were involuntarily disrobed?
MR. MACEY: Objection, she's answered it twice.
MR. KEALEY: Well, she's evading the question, but we'll stay it.
MR. MACEY: You can ask her the same question for three hours if you want.
MR. KEALEY: I may.
MR. MACEY: You can answer.
A I never spoke to anything that I didn't remember which is what I've continued to say. Whenever they would ask me if I remembered certain portions, I said, "I do not remember."
So if they would have asked me that, I would have said, "I don't remember." So I don't know. So I don't know because I don't remember what happened. The investigators never asked me that, to my recollection.

Page 127

Q I've not asked you what anybody asked you. I've asked you what you asserted.
A I never said it because it was never asked and I -- I never said that so --
Q The answer is no; correct?
A Yes.
Q You never asserted in your allegation or to anyone investigating or deciding that allegation that you asked [redacted] to leave your room?
A I never asked him to leave my room, to my knowledge.
Q Why did you have [redacted] in your room?
A I don't remember my intentions on -- so I don't know.
Q If you'd look, please, at Deposition Exhibit 11. The text on page 2 of Deposition Exhibit 11 from you to Ms. Skiba sent at the end of the week of April 17 starts out "Sorry I left to go home." So that's a text sent after you're already home?
A I'm guessing that it possibly was.
Q Why did you send this text?
A To [redacted]
Q Yes.
A Because she said, "I'm in my room if you want to talk." So I wanted to let her know that I

Page 128

wasn't just ignoring her, and I wanted to tell her -- I -- I -- if I remember correctly, I previously told her that I wanted to talk and so I wanted to tell her what I had wanted to talk about with her.
Q You hadn't previously told her what it was you wanted to discuss with her?
A I don't remember. I think that if I remember correctly from my previous thing to her, I think I told her I wanted to talk to her about something; I don't remember if I told her specifics.
Q So on the first page of Deposition Exhibit 11, the report attributes to you the following: "From this point on, she said that she does not remember what happened probably due to the alcohol she had consumed at the party earlier that night." Do you see that sentence?
A Yes, I do.
Q Is that an accurate description of what you told the RA?
A I don't remember what I specifically told her, but I am pretty sure I had told her I remembered certain parts of it, but I don't remember, as a whole, what happened, like, everything. I don't

Page 129

remember my conversation with her in full, though, so I'm not sure.
Q Well, did you have a conversation with her?
A I think after I had went home, I possibly did. I know I talked -- I had talked to her since then, but I'm not entirely sure.
Q So this report, Deposition Exhibit 11, is dated April 22nd, which was the Saturday of that week. You had texted with Ms. Skiba explaining why you weren't around to talk with her as of that Saturday.
A Uh-huh, yes.
Q So when was the communication with Ms. Skiba where you told her that you did not remember what happened?
A I don't remember when we had that conversation. I know I've talked to her about it and I know that I had texted her about it. I don't remember specifically when we talked about it.
Q It must have been sometime after your SANE exam on Thursday because the SANE summary refers to the bruises on your body; right?
A Can you repeat that question?
Q Sure. Deposition Exhibit 11 says in the RA's summary "She said that she woke up the next day

Page 134

A Yes.
Q Can you point me anywhere in this document where you found any fault with the investigators' description on page 12 of their report about the contents of the audio recording made by [redacted]
A In my appeal, I don't believe I made any contention against what actually was in the recording, but, rather, if I was -- if I sounded intoxicated or not during that recording. That is the contention I made and did not make a contention related to what was actually in the recording, and also how it was -- like, how he was able to record it. And if there was one recording versus several different recordings which was never really made clear to me which of those it was.
Q You didn't quarrel with the accuracy of the investigators' description on page 12 of what's on the recording?
A I don't believe so.
Q You didn't quarrel with their statement "They discussed their prior sexual activities, their desire to engage in future sexual activities, make a plan to see each other the following day,

Page 135

discuss the need to keep their interaction confidential, and discuss whether [redacted] would date [redacted]
A I did not quarrel with the fact that that was said during the recording but the fact that I didn't remember it was my statement, what I said.
Q Are you aware, [redacted] of the distinction between intoxication and incapacity?
A Yes, I am.
Q What do you understand to be the distinction?
A That you can be intoxicated but not necessarily incapacitated. Incapacitated is related to -- like if we're talking about mental incapacitation, whether someone is able to kind of discern what's going around -- like, going on around them; understand consequences of their actions; understand a variety of things and be able to act on those and be mentally there and aware of what's going on.
So intoxication can lead to the point where you're incapacitated. Under the influence of alcohol or drugs, you can get to the point where you're not able to understand what's going on around you and discern things.

Page 136

Q So you asserted your incapacity in your dorm room with [redacted]n that Monday night to Tuesday morning as a true description of your state?
A I believe that I was incapacitated at the time.
Q When you made the allegation, you contended that you were incapacitated from participating in any consensual sexual activity.
A Consent is -- you need to be -- if you're incapacitated, you cannot give consent, so, yes, because I was incapacitated, I was not able to give consent in that situation due to intoxication.
Q And when you made that statement, you asserted it as a truth even though you've also asserted that you were blacked out and couldn't remember what had happened.
A Being blacked out, that's another form of mental incapacitation. It's a more -- people use it more colloquially as that, but if you're blacked out, you're not able to remember, you're not able to make the same decisions that you are if you're sober and you're mentally incapacitated.
Q I'm asking a slightly different question. We've established earlier today, have we not, that

Page 137

people who are blacked out can engage in activities that are willing, just not remembered; right?
A I don't believe I ever said that. Can I ask when I said that being blacked out means that you're willing to do something necessarily when it comes to consent?
Q The key word is "necessarily," isn't it?
A contention that you were blacked out begs the question whether your lack of memory means that you were incapacitated.
A I don't really understand what you're trying to say.
Q If you're blacked out, you don't remember whether you had capacity or not; right?
A If you're incapac- -- being blacked out and not being able to be aware of your surroundings, not being able to remember things, not being mentally there means incapacitation; it means you're not able to make decisions, you're not able to give consent.
Q As you've described it, blackout just means you don't remember.
A I said that was a portion of it. That's not the entirety of it.

Page 138

Q Can you clarify to me how it is you mean that you can be blacked out, not remember something, and remember that you are incapacitated?
A I don't have to remember that I was incapacitated. If I am not able to remember something and I was not able to fully understand what was going on around me and fully understand everything because I was not able to make those decisions, that means that I was incapacitated. Someone who is in a coma is incapacitated and they don't remember that they're incapacitated.
Q You did not intend in your appeal marked as Deposition Exhibit 12 that the statements made by you on the audiotape were statements made from incapacity, did you?
A I said that I don't remember saying them, and I said that I cannot -- if I don't remember saying them, I cannot say whether they happened or not. I cannot say whether -- what occurred.
Q Whether or not you remembered making them independently of hearing them on the audiotape, you did not contend that those statements were statements made as a result of incapacity?
A I might've. I can look through this because I'm not sure if I ever said that specifically.

Page 139

Q Let me follow this through in a little different way. What you said on the audiotape about your desire to engage in future sexual activities and the plan to see each other the following day, keeping the interaction confidential is what you said in the middle of the night and what you did the next day, is it not?
A Yes.
Q So you had the capacity to make a plan in the middle of the night and carry it out the next day?
A We did not make specific plans on what was happening. It wasn't made until the next day through text. So we did not carry out a specific plan.
Q You don't quarrel with what you said on the audiotape and that maps up exactly with what you did the next day.
A We didn't choose, like, a time and a place, I didn't remember that; it was through texts that that was made.
Q When you woke up the next morning, you exchanged a text with [redacted], right?
A I believe so. I don't remember.
Q Well, you've seen the text, haven't you?

Page 140

A I have.
Q And you were able to exchange texts with him because you'd exchanged phone numbers in your room in the middle of the night before?
A According to his reports, yes. I don't remember giving him my number or me getting his number, but I had his number the next day, so we exchanged it. I don't remember that happened.
Q So if you look at the top of page 13 of Deposition Exhibit 10, 3:44 a.m. on April 18, 2017, you sent a text to [redacted] "Hey, this is [redacted]"
A I don't know if I made that text or not. He could have texted it from my phone. That was never sure.
Q In your appeal, Deposition Exhibit 12, did you dispute that this was a text exchange you had with [redacted]
A I said that we had texted, but I never said specifically that that was something that I had texted him or he had texted through my phone. I don't remember the logistics of how I got his number or he got my number.
Q How could he text you through your phone?
A He could have been with me. People do that

Page 141

sometimes, where you'll text from their phone so they have your number so they can add it to your phone. I don't remember what happened that night and I don't know when he got home. Like, I don't know when he left time-wise, so I don't know if I texted that to him. He could have texted that from my phone to him. I'm just making the point that I don't remember.
Q The investigators offered you an opportunity to review their preliminary report; correct?
A Yes, they did.
Q Did you do so?
A Prior to the panel I did not.
Q Why not?
A Because they didn't give me a long enough time period to review it and I was not able to get off work to go look at it.
Q How long a time period did they give you to look at it?
A From when they let me know when it was to when I was actually able to look at the report, I remember it being a few days.
Q Did you ask for more time to look at it?
A I didn't think there was going to be anything in there that I had to review, so I didn't.

36 (Pages 138 - 141)

Page 142

Q So it didn't matter how much time they gave you to look at it, you didn't intend to review it?
A If I had more time, I most likely would have gone up there, but I discussed with Kasey whether she thought that it would be a good idea for me to look at it, and considering I had to work and I was trying to focus on that, I -- with that short of a time period, I didn't. With a longer time period, I don't know, I might've.
Q You might have?
A I can't speak to whether I would've or I wouldn't have. It's a different set of circumstances, I don't know.
Q What do you mean?
A I can't say if I had done something if the circumstances were different, if I had a longer time period, I can't speak to that.
Q Let's take a look at Deposition Exhibit 9. Deposition Exhibit 9, at the bottom of the third page, Ms. Sermersheim refers to the audio recording. Do you see that?
A In the last paragraph?
Q Yes.
A Yeah.

Page 143

Q She does this under the heading of her conclusion that a preponderance of the evidence showed that you knowingly provided false statements regarding your accusations against [redacted]
A Yes.
Q Do you contend in this case that it was retaliatory for Dean Sermersheim to rely upon the audiotape evidence to reconstruct your intent?
A I think that the conclusions that she drew from them were -- that was the issue that I had. It wasn't the fact that she used a piece of evidence to determine whether or not an assault had happened, it was the conclusions that she drew from that that I took issue with and that -- later in that paragraph her saying, quote, a reasonable person would not draw that same conclusion, and doesn't define why she defines something as reasonable. She doesn't back that up with anything. That is the issue that I have with that and why I think that the decision was retaliatory.
Q Are you contending that her discussion of the audiotape was a pretext for a retaliatory

Page 144

intent?
MR. MACEY: Object, sorry, that's a -- to the extent that it calls for a legal conclusion.
A Can you reword that, possibly?
Q Are you contending in this case that Dr., Dean Sermersheim's thought process was anything other than exactly what she describes?
A I believe that she -- the conclusions that she drew are not based in how victims respond to trauma, and, among other things, that's what I believe. She talks about remorse being something that is not reasonable, and many victims of sexual assault face guilt and shame because of what happened and that's completely normal, especially in the week following what happened, that's extremely normal for victims to feel. And I feel like the conclusion that she drew was not informed considering the level of training she is supposed to undergo to be in her position.
Q I'll come back to your statement about shame, but I want to stay with my pending question. My pending question is whether you dispute that Deposition Exhibit 9, including the discussion of false statements on the third page, is an

Page 145

accurate description of Dean Sermersheim's reasoning process, her own reasoning process.
A I agree that that was her reasoning process; I don't agree with the reason behind it.
Q You don't agree with the conclusion?
A I don't agree with the conclusion or the steps that came to that conclusion.
Q You find fault with her reasoning, but you don't dispute that this is the reasoning she employed?
A Yes.
Q Is it not true that people who engage in infidelity experience remorse and shame?
A From my understanding, yes.
Q So the emotion of remorse and shame is not exclusive to sexual assault.
A It can be applied to many different situations, yes.
Q Taking a look at Deposition Exhibit 12, on page PU-Roe 1897 of Deposition Exhibit 12, there is stated a plan. Do you see that?
A Yes.
Q Under the plan, it says "Patient will come tomorrow to have blood testing done." Did you do that?
A I don't remember if I did or not.

Page 146

Q It says "Patient will bring clothing, undergarments, and bed linens to PUSH for deposit as evidence (probably tomorrow)." Did you do that?
A No, I did not.
Q Why not?
A Because I didn't leave my room the entire week, and I didn't want to leave, and I didn't want to interact with people other than when I went home to be with my family.
Q When you came back from going home, did you take in evidence?
A No.
Q We've looked at some passages in documents this afternoon where you refer to bruising on your neck. Do you recall those?
A Yes.
Q You did not refer to any bruising on your arm, did you?
A I don't remember referring to that.
Q So you hadn't noticed any bruises on your arm?
A I don't remember.
(Deposition Exhibit 13 marked for identification.)
Q This is Exhibit 13. Do you recognize Deposition

Page 147

Exhibit 13?
A Yes.
Q What is it?
A It's the incident report that [redacted]'s RA, Puneet, had filed.
Q Why were you meeting with Mr. [redacted]s RA?
A I had met with Puneet about -- like, he was just a guy that I was kind of friends with, so I felt comfortable with him, and I wanted to talk with him about my assault and also an issue that I had with someone on my floor, my dorm, and he was an RA in that dorm as well.
Q You had already at this time made reports of your assault to an RA in your own dorm and to PUSH and Ms. Richardson.
A Yes.
Q Why were you making another report to Mr. [redacted]s RA?
A Because I had disclosed to him what had happened to explain a different situation.
Q Which was tension with somebody else in that dorm?
A Yeah, yeah.
Q Let's take a look, again, at Deposition Exhibit 9. Excuse me, I said the wrong document. Just

Page 148

a moment.
(Deposition Exhibit 14 marked for identification.)
I'm handing you Deposition Exhibit No. 14. Do you recognize this document, [redacted]
A Yes, I do.
Q What is it?
A This is my second appeal letter. This one was to Alysa Rollock.
Q Who wrote Deposition Exhibit 14?
A I did.
Q Did anybody assist you?
A I think that possibly Kasey looked at it. I don't remember, though.
Q Looked at it or participated in writing it?
A I think she might have, like, read over it, but I don't think she actively participated writing it, as far as I remember.
Q At the time you wrote Deposition Exhibit 14, what was your familiarity with the literature on sexual assault?
A That's something that I'm very passionate about. That's something that I can see myself pursuing a career helping victims of sexual assault, so I would say I'm very well versed on it.

Page 149

Q That's not my question. My question was: At the time you wrote Deposition Exhibit 14, what was your familiarity with the literature on sexual assault?
A Very well versed, I would say.
Q How did that come to be?
A I think that after -- I think in high school that was always something that I could see myself pursuing. I had done projects in high school related to sexual assault and sexism and other things related to that, how sexual assault affects women, and I think especially after what had happened at Ball State, I became -- I informed myself a lot more on it. I also attended support groups at times, so I would say that I learned a lot about it in order to be able to process what had happened to me.
Q You state at the top of the second page of Deposition Exhibit 14 "As a result of my assault, I turned to several of these behaviors." Do you see that?
A Yes, I do.
Q What behaviors did you turn to?
A The ones that I'm referencing here included cutting. I already had issues with eating, so