UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION
CAUSE NO. 4:18-cv-00089-JEM

MARY DOE and NANCY ROE, )
)
Plaintiffs, )
)
vs. )
)
PURDUE UNIVERSITY and ALYSA ROLLOCK )
and KATIE SERMERSHEIM, in their official )
and individual capacities, )
)
Defendants. )

---

The deposition upon oral examination of KATHERINE SERMERSHEIM, a witness produced and sworn before me, Lisa C. Pierce, a Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiffs at the law offices of Stuart & Branigin LLP, 300 Main Street, Suite 900, Lafayette, Tippecanoe County, Indiana, on February 4, 2020, commencing at the hour of 9:13 a.m., pursuant to Applicable Rules of Procedure, with written notice as to time and place thereof.

APPEARANCES

FOR THE PLAINTIFFS:
Jeffrey A. Macey
MACEY SWANSON LLP
445 North Pennsylvania Street
Suite 401
Indianapolis, IN 46204
P: 317.637.2345
F: 317.637.2369
E: jmacey@maceylaw.com

FOR THE DEFENDANTS:
William P. Kealey
Joseph H. Harrison
STUART & BRANIGIN LLP
300 Main Street
Suite 900
Lafayette, IN 47902
P: 765.423.1561
F: 765.742.8175
E: wpk@stuartlaw.com
jhh@stuartlaw.com



INDEX OF EXAM

Page
DIRECT EXAMINATION..................
Questions by Jeffrey A. Macey 4

INDEX OF EXHIBITS

Page
Deposition Exhibits Previously Marked:
Exhibit 1 - University Investigator's Report - [redacted]..... 14
Exhibit 2 - Handwritten Notes........ 26
Exhibit 3 - [redacted] Appeal............. 23
Exhibit 15 - Letter from Alysa Christmas Rollock - September 1, 2017 34
Exhibit 16 - Letter from Alysa Christmas Rollock - October 17, 2017 34

Deposition Exhibit:
Exhibit 17 - Letter from Katherine L. Sermersheim, Ph.D....... 34



9:13 a.m.
February 4, 2020
KATHERINE SERMERSHEIM,
having been first duly sworn to tell the truth, the whole truth, and nothing but the truth relating to said matter, was examined and testified as follows:
THE WITNESS: I do.
DIRECT EXAMINATION,
QUESTIONS BY MR. MACEY:
Q. Could you state and spell your name for the record.
A. Katherine L. Sermersheim, S-e-r-m-e-r-s-h-e-i-m. And it's Katherine with a K, e-r-i-n-e.
Q. And the -- can you give me the pronunciation of your last name again.
A. Sermersheim.
Q. Sermersheim.
A. Yes.
Q. Okay, thanks. I didn't want to -- there's nothing more passive/aggressive than mispronouncing someone's last name repeatedly. And, Ms. Sermersheim, you're currently Dean of Students at Purdue University?
A. That is correct.
Q. Okay. And how long have you been in that position?
A. Since August 1st of 2015.



Q. Dean Sermersheim, my name is Jeff Macey. I'm an attorney for [redacted] and [redacted] in a case they've brought against yourself, Vice President Alysa Rollock and Purdue University stemming from their discipline by the university. Are you aware of this case?
A. Yes.
Q. And obviously that's why we're here today, to take your deposition, correct?
A. Yes.
Q. Okay. Have you ever had your deposition taken before?
A. Yes.
Q. Okay. And how many times?
A. Once before.
Q. Okay. Was it in a case of -- like this, over a disciplinary action at Purdue?
A. No.
Q. Okay. Okay. Well, the ground rules are probably gonna be the same as they were when you were deposed previously, but I want to run through them just quickly. And really they're not my rules. As you can see, a court reporter's taking down everything we say. At the end of the day all we're gonna have to know what went on here is the

transcript.
So to that end, I'd ask that we try and keep the transcript as clean as possible. And by "clean" I don't mean no swear words, although that's okay. I mean, generally if you can wait for me to finish my question before you provide your answer, that way we'll know exactly what I asked and what you answered at the end of the day. Is that okay?
A. Yes.
Q. Okay. Similarly, if all your answers could be verbal rather than either inverbal [sic] or not -- nonverbal, or I would say, utterances like uh-huh or uh-huh. If we have clear answers to clear questions, that'll eliminate any communication -- or confusion after the fact. Is that okay?
A. Yes.
Q. Okay. And, finally, if you don't understand the question, just ask me to rephrase it or ask me to repeat it. Because oftentimes I'm following up and formulating my questions as we go. Sometimes they come out long or, in fact, eternally contradictory. So I'm happy to rephrase.
But if you do answer the question, I'm gonna presume, after this is over, that you understood



it. Is that okay?
A. Yes.
Q. Okay. And we can take a break at any time. It's not an endurance test. I'm anticipating a half day or less today. But we can take a break whenever, at your convenience. I would just ask that you answer the question pending before we break. Is that okay?
A. Yes.
Q. Okay. So, as you know, we're here -- I'm here on behalf of [redacted] And you were involved in the adjudication of -- and if "adjudication" isn't the right word, let me know -- but what we've called the adjudication of both their complaints of discrimination and/or harassment at Purdue, correct?
A. Incorrect.
Q. Incorrect. Okay. Which -- which one were you not involved in?
A. [redacted].
Q. [redacted]
A. [redacted]-
Q. Okay.
A. -- [redacted].
Q. Okay. You -- did you have no involvement at all in



that --
A. No in --
Q. -- process?
A. -- no involvement.
Q. Okay. Why was -- did Dean -- the Associate Dean Kelley Stier involved in that process?
A. I began my caseload, along with the other duties of my position, required some assistance. And so I began delegating cases to Dean Stier.
Q. Okay. How many cases did -- did you delegate to Dean Stier?
A. From --
Q. In that time period, that -- 2017/2018.
A. I don't recall.
Q. Okay, okay. Did you delegate it sort of on a random basis? Or did you review the case prior to delegating it to Dean Stier?
A. Random basis. More so based on scheduling.
Q. Okay. Did Dean Stier report to you in determining the case, or did she have full authority to decide the case?
A. Full authority.
Q. Okay. Did Dean Stier -- to your knowledge did Dean Stier consult with you at all about the determination of [redacted] case?



A. I do not recall specifically, but that is not the standard operating procedure.
Q. What is the standard operating procedure within a delegation?
A. She handles the case in its entirety.
Q. And by the case and the -- by a dean handling the case in the entirety, does that mean a -- does that start -- I guess, how does -- how does a case start for the Dean's Office?
A. Generally the Office of Institutional Equity would have received the report. Much of the behind-the-scenes, excuse me, logistical process is handled by my executive assistant. And so she's probably the one that would have seen scheduling conflicts. And there was a form letter under my name delegating the -- the role of decisionmaker to Dean Stier.
Q. Okay.
A. And so from there Dean Stier would be the person that would convene the panel here, preside over the panel meeting, make the determination. And the decision would be sent out under her name. Excuse me.
Q. And after the decision's sent out in her name, does she -- does she send you a draft, circulate a draft

Page 10

to check on, Okay, is this okay? Or does she have full authority to just send a decision out?
A. Full authority.
Q. Okay. And then the appeal from that decision goes to Vice President Rollock?
A. Correct.
Q. And it doesn't go through your office?
A. Correct.
Q. Okay. Then let's start with [redacted]. Do you remember [redacted]?
A. I remember the case.
Q. Okay. Did you -- I think you met her at least once at the panel meeting; is that correct?
A. I believe she was present for the panel meeting.
Q. Okay. And -- and you were present as well?
A. Yes.
Q. Okay. And can you tell me a little bit about what generally goes on at a panel meeting?
A. Yes. Generally a panel meeting will last approximately three to four hours, or it's scheduled for that. A panel meeting has three faculty or staff members who are trained to be on these panels in their questioning and their understanding of various aspects and definitions within the policy.

Page 11

We are in a room similar to this. The panel will sit on one side of the table. I, as the decisionmaker, sit at the head of the table. And then throughout our process we will bring in, generally speaking, the complainant and their support person, if they choose to have one; then the respondent and their support person, if they choose to have one; then the investigators. Generally that is the scheduling. But it really would depend on people's schedules of whether or not that were to occur.
Q. So this doesn't occur in just one long day session? It's a -- is it three --
A. It is -- it is one long --
Q. Okay.
A. -- day session.
Q. Okay. Are the investigators in the room with the complainant and/or -- or the respondent? Or do they -- are those three separate interactions?
A. Three separate interactions.
Q. Okay. Do you remember if the respondent in [redacted] case had a support person present?
A. I do not recall.
Q. Okay. When you say the faculty members are trained, what did you mean by that?

Page 12

A. The Office of Institutional Equity runs a training session for those whom have expressed interest in being a panel member. They would discuss things about the definitions involved in the Anti-Harassment Policy. They would discuss general themes of trauma, informed decisionmaking. They would deform -- discuss incapacitation versus intoxication and a host of other things.

And, again, that training is run through the Title IX office and Office of Institutional Equity.
Q. And what is the role of the panel in the decision-making process?
A. The role of the panel in the decision-making process is to make recommendations. The decisionmaker in -- when it -- yeah, either myself or Dean Stier -- Stier, is to make the final determination. The panel assists via the questions that they ask, the clarifying questions. And at the end of the time together, I ask the panel whether or not they believe there's a violation to the Anti-Harassment Policy. It does not, of course, require consensus. But generally you'll have that.

But they make a recommendation that they find a violation. If they find a violation, then I

Page 13

further ask for their assistance in brainstorming possible sanctions. If they don't believe there's a violation, then -- and I concur with that, where we conclude.
Q. Okay, okay. You mentioned generally there's a consensus. But you have the ability to, I guess, overrule -- it's not -- if it's a recommendation, it's not really overruling, but -- but just make the final determination yourself, correct?
A. As the decisionmaker I make the final determination.
Q. Okay. And the evidence presented in the panel is developed by the investigators, correct?
A. The evidence in which I use to make my decision is based on the Investigator's Report and any kind of additional information that may come through the meeting, panel meeting.
Q. And what -- what is the benefit of having the panel rather than just having you meet with the investigators and the -- and the parties?
A. It's twofold. The students going through the process definitely appreciate the opportunity to verbalize, to be present in front of the person making the decision. They find great value in being able to have a face-to-face.

Page 14

As the decisionmaker I appreciate the panel to ensure that all possible questions, clarifying questions, additional insight come to fruition through the process. It's very difficult to make a determination between two people as a Dean of Students to students.
Q. Right.
A. And the additional eyes, ears and perspectives is very helpful.
Q. In terms of -- you mentioned the investigation report. And I'm gonna just show you two -- well, it's one report. But it's -- you'll see. Show you what's been marked as Exhibit 1. And that appears to be the Investigator's Report generated by Karen Bell Meyers and Christie Wright with regards to [redacted]. Have -- are you -- have you seen that before? I'm --
A. Yes.
Q. -- assuming you have. Okay.
And it mentions that -- that Karen Meyers and Christie Wright were appointed by the Dean of Students to -- as the coinvestigators in the university pursuant to the resolution process of the procedures for resolving complaints of discrimination and harassment. Is that -- is that

Page 15

accurate? You appointed Karen Meyers and Christie Wright?
A. Yes.
Q. And how did you decide that Karen Meyers and Christie Wright were the investigators that were gonna be investigating this?
A. This is one of those behind-the-scenes procedural things that my executive assistant likely called whoever the Title IX officer was then saying, What's the caseload look like? Who's in the queue?
Q. Okay. So it's just really a workload issue and -- and it's a -- it's almost -- it's an administrative function from -- even from your executive assistant.
A. Correct.
Q. Okay, okay. So there was nothing about -- when you got this case, there was nothing, like -- you know, like, I -- I need Christie Wright on this case because there's something about this case that requires her expertise.
A. That is correct.
Q. Okay. That -- that did not happen.
A. Did not happen.
Q. Okay, okay. Okay. I didn't -- I didn't think it did. I just wanted to make sure.

Page 16

Okay. So after your office makes that appointment to the investigators, when is your office next involved in the resolution of the complaint?
A. It depends. Generally speaking, the letter to assign the investigators happens, and we wouldn't see it again until the Investigator's Report comes in, and now it's time to schedule the panel meeting.
Q. Okay. And -- and you said generally speaking. What are the exceptions to that -- to that rule?
A. Exceptions that are in my recent recall would be the investigators may write me and ask for an extension to the deadline based upon a new witness, based upon the scheduling of witnesses they need more time.
The other exception that may come to mind is if there was a no-contact order or a ban from a particular area on campus that either or both parties were asked to stay away from. So, in other words, a violation to a directive while the investigation was going on. That would prompt my involvement for an additional letter and/or an additional process.
Q. Okay. Did either of those, in -- in your memory,

Page 17

happen in the [redacted] case?
A. I don't believe so, but I do not the recall.
Q. Okay. And how about [redacted]? I know it was Dean Stier's issue. But did anything come back from the investigators, to your knowledge, during the investigation process of that case?
A. I do not know.
Q. Okay, okay. But nothing that you -- you're aware of.
A. Correct.
Q. Okay. Did you -- okay. You mentioned you get the report, and then it's time to set up the panel. Is that the next step?
A. Yes.
Q. Okay. Do you review the report before the panel?
A. Before the panel, yes.
Q. Okay. And how long is there -- is there a rule about how long you have the report before the panel is scheduled?
A. No.
Q. Okay. The scheduling of the panel depends on availability.
A. Correct.
Q. Okay. Do you remember receiving [redacted] report prior to the panel?

A. Clarify, please.
Q. Do you remember receiving the report from the investigators before you went -- yeah.
A. Do I remember receiving the Investigator's Report --
Q. Yeah.
A. -- prior to the panel?
Q. Yeah.
A. Yes.
Q. Okay. What do you remember about that?
A. I remember reading the Investigator's Report prior to the panel, as I do for each panel meeting.
Q. Okay. Did anything in particular stick out in your mind about the Investigator's Report in the [redacted] case?
A. I read it for the -- the evidence provided. And then I go into the -- the panel meeting for clarifying information.
Q. Okay. Do you follow up with the investigators before you go into the panel meeting? Or is the first -- and let's talk specifically about [redacted]. Did you follow up with the investigators prior to the panel meeting, or did you first speak to the investigators about the report during the panel meeting?



A. I first spoke with the investigators about the report during the panel meeting.
Q. Okay, okay. The reason I asked whether something stuck out about it is, as I'm sure you're aware, there's this issue of a recording made by the respondent that was discovered as part of the investigation. Did that trigger for you any, I guess I would say, any need to conduct some additional processes in the case?
A. I don't recall asking for additional processes.
Q. Okay. Did you listen to the recording prior to the panel meeting?
A. I don't recall.
Q. Do you -- do you recall, as we sit here today, the nature of that recording?
A. Yes.
Q. Okay. Do you know if [redacted] had an opportunity to listen to the -- to the recording prior to the panel meeting?
A. I do not know.
Q. Did she listen to it at the panel meeting?
A. No.
Q. Okay. Prior to the finalization of the Investigator's Report, there's a preliminary report prepared by the investigators, correct?



A. Yes. That is standard process.
Q. Okay. During -- and whether or not the -- the standard process is deter -- is determine by the Office of Institutional Equity, correct, not by the Dean's Office.
A. Correct.
Q. And, in fact, the Dean of Students does a lot more than just these type of student-on-student complaints, correct?
A. Correct.
Q. Okay. What -- what percentage of your duties are spent on these types of student complaints?
A. Can you elaborate on "these types," please.
Q. I -- I -- I guess any -- on the types of complaints that result in the -- a determination under the Anti-Harassment Policy.
A. It has varied over my four-and-a-half years. Now or currently it is probably about five percent.
Q. Okay. How about in, like, 2017?
A. Ten percent.
Q. Okay. Is that -- are there fewer complaints now or --
A. It is as a result of being able to delegate Dean Stier to assist me with the caseload. That is the cause of the reduction.



Q. Okay. Okay. And was that a decision you made to begin delegating to Dean Stier, or was that a decision made by someone else?
A. A decision I made.
Q. Okay, okay. Okay. And I think we're talking about -- prior to my digression we were talking about the preparation of the preliminary report. Do you know if [redacted] had an opportunity to review the preliminary report?
A. I do not.
Q. Okay. Do you know when she first had the opportunity to review the recording?
A. I do not.
Q. Okay. How long are these -- is an ordinary panel meeting, total, with all the different parts of it?
A. Generally they are scheduled for three to four hours.
Q. Okay. Do you remember if [redacted] panel meeting was three or four hours?
A. I do not recall.
Q. Okay. Do you remember that panel meeting, any of the details of that panel meeting at all?
A. Vague recall.
Q. [redacted] attended with Casey Richardson; do you -- is that correct?

Page 22

A. Yes.
Q. Okay. And was she the first person in there, or had the investigators already been in before [redacted] was in there?
A. I don't recall. Standard process would suggest that the investigators were saved for last.
Q. Okay.
A. However, there's been a few funky scheduling complications before.
Q. And is it usually complainant, respondent, investigators?
A. The complainant and respondent can flip-flop based on availability. Investigators tend to be last for clarification of anything new that came up.
Q. Okay. And do you remember -- the -- the panel has an opportunity, obviously, to ask questions of the complainant, correct?
A. Correct.
Q. And do you remember the questions that the panel asked of the complainant?
A. I do not recall.
Q. Do you remember anybody asking [redacted] about her drinking, whether she had a problem drinking?
A. I do not recall.
Q. Okay. Gonna show you what's been marked as an

Page 23

Exhibit 3. I don't want to mess up the stack.
And, Dean Sermersheim, I'm gonna represent to you that this is a document prepared by [redacted]. And the last few pages are an attachment of medical records. What I don't know is whether she submitted this to you or she submitted it to Vice President Rollock. Do you -- do you know if you -- you'd seen this doc -- she submitted this document to you in connection with her --
A. I do not recall ever seeing this document.
Q. Okay. Now, if you look on the last page, there are medical findings made by a nurse practitioner. Do you recall seeing that, these medical findings?
A. I do not recall.
Q. Okay. And if we look on a summarized finding, it's letter N there. It says, Ecchymosis on neck. Tenderness in suprapubic labial vaginal -- and I don't know what that next word is. And anal rectal areas. Tenderness on right inner arm, left side and back and tenderness and faint ecchymosis on soft pallet.
Were you aware that these injuries had been found on [redacted]?
A. I do not recall.
Q. Okay. Do you remember talking about it at all

Page 24

on -- at the panel report or at the panel meeting?
A. I do not recall.
Q. Okay. Did -- now, obviously -- and, again, I apologize when I ask an obvious question, but I just want to get it in the record. Obviously injuries -- diagnosis of injuries or a finding of injuries are relevant to a determination of whether a sexual assault occurred, correct?
MR. KEALEY: Object to the form of the question. You may answer.
THE WITNESS: Injuries -- if there were documented injuries that could have an impact on the panel.
MR. MACEY: Yeah.
THE WITNESS: Is that --
QUESTIONS BY MR. MACEY:
Q. It depends. But if -- if there are documented injuries, it's relevant to the -- the panel's analysis of whether a sexual assault occurred.
A. It would be taken into consideration.
Q. Right. And would you expect an investigator who was reviewing a complaint of sexual assault to inquire into whether there had been documented injuries from the sexual assault?
MR. KEALEY: Object to form. You may answer.

Page 25

THE WITNESS: Thank you. I would appreciate a thorough review of the case.
QUESTIONS BY MR. MACEY:
Q. The -- when you receive the Investigator's Report, just like the one you received in Exhibit 1, the investigators make a series of suggested factual findings, correct?
A. Generally in their report, yes; that is correct.
Q. Are you reliant on the facts that they present to you? Or are you able to go out and do more factfinding?
A. I am reliant on the report in that it is providing the -- the information that is available to me.
Q. Okay, okay. And that information is the investigators' analysis of the evidence.
A. The information -- evidence and information they collect as a result of their interviews.
Q. And -- and the investigators don't prevent -- they don't kind of do the view from nowhere: This person says this; this person says that; this person says this; this person says that. Instead they summarize finding -- summarize the evidence and make suggested conclusions.
MR. KEALEY: Object to form. You may answer.
THE WITNESS: They do both.

MR. MACEY: Okay.
QUESTIONS BY MR. MACEY:
Q. Okay. Do you get -- when you're in the -- I want to show you Exhibit 2.
When you're making the determination, do you get these -- Exhibit 2 is a -- a set of notes. Do you get the underlying notes from the investigators?
A. I do not.
Q. Do you get an -- and, oh, go ahead. I'm sorry.
A. Can you elaborate on what this is.
Q. I'm sorry. These are -- this is just an example of notes, of an investigator's notes.
A. Investigator's notes.
Q. Do you -- do you receive investigator's notes?
A. I do not.
Q. And these notes are actually for the [redacted] case. So I'm not gonna ask you to talk about them.
A. Okay.
Q. I just wanted to show you notes. Do you get any other raw materials from the investigation?
A. I do not.
Q. Okay. So if you look -- okay. If you look at Exhibit 1, you'll see that pursuant to the complaint -- I'm sorry, Page 4, the Investigator's



Report, that pursuant to this complaint we also reviewed the following documents, information, redacted response to the complaint. There are ten things, right? Harrison Hall videos and still, messages between X and Y.
Do the investigators provide all of these documents to you or -- or -- or information to you independently? Or do you just get their summary of -- of those?
A. For these items listed here, we would have received them in their report and/or as an addendum. So, to be clear, when you handed me these notes and referenced raw material, I'm referencing raw handwritten notes.
Q. Uh-huh. Okay. Okay. But they -- but if it's listed in the -- in the report, generally you received the -- the materials listed in the report; is that accurate?
A. Yes.
Q. Okay. Did you -- do you remember [redacted] reaction at all to the panel meeting while she was in there?
A. I do not.
Q. Okay. Was that panel meeting -- and if you don't remember you don't remember. But was the panel



meeting, was it adversarial towards [redacted]?
A. I do not recall. Side-bar, my role as the panel facilitator, I would not allow it to feel adversarial to either student.
Q. Okay. If -- at the outset of the panel meeting, were you aware that [redacted]s was facing or could face possible discipline for her statements to the investigators in connection with this, with her complaint?
A. Will you repeat the question?
Q. Yeah. I -- when -- when the panel meeting began, were you aware that [redacted] could face discipline for her statements to the investigators?
A. I don't recall.
Q. Okay. Is there a time you became aware that [redacted] was now going to be or was now facing potential discipline for her statements in connection with her complaint?
A. I certainly don't recall the exact moment. But by the time I was writing my decision letter, I clearly thought that would -- that was the direction I was going in.
Q. Okay. Had you done that -- had you made that determination before [redacted], that there was a potential for a -- a complainant to -- to face



disciplinary action?
A. Never in the Anti-Harassment Policy process.
Q. Okay. Why did you make that determination for [redacted]
A. I believe that [redacted] lied.
Q. Okay. What did you believe she lied about?
A. I believe [redacted] lied about the sexual encounter that she had with the respondent to cover up the encounter with someone else that was not her boyfriend.
Q. Okay. Now, she had disclosed prior to the complaint to her boyfriend that she'd had this encounter, correct?
A. I do not recall.
Q. Okay. Let me ask it this way: Why did you think that she had done this? What -- what -- what about covering it up made -- I guess, why did you think she was lying?
A. The evidence presented in the investigator's report, coupled with information that was shared in text messages and the audio recording, led me to believe that her statements were dishonest.
Q. Did you believe that [redacted] was intoxicated at the time of the incident in her dorm room?
A. It is likely that she was intoxicated.

Page 30

Q. How intoxicated did you think she was?
A. I could not speak to that.
Q. Did you -- did you think that she had any memory of the incident?
A. I cannot speak to her memory of the incident.
Q. The recording. When was the last time you listened to the recording?
A. The conclusion of the case, prior to my decision. So 2017.
Q. Okay. Do you remember if it was edited at all?
A. I do not recall.
Q. Do you know if the investigators inquired whether [redacted], the respondent, had edited the recording at all?
A. I do not recall.
Q. Did the existence of that recording concern you? Obviously [redacted] was disciplined for -- for doing it, correct?
A. Uh-huh.
Q. Sorry. Is that yes or no?
A. Oh, sorry. Yes.
Q. Okay. Been trying to figure out how to ask this for three days, so I'm just gonna say it how I would ask it. When I hear that he surreptitiously recorded her, my instinct is to think that's

Page 31

evidence of a guilty conscience on his part. Did you see it that way at all?
A. I did not.
Q. Okay. Why -- why didn't you see it that way?
A. In his statement, if I'm recalling correctly, but again the summary, he felt as though the facts involving the circumstance, he was distrustful of her with all of the dynamics within the fraternity. He has now slept with a new member's girlfriend. And he thought to cover himself, CYA, cover your ass, he shared that he recorded for his own protection.
Q. The next logical inference I make from that is: Well, shouldn't he have refrained, if there were going to be issues with whether there had been consent or not? Or did you -- shouldn't he have refrained from engaging in the sexual activity at all?
A. As I recall, the recording was post intercourse. So I can't speak to what he should have done.
Q. Well, he shouldn't have made that recording or --
MR. KEALEY: I don't know if she was finished with her ques --
MR. MACEY: Oh.
MR. KEALEY: -- answer.

Page 32

QUESTIONS BY MR. MACEY:
Q. Oh, were you? I'm sorry.
A. I'm fine.
Q. Okay. Well, he -- he shouldn't have made that recording though, correct?
A. According to policy he should not have made the recording.
Q. And he was over 21, correct?
A. I do not recall.
Q. You know that he was serving drinks to her that night?
A. I do not recall.
Q. And she was under 21, correct?
A. I do not recall.
Q. But these are relevant issues, correct?
MR. KEALEY: Object to form. You may answer.
THE WITNESS: They could have relevance to other policy violations. But I -- I just don't recall the specifics.
QUESTIONS BY MR. MACEY:
Q. Okay. As -- as you sit here today, you don't recall --
A. Correct.
Q. -- those -- those details.
A. Correct.

Page 33

Q. Do you know if she had fallen asleep prior to him taking those recordings --
A. I --
Q. -- taking the recording?
A. -- I do not recall.
Q. Do you know about what time he made that recording?
A. I do not recall.
Q. As you said, he made the recording post intercourse, correct?
A. As I recall it, it seems that it was post intercourse, continual sexual activity.
Q. Do you know if she -- if -- if [redacted] actually consented to each part of the sexual activity that evening?
A. I do not recall specifics. I recall, via the audio recording, that a reasonable person would believe there was -- consent was certainly occurring during the audio recording.
Q. After the panel meeting -- how long between the panel meeting and your issuance of the determination in the [redacted] case; do you remember?
A. I do not recall.
Q. Typically how long would that take?
A. Policy allows me to have up to ten days following a

panel meeting to make my determination.
Q. Okay. Do you generally write any of that prior to the panel meeting?
A. Prior to the panel meeting? No, I do not.
MR. MACEY: Can we go off the record for one second?
MR. KEALEY: Sure.
(A discussion was held off the record.)
MR. MACEY: Back on the record.
QUESTIONS BY MR. MACEY:
Q. Dean Sermersheim, the court reporter's handed you Exhibit 16. Take a second to look at it. And then tell me what that is, if you don't mind.
A. It appears to be the appeal decision from Vice President Rollock to [redacted].
Q. Oops. I mis -- I mislabel labeled that. Okay. Then let me show you Exhibit 15 first.
(A discussion was held off the record.)
(Exhibit 17 was marked for identification.)
MR. MACEY: Back on the record.
QUESTIONS BY MR. MACEY:
Q. Let's start that over. I misnumbered the exhibits of my own files here.
Exhibit 17, do you recognize that document?
A. I do.



Q. Okay. And this is a determination -- well, I guess what's the -- final determination letter, is that what we would call this?
A. Correct.
Q. Okay. And you mentioned that ordinarily you -- you do these within ten days of the panel meeting, correct?
A. Correct.
Q. Do you know if you did that in this case?
A. I assume so.
Q. So the panel meeting, what, was towards the beginning of the school year or the end of the summer in this case? When's your school -- when does your school year typically start?
A. Third week of August.
Q. Okay.
A. So looks like if this was -- I don't recall the specific date. Monday, August 7th.
Q. So you had spent time meeting [redacted] during the panel meeting, correct?
A. I assume so, yes.
Q. Okay. But do you -- do you remember -- do you remember your conversation with her at all?
A. Not specifically, no.
Q. Did you ask her questions, or do you rely on the



panel to ask questions?
A. I do not recall if I asked her any questions. Generally I allow the panel -- I rely on the panel members to ask most of the questions. And generally I will ask any clarifying questions towards the end. So it's not -- not unusual that I would ask questions, but I do not recall on this.
Q. And do you -- during that time do you have an opportunity to sort of evaluate a complainant, in this case [redacted] credibility?
A. Certainly.
Q. Okay. And what -- did you evaluate her credibility during that meeting?
A. I'm sure there was some credibility evaluation taking place.
Q. Okay. Do you -- do you remember it? Like, what your impressions of her were?
A. I don't recall impressions of her. I do recall at some point weighing the evidence presented in the Investigator's Report: The recording, text messages, and likely what was presented during the panel meeting.
Q. Okay. Did -- but do you remember from your interaction with her during that panel meeting forming a negative impression, just based on your



interaction with her, of her credibility?
A. I do not recall.
Q. Okay. Is it helpful during the panel meeting to sort of get a sense of who you're dealing with in terms of the complainant and respondent?
A. Only from the sense of clarifying what would be in the Investigator's Report or if it contradicted what's in the Investigator's Report. Stating that generally, I do not recall specifics on this one.
Q. Okay, okay. In the final determination letter, it looks like there are three italicized section headings. Do you see those?
A. Yes.
Q. Okay. And the first is, I find a preponderance of the evidence that redacted -- we know it's the respondent -- is a credible witness in this matter, correct?
A. Correct.
Q. Okay. And the second one is, I find that by -- find by a preponderance of the evidence that you were not incapacitated. Do you see that?
A. Correct. Yes.
Q. And then in the subs -- you know, the immediately following paragraph you presumably are laying out the reasons you find that she was not

Page 38

incapacitated, correct?
A. Correct.
Q. What did "incapacitated" to you mean?
A. Incapaci -- "incapacitated" means unable to give consent.
Q. Okay. And I'm just gonna walk through the evidence. And I'm -- I'm -- I'm curious why this is evidence that she was not incapacitated. Okay? The investigators noted that -- and I'm -- from the same paragraph. The investigators noted that you walked through the lobby without any problems and that you swiped yourself into a secured area of the residence hall.
Did you believe that that indicated that she was able to give consent?
A. Yes.
Q. Okay. You left the respondent in a restroom, spoke with your RA and obtained a key to your room from the clerk in the residence hall.
Was that evidence to you that she was able to give consent?
A. And therefore not incapacitated, yes.
Q. Okay. And the following you've already talked about. But, additionally, the audio recording demonstrated that you were able to think of the

Page 39

potential consequences of your actions and were concerned that your boyfriend would learn of the encounter with the respondent.
A. Correct.
Q. And that's evidence that she was not inc -- was -- was able to give consent and therefore was not incapacitated.
A. Correct.
Q. And same for the next sentence, correct?
A. I'm sorry. Which sentence?
Q. The -- the very next one. The audio also demonstrates that were you able to make plans with the respondent for the following day.
And that was evidence that she was not inc -- incapacitated?
A. Correct. If she is speaking and making plans, she is not incapacitated.
Q. Okay. Now, [redacted] explained -- well, I don't know if she explained to you. She -- did -- did [redacted] explain to the panel, where you're present, that she didn't remember exactly what had happened in her dorm room that night?
A. I don't recall specifically.
Q. Did any -- do you remember anybody inquiring into what she remembered from that evening, from that

Page 40

night?
A. I don't recall.
Q. And then if you look at the third page, in the bold sentence. Given my concerns regarding your accusations against the respondent, I am referring you to the Office of Student Rights and Responsibilities to assess whether you engaged in conduct for which you may be subject to discipline. And then you list the policy, correct?
A. Correct.
Q. And this is the first time you'd done this in an anti-harassment complaint.
A. Correct.
Q. Okay. Why you did you make the -- and -- and not -- I understand why you thought she should be subject to discipline. But why did you refer her to the Office of Student Rights and Responsibilities?
A. I recall there trying to figure out which policy was the best route. And so with it being the first of its kind, I was uncertain whether or not I should be weighing in on that while trying to make a decision on whether or not there was a violation to the Anti-Harassment Policy or if here there was a -- a policy that should be reviewed by the

Page 41

Conduct Code.
Q. Okay. And why did you believe it should be reviewed under the Conduct Code?
A. I believe I had conversations with my legal -- legal counsel. And, again, first of its kind, we had determined it would be best to let a separate entity determine the -- whether or not there was a violation to a false report.
Q. Okay. Who would have made the determination about the -- her conduct, if it had gone to the Office of Students' Rights and Responsibilities? Who -- who at Purdue is responsible for that?
A. It would have been a panel of Community Standards Board, CSB. And the conduct process would have been managed by the Director of Student Rights and Responsibilities.
Q. And who -- who was that at that time?
A. Jeff Stefancic.
Q. And who did he report to?
A. He reported to me.
Q. Okay. But, in fact, her case was not ultimately sent -- referred to the Office of Student Rights and Responsibilities, correct?
A. That is correct.
Q. Okay. And could -- [redacted] had appealed to Vice

President Rollock. And Vice President Rollock revoked that referral, correct?
A. Correct.
Q. Did -- did you know that Vice President Rollock had the authority to revoke your referral to the Office of Student Rights and Responsibilities?
A. I don't -- I don't know.
Q. She's in a separate department than you, correct?
A. Correct.
Q. So how did it come about that she re -- revoked that referral?
A. She is the appeal officer, Vice President of Office of Institutional Equity. I can't speak to her decisionmaking.
Q. Okay. Did she have a conversation with you? I -- I've seen a letter and I can show it. But did she have a conversation with you outside the letter that she sent to [redacted]s announcing the revocation?
A. I have vague recall that she might have called with a professional courtesy to say, I think it's cleaner -- I'm paraphrasing --
Q. Yeah.
A. -- if you, as the decisionmaker of the Anti-Harassment Policy, also are the decisionmaker



of the false allegation.
Q. Okay.
A. And I will be sending that in my letter forthcoming.
Q. Okay.
A. I have a general recall of that happening.
Q. Did she say why she thought it was cleaner?
A. I do not recall.
Q. Did you think it was cleaner?
MR. KEALEY: Object to form. You may answer.
THE WITNESS: I don't really have -- I mean, it was her decision. I needed to now move forward.
QUESTIONS BY MR. MACEY:
Q. Did [redacted] have the opportunity for -- I guess, was there -- was there another investigation conducted specifically into [redacted] comments to the investigators as part of her complaint? Or did you rely on the Investigator's Report that's already -- that we've already talked about?
A. I don't recall.
Q. Was there, like, a second panel meeting where it was addressed to [redacted]onduct?
A. No, there was not.
Q. Okay. Would there have been a second independent investigation if it had gone to the Office of



Student Rights and Responsibilities?
A. Because it was a first-time effort and that got stopped, I'm not sure.
Q. Okay. We -- we don't know why -- we don't know what would have happened if it had gone to the Office of Student Rights and Responsibilities?
A. I do not.
Q. Presumably though, if there had been a -- was it -- let me start over.
Was it your intent that they would -- that the Office of Student Rights and Responsibilities then would open up a university investigation which [redacted] was the respondent?
A. Not necessarily. I just -- I recall just thinking that it needed to go somewhere else, in that I was reviewing one claim; this was a second claim. I hadn't thought through the process.
Q. Was part of the reason you thought it needed to go somewhere else the fact that if you're making the determination when you're acting to receive her complaint, you're also evaluating her as a potential respondent?
A. Ask that again, please.
Q. Yeah. Was part of the reason you thought it needed to go to the Office of Student Rights and



Responsibilities the fact that in your role you had been evaluating her complaint of harassment, and someone now needed to evaluate her in a role as a respondent? Did you feel that that was in conflict with the role that you had already been performing?
A. I don't know that I recall it being in conflict. With it being the first of its kind, I wanted to ensure tha[redacted] was getting as much of a fair process as she could.
Q. And that would have been, in your view, at the Office of Student Rights and Responsibilities.
A. At the time it felt like it should go somewhere else. As we're talking, I remember the downside of that, where I would have agreed with VP Rollock, was then a whole 'nother set of people would have to learn about [redacted] experience. And therefore it was -- the confidentiality of her process would be opened up much wider to now students, faculty and staff who had not been trained on the Title IX process. So it was actually to her advantage.
Q. Are the -- and I had forgotten to ask this earlier: Was the meeting with the panel recorded?
A. No. There is no recording.
Q. Is there --

A. Audio or video.
Q. Okay. Is there note taking?
A. Each individual -- nothing formal.
Q. Okay, okay. You mentioned that [redacted] was the first of her kind in terms of determining -- while you've been dean in terms of determining whether there were false statements in connection with the investigation.
And there was another student around the -- almost the exact same time where there were decisions made about whether she had made false statements in connection with the investigation. Was -- do you know if that was before? And then there was [redacted] who Dean Stier was handling. Do you know if the second student was before or after [redacted]? Or was it contemporaneous?
A. I do not recall. What I recall is this was the -- the first that it was a -- the case in which was in front of me.
Q. Okay.
A. Timeframe of everyone, I do not know.
Q. Was -- and all three of those were handled differently, correct? I mean, do you -- do you --
A. I do not recall.
Q. You don't know. Okay.



A. I believe we would have followed our Title IX Anti-Harassment Policy.
Q. Uh-huh. But I'm talking about in terms of the referral to the Office of Student -- or whether there was a referral to the Office of Student Rights and Responsibilities, whether the dean was supposed to make the decision, or whether some third party or some other entity was supposed to make the decision.
I -- I think I know at least three cases were handled differently under those procedures; is that correct?
A. I cannot speak to those other cases. I will reiterate, this was the first of its kind. And so we probably learned from our processes as a result of it.
Q. Okay. And the processes evolved from [redacted] to [redacted], correct?
A. I cannot speak to [redacted] case.
Q. What's the current process if a student is found to make a false statement or is -- I guess I'm not sure when the finding happened. But let's say there's a -- a question about whether a student made false statements in connection with an investigation. What -- what's the current process?



A. Present day, if I were to hear a case, do a panel meeting with a student that I believe lied, falsified information and/or filed a false report, I would, in addition to the decision that I make on the actual case, weigh in on a decision of the level of or the -- the dishonesty, the filing of the false report.
Q. Does the student get a second investigation into their conduct?
A. I do not believe so. I think we --
Q. So currently then is a student notified before the panel meeting that the investigators have suspicions about the student's statements?
MR. KEALEY: Object to form. You may answer.
THE WITNESS: I am not aware of -- of any process that would suggest that.
QUESTIONS BY MR. MACEY:
Q. Okay. Are you concerned that a student headed into the panel meetings now has to be prepared to address allegations of false statements --
MR. KEALEY: Object to form.
QUESTIONS BY MR. MACEY:
Q. -- or face discipline at Purdue?
MR. KEALEY: Same objection. You may answer.
THE WITNESS: I am not concerned.



MR. MACEY: Okay.
QUESTIONS BY MR. MACEY:
Q. The Title IX compliance process is -- I think you testified earlier, but I just want to make sure -- those are determined by the Office of Institutional Equity, correct?
A. Clarify, please?
Q. Yeah. The -- the compliance with Title IX, I think you mentioned there's training for the panel folks and -- and the procedures themselves. All of that is from the Office -- Office of Institutional Equity, correct?
A. That is correct.
Q. Okay. And -- and you've been through that training, presumably, in connection with your role in making determinations on these types of cases, correct?
A. That is correct.
Q. Okay. Has anybody raised to you a concern that the process, which I think you've testified began with [redacted] of evaluating complainants for false statements is going to deter Title IX complaints?
MR. KEALEY: Object -- may I have the question read back, please?
(The requested text was read by the court

Page 50

reporter.)
MR. KEALEY: Go ahead.
THE WITNESS: Anyone?
MR. MACEY: Anyone.
THE WITNESS: I think I've -- I saw a -- I was copied on an e-mail where a student was expressing that concern.
QUESTIONS BY MR. MACEY:
Q. Just a student?
A. Yes.
Q. Anyone else?
A. Not that I recall.
Q. Okay. Are you concerned that that process is going to deter Title IX complaints?
A. I am not concerned.
Q. Why are you not concerned?
A. I think a individual who comes forward with a allegation of a violation to the Title IX process, and does so in good faith, has absolutely nothing to be concerned about. If a student has ulterior motives for the filing of their report, that is when they should be concerned.
Q. Prior to [redacted] did you feel that there were complaints made with ulterior -- ulterior motives -- that there had been complaints made with

Page 51

ulterior motives?
A. No, I did not.
Q. So that --
A. The [redacted] case was the most egregious and obvious in my career.
Q. Okay. And what do you base that on?
A. The audio recording, the text messages, and the details in the Investigator's Report.
MR. MACEY: Can we take a quick break?
MR. KEALEY: Uh-huh.
(A recess was taken between 10:34 a.m. and 10:42 a.m.)
MR. MACEY: I'm ready. We ready?
THE WITNESS: Ready.
QUESTIONS BY MR. MACEY:
Q. Dean Sermersheim, I'm just going to ask you some questions about the facts that were adduced as part of the [redacted] case. And most of them are from the -- from the report in Exhibit 1. Which I think is -- it's right there.
You mentioned that -- and I don't want to mischaracterize your testimony -- but I'm just sort of summarizing so I don't have to ask you again -- that you believe that [redacted] had manufactured the claim that she did not consent because of the

Page 52

situation with her boyfriend. Is that -- is that an accurate summary?
A. Speculating that, yes.
Q. Okay, okay. And -- and specifically what did you believe was her state of mind when she complained about sexual assault by the respondent?
A. I don't think I can speak to her state of mind.
Q. Well, I -- did you believe she was acting maliciously?
A. I believe that she had ulterior motives to filing the report. I don't know that she maliciously was going after the respondent. But there was a benefit for her to file the report.
Q. And what was the benefit for her to file the report?
A. I believe she was trying to save a relationship with her boyfriend.
Q. Okay. Okay. And just to close the loop. How would filing the report save her relationship with her boyfriend?
A. To suggest that the sexual encounter was not something she willingly engaged in would make a boyfriend -- I believe would suggest to her boyfriend she was not cheating on him.
Q. Okay. But the boyfriend knew that she had

Page 53

consensually engaged in sexual activity the next day, correct?
A. I do not recall.
Q. Okay. And she never alleged that the second day -- the second sexual encounter was nonconsensual.
A. I do not recall.
Q. In fact, she said she did it with the motivation to gain power over the situation, correct?
A. I do recall that.
Q. Okay. So there was at least one consensual sexual activity with the respondent that her boyfriend was aware of, correct?
A. As you are reminding me, yes.
Q. So how did her complaint put her back in her boyfriend's good graces?
A. The -- I don't recall if the boyfriend is aware of the encounter that she is -- the -- the next day to claim power over her. I do recall that that is -- the evidence of that second encounter is either in the audio or the text messages. There was some evidence proving that the second encounter happened. And therefore I believe she was caught in a lie and had to -- had to come up with a statement that this was to gain power over him.
Q. Okay. But let's look at Page 16 of this report.

A. Of the Investigator's Report?
Q. Yeah, Exhibit 1.
A. (Witness complies.)
Q. If you see here, I believe on -- it's redacted. But I believe that we -- the redacted name in the last paragraph is her boyfriend.
A. Okay.
Q. And the reason I believe that is that in the third line down she told him, I cheated on you with X. That's the respondent. He and I had sex Monday night. Okay? Do you see that?
A. Uh-huh.
Q. Okay. So are we on the same page here that this is her boyfriend she's talking to?
A. I believe I am surmising that that is the boyfriend, yes.
Q. Okay. I cheated on you with the respondent. The respondent and I had sex Monday night. The boyfriend responded, You were drunk. Did you consent? [redacted] stated, I don't know. Do you see that?
A. Uh-huh.
Q. Now, this is a conversation that occurred prior -- reported by her boyfriend that occurred prior to any complaint to Purdue, correct?



A. I don't recall.
Q. Well, it makes a difference if it was, correct?
A. Restate your question, please.
Q. If this is a conversation she had with her boyfriend prior to the complaint to Purdue.
A. She is certainly suggesting that.
Q. Well, actually, if you look here it says he's -- the boyfriend reported the conversation with [redacted] which occurred Wednesday night.
A. Okay. And what is your question, please?
Q. So this occurred -- this conversation occurred before she reported to Purdue.
MR. KEALEY: Object to form. Are you representing that as a fact?
MR. MACEY: Yes. I think it's in the -- in the -- in the report. It's a fact from the report.
MR. KEALEY: Are you representing that this conversation predated her contact with Kelley [sic] Richardson?
MR. MACEY: No. Her -- her contact with Casey Richardson occurred prior to even the assault.
MR. KEALEY: So Casey Richardson's a Purdue employee? Your question was "reported to Purdue." So I'm just -- I -- I don't -- you know, I don't want to interfere with your line of questioning.



But it's unclear to me whether you're saying prior to a report to OIE, prior to a report to Casey Richardson, when you say prior to any report to Purdue.
MR. MACEY: Okay. Casey Richardson -- I just want to make clear. I'm -- I'm talking about the complaint that led to the investigation.
MR. KEALEY: I'm not sure that resolves the ambiguity.
MR. MACEY: Okay. We can -- I guess we can sort through the time later.
QUESTIONS BY MR. MACEY:
Q. But prior to the investigation beginning by Purdue, can we -- prior to the investigation beginning by Purdue, this was a conversation that [redacted] had with her boyfriend at the time.
A. Someone is suggesting that.
Q. Okay.
A. I do not know that to be true and accurate nor its timeframe.
Q. Okay. Well, I'd suggest that this is the investigation report that was provided to you that you relied on in connection with the determination of [redacted] complaint, correct?
A. It would have been part of the 22-page document presented to me.



Q. Okay. And in that document Miss -- her boyfriend reported that she had told him that they had -- the respondent and her had sex again on Tuesday when you were at ROTC and at Acacia.
A. Can you please rephrase your question or ask again.
Q. On the last paragraph of this -- well, I guess let's just back up here. It's worth taking the time here. We're looking at the Investigator's Report, correct?
A. Correct.
Q. And the first section of the Investigator's Report is the Investigators' Charge, correct?
A. Correct.
Q. The second -- the second section is the Relevant Provisions, which lists a series of provisions and definitions that come from Purdue's policy on anti-harassment, correct?
A. Correct.
Q. Okay. The third section here, we're on Page 3, Interviews and Document Review, is a list of the witnesses and documents considered by the investigators, correct?
A. Correct.
Q. Okay. It's redacted. But one of those witnesses

Page 58

was [redacted] then boyfriend, correct?
A. Correct.
Q. Okay. Then on IV, page -- which is Page 4, Roman Numeral IV, there's a list of the allegations that [redacted] made, correct?
A. Correct.
Q. Okay. Then on Page 5 is a background statement, which sort of provides the bare-bones details of the -- the events and then the Investigator's Report.
A. Summary of Facts.
Q. Yes. Well, the background and then -- then VI is the Summary of Facts, correct?
A. Correct.
Q. And these Summary of Facts was pre -- prepared by Purdue investigators, correct?
A. Correct.
Q. Okay. And the investigators' facts are laid out chronologically, correct? On -- starts here. The first paragraph is, During the day on Monday, April 17th.
A. It would appear so, correct.
Q. And then it moves to the party and describes the party. Then on Page 8 it moves to the respondent's bedroom at Acacia. Correct?

Page 59

A. Correct.
Q. And then from there on we move from Acacia to Harrison Hall, correct?
A. Correct.
Q. Then we get to Harrison Hall on Page 10, correct?
A. Correct.
Q. And at that point, if you look at -- at the second full paragraph on Page 10, we're up to 2:19 a.m. on Tuesday, April 18th, 2017, correct?
A. Correct.
Q. Okay. Then we have the description of [redacted] conduct at -- getting into her room at Harrison Hall, correct, on Page 10?
A. That is correct.
Q. And on Page 11, in [redacted] room in Harrison Hall, there's the description of -- it's actually several descriptions of what happened. What her testi -- she testified about, what the respondent testified about, correct?
A. Correct.
Q. And then we get to the next morning on Page 13. So Tuesday, April 18th, correct?
A. Correct.
Q. Okay. Now -- and this is all chronological to this point, correct?

Page 60

A. Correct.
Q. And Tuesday, April 18th, there's not been any complaint of sexual assault made by [redacted] to Purdue, correct?
A. I'm not aware of the timeframe.
Q. Well, we don't -- investigators haven't reported any.
A. I don't recall what day she reported the incident.
Q. All right. Then there's a meeting at Acacia on Page 13. And then there's Tuesday afternoon in [redacted]'s dorm room on Page 14. And we're still talking about Tuesday. And now we're just at 9:26 in the morning. You see that on Page 14?
A. I do.
Q. So we're still moving chronologically, correct?
A. Correct.
Q. And in this they -- he reports that he's coming over to have sex with her on Tuesday the 18th, correct?
A. It appears so.
Q. Okay. And then on Page 15 we're at the party that night. Do you see that on Tuesday, April 18th?
A. Yes.
Q. Correct? And now we're on Wednesday, April 19th, correct?

Page 61

A. Correct.
Q. And it looks like at that point on Wednesday, April 19th [redacted] tells the investigators that she had told her boyfriend that she and the respondent had sex on Monday night. And then there's other witnesses talking about when they found -- we're still on April 19th, correct?
A. Correct.
Q. And there's not been any reference in here to somebody going back to complain -- to claim that she was assaulted at this point, correct?
A. I presume so although I have not read this since 2017.
Q. But you agree that this is presented in chronological order.
A. Correct.
Q. And then the Investigator's Report, at the bottom of Page 16, still in chronological order, that on Wednesday, April 19th, [redacted] boyfriend, who we're talking about here, reports that [redacted] told him that they had sex on Tuesday when you were at ROTC and at Acacia. Do you see that?
A. Yes.
Q. Okay. And, according to the boyfriend [redacted] wanted him to break up with her. But he kept

Page 62

asking her, Did you consent on Monday? You see that?
A. Yes.
Q. And she stated, I don't know; I don't remember. You see that?
A. Yes.
Q. Okay. We're not talking about Tuesday; we're talking about Monday, correct?
A. Yes.
Q. And the boyfriend says, If you don't know, then it's rape. And presumably the respondent raped you. You see that on the bottom of Page 16?
A. Yes.
Q. Did you believe that the boyfriend was lying to the investigators about that conversation?
A. I do not believe that he was lying.
Q. Okay. And the next look -- if we look at Page 17. And we're on April 20th. And it says, On Thursday the boyfriend went to CARE to discuss the matter. He asked [redacted] to come along but she refused. The CARE staff told him it was [redacted]'s choice whether to file a report; but that, if he could, he should try to get her to get a SANE exam. Do you see that?
A. Yes.

Page 63

Q. What's a SANE exam?
A. It's a Sexual Assault Nurse -- I don't recall what the E is right now. But it's a physical exam performed by the hospital.
Q. And she did, in fact, get an exam, correct?
A. I believe, based on an earlier document you showed me, she did.
Q. But the results of that exam weren't included in this report, correct?
A. I do not recall.
Q. Okay. Now, if you look on that -- so according to these university investigators, the boyfriend goes to CARE. She says she doesn't want to come. According to the invest -- and then that's on Page 17 at the top, correct?
A. Correct.
Q. And on the previous page, according to the investigators, she and the boyfriend have already had a conversation where she's disclosed two sexual encounters with the respondent, correct?
A. I think that is described, yes.
Q. And one of those she describes as consensual, and one of them she describes as she doesn't remember it, correct?
MR. KEALEY: Object to form. Misstates the

Page 64

record.
MR. MACEY: Well, we just went it over.
MR. KEALEY: It says, I cheated on you.
MR. MACEY: Right. And I -- he and I had sex Monday night.
MR. KEALEY: That's a consensual act.
MR. MACEY: I'll let you make that in your brief.
QUESTIONS BY MR. MACEY:
Q. According to --
MR. KEALEY: Well, you're describing what the document says. And if you're gonna paraphrase the document, you've got to paraphrase it accurately.
MR. MACEY: Okay. I'm gonna go down to the middle of that paragraph.
QUESTIONS BY MR. MACEY:
Q. Dean Sermersheim, if you look --
A. Are we on --
Q. -- at Page 16.
A. Okay.
Q. According to blank -- that's the boyfriend -- [redacted] wanted him to break up with her. But he kept asking her, Did you consent on Monday? She stated, I don't know; I don't remember. You see there?
A. I see that.

Page 65

Q. Okay.
MR. KEALEY: So, again, she does not state that she did not consent.
MR. MACEY: Okay.
QUESTIONS BY MR. MACEY:
Q. Now, on Thursday, April 20th, we have actual texts between [redacted] and her boyfriend. In those texts the boyfriend says that someone, presumably the respondent, just texted me asking if we could meet up and talk. He relays his conversation. [redacted] says, Okay, if you want to talk to him and have time, go ahead. Yeah, it sucks, but I messed up and have to deal with it.
A. Correct.
Q. Okay. Two thirds of the way down the page the boyfriend says, Look, it was consensual and everything, right? 'Cause I know you were both really drunk, and I just assumed it was last night so it was right? I don't know -- that's text speak. Do you see that?
A. The paragraph that you just read --
Q. Yeah.
A. -- do I see that? I do see that.
Q. And then [redacted] says, The first time I don't remember much at all, correct?

Page 66

A. That is what's reported there, yes.
Q. Okay. Then on the top of Page 18, or at the bottom of 17 and 18 she describes what she does remember. Remember having to get my key.
A. Uh-huh.
Q. I remember him on top of me.
A. Uh-huh.
Q. Like I told you, I'm pretty sure he didn't use a condom.
A. Yes.
Q. And then I woke up in the morning. And then the boyfriend says, I'm sorry you don't remember much. I'm sorry about this whole situation. She says, It's still my fault though. Correct?
A. Correct.
Q. Okay. Now, we've just seen from the Investigator's Report that prior to her having a SANE exam, reporting it to anybody at Purdue University, she disclosed both the sexual en -- encounter in her room on the first night and then the encounter the second day, correct?
A. Yes.
Q. And she never -- there's nothing in here where she's denies consenting the second day, correct?
A. Or the first.

Page 67

Q. And that's not my question.
A. Correct.
Q. Okay.
MR. KEALEY: Can we go off the record briefly?
MR. MACEY: Sure.
(A discussion was held off the record.)
MR. MACEY: Can we go back on?
MR. KEALEY: Yes.
QUESTIONS BY MR. MACEY:
Q. So I think your counsel's clarified that these might be texts with another student who was a friend o[redacted]
A. I'm sorry. Which page are we on now?
Q. Page 17. And it looks like they're text messages between her and a friend. And apparently her friend is asking the questions we were just talking about. Where her friend asked, Look, it was consensual and everything, right? 'Cause I know you were both really drunk, and I just assumed it was last night so it was right?
We think that's her friend. Do you see that?
A. Which paragraph, please?
Q. On Page 17, about two-thirds of the way down.
A. Okay.
Q. And then she says the first time she doesn't

Page 68

remember much at all. Then she describes what she does remember at the bottom of 17, beginning of 18. And she says, It's still my fault.
A. Correct.
Q. So it looks like prior to -- prior to the complaint, she's disclosed to her boyfriend and to another individual that she feels that she was at fault, but she doesn't remember what happened in her room, correct?
A. As we've just reviewed things here, I think that is correct.
Q. And that is the story she told the whole time, correct?
MR. KEALEY: Object to form.
THE WITNESS: No. I think there were times that she said this was something other than a consensual activity in which she screwed up.
QUESTIONS BY MR. MACEY:
Q. Right. Well, if we -- I think she also went to SANE and discovered injuries that she didn't realize she had. Not SANE but PUSH, Purdue University Student Health, and discovered injuries that she didn't realize she had during her SANE exam. Do you remember that?
A. I remember seeing that today. And I think a

Page 69

reasonable person would question whether they were injuries or they were marks as a result of a sexual encounter between two consenting individuals.
Q. Okay. Now, what about the evidence that she had already disclosed to the boyfriend, both sexual incidents prior to going to Purdue with a complaint, did that -- does that affect your judgment about whether or not she fabricated the incident to make up with her boyfriend?
A. My interpretation of the in -- information that you are presenting as supporting information for her is contradictory information for me.
As I interpret that exchange, she is coming forward to admit fault. Her boyfriend gives her an out by saying, "You were raped." He is the one initiating any and all conversations with CARE. She sees this as an opportunity and accepted it.
Q. But didn't she tell CARE and the university exactly what she'd told her boyfriend?
MR. KEALEY: Object to form.
THE WITNESS: I don't know which part you're referencing. There's so much material here.
MR. MACEY: Sure.
QUESTIONS BY MR. MACEY:
Q. What's different about what she told her boyfriend

Page 70

on April 16th than what you understood her testimony or version of events to be in -- in the process of -- of the -- the complaint?
MR. KEALEY: Object to form.
THE WITNESS: I guess I'm not sure which specific thing we're talking about. But, as I just stated, I think it's how one interpreted -- interprets the comments and interactions.
QUESTIONS BY MR. MACEY:
Q. Now, her boyfriend tells her, or maybe, if you don't know, then it's rape. You see that?
A. Yes.
Q. Is that accurate? Is that an -- a definition of -- of rape for Purdue's policy?
MR. KEALEY: Object to form.
THE WITNESS: That -- just that exchange right there does not suggest -- that he says, If you don't know if it was consensual, it's rape. That's too broad of a statement for me to weigh in on.
However, as I recall, the question is: Was she intoxicated and doesn't remember certain things? Or was she incapacitated and could not actively participate in the process? She absolutely was not incapacitated. Incapacitated would imply she's not walking, she's not

Page 71

communicating to an RA, she's incapable of getting a key to unlock her door. She is incapacitated and unable to perform any activity.
Could there be truth in her being intoxicated, drunk, blacking out, not remembering aspects? That is possible.
QUESTIONS BY MR. MACEY:
Q. And if she wasn't remembering aspects and was blacking out, how could you make a determination that she made a knowingly false statement to the university?
A. It is the totality of the facts presented in the Investigator's Report, the audio recording, the text messages, and even the most recent breakdown of the boyfriend[redacted]' conversation that led me to believe, an individual that's been doing -- working with students for over 28 years, that there was an inaccurate statement; that indeed it proved beneficial for [redacted] to lie about the encounter rather than to speak the truth.
Q. And the lie was -- and -- well, we've already -- I think -- have we already covered what the lie is? The lie she made, the false statement she made, and what was that?
A. Well, in fact, as you took me through the various

Page 72

scenarios, so on, its most -- one -- one of the multiple things that I recall looking at is this conversation with the boyfriend. Prior to the conversation with the boyfriend, she was not calling it rape. She was -- or that she didn't consent.
She's not -- she's saying that she might not remember everything. But that is not on him to, "him" the respondent, to know that she is not recalling. She's an active participant in the process. And therefore it would not qualify, again, in its simplistic sense, as a sexual assault. She does not come forward with the allegation of rape until the boyfriend says, No, no; this is not on you; he did this to you.
Q. Is it possible that Ms. [redacted] misunderstood what incapacitated meant and thought it meant heavily intoxicated?
MR. KEALEY: Objection to form.
THE WITNESS: I suppose it is possible. Having said that, her advocates at CARE, the hospital likely or PUSH, and certainly the investigators and our written policy would have defined it for her.
QUESTIONS BY MR. MACEY:

Page 73

Q. Is it possible that because she was blacked out for por -- portions of the encounter she believed that she could not consent?
MR. KEALEY: Objection to form.
THE WITNESS: It is possible that an individual who is intoxicated may not recall all activities associated with an event. It does not meet the definition of incapacitated.
QUESTIONS BY MR. MACEY:
Q. Do you know if there was ever a meeting where somebody explained that to [redacted]?
A. I do not know.
Q. All right.
MR. MACEY: Give me, like, five minutes. I think I'm almost done.
MR. KEALEY: Sure.
(A recess was taken between 11:17 a.m. and 11:20 a.m.)
MR. MACEY: Okay. We're back on the record.
QUESTIONS BY MR. MACEY:
Q. Dean Sermersheim, I'm wondering about this concept of intoxication versus incapacitation. Is there something written down in terms of, like, blood alcohol content to determine whether someone's so intoxicated that they become incapacitated?

Page 74

A. I'm not familiar with a blood alcohol count being the determining factor. I think it varies person to person.
Q. Okay. Is there -- is there any, like, objective standard that of, I don't know, measurables that defines incapacitation?
A. There likely is somewhere, and I do believe the full definition is in the policy. Generalizing, if a person is incapacitated, they are incoherent, unable to move, walk. They are, in essence, passed out.
Q. Okay. And that's the standard of incapacitation you're applying to [redacted] case.
A. That is correct. [redacted] was able to walk back to her residence hall; ask her RA, so verbally communicate; physically walking; legitimately keys into her room; is heard on the audio recording talking.
Q. And where did you understand -- where did you develop your understanding that that was the definition of incapacitation?
A. I don't recall specifically when. But working in higher education for 28, 29 years now, that is a common understanding of the definition of incapacitation.

Page 75

Q. Okay. Does the Office of Institutional Equity or the Vice President for Ethics and Compliance's Office ever run a training for you on the definition of incapacitation?
A. Not a training specifically for me. But as a part of their training process, I do recall them defining intoxicated versus incapacitated.
Q. Okay. Is it possible for a student not to be aware that she consented to sexual activity but a respondent had believed that he was engaging in sexual -- consensual sexual activity?
A. Yes, it is possible.
MR. MACEY: I don't have any further questions.
MR. KEALEY: I have no questions.
MR. MACEY: Thank you.
THE REPORTER: Signature?
MR. KEALEY: So you have the opportunity to review the transcript and sign it. Would you like to do that?
THE WITNESS: Is that advisable?
MR. KEALEY: Most witnesses want to do that.
THE WITNESS: Yes, please.
THE REPORTER: Same orders as yesterday?
MR. MACEY: Yes, please.

Page 76

MR. KEALEY: Yeah.

AND FURTHER DEPONENT SAITH NOT.
(11:25 a.m.)

____________________________
KATHERINE SERMERSHEIM

Page 77

STATE OF INDIANA )
) SS:
COUNTY OF HAMILTON )

I, Lisa C. Pierce, a Notary Public in and for the County of Hamilton, State of Indiana at large, do hereby certify that KATHERINE SERMERSHEIM, the deponent herein, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiffs at the law offices of Stuart & Branigin LLP, 300 Main Street, Suite 900, Lafayette, Tippecanoe County, Indiana, on February 4, 2020, commencing at the hour of 9:13 a.m., pursuant to Rules of Applicable Procedure;

That said deposition was taken down in stenographic notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by said deponent; and thereafter presented to said deponent for her signature;

That the parties were represented by their aforementioned counsel.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of any party, or otherwise interested in the event of this action, and am not in the employ of the attorneys for any party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of February, 2020.

NOTARY PUBLIC

My Commission Expires:
March 14, 2021

County of Residence:
Hamilton



Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

February 24, 2020

To: Mr. William Kealey

Case Name: Doe, Mary, et al. v. Purdue University, et al.

Veritext Reference Number: 3964429

Witness: Katherine Sermersheim Deposition Date: 2/4/2020

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3964429
CASE NAME: Doe, Mary, et al. v. Purdue University, et al.
DATE OF DEPOSITION: 2/4/2020
WITNESS' NAME: Katherine Sermersheim

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ _______________________
Date Katherine Sermersheim

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

__________________________________
Notary Public

__________________________________
Commission Expiration Date



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3964429
CASE NAME: Doe, Mary, et al. v. Purdue University, et al.
DATE OF DEPOSITION: 2/4/2020
WITNESS' NAME: Katherine Sermersheim

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ _______________________
Date Katherine Sermersheim

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

__________________________________
Notary Public

__________________________________
Commission Expiration Date

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 3964429

PAGE/LINE(S) / CHANGE /REASON

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_____________ ____________________

Date Katherine Sermersheim

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ____________________, 20______ .

___________________________

Notary Public

___________________________

Commission Expiration Date

**&**

**&** 1:16 2:10 77:13

**0**

**00089** 1:3

**1**

**1** 3:9,12 14:13 25:5 26:24 51:19 54:2
**10** 59:5,8,13
**10:34** 51:11
**10:42** 51:12
**11** 59:15
**1100** 79:1
**11:17** 73:17
**11:20** 73:18
**11:25** 76:4
**13** 59:21 60:10
**14** 3:10 60:11,13 78:17
**15** 3:11 34:17 60:21
**16** 3:12 34:12 53:25 61:18 62:12 64:19
**16th** 70:1
**17** 3:13,15 34:19 34:24 62:17 63:15 66:3 67:14,23 68:2
**17th** 58:21
**18** 66:2,3 68:2
**1820** 79:2
**18th** 59:9,22 60:2 60:18,22
**19th** 60:24 61:3,7 61:19
**1st** 4:25

**2**

**2** 3:10 26:4,6
**2/4/2020** 79:8 80:3 81:3
**20** 80:16 81:22 82:22
**2015** 4:25
**2017** 3:12,13 20:19 30:9 59:9 61:13
**2017/2018** 8:13
**2020** 1:18 4:2 77:15 78:8 79:4
**2021** 78:17
**20th** 62:18 65:6
**21** 32:8,13
**21173** 78:13
**216-523-1313** 79:3
**22** 56:25
**23** 3:11
**24** 79:4
**24th** 78:7
**26** 3:10
**28** 71:17 74:23
**29** 74:23
**2:19** 59:8

**3**

**3** 3:11 23:1 57:20
**300** 1:16 2:11 77:13
**317.637.2345** 2:5
**317.637.2369** 2:6
**34** 3:12,13,16
**3964429** 79:7 80:2 81:2 82:2

**4**

**4** 1:18 3:3 4:2 26:25 58:3 77:15
**401** 2:4
**44114** 79:2
**445** 2:4
**46204** 2:5
**47902** 2:12
**4:18** 1:3

**5**

**5** 58:7

**7**

**765.423.1561** 2:12
**765.742.8175** 2:13
**7th** 35:18

**8**

**8** 58:24

**9**

**900** 1:16 2:11 77:13
**9:13** 1:19 4:1 77:16

**a**

**a.m.** 1:19 4:1 51:11,12 59:8 73:17,18 76:4 77:16
**ability** 13:6
**able** 13:25 20:23 25:10 38:15,20,25 39:6,12 74:14
**absolutely** 50:19 70:24
**acacia** 57:5 58:25 59:2 60:9 61:22
**accepted** 69:17
**accurate** 15:1 27:18 52:2 56:19 70:13
**accurately** 64:13
**accusations** 40:5
**acknowledge** 80:11 81:16
**act** 64:6 80:14 81:20
**acting** 44:20 52:8
**action** 5:17 29:1 78:2,4
**actions** 39:1
**active** 72:10
**actively** 70:23
**activities** 73:7
**activity** 31:17 33:11,13 53:1,11 68:17 71:3 75:9 75:11
**actual** 48:5 65:6
**addendum** 27:11
**addition** 48:4
**additional** 13:16 14:3,8 16:23,24 19:9,10
**additionally** 38:24
**address** 48:20 79:16
**addressed** 43:22
**adduced** 51:17
**adjudication** 7:12 7:13,14
**administrative** 15:12
**admit** 69:14
**advantage** 45:21
**adversarial** 28:1,4
**advisable** 75:21
**advocates** 72:21
**affect** 69:7
**affixed** 78:7 80:15 81:21
**aforementioned** 77:10,25
**afternoon** 60:10
**aggressive** 4:19

**agree** 61:14
**agreed** 45:14
**ahead** 26:10 50:2 65:12
**al** 79:6,6 80:3,3 81:3,3
**alcohol** 73:24 74:1
**allegation** 43:1 50:18 72:14
**allegations** 48:20 58:4
**alleged** 53:4
**allow** 28:3 36:3
**allows** 33:25
**alysa** 1:7 3:11,12 5:4
**ambiguity** 56:9
**anal** 23:18
**analysis** 24:19 25:15
**announcing** 42:18
**answer** 6:7,24 7:7 24:10,25 25:24 31:25 32:16 43:10 48:14,24
**answered** 6:8
**answers** 6:11,14
**anti** 12:5,21 20:16 29:2 40:12,24 42:25 47:2 57:18
**anticipating** 7:4
**anybody** 22:22 39:24 49:19 66:18
**apologize** 24:4
**apparently** 67:15
**appeal** 3:11 10:4 34:14 42:12
**appealed** 41:25
**appear** 58:22 80:11 81:15
**appears** 14:13 34:14 60:20
**appended** 81:11 81:18
**applicable** 1:19 77:16
**applying** 74:13
**appointed** 14:21 15:1
**appointment** 16:2
**appreciate** 13:22 14:1 25:1
**approximately** 10:20
**april** 58:21 59:9 59:22 60:2,22,24 61:3,7,19 62:18 65:6 70:1
**area** 16:19 38:12
**areas** 23:19
**arm** 23:19
**asked** 6:7 16:20 19:3 22:20 36:2 62:20 67:17
**asking** 19:10 22:22 62:1 64:23 65:9 67:16
**asleep** 33:1
**aspects** 10:24 71:5 71:8
**ass** 31:11
**assault** 24:8,19,22 24:24 52:6 55:21 60:3 63:2 72:13
**assaulted** 61:11
**assess** 40:7
**assign** 16:6
**assignment** 80:2 81:2 82:2
**assist** 20:24
**assistance** 8:8 13:1
**assistant** 9:13 15:8 15:14
**assists** 12:17
**associate** 8:5
**associated** 73:7
**assume** 35:10,21
**assumed** 65:18 67:19
**assuming** 14:19
**attached** 81:7
**attachment** 23:4
**attended** 21:24
**attorney** 5:2 78:3
**attorneys** 78:5
**audio** 29:21 33:15 33:18 38:24 39:11 46:1 51:7 53:20 71:13 74:17
**august** 4:25 35:15 35:18
**authority** 8:20,22 10:2,3 42:5
**authorize** 81:11
**availability** 17:22 22:13
**available** 25:13
**ave** 79:1
**aware** 5:5 17:8 19:4 23:22 28:6 28:12,15 48:15 53:12,16 60:5 75:8

**b**

**b** 78:14
**back** 17:4 23:20 34:9,20 49:24 53:14 57:8 61:10 67:7 73:19 74:14 79:15
**background** 58:7 58:12
**ban** 16:18
**bar** 28:2
**bare** 58:8
**base** 51:6
**based** 8:18 13:15 16:14,15 22:12 36:25 63:6
**basis** 8:16,18
**bedroom** 58:25
**began** 8:7,9 28:11 49:20
**beginning** 35:12 56:13,14 68:2
**behalf** 1:15 7:11 77:12
**believe** 10:14 12:20 13:2 17:2 29:5,6,7,22,23 33:16 38:14 41:2 41:4 47:1 48:2,10 51:24 52:5,8,10,16 52:23 53:22 54:4 54:5,8,15 62:14,16 63:6 71:16 74:7
**believed** 73:2 75:10
**bell** 14:15
**beneficial** 71:19
**benefit** 13:18 52:13,14
**best** 40:20 41:6
**bit** 10:17
**blacked** 73:1
**blacking** 71:5,9
**blank** 64:21
**blood** 73:23 74:1
**board** 41:14
**bold** 40:3

**bones** 58:8
**bottom** 61:17 62:12 66:2 68:2
**boyfriend** 29:10 29:12 39:2 52:1 52:17,20,23,24,25 53:11,16 54:6,14 54:16,19,24 55:5,8 56:16 57:2 58:1 61:4,19,24 62:10 62:14,19 63:12,18 64:21 65:7,8,16 66:12 68:6 69:5,9 69:14,19,25 70:10 71:15 72:3,4,14
**boyfriend's** 53:15
**brainstorming** 13:1
**branigin** 1:16 2:10 77:13
**break** 7:3,5,7 51:9 61:25 64:22
**breakdown** 71:14
**brief** 64:8
**briefly** 67:4
**bring** 11:4
**broad** 70:19
**brought** 5:3

**c**

**c** 1:13 2:1 77:5 78:14
**ca** 79:25
**call** 35:3
**called** 7:14 15:8 42:20
**calling** 72:5
**campus** 16:19
**capacities** 1:8
**care** 62:19,21 63:13 69:16,18 72:21
**career** 51:5
**case** 5:2,6,16 8:16 8:20,21,25 9:5,6,7 9:8 10:11 11:22 15:17,18,19 17:1,6 18:15 19:9 25:2 26:18 30:8 33:21 35:9,13 36:10 41:21 46:18 47:19 48:1,5 51:4,18 74:13 79:6 80:3 81:3
**caseload** 8:7 15:10 20:24
**cases** 8:9,10 47:10 47:13 49:16
**casey** 21:24 55:20 55:22 56:2,5
**caught** 53:22
**cause** 1:3 20:25 65:17 67:18 78:2
**certain** 70:21
**certainly** 28:19 33:17 36:11 55:6 72:22
**certificate** 81:11
**certification** 80:1 81:1
**certify** 77:7 78:1
**change** 79:13,14 81:8 82:3
**changes** 79:12 80:7 81:7,9
**charge** 57:13
**cheated** 54:9,17 64:3
**cheating** 52:24
**check** 10:1
**choice** 62:21
**choose** 11:6,8
**christie** 14:15,21 15:1,5,18
**christmas** 3:11,12
**chronological** 59:24 61:15,18
**chronologically** 58:19 60:15
**circulate** 9:25
**circumstance** 31:7
**civil** 80:5 81:5
**claim** 44:16,16 51:25 53:18 61:10
**clarification** 22:14
**clarified** 67:10
**clarify** 18:1 49:7
**clarifying** 12:18 14:2 18:18 36:5 37:6
**clean** 6:3,4
**cleaner** 42:22 43:7 43:9
**clear** 6:14,14 27:12 56:6
**clearly** 28:21
**clerk** 38:19
**cleveland** 79:2
**close** 52:18
**code** 41:1,3
**coinvestigators** 14:22
**collect** 25:17
**come** 6:22 13:16 14:3 16:17 17:4 42:10 53:23 57:17 62:20 63:13 72:13
**comes** 16:7 50:17
**coming** 60:17 69:13
**commencing** 1:18 77:15
**comments** 43:16 70:8
**commission** 78:17 80:19 81:25 82:25
**common** 74:24
**communicate** 74:16
**communicating** 71:1
**communication** 6:15
**community** 41:13
**complain** 61:10
**complainant** 11:5 11:18 22:10,12,17 22:20 28:25 36:9 37:5
**complainants** 49:21
**complained** 52:5
**complaint** 16:4 24:22 26:25 27:1 27:3 28:9,18 29:12 40:12 43:17 44:21 45:2 53:14 54:25 55:5 56:7 56:24 60:3 68:6 69:7 70:3
**complaints** 7:15 14:24 20:9,12,14 20:21 49:22 50:14 50:24,25
**completed** 79:15
**compliance** 49:3,8
**compliance's** 75:2
**complications** 22:9
**complies** 54:3
**concept** 73:21
**concern** 30:16 49:19 50:7

**concerned** 39:2 48:18,25 50:13,15 50:16,20,22
**concerns** 40:4
**conclude** 13:4
**conclusion** 30:8
**conclusions** 25:23
**concur** 13:3
**condom** 66:9
**conduct** 19:8 40:8 41:1,3,10,14 43:22 48:9 59:12
**conducted** 43:16
**confidentiality** 45:17
**conflict** 45:4,6
**conflicts** 9:15
**confusion** 6:16
**connection** 23:9 28:8,18 46:7,12 47:24 49:15 56:23
**conscience** 31:1
**consensual** 53:10 63:22 64:6 65:16 67:18 68:17 70:18 75:11
**consensually** 53:1
**consensus** 12:22 13:6
**consent** 31:16 33:17 38:5,15,21 39:6 51:25 54:20 62:1 64:23 65:3 72:6 73:3
**consented** 33:13 75:9
**consenting** 66:24 69:3
**consequences** 39:1
**consideration** 24:20
**considered** 57:22
**consult** 8:24
**contact** 16:18 55:18,20
**contemporaneous** 46:16
**content** 73:24
**continual** 33:11
**contradicted** 37:7
**contradictory** 6:22 69:12
**convene** 9:20
**convenience** 7:6
**conversation** 35:23 42:15,17 54:23 55:4,8,11,18 56:15 62:15 63:19 65:10 71:15 72:3 72:4
**conversations** 41:4 69:16
**copied** 50:6
**correct** 4:23 5:9 7:16 10:6,8,13 13:9,13 15:15,21 17:10,23 19:25 20:4,6,9,10 21:25 22:17,18 24:8 25:7,8 29:13 30:18 32:5,8,13,15 32:23,25 33:9 35:4,7,8,20 37:17 37:18,22 38:1,2 39:4,8,9,16 40:9 40:10,13 41:23,24 42:2,3,8,9 46:23 47:12,18 49:6,12 49:13,17,18 53:2,8 53:12 54:25 55:2 56:24 57:10,11,13 57:14,18,19,23,24 58:1,2,5,6,13,14 58:16,17,19,22,25 59:1,3,4,5,6,9,10 59:13,14,19,20,22 59:23,25 60:1,4,15 60:16,19,24,25 61:1,7,8,11,16 62:8 63:5,9,15,16 63:20,24 65:14,25 66:14,15,21,24 67:2 68:4,9,11,13 74:14
**corrections** 79:12 81:17
**correctly** 31:5
**counsel** 41:5 77:25
**counsel's** 67:10
**count** 74:1
**county** 1:14,17 77:3,6,14 78:19 80:10 81:15
**coupled** 29:20
**course** 12:22
**court** 1:1 5:23 34:11 49:25 80:7
**courtesy** 42:21
**cover** 29:8 31:10 31:10
**covered** 71:22
**covering** 29:17
**credibility** 36:10 36:12,14 37:1
**credible** 37:16
**csb** 41:14
**curious** 38:7
**current** 47:20,25
**currently** 4:21 20:18 48:11
**cv** 1:3
**cya** 31:10

**d**

**date** 35:18 79:8 80:3,9,19 81:3,13 81:25 82:20,25
**day** 5:24 6:8 7:4 11:12,16 39:13 48:1 53:2,4,17 58:20 60:8 66:21 66:24 78:7 80:16 81:22 82:22
**days** 30:23 33:25 35:6 79:19
**deadline** 16:14
**deal** 65:13
**dealing** 37:4
**dean** 4:21 5:1 8:5 8:5,9,11,17,19,23 8:23 9:6,17,19 12:16 14:5,21 17:4 20:7,23 21:2 23:2 34:11 46:6 46:14 47:6 51:16 64:17 73:21
**dean's** 9:9 20:5
**dear** 79:10
**decide** 8:20 15:4
**decision** 9:22 10:2 10:4 12:12,13 13:14,24 21:1,3,4 28:20 30:8 34:14 40:23 43:12 47:7 47:9 48:4,5
**decision's** 9:24
**decisionmaker** 9:16 11:3 12:15 13:10 14:1 42:24 42:25
**decisionmaking** 12:6 42:14
**decisions** 46:11

**deed** 80:14 81:20
**deemed** 79:20
**defendants** 1:9 2:8
**defined** 72:24
**defines** 74:6
**defining** 75:7
**definitely** 13:22
**definition** 70:13 73:8 74:8,21,24 75:4
**definitions** 10:24 12:4 57:17
**deform** 12:7
**delegate** 8:10,15 20:23
**delegating** 8:9,17 9:16 21:2
**delegation** 9:4
**demonstrated** 38:25
**demonstrates** 39:12
**denies** 66:24
**department** 42:8 79:22
**depend** 11:10
**depends** 16:5 17:21 24:17
**deponent** 76:3 77:8,22,23
**deposed** 5:21
**deposition** 1:11 3:8,14 5:9,11 77:11,18 79:8,11 80:1,3 81:1,3
**described** 63:21
**describes** 58:23 63:22,23 66:3 68:1
**describing** 64:11
**description** 59:11 59:16
**descriptions** 59:17
**details** 21:22 32:24 51:8 58:8
**deter** 20:3 49:22 50:14
**determination** 8:25 9:21 12:17 13:9,11 14:5 20:15 24:7 26:5 28:24 29:3 33:21 34:1 35:1,2 37:10 41:9 44:20 56:23 71:9
**determinations** 49:16
**determine** 20:3 41:7 73:24
**determined** 41:6 49:5
**determining** 8:19 46:5,6 74:2
**develop** 74:20
**developed** 13:13
**diagnosis** 24:6
**difference** 55:2
**different** 21:15 69:25
**differently** 46:23 47:11
**difficult** 14:4
**digression** 21:6
**direct** 3:3 4:8
**direction** 28:22 77:20
**directive** 16:21
**director** 41:15
**disciplinary** 5:17 29:1
**discipline** 5:5 28:7 28:13,17 40:8,16 48:23
**disciplined** 30:17
**disclosed** 29:11 63:19 66:19 68:6 69:5
**discovered** 19:6 68:20,22
**discrimination** 7:15 14:25
**discuss** 12:3,5,7 62:19
**discussion** 34:8,18 67:6
**dishonest** 29:22
**dishonesty** 48:6
**disinterested** 78:1
**district** 1:1,1
**distrustful** 31:7
**division** 1:2
**doc** 23:8
**document** 23:3,8 23:10 34:24 56:25 57:2,21 63:6 64:12,13
**documented** 24:12 24:17,23
**documents** 27:2,7 57:22
**doe** 1:4 79:6 80:3 81:3
**doing** 30:18 71:16
**door** 71:2
**dorm** 29:24 39:22 60:11
**downside** 45:13
**draft** 9:25,25
**drinking** 22:23,23
**drinks** 32:10
**drunk** 54:19 65:18 67:19 71:5
**duly** 4:4 77:8
**duties** 8:7 20:11
**dynamics** 31:8

**e**

**e** 2:1,1,6,13 4:11 4:11,11,12,12 50:6 63:3
**earlier** 45:22 49:4 63:6
**ears** 14:8
**ecchymosis** 23:16 23:20
**edited** 30:10,13
**education** 74:23
**effort** 44:2
**egregious** 51:4
**either** 6:12 12:15 16:19,25 28:4 53:19
**elaborate** 20:13 26:11
**eliminate** 6:15
**email** 79:16
**employ** 78:5
**employee** 55:23
**en** 66:19
**enclosed** 79:11
**encounter** 29:8,9 29:13 39:3 52:21 53:5,17,19,21 66:19,20 69:3 71:20 73:2
**encounters** 63:20
**endurance** 7:4
**engaged** 40:7 52:22 53:1
**engaging** 31:17 75:10

**ensure** 14:2 45:8
**entered** 81:9
**entire** 80:5 81:5
**entirety** 9:5,7
**entity** 41:7 47:8
**equity** 9:10 12:1 12:10 20:4 42:13 49:6,12 75:1
**errata** 79:13,19 81:7,10,18 82:1
**essence** 74:10
**et** 79:6,6 80:3,3 81:3,3
**eternally** 6:22
**ethics** 75:2
**evaluate** 36:9,12 45:3
**evaluating** 44:21 45:2 49:21
**evaluation** 36:14
**evening** 33:14 39:25
**event** 73:7 78:4
**events** 58:9 70:2
**evidence** 13:12,14 18:16 25:15,16,22 29:19 31:1 36:19 37:15,20 38:7,8,20 39:5,14 53:19,21 69:4
**evolved** 47:17
**exact** 28:19 46:10
**exactly** 6:7 39:21 69:18
**exam** 3:1 62:23 63:1,3,5,8 66:17 68:24
**examination** 1:11 3:3 4:8
**examined** 4:6
**example** 26:12
**exception** 16:17
**exceptions** 16:11 16:12
**exchange** 69:13 70:16
**excuse** 9:12,22
**executed** 81:10
**execution** 80:14 81:19
**executive** 9:13 15:8,13
**exhibit** 3:9,10,11 3:11,12,14,15 14:13 23:1 25:5 26:4,6,24 34:12,17 34:19,24 51:19 54:2
**exhibits** 3:6,8 34:22
**existence** 30:16
**expect** 24:21
**experience** 45:16
**expertise** 15:20
**expiration** 80:19 81:25 82:25
**expires** 78:17
**explain** 39:20
**explained** 39:18 39:19 73:11
**expressed** 12:2
**expressing** 50:6
**extension** 16:14
**eyes** 14:8

**f**

**f** 2:6,13
**fabricated** 69:8
**face** 13:25,25 28:7 28:12,25 48:23
**facilitator** 28:3
**facing** 28:6,16
**fact** 6:16,22 20:7 41:21 44:19 45:1 53:7 55:14,16 63:5 71:25
**factfinding** 25:11
**factor** 74:2
**facts** 25:9 31:6 51:17 58:11,13,15 58:18 71:12
**factual** 25:6
**faculty** 10:22 11:24 45:19
**faint** 23:20
**fair** 45:9
**faith** 50:19
**fallen** 33:1
**false** 41:8 43:1 46:7,11 47:21,24 48:3,7,20 49:21 71:10,23
**falsified** 48:3
**familiar** 74:1
**fault** 66:14 68:3,8 69:14
**february** 1:18 4:2 77:15 78:8 79:4
**feel** 28:3 45:4 50:23
**feels** 68:7
**felt** 31:6 45:12
**fewer** 20:21
**figure** 30:22 40:19
**file** 52:13,14 62:22
**filed** 48:3
**files** 34:23
**filing** 48:6 50:21 52:10,19
**final** 12:16 13:9,10 35:2 37:10
**finalization** 19:23
**finally** 6:18
**find** 12:24,25 13:24 37:14,19,20 37:25 79:11
**finding** 23:15 24:6 25:22 47:22
**findings** 23:12,13 25:7
**fine** 32:3
**finish** 6:6
**finished** 31:22
**first** 4:4 18:21,23 19:1 21:11 22:2 34:17 37:14 40:11 40:20 41:5 44:2 45:7 46:5,18 47:14 57:12 58:20 65:24 66:20,25 67:25 77:8
**five** 20:18 73:14
**flip** 22:12
**flop** 22:12
**folks** 49:9
**follow** 18:19,22
**followed** 47:1
**following** 6:20 27:2 33:25 37:24 38:23 39:13
**follows** 4:6
**foregoing** 77:11 80:13 81:18
**forgotten** 45:22
**form** 9:15 24:9,25 25:24 32:16 43:10 48:14,21 55:13 63:25 68:14 69:20 70:4,15 72:19 73:4
**formal** 46:3

**forming** 36:25
**formulating** 6:21
**forthcoming** 43:4
**forward** 43:12 50:17 69:14 72:13 79:15
**found** 23:23 47:20 61:6
**four** 10:20 20:17 21:16,19
**fraternity** 31:8
**free** 80:14 81:20
**friend** 67:12,15,16 67:17,21
**front** 13:23 46:19
**fruition** 14:3
**full** 8:20,22 10:2,3 59:8 74:8
**function** 15:13
**funky** 22:8
**further** 13:1 75:13 76:3 78:1

**g**

**gain** 53:8,24
**general** 12:5 43:6
**generalizing** 74:8
**generally** 6:5 9:10 10:18,19 11:5,9 12:22 13:5 16:5 16:10 21:16 25:8 27:16 34:2 36:3,5 37:9
**generated** 14:14
**getting** 45:8 59:12 71:1
**girlfriend** 31:9
**give** 4:13 38:4,15 38:21 39:6 73:14
**given** 40:4 77:22
**gives** 69:14
**go** 6:21 10:7 18:17 18:20 25:10 26:10 34:5 44:15,18,25 45:12 50:2 64:14 65:12 67:4,7
**goes** 10:4,18 63:12
**going** 13:21 16:22 28:16,22 31:15 49:22 50:13 51:16 52:12 61:10 69:6
**gonna** 5:20,25 6:24 14:11 15:6 22:25 23:2 26:18 30:23 38:6 64:12 64:14
**good** 50:19 53:15
**graces** 53:15
**great** 13:24
**ground** 5:19
**guess** 9:8 13:6 19:8 20:14 29:17 35:1 43:14 47:21 56:10 57:7 70:5
**guilty** 31:1

**h**

**h** 2:10 4:11
**half** 7:4 20:17
**hall** 27:4 38:13,19 59:3,5,13,15 74:15
**hamilton** 1:14 77:3,6 78:19
**hand** 78:7
**handed** 27:12 34:11
**handled** 9:13 46:22 47:11
**handles** 9:5
**handling** 9:6 46:14
**handwritten** 3:10 27:14
**happen** 15:22,23 17:1
**happened** 39:22 44:5 47:22 53:22 59:17 68:8
**happening** 43:6
**happens** 16:6
**happy** 6:23
**harassment** 7:16 12:5,21 14:25 20:16 29:2 40:12 40:24 42:25 45:2 47:2 57:18
**harrison** 2:10 27:4 59:3,5,12,15
[redacted] 3:10,11 5:2 7:11 10:9,10 14:16 17:1 18:15 18:22 19:17 21:8 21:24 22:4,22 23:4,23 28:1,6,12 28:16,24 29:4,5,7 29:23 33:12,21 34:15 35:19 39:18 39:20 41:25 42:18 43:14 44:13 45:8 45:16 46:4,16 47:17 49:21 50:23 51:4,18,24 54:20 55:8 56:15,24 58:1,5 60:3 61:3 61:19,24 62:20 64:21 65:7,10,24 67:12 71:15,19 72:16 73:11 74:13 74:14
[redacted]**'s** 11:22 17:24 21:18 27:20 36:10 43:16,22 59:11,15 60:11 62:21
**head** 11:3
**headed** 48:18
**headings** 37:12
**health** 68:22
**hear** 30:24 48:1
**heard** 74:17
**heavily** 72:17
**held** 34:8,18 67:6
**helpful** 14:9 37:3
**hereunto** 78:6
**higher** 74:23
**hospital** 63:4 72:22
**host** 12:8
**hour** 1:18 77:15
**hours** 10:20 21:17 21:19
**huh** 6:13,14 27:15 30:19 47:3 51:10 54:12,22 66:5,7

**i**

**identification** 34:19
**immediately** 37:23
**impact** 24:12
**imply** 70:25
**impression** 36:25
**impressions** 36:17 36:18
**inaccurate** 71:18
**incapable** 71:1
**incapaci** 38:4
**incapacitated** 37:21 38:1,3,4,8 38:22 39:7,15,17 70:22,24,24 71:2 72:17 73:8,25 74:9 75:7
**incapacitation** 12:7 73:22 74:6 74:12,21,25 75:4

**incident** 29:24 30:4,5 60:8 69:9
**incidents** 69:6
**included** 63:8 79:13
**incoherent** 74:9
**incorporated** 81:12
**incorrect** 7:17,18
**independent** 43:24
**independently** 27:8
**index** 3:1,6
**indiana** 1:1,14,17 77:1,6,14
**indianapolis** 2:5
**indicated** 38:14
**indicating** 79:13
**individual** 1:8 46:3 50:17 68:7 71:16 73:6
**individuals** 69:3
**inference** 31:13
**information** 13:16 18:18 25:13,14,16 25:16 27:2,7 29:20 48:3 69:10 69:11,12
**informed** 12:6
**initiating** 69:16
**injuries** 23:22 24:6,6,7,11,12,18 24:24 68:20,22 69:2
**inner** 23:19
**inquire** 24:23
**inquired** 30:12
**inquiring** 39:24
**insight** 14:3
**instinct** 30:25
**institutional** 9:10 12:1,10 20:4 42:13 49:5,11 75:1
**intent** 44:10
**interaction** 36:24 37:1
**interactions** 11:19 11:20 70:8
**intercourse** 31:19 33:9,11
**interest** 12:2
**interested** 78:4
**interfere** 55:25
**interpret** 69:13
**interpretation** 69:10
**interpreted** 70:7
**interprets** 70:8
**interviews** 25:17 57:21
**intoxicated** 29:23 29:25 30:1 70:21 71:4 72:18 73:6 73:25 75:7
**intoxication** 12:8 73:22
**inverbal** 6:12
**invest** 63:14
**investigating** 15:6
**investigation** 14:10 16:22 17:6 19:7 26:21 43:15 43:25 44:12 46:8 46:12 47:25 48:8 56:7,13,14,22
**investigator** 24:21
**investigator's** 3:9 13:15 14:14 16:7 18:4,11,14 19:24 25:4 26:13,14,15 26:25 29:19 36:20 37:7,8 43:18 51:8 54:1 57:9,12 58:9 61:17 66:16 71:13
**investigators** 11:8 11:17 13:13,20 15:5 16:2,6,13 17:5 18:3,19,22,24 19:1,25 22:3,6,11 22:13 25:6,15,18 26:8 27:6 28:8,13 30:12 38:9,10 43:17 48:12 57:13 57:23 58:16,18 60:6 61:3 62:15 63:12,18 72:23
**involved** 7:12,19 8:6 12:4 16:3
**involvement** 7:25 8:4 16:23
**involving** 31:7
**issuance** 33:20
**issue** 15:11 17:4 19:5
**issues** 31:15 32:15
**italicized** 37:11
**items** 27:10
**iv** 58:3,4
**ix** 12:10 15:9 45:20 47:1 49:3,8 49:22 50:14,18

**j**

**jeff** 5:1 41:18
**jeffrey** 2:3 3:3
**jem** 1:3
**jhh** 2:14
**jmacey** 2:6
**joseph** 2:10
**judgment** 69:8

**k**

**k** 4:12
**karen** 14:14,20 15:1,4
**katherine** 1:12 3:15 4:3,11,12 76:7 77:7 79:8 80:4,9 81:4,13 82:20
**katie** 1:7
**kealey** 2:9 24:9,25 25:24 31:22,25 32:16 34:7 43:10 48:14,21,24 49:23 50:2 51:10 55:13 55:17,22 56:8 63:25 64:3,6,11 65:2 67:4,8 68:14 69:20 70:4,15 72:19 73:4,16 75:15,18,22 76:1 79:5
**keep** 6:2
**kelley** 8:6 55:18
**kept** 61:25 64:22
[redacted] 5:2 7:11 7:20,21,24 17:3 26:17 46:14 47:18
[redacted] 8:25 47:19
**key** 38:18 66:4 71:2
**keys** 74:16
**kind** 13:15 25:19 40:21 41:5 45:7 46:5 47:14
**knew** 52:25
**know** 5:25 6:7 7:10,13 15:17 17:3,7 19:17,20 21:8,11 23:5,7,18

30:12 31:22 32:10 33:1,6,12 35:9 37:15,23 39:19 42:4,7 44:4,4 45:6 46:13,15,21,25 47:10 52:11 54:20 55:24 56:19 62:4 62:10 64:24 65:17 65:19 67:18 69:21 70:11,18 72:9 73:10,12 74:5
**knowingly** 71:10
**knowledge** 8:23 17:5

**l**

**l** 3:15 4:11 78:14
**labeled** 34:16
**labial** 23:17
**lafayette** 1:2,17 2:12 77:14
**laid** 58:18
[redacted] 30:13,17
**large** 77:6
**law** 1:15 77:12
**laying** 37:24
**learn** 39:2 45:16
**learned** 47:15
**led** 29:21 56:7 71:15
**left** 23:19 38:17
**legal** 41:4,5 79:1 82:1
**legitimately** 74:16
**letter** 3:11,12,15 9:15 16:5,23 23:16 28:20 35:2 37:10 42:16,17 43:3 79:20
**level** 48:6
**lie** 53:23 71:19,21 71:22,23
**lied** 29:5,6,7 48:2
**line** 54:9 55:25 79:13 81:7 82:3
**lisa** 1:13 77:5
**list** 40:9 57:21 58:4
**listed** 27:10,16,17 81:7,17
**listen** 19:11,18,21
**listened** 30:6
**listing** 81:7
**lists** 57:16
**little** 10:17
**llp** 1:16 2:3,10 77:13
**lobby** 38:11
**logical** 31:13
**logistical** 9:12
**long** 4:24 6:22 11:12,14 17:17,18 21:14 33:19,24
**look** 15:10 23:11 23:15 26:23,23 34:12 40:3 53:25 55:7 59:7 62:17 62:17 63:11 64:17 65:16 67:17
**looking** 57:9 72:2
**looks** 35:17 37:11 61:2 67:14 68:5
**loop** 52:18
**lot** 20:7
**lying** 29:18 62:14 62:16

**m**

**m** 4:11,11
**macey** 2:3,3 3:3 4:9 5:1 24:14,16 25:3 26:1,2 31:24 32:1,20 34:5,9,10 34:20,21 43:13 48:17,22 49:1,2 50:4,8 51:9,13,15 55:15,20 56:5,10 56:12 64:2,4,7,9 64:14,16 65:4,5 67:5,7,9 68:18 69:23,24 70:9 71:7 72:25 73:9 73:14,19,20 75:13 75:16,25
**maceylaw.com** 2:6
**madam** 79:10
**mail** 50:6
**main** 1:16 2:11 77:13
**making** 12:12,13 13:24 26:5 39:16 44:19 49:16
**maliciously** 52:9 52:11
**managed** 41:15
**manufactured** 51:24
**march** 78:17
**marked** 3:8 14:13 22:25 34:19
**marks** 69:2
**mary** 1:4 79:6 80:3 81:3
**material** 27:13 69:22
**materials** 26:21 27:17
**matter** 4:6 37:16 62:19 77:10
**mean** 6:4,5 9:7 11:25 38:3 43:11 46:23
**means** 38:4
**meant** 72:17,17
**measurables** 74:5
**medical** 23:5,12 23:13
**meet** 13:19 65:9 73:8
**meeting** 9:21 10:13,14,18,19,21 13:17,17 16:9 18:12,17,20,23,25 19:2,12,19,21 21:15,19,21,22 24:1 27:21,24 28:1,5,11 33:19,20 34:1,3,4 35:6,11 35:19,20 36:13,22 36:24 37:3 43:21 45:23 48:2,12 60:9 73:10
**meetings** 48:19
[redacted] 3:10 5:2 7:11 10:9,10 11:21 14:16 17:1 17:24 18:14,21 19:17 21:8,18,24 22:3,22 23:3,23 27:20 28:1,6,12,15 29:23 33:12,21 35:19 36:10 43:22 44:13 46:4,16 47:17 49:21 50:23 51:4,18 58:1 60:3 61:20 73:11
**member** 12:3
**member's** 31:9
**members** 10:22 11:24 36:4
**memory** 16:25 30:3,5
**mentioned** 13:5 14:10 17:11 35:5 46:4 49:9 51:21

**mentions** 14:20
**mess** 23:1
**messages** 27:5 29:21 36:21 51:7 53:20 67:14 71:14
**messed** 65:12
**met** 10:12
**meyers** 14:15,20 15:1,4
**middle** 64:15
**midwest** 79:17 82:1
**mind** 16:17 18:14 34:13 52:5,7
**minutes** 73:14
**mis** 34:16
**mischaracterize** 51:22
**mislabel** 34:16
**misnumbered** 34:22
**mispronouncing** 4:19
**misstates** 63:25
**misunderstood** 72:16
**moment** 28:19
**monday** 35:18 54:10,18 58:20 61:5 62:1,8 64:5 64:23
**morning** 59:21 60:13 66:11
**motivation** 53:7
**motives** 50:21,25 51:1 52:10
**move** 43:12 59:2 74:10
**moves** 58:23,24
**moving** 60:15
**multiple** 72:2

**n**

**n** 2:1 4:12 23:16 78:14
[redacted] 5:2 7:11,21 7:22 8:25 17:3 26:17 46:14 47:18 47:19
**name** 4:10,14,20 5:1 9:16,22,24 54:5 79:6 80:3,4 80:15 81:3,4,21
**nancy** 1:4
**natalie** 7:20
**nature** 19:15
**necessarily** 44:14
**neck** 23:16
**need** 15:18 16:15 19:8
**needed** 43:12 44:15,18,24 45:3
**negative** 36:25
**never** 29:2 53:4 66:23
**new** 16:14 22:14 31:9
**night** 32:11 39:22 40:1 54:11,18 55:9 60:22 61:5 64:5 65:18 66:20 67:20
**nonconsensual** 53:5
**nonverbal** 6:13
**north** 2:4
**northern** 1:1
**notarial** 78:7
**notarized** 79:15
**notary** 1:13 77:5 79:25 80:10,18 81:15,23 82:23
**note** 46:2 79:12
**noted** 38:9,10
**notes** 3:10 26:6,7 26:13,13,14,15,17 26:20 27:12,14 77:19
**nother** 45:15
**notice** 1:20
**notified** 48:11
**number** 79:7,13
**numbers** 81:7
**numeral** 58:4
**nurse** 23:12 63:2

**o**

**o** 78:14
**object** 24:9,25 25:24 32:16 43:10 48:14,21 49:23 55:13 63:25 68:14 69:20 70:4,15
**objection** 48:24 72:19 73:4
**objective** 74:4
**obtained** 38:18
**obvious** 24:4 51:5
**obviously** 5:8 22:16 24:3,5 30:17
**occur** 11:11,12
**occurred** 24:8,19 54:23,24 55:9,11 55:11,21
**occurring** 33:17
**october** 3:13
**office** 9:9,10 10:7 12:1,10,10 16:1,3 20:4,5 40:6,17 41:10,22 42:5,12 43:25 44:6,11,25 45:11 47:4,5 49:5 49:11,11 75:1,3
**officer** 15:9 42:12
**offices** 1:15 77:12
**official** 1:7 80:15 81:21
**oftentimes** 6:20
**oh** 26:10 30:21 31:24 32:2
**ohio** 79:2
**oie** 56:2
**okay** 4:18,24 5:11 5:14,16,19,19 6:5 6:9,11,16,18 7:1,3 7:8,10,18,23,25 8:5,10,15,15,19,23 9:18 10:1,1,4,9,12 10:15,17 11:15,17 11:21,24 13:5,5,12 14:19 15:11,16,16 15:22,24,24,24 16:1,10,25 17:3,8 17:8,11,11,15,17 17:21,24 18:10,13 18:19 19:3,3,11,17 19:23 20:2,11,19 20:21 21:1,1,5,5,5 21:11,14,18,21 22:2,7,15,25 23:11 23:15,25 24:3 25:14,14 26:1,3,19 26:23,23 27:15,15 27:20,24 28:5,15 28:23 29:3,6,11,15 30:10,22 31:4 32:4,21 34:2,16 35:1,5,16,22 36:12 36:16,23 37:3,10 37:10,14,19 38:6,8 38:17,23 39:18 40:14 41:2,9,21,25 42:15 43:2,5,24 44:4 46:2,4,4,20

46:25 47:17 48:18 49:1,14,19 50:13 51:6 52:4,4,18,18 52:25 53:4,10,25 54:7,11,13,17 55:10 56:5,10,18 56:21 57:2,20,25 58:3,7,18 59:11,24 60:21 61:24 62:7 62:17 63:11 64:14 64:20 65:1,4,11,15 66:2,16 67:3,24 69:4 73:19 74:4 74:12 75:1,8
**once** 5:15 10:12
**oops** 34:16
**open** 44:12
**opened** 45:18
**operating** 9:2,3
**opportunity** 13:22 19:18 21:8,12 22:16 36:9 43:14 69:17 75:18
**oral** 1:11
**order** 16:18 61:15 61:18
**orders** 75:24
**ordinarily** 35:5
**ordinary** 21:14
**outset** 28:5
**outside** 42:17
**overrule** 13:7
**overruling** 13:8

**p**

**p** 2:1,1,5,9,12 78:14
**page** 3:2,7 23:11 26:25 40:3 53:25 54:13 56:25 57:20 58:3,3,7,24 59:5,8 59:13,15,21 60:10 60:11,13,21 61:18 62:12,17 63:15,17 64:19 65:15 66:2 67:13,14,23 79:13 79:15 81:7 82:3
**pages** 23:4
**pallet** 23:21
**panel** 9:20,21 10:13,14,18,19,21 11:1 12:3,11,13,17 12:19 13:12,17,18 14:1 16:8 17:12 17:15,16,18,21,25 18:7,12,12,17,20 18:23,25 19:2,12 19:19,21 21:14,18 21:21,22 22:15,19 24:1,1,13 27:21,24 27:25 28:2,5,11 33:19,20 34:1,3,4 35:6,11,20 36:1,3 36:3,22,24 37:3 39:20 41:13 43:21 45:23 48:1,12,19 49:9
**panel's** 24:18
**panels** 10:23
**paragraph** 37:24 38:10 54:6 57:7 58:20 59:8 64:15 65:21 67:22
**paraphrase** 64:12 64:13
**paraphrasing** 42:22
**part** 19:6 31:1 33:13 43:17 44:18 44:24 51:17 56:25 69:21 75:5 81:9
**participant** 72:10
**participate** 70:23
**particular** 16:19 18:13
**parties** 13:20 16:20 77:24
**parts** 21:15
**party** 47:8 58:23 58:24 60:21 78:3 78:5
**passed** 74:10
**passive** 4:19
**pending** 7:7
**pennsylvania** 2:4
**people** 14:5 45:15
**people's** 11:10
**percent** 20:18,20
**percentage** 20:11
**perform** 71:3
**performed** 63:4
**performing** 45:5
**period** 8:13
**person** 9:19 11:6,7 11:22 13:23 22:2 25:20,20,21,21 33:16 69:1 74:2,3 74:9 78:2
**personally** 80:11 81:15
**perspectives** 14:8
**ph.d.......** 3:16
**phone** 79:3
**physical** 63:3
**physically** 74:16
**pierce** 1:13 77:5
**place** 1:20 36:15
**plaintiffs** 1:5,15 2:2 77:12
**plans** 39:12,16
**please** 18:1 20:13 44:23 49:7,24 55:3,10 57:6 67:22 75:23,25 79:11,11
**point** 36:19 59:7 59:25 61:2,11
**policy** 10:25 12:5 12:21 20:16 29:2 32:6,18 33:25 40:9,19,24,25 42:25 47:2 57:17 70:14 72:23 74:8
**por** 73:2
**portions** 73:2
**position** 4:24 8:8
**possible** 6:3 13:2 14:2 28:7 71:6 72:16,20 73:1,5 75:8,12
**post** 31:19 33:8,10
**potential** 28:17,25 39:1 44:22
**power** 53:8,18,24
**practitioner** 23:12
**pre** 58:15
**predated** 55:18
**preliminary** 19:24 21:7,9
**preparation** 21:7
**prepared** 19:25 23:3 48:19 58:15
**preponderance** 37:14,20
**present** 10:14,15 11:22 13:23 25:9 39:21 48:1
**presented** 13:12 29:19 36:19,21 57:1 61:14 71:12 77:23
**presenting** 69:11
**preside** 9:20

**president** 5:3 10:5 23:7 34:15 42:1,1 42:4,12 75:2
**presumably** 37:24 44:8 49:15 62:11 65:8
**presume** 6:25 61:12
**pretty** 66:8
**prevent** 25:18
**previous** 63:17
**previously** 3:8 5:21
**prior** 8:16 17:25 18:7,11,23 19:11 19:19,23 21:6 29:11 30:8 33:1 34:2,4 50:23 54:23,24 55:5,21 56:1,2,3,13,14 66:17 68:5,5 69:6 72:3
**probably** 5:19 9:14 20:18 47:15
**problem** 22:23
**problems** 38:11
**procedural** 15:7
**procedure** 1:20 9:2,3 77:17 80:5 81:5
**procedures** 14:24 47:11 49:10
**process** 8:3,6 9:12 11:4 12:12,14 13:22 14:4,23 16:24 17:6 20:1,3 22:5 29:2 41:14 44:17 45:9,18,20 47:20,25 48:16 49:3,20 50:13,18 70:3,23 72:11 75:6
**processes** 19:9,10 47:15,17
**produced** 1:12
**production** 79:16 79:16,22
**professional** 42:21
**prompt** 16:22
**pronunciation** 4:13
**protection** 31:12
**proved** 71:18
**provide** 6:6 27:6
**provided** 18:16 56:22
**provides** 58:8
**providing** 25:12
**proving** 53:21
**provisions** 57:16 57:16
**public** 1:13 77:5 80:10,18 81:15,23 82:23
**purdue** 1:7 4:22 5:4,17 7:16 41:12 48:23 54:25 55:5 55:12,22,23 56:4 56:13,15 58:16 60:4 66:18 68:21 69:6 79:6 80:3 81:3
**purdue's** 57:17 70:14
**pursuant** 1:19 14:23 26:24 27:1 77:16
**push** 68:21 72:22
**put** 53:14

**q**

**qualify** 72:11
**ques** 31:23
**question** 6:6,19,24 7:7 24:4,10 28:10 47:23 49:23 55:3 55:10,23 57:6 67:1 69:1 70:20
**questioning** 10:23 55:25
**questions** 3:3 4:9 6:15,21 12:17,18 14:2,3 22:16,19 24:16 25:3 26:2 32:1,20 34:10,21 35:25 36:1,2,4,5,7 43:13 48:17,22 49:2 50:8 51:15 51:17 56:12 64:9 64:16 65:5 67:9 67:16 68:18 69:24 70:9 71:7 72:25 73:9,20 75:14,15
**queue** 15:10
**quick** 51:9
**quickly** 5:22

**r**

**r** 2:1 4:11,11,12 78:14
**ra** 38:18 71:1 74:15
**raised** 49:19
**random** 8:16,18
**rape** 62:11 70:11 70:14,18 72:5,14
**raped** 62:11 69:15
**raw** 26:21 27:13 27:13
**reaction** 27:21
**read** 18:16 49:24 49:25 61:12 65:21 80:5,6,12 81:5,6 81:17
**reading** 18:11 79:20
**ready** 51:13,13,14
**realize** 68:21,23
**really** 5:22 11:9 13:8 15:11 43:11 65:18 67:19
**reason** 19:3 44:18 44:24 54:8 79:14 81:8 82:3
**reasonable** 33:16 69:1
**reasons** 37:25
**recall** 8:14 9:1 11:23 16:12 17:2 19:10,13,14 21:20 21:23 22:5,21,24 23:10,13,14,24 24:2 28:2,14,19 29:14 30:11,15 31:19 32:9,12,14 32:19,22 33:5,7,10 33:15,15,23 35:17 36:2,7,18,18 37:2 37:9 39:23 40:2 40:19 42:20 43:6 43:8,20 44:14 45:6 46:17,17,24 50:12 53:3,6,9,16 53:18 55:1 60:8 63:2,10 70:20 72:2 73:6 74:22 75:6
**recalling** 31:5 72:10
**receipt** 79:19

**receive** 25:4 26:15 44:20
**received** 9:11 25:5 27:10,17
**receiving** 17:24 18:2,4
**recess** 51:11 73:17
**recognize** 34:24
**recommendation** 12:24 13:7
**recommendations** 12:14
**record** 4:10 24:5 34:5,8,9,18,20 64:1 67:4,6 73:19 77:21 81:9
**recorded** 30:25 31:11 45:23
**recording** 19:5,11 19:15,18 21:12 29:21 30:6,7,13,16 31:19,21 32:5,7 33:4,6,8,16,18 36:20 38:24 45:24 51:7 71:13 74:17
**recordings** 33:2
**records** 23:5
**rectal** 23:18
**redacted** 27:3 37:15 54:4,5 57:25
**reduced** 77:19
**reduction** 20:25
**refer** 40:16
**reference** 61:9 79:7 80:2 81:2
**referenced** 27:13 80:11 81:15
**referencing** 27:13 69:22
**referral** 42:2,5,11 47:4,5
**referred** 41:22
**referring** 40:5
**refrained** 31:14,17
**refused** 62:20
**regarding** 40:4
**regards** 14:15
**reiterate** 47:14
**relating** 4:5
**relationship** 52:16 52:19
**relative** 78:3
**relays** 65:10
**relevance** 32:17
**relevant** 24:7,18 32:15 57:15
**reliant** 25:9,12
**relied** 56:23
**rely** 35:25 36:3 43:18
**remember** 10:10 10:11 11:21 17:24 18:2,4,10,11 21:18 21:21 22:15,19,22 23:25 27:20,25,25 30:10 33:22 35:22 35:23 36:16,23 39:21,24 45:13 62:4 63:23 64:24 65:25 66:3,4,6,12 68:1,2,8,24,25 70:21 72:8
**remembered** 39:25
**remembering** 71:5 71:8
**reminding** 53:13
**repeat** 6:20 28:10
**repeatedly** 4:20
**rephrase** 6:19,23 57:6
**report** 3:10 8:19 9:11 13:15 14:11 14:12,14 16:7 17:12,15,18,25 18:2,5,11,14,24 19:2,24,24 21:7,9 24:1 25:4,8,12 27:1,11,16,17 29:20 36:20 37:7 37:8 41:8,19 43:18 48:3,7 50:21 51:8,19 52:11,13,15,19 53:25 54:1 55:16 55:16 56:2,2,3,22 57:10,12 58:10 61:17 62:22 63:9 66:17 71:13
**reported** 41:20 54:24 55:8,12,23 57:3 60:6,8 66:1
**reporter** 50:1 75:17,24 80:7
**reporter's** 5:23 34:11
**reporting** 66:18
**reports** 60:17 61:20
**represent** 23:2
**represented** 77:24
**representing** 55:14,17
**request** 81:9,11
**requested** 49:25
**require** 12:22
**required** 8:8 79:25
**requires** 15:20
**residence** 38:13,19 74:15 78:19
**resolution** 14:23 16:3
**resolves** 56:8
**resolving** 14:24
**responded** 54:19
**respondent** 11:7 11:18,21 19:6 22:10,12 29:8 30:13 37:5,16 38:17 39:3,13 40:5 44:13,22 45:4 52:6,12 53:11 54:10,17,18 57:4 59:18 61:4 62:11 63:20 65:9 72:9 75:10
**respondent's** 58:24
**response** 27:3
**responsibilities** 40:7,18 41:11,16 41:23 42:6 44:1,6 44:11 45:1,11 47:6
**responsible** 41:12
**restate** 55:3
**restroom** 38:17
**result** 20:15,23 25:17 47:15 69:2
**results** 63:8
**returned** 79:19
**review** 8:16 17:15 21:9,12 25:2 57:21 75:19 79:12 80:1 81:1
**reviewed** 27:2 40:25 41:3 68:10
**reviewing** 24:22 44:16
**revocation** 42:19

**revoke** 42:5
**revoked** 42:2,10
**richardson** 21:24 55:19,21 56:3,5
**richardson's** 55:22
**right** 7:13 14:7 23:19 24:21 27:4 51:20 60:9 63:3 64:4 65:17,19 67:18,20 68:19 70:16 73:13
**rights** 40:6,17 41:11,15,22 42:6 44:1,6,11,25 45:11 47:6
**roe** 1:4
**role** 9:16 12:11,13 28:2 45:1,3,5 49:15
**rollock** 1:7 3:12,13 5:4 10:5 23:7 34:15 42:1,1,4 45:14
**roman** 58:3
**room** 11:1,17 29:24 38:18 39:22 59:12,15 60:11 66:20 68:9 74:17
**rotc** 57:5 61:22
**route** 40:20
**rule** 16:11 17:17
**rules** 1:19 5:19,22 77:16 80:5 81:5
**run** 5:21 12:9 75:3
**runs** 12:1

**s**

**s** 2:1 4:11,11 79:15 81:8,8 82:3
**saith** 76:3
**sanctions** 13:2
**sane** 62:23 63:1 66:17 68:20,21,23
**save** 52:16,19
**saved** 22:6
**saw** 50:5
**saying** 15:9 56:1 69:15 72:7
**says** 23:16 25:20 25:20,21,21 55:7 62:10,18 63:13 64:3,12 65:8,11,16 65:24 66:12,13 67:25 68:3 70:17 72:14
**scenarios** 72:1
**scenes** 9:12 15:7
**schedule** 16:8
**scheduled** 10:21 17:19 21:16
**schedules** 11:10
**scheduling** 8:18 9:14 11:9 16:15 17:21 22:8
**school** 35:12,13,14
**screwed** 68:17
**seal** 78:7 80:15 81:21
**second** 34:6,12 37:19 43:21,24 44:16 46:15 48:8 53:4,5,19,21 57:15 57:15 59:7 66:21 66:24
**section** 37:11 57:12,15,20
**secured** 38:12
**see** 5:23 14:12 16:7 26:24 31:2,4 37:12,21 54:4,11 54:20 60:13,22 61:22 62:1,5,12,23 64:24,25 65:20,23 65:23 67:21 70:11
**seeing** 23:10,13 68:25
**seen** 9:14 14:16 23:8 42:16 66:16
**sees** 69:17
**send** 9:25 10:2
**sending** 43:3
**sense** 37:4,6 72:12
**sent** 9:22,24 41:22 42:18
**sentence** 39:9,10 40:4
**separate** 11:19,20 41:6 42:8
**september** 3:12
**series** 25:6 57:16
**sermersheim** 1:7 1:12 3:16 4:3,11 4:15,16,21 5:1 23:2 34:11 51:16 64:17 73:21 76:7 77:7 79:8 80:4,9 81:4,13 82:20
**serving** 32:10
**session** 11:12,16 12:2
**set** 17:12 26:6 45:15 78:6
**sex** 54:10,18 57:4 60:18 61:5,21 64:4
**sexual** 24:8,19,22 24:24 29:7 31:17 33:11,13 52:6,21 53:1,5,10 60:3 63:2,19 66:19 69:2,5 72:12 75:9 75:11,11
**shared** 29:20 31:11
**she'd** 29:12 69:19
**sheet** 79:13 81:7 81:10,18 82:1
**show** 14:11,12 22:25 26:4,20 34:17 42:16
**showed** 63:6
**shown** 79:16
**sic** 6:12 55:18
**side** 11:2 23:19 28:2
**sign** 75:19
**signature** 75:17 77:23 78:13 79:14
**signed** 80:13 81:18
**signing** 79:20
**similar** 11:1
**similarly** 6:11
**simplistic** 72:12
**sincerely** 79:21
**sir** 79:10
**sit** 11:2,3 19:14 32:21
**situation** 52:1 53:8 66:13
**slept** 31:9
**soft** 23:21
**solutions** 79:1 82:1
**somebody** 61:10 73:11
**someone's** 4:20 73:24
**sorry** 26:10,12,25 30:20,21 32:2 39:10 66:12,13 67:13
**sort** 8:15 36:9 37:4 51:22 56:11 58:8

**speak** 18:23 30:2,5 31:20 42:13 47:13 47:19 52:7 65:20 71:20
**speaking** 11:5 16:5,10 39:16
**specific** 35:18 70:6
**specifically** 9:1 18:21 35:24 39:23 43:16 52:4 74:22 75:5
**specifics** 32:19 33:15 37:9
**speculating** 52:3
**spell** 4:10
**spent** 20:12 35:19
**spoke** 19:1 38:17
**ss** 77:2
**stack** 23:1
**staff** 10:22 45:19 62:21
**standard** 9:2,3 20:1,3 22:5 74:5 74:12
**standards** 41:13
**start** 9:8,8 10:9 34:22 35:14 44:9
**starts** 58:19
**state** 1:14 4:10 52:5,7 65:2 77:1,6 80:10 81:15
**stated** 54:20 62:4 64:23 70:7
**statement** 31:5 47:21 53:24 58:7 70:19 71:10,18,23 80:13,14 81:19,19
**statements** 28:7 28:13,17 29:22 46:7,12 47:24 48:13,20 49:22
**states** 1:1
**stating** 37:8
**stay** 16:20
**stefancic** 41:18
**stemming** 5:4
**stenographic** 77:19
**step** 17:13
**stick** 18:13
**stier** 8:6,9,11,17 8:19,23,24 9:17,19 12:16,16 20:24 21:2 46:14
**stier's** 17:4
**stopped** 44:3
**story** 68:12
**street** 1:16 2:4,11 77:13
**stuart** 1:16 2:10 77:13
**stuartlaw.com** 2:13,14
**stuck** 19:4
**student** 20:8,8,12 28:4 40:6,17 41:15,22 42:6 44:1,6,11,25 45:11 46:9,15 47:4,5,20 47:23 48:2,8,11,18 50:6,9,20 67:11 68:22 75:8
**student's** 48:13
**students** 4:21 13:21 14:6,6,22 20:7 41:11 45:19 71:17
**subject** 40:8,16
**submitted** 23:6,6,8
**subs** 37:23
**subscribed** 80:10 81:14 82:21
**sucks** 65:12
**suggest** 22:5 48:16 52:21,23 56:21 70:17
**suggested** 25:6,23
**suggesting** 55:6 56:17
**suite** 1:16 2:4,11 77:13 79:2
**summarize** 25:22 25:22
**summarized** 23:15
**summarizing** 51:23
**summary** 27:8 31:6 52:2 58:11 58:13,15
**summer** 35:13
**superior** 79:1
**support** 11:6,7,22
**supporting** 69:11
**suppose** 72:20
**supposed** 47:7,8
**suprapubic** 23:17
**sure** 15:25 19:4 34:7 36:14 44:3 47:22 49:4 56:8 66:8 67:5 69:23 70:5 73:16
**surmising** 54:15
**surreptitiously** 30:24
**suspicions** 48:13
**swanson** 2:3
**swear** 6:4
**swiped** 38:12
**sworn** 1:12 4:4 77:8 80:10,13 81:14,18 82:21

**t**

**t** 78:14
**table** 11:2,3
**take** 5:8 7:3,5 33:24 34:12 51:9
**taken** 1:14 5:11 24:20 51:11 73:17 77:11,18
**talk** 18:21 26:18 65:10,11
**talked** 38:23 43:19
**talking** 21:5,6 23:25 45:13 47:3 54:14 56:6 60:12 61:6,20 62:7,8 67:16 70:6 74:18
**tell** 4:4 10:17 34:13 69:18 77:8
**tells** 61:3 70:10
**ten** 20:20 27:3 33:25 35:6
**tend** 22:13
**tenderness** 23:17 23:19,20
**terms** 14:10 37:5 46:5,6 47:3 73:23
**test** 7:4
**testi** 59:17
**testified** 4:6 49:4 49:20 59:18,18
**testimony** 51:22 70:2 77:22 80:6,7 81:6,9,12
**text** 29:21 36:20 49:25 51:7 53:20 65:19 67:14 71:14
**texted** 65:9
**texts** 65:6,7 67:11
**thank** 25:1 75:16
**thanks** 4:18

**themes** 12:6
**thereof** 1:21
**thing** 70:6
**things** 12:3,8 15:8 27:4 68:10 70:22 72:2
**think** 10:12 15:24 21:5 29:15,17 30:1,3,25 38:25 42:21 43:9 47:10 48:10 49:3,8,20 50:5,17 51:19 52:7 55:15 63:21 67:10,21 68:10,15 68:19,25 70:7 71:22 73:15 74:2
**thinking** 44:14
**third** 35:15 40:3 47:8 54:8 57:20
**thirds** 65:15 67:23
**thirty** 79:19
**thorough** 25:2
**thought** 28:21 31:10 40:15 43:7 44:17,18,24 72:17
**three** 10:20,21 11:13,19,20 21:16 21:19 30:23 37:11 46:22 47:10
**thursday** 62:18 65:6
**time** 1:20 7:3 8:13 12:19 16:8,16 17:12 28:15,20 29:24 30:6 33:6 35:19 36:8 40:11 41:17 44:2 45:12 46:10 56:11,16 57:9 65:12,24 67:25 68:12
**timeframe** 46:21 56:20 60:5
**times** 5:14 68:15
**tippecanoe** 1:17 77:14
**title** 12:10 15:9 45:20 47:1 49:3,8 49:22 50:14,18
**today** 5:8 7:5 19:14 32:21 68:25
**told** 54:9 57:3 61:4 61:20 62:21 66:8 68:12 69:19,25
**top** 63:15 66:2,6
**total** 21:15
**totality** 71:12
**trained** 10:22 11:25 45:20
**training** 12:1,9 49:9,15 75:3,5,6
**transcribed** 80:7
**transcript** 6:1,3 75:19 77:21 79:11 79:12 80:5,12 81:5,11,17
**trauma** 12:6
**trigger** 19:7
**true** 56:19 77:21
**truth** 4:4,5,5 71:4 71:20 77:9,9,10
**try** 6:2 62:23
**trying** 30:22 40:19 40:22 52:16
**tuesday** 57:4 59:9 59:22 60:2,10,12 60:18,22 61:21 62:7
**two** 14:5,11 63:19 65:15 67:23 69:3
**twofold** 13:21
**type** 20:8
**types** 20:12,13,14 49:16
**typewriting** 77:20
**typewritten** 77:21
**typically** 33:24 35:14

**u**

**u** 78:14
**uh** 6:13,14 27:15 30:19 47:3 51:10 54:12,22 66:5,7
**ulterior** 50:20,24 50:24 51:1 52:10
**ultimately** 41:21
**unable** 38:4 71:3 74:10
**uncertain** 40:21
**unclear** 56:1
**underlying** 26:7
**understand** 6:18 40:15 74:19
**understanding** 10:24 74:20,24
**understood** 6:25 70:1
**united** 1:1
**university** 1:7 3:9 4:22 5:4,5 14:23 44:12 63:12 66:18 68:22 69:18 71:11 79:6 80:3 81:3
**unlock** 71:2
**unusual** 36:6
**use** 13:14 66:8
**usually** 22:10
**utterances** 6:13

**v**

**v** 79:6 80:3 81:3
**vaginal** 23:17
**vague** 21:23 42:20
**value** 13:24
**varied** 20:17
**varies** 74:2
**various** 10:24 71:25
**verbal** 6:12
**verbalize** 13:23
**verbally** 74:15
**veritext** 79:1,7 82:1
**veritext.com.** 79:17
**version** 70:2
**versus** 12:7 73:22 75:7
**vi** 58:12
**vice** 5:3 10:5 23:6 34:14 41:25 42:1 42:4,12 75:2
**video** 46:1
**videos** 27:4
**view** 25:19 45:10
**violation** 12:20,25 12:25 13:3 16:21 40:23 41:8 50:18
**violations** 32:18
**vp** 45:14
**vs** 1:6

**w**

**wait** 6:5
**waived** 79:20
**walk** 38:6 74:10 74:14
**walked** 38:11
**walking** 70:25 74:16
**want** 4:18 5:21 23:1 24:5 26:3 49:4 51:21 55:25

56:6 63:13 65:11 75:22
**wanted** 15:25 26:20 45:7 61:25 64:22
**way** 6:7 29:15 31:2,4 65:15 67:23
**we've** 7:14 43:19 66:16 68:10 71:21
**wednesday** 55:9 60:24 61:2,19
**week** 35:15
**weigh** 48:5 70:19
**weighing** 36:19 40:22
**went** 5:25 18:3 62:19 64:2 68:19
**when's** 35:13
**whereof** 78:6
**wider** 45:18
**william** 2:9 79:5
**willingly** 52:22
**witness** 1:12 4:7 16:14 24:11,15 25:1,25 32:17 37:16 43:11 48:15 48:25 50:3,5 51:14 54:3 68:15 69:21 70:5,16 72:20 73:5 75:21 75:23 78:6 79:8 79:12 80:1,4,11 81:1,4,15
**witnesses** 16:15 57:22,25 61:6 75:22
**witness'** 79:14
**woke** 66:11
**wondering** 73:21
**word** 7:13 23:18
**words** 6:4 16:21
**working** 71:17 74:22
**workload** 15:11
**worth** 57:8
**wpk** 2:13
**wright** 14:15,21 15:2,5,18
**write** 16:13 34:2
**writing** 28:20
**written** 1:20 72:23 73:23

**x**

**x** 27:5 54:9

**y**

**y** 27:5 78:14
**yeah** 12:15 18:3,6 18:8 24:14 28:11 42:23 44:24 49:8 54:2 65:12,22 76:1
**year** 35:12,14
**years** 20:17 71:17 74:23
**yesterday** 75:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.