**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| MARY DOE and NANCY ROE, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:18-CV-89-JEM |
| | ) | |
| PURDUE UNIVERSITY, *et al.*, | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment as to Plaintiff Nancy Roe [DE 53], filed by Defendants on March 4, 2021. On April 30, 2021 Plaintiff Roe filed a response, and Defendants filed a reply on May 21, 2021.

**I.      Procedural Background**

On November 13, 2018, Plaintiffs, female students, filed an eight count Complaint against Defendants, their former University and several of its administrators, alleging that they were assaulted in unrelated incidents by male students at Purdue University and were then wrongfully expelled, with the expulsions later reduced to suspensions. Plaintiffs separately reported the incidents to Purdue. According to the Complaint, Purdue investigated and found that Plaintiff Mary Doe had "fabricated" her allegation and Plaintiff Nancy Roe had "reported [her] assault maliciously." Plaintiffs allege that Purdue "has implemented a policy . . . wherein women who cannot prove their claims to the satisfaction of Purdue decisionmakers face discipline up to expulsion at Purdue," and assert that both Plaintiffs were wrongly suspended.

After a motion to dismiss was granted in part, the remaining counts allege violations of Title IX (counts I and II), retaliation under Title IX (counts III and IV), deprivation of civil rights

1

under § 1983 against the individuals in their official capacity (Counts V and VI), and individual § 1983 liability (Counts VII and VIII).

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## II.   Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.' (emphasis in original)" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Liberty Lobby*, 477 U.S. 242, 255 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Liberty Lobby*, 477 U.S. at 249-50.

## III.    Material Facts

Northern District of Indiana Local Rule 56-1 requires the moving party to include with its motion for summary judgment a "'Statement of Material Facts' that identifies the facts that the moving party contends are not genuinely disputed." N.D. Ind. L.R. 56-1(a). In response, the opposing party is obligated to file a "'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed." N.D. Ind. L.R. 56-1(b)(2). In this case, Defendants included a Statement of Material Facts within their Memorandum in Support of Motion

for Summary Judgment, along with appropriate citations to supporting evidence. Plaintiff Roe included a Statement of Material Facts within her Response in Opposition to Motion for Summary Judgment; however, Roe's Statement of Material Disputes sets forth only broad categories of disputes, three of the four couched as legal disputes rather than factual ones, and does not identify particular facts which are disputed.

    A.  Undisputed Facts

Roe was a sophomore at Purdue in the spring of 2017. She attended a party on April 17, 2017, at which she drank alcohol. Upon returning to her dorm around 2:00 a.m., Roe realized that she did not have her dorm key; she therefore asked a Resident Assistant to let her into her dorm room. The Resident Assistant advised her to go to the dorm hall front office for a spare key. Roe did so.

On April 22, 2017, Roe texted the same Resident Assistant: "So Monday night, after I knocked on your door I was sexually assaulted by the guy who walked me back from a party." Defs.' Br. Ex. A [DE 54-2]. On April 25, 2017, Roe and her then-boyfriend met with a different Resident Assistant and Roe advised that Resident Assistant she had been sexually assaulted.

On April 23 and May 3, 2017, Roe was contacted by the Office of Institutional Equity Title IX specialist to discuss the allegations of sexual assault and information received during the course of the investigation. On May 17, 2017, Dean of Students Sermersheim advised Roe that Purdue was exercising its right to investigate Roe's allegations pursuant to its Anti-Harassment Policy and other applicable policies. In that notice, reference is made to Roe's allegation of sexual assault and the allegation that Male Student B made a recording of part or all of the encounter without Roe's consent. On May 30, 2017, Roe was provided with a copy of Male Student B's written response

to Roe's complaint. During the investigation, Purdue's investigators interviewed people, including Roe and Male Student B. They also reviewed Male Student B's audio recording, dorm hall videos and photos, and text messages.

Roe had sex with Male Student B in the early morning hours of April 18, 2017. Male Student B made an audio recording of Roe and of portions of the sexual encounter, including the two arranging to meet the afternoon of April 18, 2017, for a second sexual encounter. Roe was unaware Male Student B was recording but did learn about the recording during Purdue's investigation into her allegations. Roe and Male Student B had sex on the afternoon of April 18, 2017, in Roe's dorm room.

Purdue's investigators interviewed friends of Roe and examined text messages exchanged between Roe and those friends, as well as discussions and text messages between Roe and her then-boyfriend. In those discussions and text messages, Roe told her friends of the encounters, used the phrase "hooked up" and expressed remorse over "cheating" on her then-boyfriend. In the discussions with her then-boyfriend, Roe told him she had cheated on him in the encounter in the early morning hours of April 18, 2017. The investigation included interviews of 12 witnesses, review of Roe's text messages and emails about the incident, review of video tapes of the common areas of Roe's dorm and of an audio recording of the early morning encounter between Roe and Male Student B. There is no indication that Roe was given an opportunity to ask questions of any witnesses.

Roe declined the opportunity to review the investigator's preliminary report and submit feedback on that report. The final report was issued on July 24, 2017.

Based on the investigator's recommendations and conclusions, Sermersheim advised Roe

that she planned to meet with the three-member Advisory Committee on Equity on August 7, 2017 to discuss the investigation. The notice to Roe of the panel hearing indicated it was called to investigate "possible violation(s) of the University's Anti-Harassment Policy by [Male Student B]". Roe appeared at the meeting.

During the August 7, 2017 meeting with the Advisory Committee on Equity, Roe was asked why she engaged in a sexual encounter with Male Student B a second time, and Roe responded that it was her way of gaining control over the person who had previously exerted control over her. Roe was also questioned about what she was wearing the night of the party, her drinking habits, why she continued to drink when she had a history of blacking out, and details about the sexual encounter during the early morning hours of April 18, 2017.

Sermersheim advised Roe that Sermersheim had concerns that Roe made a false statement and referred Roe to the Office of Student Rights and Responsibilities. Roe was also advised of her right to appeal Sermersheim's determination to Vice President for Ethics and Compliance Rollock. Roe appealed and submitted additional information to Rollock. Rollock found that Male Student B violated the Anti-Harassment Policy by recording his encounter with Roe but found no other misconduct by him. Male Student B was directed to write a ten-page paper as punishment for that violation. Rollock remanded the referral of Roe to the Office of Student Rights and Responsibilities and requested a finding from Sermersheim as to whether Roe knowingly made a false statement. Sermersheim found Roe knowingly made false statements in violation of the Anti-Harassment Policy, and directed that Roe be expelled.

Roe appealed that decision to Rollock. Rollock upheld Sermersheim's findings but reduced the sanction to suspension for a two-year period.

6

Purdue's investigators concluded Roe "initiated the conduct and stated on the recording that she not only enjoyed it but wanted to engage in sexual conduct with [Male Student B] in the future. Her consent was affirmative and clear, and there would be no reasonable cause for [Male Student B] to have questioned whether she was consenting to the conduct." Defs.' Br. Ex. K. at p. 22 [DE 54-13]. Since Purdue concluded that the sexual encounter in the early morning hours of April 18, 2017, was consensual, it determined that Roe lied about it. On that basis, Purdue's investigators recommended to Sermersheim that Roe "made a knowingly false and malicious complaint." Defs.' Br. Ex. F at p. 49:11-16 [DE 54-8].

Roe acknowledges that Purdue's decisionmakers issued the sanction because they believed that she lied about whether a sexual assault occurred.

B.  Disputed Facts

It is claimed by Defendants that the sex in the early morning hours of April 18, 2017 was consensual, and by Roe that it was not, as she was too intoxicated to give consent. Roe asserts that she does not remember much of what occurred that early morning due to her level of intoxication. Defendants assert that video of her retrieving her spare key from the dorm hall front office does not appear to show Roe too intoxicated to walk or find her way to and from the office. They allege that the dorm hall video shows Roe and Male Student B walking together to get Roe's dorm room key, Roe reaching over to touch Male Student B, and the two embracing and kissing.

Roe asserts that she was unaware that her reporting of the encounter was being considered for disciplinary action against her, and that she was denied the opportunity to fully present her position on that issue. Defendants assert that Roe failed to avail herself of opportunities to more fully participate in the process and present additional evidence or argument on her behalf.

## IV.    Analysis

Plaintiffs' Complaint claims that Roe's federally guaranteed equal access to educational opportunities was denied by Purdue's handling of her complaint of assault. Roe also claims her suspension was made in retaliation for complaining to Purdue about the assault. Roe further claims that Rollock and Sermersheim, acting in their official capacities, violated her constitutionally guaranteed right to Equal Protection while acting under color of state law. Finally, Plaintiff asserts individual liability against Rollock (Count VII) and Sermersheim (Count VIII) for "knowingly or recklessly implement[ing] and manag[ing] a sexual assault complaint process that deprived the Plaintiffs of their constitutional rights to due process and equal protection of the law."

Defendants move for judgment on all of Roe's claims. They assert that Roe has not come forward with evidence that Purdue's application of its False Statement Rule to Roe was gender discrimination or retaliation for protected activity. Defendants argue that the evidence adduced during Purdue's investigation of Roe's complaint of assault indicated that she "falsely reported a consensual encounter as an assault" and as a result, Roe's false statements do not constitute protected activity under Title IX. Defendants further argue that Purdue did not possess a retaliatory intent when applying its False Statement Rule to Roe's statements. It is Defendants' position that Roe cannot establish a deprivation of any protected interest in life, liberty, or property, and therefore cannot establish any Due Process or Equal Protection violations. Finally, Defendants assert that Roe's individual §1983 claims also fail based on a lack of Due Process or Equal Protections violations and qualified immunity.

The crux of Roe's response is that Defendants did not conduct an independent investigation into her culpability, but rather made the determination that she lied as part of the investigation into

her complaint of a sexual assault. Roe contends that the practice of assessing the reporter's culpability in the same investigation in which the assault allegations themselves are reviewed discriminates against women who report assaults. Roe argues that Purdue's complaint process violates Title IX, the issue of whether she lied during the investigation into her complaint is a factual issue, the focus of Purdue's investigation into Roe's culpability was discriminatory, Purdue's investigation process violated Due Process, and Sermersheim and Rollock are not entitled to qualified immunity.

A.    Title IX

Roe claims that Purdue violated Title IX, 20 U.S.C., § 1681 *et seq*., both through its deliberate indifference in investigating and acting on her report of sexual assault and by punishing her for making the report. In Count II, Roe seeks relief under Title IX only against Purdue University and not the individual defendants. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998) (recognizing that Congress abrogated the "States' Eleventh Amendment immunity under Title IX" as to entities receiving federal funds (citing 42 U.S.C. § 2000d-7)). Defendants seek summary judgment on Roe's Title IX claim against Purdue University asserted in Count II, arguing that Roe has failed to plead plausible facts showing that Roe was disciplined because she is female. Roe, in Count IV, also asserts Title IX liability for retaliation by Purdue against her for reporting the assault, Defendants argue that since Purdue's application of its False Statement Rule was "fact-based" it is not retaliation, because Roe was not engaged in a protected activity.

i.    Deliberate Indifference

Roe claims a violation of Title IX "by Purdue University's handling of her complaint of assault" and that "Purdue, through its handling of [her] complaint, was deliberately indifferent to

the harassment and thus violated Title IX." Pl. Resp. p. 12 [DE 68]. Deliberate indifference to harassment constitutes intentional discrimination under Title IX. *See, e.g., Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (private right of action lies for teacher-on-student harassment when funding recipient acts with deliberate indifference); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (finding a private right of action for damages under Title IX exists for "student-on-student" (peer) harassment where funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities). A plaintiff claiming Title IX discrimination based on an institution's deliberate indifference must establish that the funding recipient acted with deliberate indifference to known acts of harassment which were so severe, pervasive, and objectively offensive that they barred victim's access to educational opportunity. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S. Ct. 1661 (1999); *see also Doe v. Bd. of Educ.*, 2020 U.S. Dist. LEXIS 51256 (N.D. IL., March 24, 2020) (concluding that when a school official with authority to correct the issue had knowledge of the sexual abuse but failed to act to stop abuse it constituted deliberate indifference).

Defendants argue they are entitled to summary judgment on Count II because there is no recognized private right of action for disparate impact, and therefore Roe must show "facts raising the inference that Purdue acted at least partly on the basis of sex in [her] particular case." *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019). Defendants argue that Purdue's decisionmakers did not base their decision to discipline Roe on the fact that Roe was female, but on the fact that she made false statements. Defendants assert that Roe has acknowledged that Purdue's decisionmakers believed she made false statements and that they sanctioned her on that basis, and that this concession is dispositive. Defendants argue there is no evidence of "selective

enforcement" of Purdue's False Statement Rule, that Purdue's investigative process was reasonable, and that Roe's conduct was to blame for any deficiencies in the process.

Roe argues that the deliberate indifference of Purdue's decisionmakers constitutes intentional discrimination within the meaning of Title IX. Roe asserts that she was ambushed because she was advised the panel hearing was called to investigate "possible violation(s) of the University's Anti-Harassment Policy by [Male Student B]," but it resulted in disciplinary action against her. Roe argues that the questioning during the investigative process was unreasonable in that questions such as what Roe was wearing that evening, why she drank that evening since she had blacked out previously, and about the sexual acts which took place during that encounter were asked, in Roe's opinion, in an aggressive manner. Roe argues such questions would have been impermissible in a trial and should not have been permitted in this matter. Roe argues that credibility determinations by the panel made on the basis of such flawed processes violate Title IX.

A school is considered deliberately indifferent if its actions are clearly unreasonable in light of the known circumstances. *See Doe v. Macomb Cmty. United Sch. Dist. 185*, 2020 U.S. Dist. LEXIS 247132 (C.D. Ill. March 30, 2020). In this case, Roe's complaint of sexual assault triggered an investigation, which lead to a report, a panel hearing, a decision by Sermersheim that Roe had lied and that Male Student B had recorded his and Roe's interaction without Roe's consent, a sentence of writing a paper for Male Student B, and an expulsion (reduced by Rollock to a suspension) for Roe. Roe was advised that the panel was investigating "possible violation(s) of the University's Anti-Harassment Policy by [Male Student B]," Def. Br. Ex. N [DE 54-16], but Defendants have not provided any evidence Roe was advised that the panel was investigating

11

*Roe's* conduct. A jury could find that not telling a student that her conduct was being investigated is unreasonable. In addition, Roe was asked questions about her clothing, her drinking, and details about the sexual acts which occurred, questions that may have been impermissible if asked in a criminal trial for sexual assault. *See* Fed. R. Evid. 412(a)(2). A jury could conclude that the questions precluded the possibility of a fair, unbiased hearing or were indicative of sexual stereotyping. Reasonable factfinders could find that the questions were not designed to determine whether Male Student B engaged in wrongful conduct. In short, a jury could find that asking questions such as those asked of a possible victim of sexual assault during Roe's investigation was unreasonable and objectively offensive. *See Doe v. Macomb, supra*, at \*64 ("whether [the school] responded in a way that was clearly unreasonable in light of the known circumstances—is for a jury to decide"). Defendants are not entitled to summary judgment on Count II.

      ii.     Retaliation

Roe also claims that Purdue suspended her in retaliation for reporting the alleged sexual assault, in violation of Title IX (Count IV). Purdue argues that Roe's suspension was based on Defendants' determination that Roe made false statements about the nature of the encounter, not because she reported it.

Title IX "encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, *supra*, at 178. It prohibits educational institutions from retaliating against people who speak out against sexual harassment. *Id.*, at 183. To establish a claim for retaliation in violation of Title IX, a plaintiff must produce enough evidence for a reasonable trier of fact to conclude: (1) she engaged in a statutorily protected activity; (2) the school took a materially adverse action against her; and

(3) there existed a but-for causal relationship between the two. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). "[A]n adverse action is one that a reasonable [student] would find to be materially adverse such that the [student] would be dissuaded from engaging in the protected activity." *Burton*, *supra*, at 696. (quotation marks omitted) (citing *Doe v. Macomb Cmty. Unit Sch. Dist. 185*, 2020 U.S. Dist. LEXIS 247132 (C.D. Ill. March 30, 2020)).

The elements of a Title IX retaliation claim are the same as a claim brought pursuant to the antiretaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). In *Jackson*, *supra*, the Seventh Circuit Court of Appeals considered a retaliation claim brought by a high school basketball coach who was removed from his coaching position after reporting sex discrimination in the school's athletic program. *Jackson*, *supra*, at 171-72. In holding that the coach could bring a claim against the school board, the *Jackson* Court noted, "[r]etaliation . . . is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id*. at 173-74. Because "[r]eporting incidents of discrimination is integral to Title IX enforcement," in cases "[w]here the retaliation occurs because the complainant speaks out about sex discrimination, the 'on the basis of sex' requirement is satisfied." *Id*. at 179-80.

There is no dispute that Roe's suspension was a materially adverse action by Defendants. There also does not seem to be any dispute that Roe's suspension was causally related to her complaint of a sexual assault. Where the parties differ is in their assessment of whether Roe's report was a protected activity under Title IX. Roe asserts that because she has an incomplete

memory of the alleged assault and believes herself to have been unable to consent to the interaction, her report of the events in the early morning hours of April 18, 2017 is protected activity. Purdue argues that there was no evidence to support her report of assault, and therefore it is not protected activity. Purdue further asserts that Roe's acknowledgement that Purdue believed she was lying is dispositive.

Roe testified in her deposition that she believes herself to have been incapacitated due to intoxication at the time of the early morning encounter, stating "If I am not able to remember something and I was not able to fully understand what was going on around me and fully understand everything because I was not able to make those decisions, that means that I was incapacitated." Pl. Resp. Ex. 1, p. 138 [DE 66-1]. Defendant Sermersheim concluded during the investigation that, although Roe may have been intoxicated, she was not incapacitated, explaining: "Incapacitated would imply she's not walking, she's not communicating to an RA, she's incapable of getting a key to unlock her door. She is incapacitated and unable to perform any activity," Pl. Resp. Ex. 4, p. 70 [DE 66-4], and that "[i]f a person is incapacitated, they are incoherent, unable to move, walk. They are, in essence, passed out." *Id*. at 74. Purdue's anti-harassment policy defines incapacitation as "[a] mental state in which an individual cannot make rational decision because they lack the capacity to give knowing Consent (e.g., to understand the who, what, where, why and how of their sexual interaction). Such Incapacitation may be caused by alcohol or other drug use, sleep or unconsciousness. Intoxication is not equivalent to Incapacitation." Pl. Resp., p. 18 (citing https://www.purdue.edu/policies/ethics/iiic1.html) [DE 68].

Sermersheim's definition does not comport with the official Purdue definition of incapacitation for purposes of its anti-harassment policy. Indeed, her definition requires a much

14

lower degree of functioning for the alleged victim to be considered incapacitated and therefore unable to consent. Roe's definition is closer to Purdue's definition. If Sermersheim applied her definition when making her decision as to Roe's incapacity, a jury could find that her conclusion was inconsistent with Purdue's stated policy. If Roe was held to a different standard than Purdue's stated policies described, a jury could determine that the investigative process was unreasonable. Since a crucial issue in Defendants' decision making was whether Roe's report of the assault was made in good faith, those factual issues should be resolved by a trier of fact.

Since Purdue's False Statement Rule provides that "a good faith report of discrimination or harassment that is not later substantiated" is protected activity, whether Roe was acting in good faith is a crucial factor in determining whether her report is protected activity. Defendants argue that, even if Roe could show facts that supported her claim her statements were made in good faith, she must still prove retaliatory intent to establish a claim for Title IX retaliation. However, that does not take into account that, if Sermersheim applied the wrong standard to reports in which incapacity was an issue, the process itself may have been fundamentally flawed. In that situation, a jury could find the flaws in the process equate to deliberate indifference and punishing reporters for those reports would be an intentional response. *See Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629, 648-49 (1999); *Jackson*, *supra*, at 173-74 ("Retaliation . . . is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.").

Considering the factual disputes as to what standard Sermersheim held Roe to and whether Roe acted in good faith, this Court is unable to conclude that the investigatory process was not

unreasonable, and summary judgment on Roe's retaliation claim is inappropriate, as whether Roe's report was protected activity is crucial to a cause of action for Title IX retaliation.

  B.  Equal Protection and Due Process Claims

  The Fourteenth Amendment contains what are commonly referred to as the Equal Protection Clause and the Due Process Clause. The Equal Protection Clause states: "No State shall make or enforce any law which shall . . .deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Due Process Clause provides: "No State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. 42 U.S.C. § 1983 serves as a procedural vehicle for lawsuits vindicating federal rights elsewhere conferred. To succeed on a § 1983 claim, a plaintiff must show that she was deprived of a right secured by the Constitution or federal law, by a person acting under color of law. Under 42 U.S.C. § 1983, an individual may bring a claim against a person acting under the color of state law for a violation of the Due Process Clause or the Equal Protection Clause. *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017); *Fitzgerald v. Barnstable Sch Comm*., 555 U.S. 246, 254 (2009). Roe's § 1983 claims against Purdue have been dismissed. Defendants seek summary judgment on the § 1983 claims against the individual defendants in their official capacities (Count VI) based on Eleventh Amendment immunity and against the individual Defendants in their individual capacity (Rollock (Count VII), and Sermersheim (Count VIII)) based on a lack of equal protection or due process offense, and qualified immunity. The Court considers each argument in turn.

i.      Claims against individuals in their official capacities

Roe's Count VI asserts a § 1983 claim against individual defendants Sermersheim and Rollock in their official capacities. She alleges that the decision to suspend her violated both her Equal Protection and Due Process rights. She seeks injunctive relief to be reinstated to Purdue and the removal of the disciplinary action from her record. Defendants move for summary judgment on the official capacity count and argue that Roe's claim is flawed because (a) Roe lacks standing for an order for reinstatement; (b) Roe has not raised any factual issue relative to reinstatement or expungement; (c) Roe was not deprived of any protected interest; and (d) there no evidence of current or prospective harm attributable to an unequal protection of law. To succeed on her claim, Roe must establish that the actions of Defendants deprived her of a protected interest without due process or that she is suffering or will suffer harm as a result of unequal treatment by the Defendants.

a)   Standing for Reinstatement

Defendants assert that Roe lacks standing to seek reinstatement since her suspension has expired, she alleges no obstacle to re-enrollment, and she has not alleged an intention to return to Purdue. Roe failed to respond to this argument, and hence it is waived. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc*., 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Since the two-year suspension period has expired, the issue of whether Roe was entitled to re-enroll during that period is moot.

b)  Factual Issue on Reinstatement or Expungement.

Defendants also argue that because Roe did not seek, and does not wish to seek, reenrollment, there is no factual issue regarding reinstatement or expungement. Roe argues that since the disciplinary action has not been expunged from her student record, she is obligated to disclose it to any institutions of higher learning to which she may apply, and that would have a negative impact on her ability to enroll at other schools. Defendants did not respond to the argument that the continuing existence of a disciplinary action on Roe's record creates an obligation on her part to disclose it, instead focusing on the fact she did not allege she wished to enroll at Purdue. Defendants did not thoroughly develop this argument, and Roe provided unrebutted evidence that her admissions applications were rejected by two other schools as a result of the disciplinary action on her record, so summary judgment is inappropriate.

c)  Deprivation of Protected Interest

Defendants also argue that Roe did not suffer any loss of any protected life, liberty, or property interest, since she had no guaranteed interest in a Purdue education. Roe responds that, in addition to the procedural due process violations of a lack an opportunity to cross-examine, to be fully heard, and notice of what was at stake, she was deprived of the property interest in the sums she paid for tuition for the semester in which she was suspended. Roe also asserts that she has incurred additional expenses as a result of enrolling at a different university.

A tuition payment is not a property interest for which no other remedy is available, *Doe v. Purdue Univ.*, 928 F.3d 652, 662-63 (7th Cir. 2019) (holding that breach of contract causes of action are available for losses attributable to claims for tuition paid for an incomplete semester), and Roe has an available state court cause of action for breach of contract, but Roe has also alleged

18

other losses, including fees and expenses associated with other institutions. There has been no developed argument that the other damages Roe has suffered are not a protected interest, and due to the factual disputes regarding the procedural posture of Roe's investigation as set forth above, a jury could find that the individual Defendants acting in their official capacities deprived Roe of due process, and that deprivation caused her losses. Summary judgment in favor of Defendants would therefore be inappropriate.

### d)  Harm Attributable to Unequal Protection

Defendants' final basis for summary judgment on Count VI is that Roe presented no evidence of current or prospective harm caused by any equal protection violation. Roe responds that the unfairness of the process inherently violated her rights on the basis of her sex as protected by the Equal Protection Clause. She also asserts that she has been denied admission to other institutions, and that issue can continue to arise. Again, given the factual disputes as to the investigatory process, and their implication of Title IX, summary judgment will not be granted on Count VI.

Because there are unanswered questions of fact for a jury about the process by which Roe was disciplined and the role of the individual defendants in the investigation and discipline, summary judgment on her § 1983 claims against the individual defendants in their official capacities is inappropriate.

### ii.    Claims against individuals

Defendants move for summary judgment on the individual capacity claims on the basis that the only due process claim recognized by the Seventh Circuit Court of Appeals in a university student discipline context is a "'stigma-plus' deprivation of 'occupational liberty.'" *See Doe v.*

*Purdue Univ.*, 928 F.3d 652, 662-63 (7th Cir. 2019). Stigma-plus deprivations of occupational liberty entail both the stigma of negative information as well as dissemination of that information. *Id*. Defendants argue there is no factual question that Roe is suffering any current deprivation of life, liberty, or property, so Roe was not entitled to any process she was denied, and they are therefore entitled to summary judgment. Roe argues that "[w]hen a right is protected by the Due Process Clause, a state may not withdraw it on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred." *Id.* at 663. Roe further argues that the more severe the discipline, the more procedural safeguards should be in place, and that procedural defects in Purdue's process taint the decision to suspend her. Roe asserts that she will be obligated to self-report this sanction to other institutions of higher education, including law schools, and by implication, bar admission authorities, meaning her stigma of a sanction will continue to be disseminated.

As in *Doe v. Purdue Univ.*, *supra*, in which the plaintiff was required to authorize Purdue to release information about a sanction to his ROTC program and the Court of Appeals found that even with his permission to disclose, the disclosure satisfied the stigma-plus standard, the disclosure of Roe's sanction may impact her future education and employment opportunities. Roe may be the person who either has to self-report this sanction, or authorize its report by Purdue, but she has alleged that report it she must, and Defendants do not dispute that. Instead, they argue that because Roe had no protected right to a Purdue education, the suspension (rather than an expulsion) does not constitute a deprivation of any protected interest. A jury could find that Roe has sustained a loss of a liberty interest in a stigma-plus claim as a result of a flawed investigatory process. *See, e.g.*, *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2015) (noting that the plaintiffs legally obligated to

20

allow state to disclose finding they were child abusers); *Mann v. Vogel*, 707 F.3d 872 (7th Cir. 2013) (holding that the state deprived plaintiffs of liberty interest when state adjudicated they violated child safety laws and could no longer operate day care center); *Doyle v. Camelot Care Ctrs.*, 305 F.3d 603 (7th Cir. 2002) (concluding that the state deprived plaintiffs of an occupational interest when reported finding of child neglect to employers).

Summary judgment on Roe's claims for deprivation of due process is not appropriate because a jury could find Purdue's flawed investigatory process resulted in a loss of a liberty interest to Roe in a stigma-plus context, even if Roe is the one who may be legally obligated to report the stigma. Roe has asserted that the decision by Purdue, which she asserts was based on a flawed process, has resulted in a loss of future educational and employment opportunities, and a factfinder could agree.

## V.      Conclusion

For the foregoing reasons, the Court hereby **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff Nancy Roe [DE 53]. The Court hereby **DENIES as moot** Defendants' MOTION for Hearing re [53] MOTION for Summary Judgment as to Nancy Roe, [58] MOTION for Summary Judgment as to Mary Doe (Motion for Oral Argument on Defendants' Motion for Summary Judgment) [DE 67]. The Court **SETS** this matter for a status conference on **February 10, 2022 at 12:30 p.m. (Central Time).** Parties are instructed to dial 877-873-8017 and enter access code 5155509# when prompted.

SO ORDERED this 13th day of January, 2022.

s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc:      All counsel of record