```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
 2                        HAMMOND DIVISION

 3   NANCY ROE,                     )
                                    )
 4        Plaintiff,                )
                                    )
 5     vs.                          )   Case No.
                                    )   4:18-cv-00089-JEM
 6   PURDUE UNIVERSITY, ALYSA       )
     CHRISTMAS ROLLOCK, and         )
 7   DR. KATHERINE L. SERMERSHEIM,  )
     in their official and          )
 8   individual capacities,         )
                                    )
 9        Defendants.               )
     _____)   Volume 4 of 5
10

11                   DAY FOUR OF JURY TRIAL:
                      SEPTEMBER 22, 2022
12           BEFORE THE HONORABLE JOHN E. MARTIN
               UNITED STATES MAGISTRATE JUDGE
13
     FOR THE PLAINTIFF:        JEFFREY A. MACEY and BARRY A. MACEY
14                             Macey Swanson LLP
                               429 North Pennsylvania St., Ste. 204
15                             Indianapolis, Indiana 46204
                               317-637-2345
16                             Email: jmacey@maceylaw.com

17   FOR THE DEFENDANTS:       WILLIAM P. KEALEY
                               JOSEPH H. HARRISON , III
18                             Stuart & Branigin LLP
                               300 Main Street, Suite 900
19                             PO Box 1010
                               Lafayette, Indiana 47902-1010
20                             765-423-1561
                               Email: jhh@stuartlaw.com
21

22   ALSO PRESENT:            Plaintiff Roe;
                              Defendant Sermersheim;
23                            Defendant Rollock.

24   OFFICIAL REPORTER:       Angela Phipps, RMR, CRR
                              5400 Federal Plaza
25                            Hammond, Indiana 46320
                              (219) 852-3616
```

1    Proceedings reported by stenotype.   Transcript produced by

2    computer-aided transcription.

3                                     * * *

4                                  INDEX

5
**MEGAN SKIBA**                                           **PAGE**
6    Direct Examination by Mr. Harrison                   633
     Cross Examination by Mr. Jeffrey Macey               639

7

8    **CHRISTIE WRIGHT**                                   PAGE
     Direct Examination by Mr. Kealey                     643
9    Cross-Examination by Mr. Jeffrey Macey               699
     Redirect                                             755
10   Recross                                              758
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        (The following proceedings commenced and resumed in open
2         court at 8:38 a.m., jury not present; reported as
3         follows:)
4            COURTROOM DEPUTY:  All rise.
5            THE COURT:  Everybody may be seated.
6     Good morning, Mr. Macey.
7            MR. JEFFREY MACEY:  Good morning, Your Honor.
8            THE COURT:  Good morning, Mr. Kealey.
9            MR. KEALEY:  Good morning, Your Honor.
10           THE COURT:  Mr. Harrison.
11           MR. HARRISON:  Good morning.
12           THE COURT:  Are we ready to proceed?
13      Defense, I received Defendants' motion for judgment as a
14   matter of law, Plaintiff's response in opposition, both in
15   timely manners.  Thank you.  And I will hear argument on those
16   motions at this time.
17      Defense, ready to proceed?
18           MR. HARRISON:  Thank you, Your Honor.
19      The Defendants, pursuant to Federal Rule 50(a), move for
20   judgment as a matter of law.
21      Ms. Roe alleges that Purdue's decision to suspend her
22   violated Title IX and deprived of her of due process and equal
23   protection.  In her case in chief, Ms. Roe has not come forward
24   with any evidence that produces application of its false
25   statement rule to her was motivated by her gender, nor has she
```

1    come forward with any evidence that the individual defendants

2    who decided the discipline acted with discriminatory intent.

3         To the contrary, the evidence submitted during Plaintiff's

4    case in chief has shown that Purdue and the individual

5    defendants relied solely on the evidence collected.

6         The unchallenged testimony of the individual defendants is

7    that they employed the same decision-making process as they

8    would if Plaintiff were a man, not a woman.  The unchallenged

9    evidence is that the false statement rule applies to all

10   persons reporting sexual assault, regardless of gender.  The

11   unchallenged evidence is that the Defendants genuinely

12   believed, based on the weight of the evidence, that Ms. Roe

13   violated the false statement rule.

14        Ms. Roe tendered no circumstantial or direct evidence that

15   her gender was a motivating factor in the individual

16   defendants' determination that she made false statements.

17        Ms. Roe has tendered no evidence that she was deprived of

18   notice and an opportunity to be heard on whether she made false

19   statements during Purdue's resolution of her report of sexual

20   assault.

21        Ms. Roe testified that Plaintiff's Exhibit 13, the

22   September 1, 2017 letter from vice president of ethics and

23   compliance, Alysa Rollock, to dean of students, Dr. Katherine

24   Sermersheim, gave her notice and an opportunity to address

25   whether she made knowingly made false statements in connection

1  with the resolution of her allegation of sexual assault and

2  what discipline, if any, should be imposed for such misconduct.

3      Ms. Roe testified that she submitted to Purdue all the

4  evidence she had and wanted Purdue to consider as part of

5  Purdue's determination whether she made false statements.

6      Ms. Roe testified that she knew she had to be honest as

7  part of Purdue's resolution of her allegation of sexual

8  assault.

9      There's no pending claim for relief on Purdue's

10 determination that the lack of a sexual assault finding

11 interfered with Ms. Roe's educational opportunity at Purdue.

12     Therefore, her deliberate indifference claim fails as a

13 matter of law.

14     Ms. Roe alleges incapacitation as a defense to the finding

15 that she violated the false statement rule.  However, a gender

16 bias or due process allegation cannot be proved by alleging

17 incapacitation.  Incapacitation is an element of the analysis

18 of consent for evaluation of a sexual assault allegation,

19 whether the assault is alleged as a criminal act, civil tort,

20 or a violation of Purdue's anti-harassment policy.

21     Just as reasonable fact-finders can weigh the evidence of

22 sexual assault differently in a criminal case or in a civil

23 tort case, reasonable fact-finders can also weigh the factual

24 question of incapacitation based on their reasonable judgment.

25     Ms. Roe has elicited nothing more than evidence that

1    Purdue decision-makers analyzed incapacitation based on that

2    reasonable judgment.

3        Ms. Roe's arguments about the exercise of that judgment

4    are insufficient to show that incapacitation was analyzed on

5    the basis of her gender and not on the weight of the evidence.

6        From Defendants' perspective, they cannot think of a

7    single anti-female question posed by Ms. Roe's counsel during

8    Plaintiff's case in chief.

9        The trial evidence confirms that Ms. Roe's Section 1983

10   damage claims are directed against Purdue and, therefore, are

11   barred by the Eleventh Amendment.

12       The evidence at trial establishes that Ms. Roe's

13   Section 1983 individual capacity claims against the individual

14   defendants, Counts Seven and Eight, are claims against Purdue,

15   not the individual defendants.

16       Throughout Plaintiff's case in chief, Plaintiff's counsel

17   has conflated the individual defendants and Purdue.  The trial

18   evidence has shown that these claims are directed at university

19   personnel tasked with deciding and implementing a university

20   sanction and that Purdue is the real party on Ms. Roe's

21   Section 1983 damage claims.

22       Because Purdue University is the real party on Ms. Roe's

23   policy allegation, the Eleventh Amendment bars a damage claim

24   against the individual defendants for allegedly carrying out

25   the alleged policy.

1      The trial evidence establishes that Ms. Roe's Title IX and

2  Section 1983 claims fail as a matter of law because Plaintiff

3  has failed to carry her burden of proof on all claims.

4      A reasonable jury would not have a legally sufficient

5  evidentiary basis to find for Ms. Roe on her Title IX claim

6  against Purdue.

7      Ms. Roe has not carried her burden of proof at trial as to

8  her Title IX claim against Purdue.  The unrebutted evidence at

9  trial showed that, if Ms. Roe had been a male instead of a

10 female and the evidence were in all other respects the same,

11 Defendants would have made the same false statement

12 determination and would have imposed the same discipline.

13     Ms. Roe failed to show Title IX gender bias in the text or

14 application of Purdue's false statement rule because she failed

15 to come forward with sufficient evidence to show that sex was a

16 motivating factor in Purdue's decision to discipline her.

17     The evidence at trial revealed the serious inconsistencies

18 between Ms. Roe's account and the evidence gathered during the

19 investigation, together with compelling eyewitness testimony

20 and audio and video evidence showing Ms. Roe's competency and

21 intent that convinced Purdue decision-makers that Ms. Roe's

22 account of events was threaded with false statements.

23     Ms. Roe admitted that she could understand if Purdue did

24 not believe there was sufficient evidence to support her

25 allegation of sexual assault.

1       She also admitted that Purdue and the individual

2   defendants sanctioned her because they believed she had made

3   false statements.

4       The evidence, together with Defendants undisputed, genuine

5   belief that the evidence showed violation of the false

6   statement rule, makes it impossible for a jury to conclude that

7   Defendants lacked a reasonable, nondiscriminatory basis to find

8   that Ms. Roe was a consenting participant in the documented

9   sexual acts and falsely reported a consensual encounter as an

10  assault.

11      Ms. Roe failed to show that her false statements were

12  protected activity under Title IX or that Purdue possessed a

13  retaliatory intent when applying the false statement rule to

14  her statements.

15      Department of Education Regulation 34 CFR Section

16  106.71(b)(2) states that the application of a false statement

17  rule is not Title IX retaliation.

18      Purdue's false statement rule is consistent with

19  Title IX's requirement for Purdue to investigate and determine

20  responsibility for alleged assaults.

21      Simply highlighting the existence and application of

22  Purdue's false statement rule does not equate to Plaintiff

23  carrying her burden of proof.

24      Ms. Roe has failed to submit evidence that Purdue

25  possessed retaliatory intent in applying the false statement

1    rule to her, and for this reason, her Title IX retaliation

2    claim fails as a matter of law.

3        A reasonable jury would not have a legally sufficient

4    evidentiary basis to find for Ms. Roe on her Section 1983

5    claims against the individual defendants.  Based on the

6    evidence at trial, Ms. Roe cannot establish any equal

7    protection or due process violation under Section 1983.  Her

8    Section 1983 claim fails for the same reason as her Title IX

9    claim because there is insufficient evidence of discriminatory

10   intent.

11       Her Section 1983 due process claim also fails.

12       At trial, during Plaintiff's case in chief, Plaintiff

13   failed to come forward with evidence showing deprivation of any

14   constitutionally protected interest in liberty or property.

15   Ms. Roe has failed to submit evidence of a constitutional

16   deprivation of a property interest eligible for due process

17   protection.

18       Her suspension is over.  She is not currently experiencing

19   any current or prospective deprivation of property.  She is not

20   barred from enrollment at Purdue, and in any event, the

21   Seventh Circuit does not recognize a property interest in a

22   Purdue education.

23       Ms. Roe has failed to submit evidence of a constitutional

24   deprivation of a protected liberty interest.

25       Ms. Roe has also failed to tender evidence showing a lack

1    of notice and an opportunity to be heard on the false statement

2    violation.  Ms. Roe has not shown any lack of notice of the

3    false statement rule or lack of access to the evidence on which

4    Purdue relied in applying the false statement rule to her.

5        She has not contended nor shown that she lacked sufficient

6    opportunity to prove the truth of her statements that were

7    found to offend the false statement rule.

8        Further, the evidence at trial showed that

9    Defendant Sermersheim informed Ms. Roe of her right to appeal

10   her false statement determination and sanction to

11   Defendant Rollock.  Ms. Roe exercised her right to appeal, and

12   Rollock's response to Ms. Roe's first appeal expressly afforded

13   her an opportunity to make her showing on the false statement

14   violation.

15       The trial testimony established that Rollock reviewed

16   Ms. Roe's appeal materials and the underlying evidence.

17   Ms. Roe was unable to identify any evidence that she did not,

18   in fact, provide to Purdue when afforded the opportunity to be

19   heard on the potential finding of a false statement rule

20   violation.

21       As previously briefed, the individual defendants have

22   qualified immunity to Ms. Roe's Section 1983 due process claim

23   because there's no clearly established requirement that Purdue

24   provide Ms. Roe with any more or different process than she, in

25   fact, was afforded.

1      Ms. Roe's purported claim for emotional distress damages

2  on her Title IX claim fails as a matter of law.  Controlling

3  Supreme Court authority in *Cummings v. Premier Rehab Keller,*

4  *P.L.L.C.* bars Ms. Roe's claim for emotional distress damages on

5  her Title IX claim.

6      Less than six weeks ago, Judge Kolar held that the Supreme

7  Court's decision in *Cummings* foreclosed the Plaintiff's

8  Title IX claim for emotional and psychological damages.

9      Ms. Roe's purported claim for punitive damages also fails

10  as a matter of law.  Ms. Roe has failed to tender evidence at

11  trial that would be sufficient for a jury to make an award of

12  punitive damages.  She failed to submit evidence that

13  Defendant Sermersheim or Defendant Rollock's conduct was

14  malicious or in reckless disregard of the Plaintiff's rights.

15      Federal Civil Jury Instructions of the Seventh Circuit

16  Instruction 7.28 requires that the jury determine whether the

17  alleged conduct is malicious, defined as "conduct accompanied

18  by ill will or spite, or is done for the purpose of injuring

19  Plaintiff," or, "Defendant simply did not care about

20  Plaintiff's [safety] [or] [rights]."

21      Ms. Roe has elicited no evidence, let alone sufficient

22  evidence, that would equip the jury to make such a finding.

23      For these reasons, a reasonable jury would not have a

24  legally sufficient evidentiary basis to award emotional

25  distress damages to Plaintiff Roe on her Title IX claim or to

1    award punitive damages to Ms. Roe on her Section 1983 claims

2    against the individual defendants.

3        I would now like to just briefly respond to the opposition

4    submitted by the Plaintiff.

5        Ms. Roe cannot prove gender bias by quarreling with

6    Purdue's evidence-based incapacitation determination.  There is

7    no evidence that Ms. Roe's gender was a motivating factor in

8    that evidence-based incapacitation determination by the

9    Defendants.

10       On page 5 of Plaintiff's opposition, the Plaintiff argues

11   that it's clear from the evidence adduced by the Plaintiff that

12   Purdue failed to investigate Ms. Roe's allegation of sexual

13   assault.

14       The 182-page investigator's report and the other evidence

15   collected by the university investigators and considered by the

16   Purdue decision-makers is not evidence of a failure to

17   investigate.  Instead, it shows the thoroughness and lawfulness

18   of Purdue's response to Ms. Roe's allegation of sexual assault.

19       On page 6 of Plaintiff's opposition, the Plaintiff states

20   to the extent that the Defendant contends that the Plaintiff

21   must prove that she would have been treated differently were

22   she a male, and goes on, the Defendants respond, yes.  This is

23   precisely what Plaintiff has failed to show during her case in

24   chief.

25       Asking the jury to consider Mr. Lanza's discipline for a

 1     different policy violation is not evidence of gender

 2     discrimination.

 3          Contrary to what the Plaintiff says on page 6, Purdue did

 4     find by a preponderance of the evidence that Mr. Lanza did not

 5     sexually assault Ms. Roe, thereby finding her allegation

 6     unsubstantiated by the evidence.

 7          Referring to page 7 of Plaintiff's opposition,

 8     Dean Sermersheim testified at trial that she did review

 9     Ms. Roe's first written appeal submission before making her

10     false statement determination.

11          During her deposition, Dean Sermersheim testified that she

12     did not recall if she had reviewed the submission.  Saying, "I

13     do not recall," is different than her saying, "I did not

14     review."  Dean Sermersheim's trial testimony and Defendant's

15     Exhibit L set the record straight on this issue.

16          For these reasons, Purdue and the individual defendants

17     respectfully request their motion for judgment as a matter of

18     law be granted.  Thank you, Your Honor.

19          **THE COURT:**  All right.  Thank you, Mr. Harrison.

20          Mr. Macey.

21          **MR. JEFFREY MACEY:**  Thank you, Your Honor.

22          In our response to the Defendants' submission last

23     evening, one thing I did is, I went through and listed every

24     allegation we made in our Complaint.  And in the allegations we

25     made in the Complaint, we provided evidence on each point.

 1          Ms. Roe was sexually assaulted in her dorm room.  She had

 2     become intoxicated at a party at the Acacia Fraternity, where

 3     she was served alcohol.  The party's host who served Nancy Roe

 4     drinks at the party walked her back to her room.  She was

 5     incapable of consenting to sexual intercourse -- intercourse

 6     due to her intoxication; and despite her intoxication, without

 7     her consent, the male student assaulted her in the dorm room.

 8          He made audio recordings of the assault.

 9          She awoke the next day, still intoxicated, and attended

10     class, where she left to vomit.

11          That week, she discovered increased bruising on her neck,

12     which made her concerned about what happened in her dorm room.

13          She sought and received medical treatment for her

14     injuries, and realizing the extent of the assault, she reported

15     the assault to the university.

16          That was the uncontested testimony that we actually heard

17     here.  What that establishes is that my client made a protected

18     complaint under Title IX.

19          Defendants' contention has always been that it applied a

20     false statement rule to my client, but the false statement that

21     my client allegedly made was that she was incapacitated; and

22     Defendant claims that she was not incapacitated and, therefore,

23     it was false for her to say that.

24          The evidence we produced showed that the Defendant failed

25     to consider the fact that, according to their own report, the

1   Plaintiff consumed 18 drinks in four hours.

2       The Defendant failed to consider any evidence or even

3   conduct an inquiry into how that might affect her ability to

4   consent that evening.  This is the crux of the case, my

5   client's ability to consent.  And the Defendant conducted no

6   investigation into the level of intoxication she was at that

7   night.

8       As Dean Sermersheim conceded on the direct examination,

9   Title IX requires a fair process, whether you're male, whether

10  you're female, whether it's opposite-sex violence or same-sex

11  violence; and the reason is that Title IX requires universities

12  to remedy complaints of sexual assault.

13      I think what the Defendant has failed to recognize and

14  continues to fail to recognize is that Mr. Lanza's assault on

15  Ms. Roe was the gender discrimination.  That was the sexual

16  assault.  That was the sexual harassment.

17      What Title IX does is, it imposes an obligation on

18  Purdue University to address that.  It requires them to have a

19  complaint process, and it requires them not to be deliberately

20  indifferent to what happened to Roe that night.

21      Now, this Court has already used the deliberate

22  indifference standard to analyze Plaintiff's claims in

23  connection with the Rule 56 motion that the Defendant filed a

24  year-and-a-half ago and the Court's Order this spring that

25  applied the deliberate indifference standard to this case.

1     It cited *Jackson vs. Birmingham Board of Education* and

2     *Davis vs. Monroe County Board of Education*.

3     A Plaintiff claiming Title IX discrimination must show

4     that the funding recipient acted with deliberate indifference

5     to known acts of harassment which were so severe, pervasive,

6     and objectively offensive that they barred victim's access to

7     educational opportunity.

8     Sexual assault is indisputably an act that is so severe,

9     pervasive, and objectively offensive that it bars plaintiff's

10    access to educational opportunity.

11    But in this case, what's even worse is that the Defendant

12    itself barred my client's access to educational opportunity.

13    The Plaintiff, in her case in chief, established

14    deliberate indifference two ways.

15    First, she established that, as I referenced, the

16    Defendant made no attempt, none, to address the effect that

17    alcohol had on her that night.  None.

18    Two, Defendant never reviewed Plaintiff's medical records

19    from that week.  Mr. Harrison suggested that it was not

20    established that Dean Sermersheim had not reviewed those

21    medical records, but on her direct testimony, she said:  I

22    guess I didn't.

23    I asked her:  Had you seen this before you made a decision

24    on her appeal?  She said:  I guess I didn't.

25    Defendant then produced a letter where Dean Sermersheim

1    said, "I am in receipt of the appeal materials you submitted to

2    Vice President Rollock."  Respectfully, that does not establish

3    that she reviewed them.  Frankly, I'm in receipt of multiple

4    credit card offers a day, and I don't review any of them.

5        The evidence is that no one, no one, in connection with

6    this process reviewed the medical records provided by my client

7    which showed bruising in her neck.

8        And if you look at the investigator's report, Exhibit I,

9    it's clear from the timeline, especially the texts that my

10   client sent to her friend, Isabelle Ortt, as the week

11   proceeded, my client became increasingly concerned about what

12   happened in that dorm room.  And no one -- no one from Purdue

13   acted to investigate the extent of her injuries and the extent

14   of her incapacitation.  That's deliberate indifference.

15       Retaliation.  Purdue's contention is:  We had an

16   investigatory process.  We had an investigatory process.  And

17   during the investigation, we determined that the Plaintiff made

18   a false statement about her incapacitation, and, therefore, we

19   disciplined her.

20       The problem with that contention is this.  The

21   investigatory process itself ceased inquiring into my client's

22   incapacitation as soon as the Defendant -- not the Defendant --

23   Christopher Lanza produced that tape.

24       The Defendant's theory of the case is that the tape is

25   dispositive of my client's incapacitation.  We had an expert

1    witness testify.  We had Vice President Rollock testify.  And
2    both of them acknowledged that, contrary to Dean Sermersheim's
3    interpretation, that a victim of sexual assault need not be
4    passed out to be incapacitated.

5        In fact, I think it's the consensus, despite Defendant's
6    attempt to continue to show a video of her walking through the
7    dorm, that people who are incapacitated can walk.  People who
8    are incapacitated can drive a car.

9        Why this matters to the retaliation analysis is that,
10   given the evidence about the lack of investigation of my
11   client's actual state of incapacitation, a jury could find that
12   the application of the false statement rule is a pretext for
13   retaliatory animus.

14       And what was the retaliatory animus?  I think the jury
15   could find and should find that, as soon as Purdue's agents
16   heard what was going on on that tape, heard my client saying
17   those things, they decided that a person like that, a woman in
18   that situation, couldn't be raped.  That's gender
19   discrimination.

20       This case has been riddled, riddled, with discriminatory
21   assumptions about my client.  And I think the key one, the most
22   important one, is that somehow through her behavior that night,
23   she was asking for this.  That's not consistent with Title IX.
24   And it's clear that, because the Defendant believed that, they
25   decided to make an example of her and expel her.

1       As Mr. Harrison noted, I did point out in my contention

2  that that, even if the Court agrees with the Defendant -- which

3  we strongly object.  But even if the Court agrees with

4  Defendant that what we must show is an actual differential

5  treatment, well, there were two people in the room that night.

6  One person committed sexual exploitation.  The other one, at

7  best, didn't understand the precise nature of Purdue's

8  incapacitation rule.  The one who committed sexual exploitation

9  had to write a 10-page paper.  The other one was suspended for

10 two years.

11      Regarding the due process argument, we've always contended

12 that Vice President Rollock made a decision, and the evidence

13 is that she reported directly to the president.  She is the

14 chief compliance officer at Purdue University.  This is not a

15 claim against Purdue University.  This is a claim against Vice

16 President Rollock acting under the color of state law.  She was

17 the top person there.  And what she did was say that no longer

18 are people who make false statements going to be referred to a

19 disciplinary process; the decision is going to come from the

20 investigation of their complaint of assault.

21      Why is that important?  First, Vice President Rollock

22 testified under oath that the right to due process in this

23 instance is clearly established.  Second, the Plaintiff was not

24 notified when all the evidence that the decision-makers were

25 relying on in this case was generated.  She was not notified

1   that she was the subject of an investigation.  All of the

2   evidence was directed at determining whether Mr. Lanza

3   assaulted the Plaintiff, not whether the Plaintiff made a false

4   statement.

5       Why that mattered?  Because as soon as she was aware that

6   she was the target of an investigation, within 10 days, within

7   10 days, she submitted two crucial pieces of evidence; the

8   medical records and she submitted the blood alcohol content

9   analysis.

10      Now, the investigation was so poor in this case they

11  didn't even have the medical records, despite the fact she

12  disclosed to them that she had a SANE exam by Purdue; and it's

13  in the report that she had a SANE exam, and they never thought

14  to go get the SANE exam.  Had she known that she was in

15  trouble, in jeopardy, of being disciplined for a false

16  statement, she would have said, "Hey, look, here's the SANE

17  exam.  This shows what he did to me."

18      What exacerbates it in this case is that, once she

19  provided the SANE exam records to the Defendant and the blood

20  alcohol analysis, what the Defendants contend she needed to do,

21  that this is the process they had, there's no evidence the

22  Defendants ever considered it.  There's no evidence the

23  Defendants -- In fact, the evidence is not there's no evidence;

24  the Defendants never investigated it.  They never investigated

25  it.  That was the testimony.

1    A new wrinkle to this that popped up at trial and bears on

2  the due process argument is that, to have due process, you have

3  to have to have notice that there's a potential violation.  The

4  Defendants say that the false statement rule provided that

5  notice.  But what was the false statement?  The false statement

6  was that she was incapacitated, and Ms. Roe was relying on the

7  published policy of Purdue about the definition of

8  "incapacitation."

9    And that definition was not even applied by the

10 decision-maker Dean Sermersheim.  She applied a different,

11 unpublished definition to Nancy Roe.  She said:  Oh, no, it

12 means you had to be passed out.

13    Nancy Roe never contended she was passed out.  She knew

14 she wasn't passed out.  She knew she had gotten back from

15 Acacia to her room.  She knew she had asked for a key.  She

16 knew this.  She explained it to the investigators.  Nobody

17 said, "Hey, you know, Ms. Roe, to be incapacitated, you need to

18 be passed out.  Seems like you're walking around a lot

19 tonight."

20    No, they investigated and said:  You know what, the

21 definition that you think is "incapacitated" is not actually

22 our definition of "incapacitated," which, I think, the record

23 shows is not consistent with the best practices in Title IX.

24 And I think it shows that the Defendants were -- to the extent

25 they even attempted to apply a definition of "incapacitated,"

1   it was wildly inconsistent.

2       But the point is, for the due process analysis, she had to

3   know what the violation was; and what they're saying is that

4   she disagreed with the -- or she applied to her own case the

5   wrong incapacitation standard.  She was applying Purdue's

6   standard, and she was never warned by anyone that that standard

7   was not applicable to her case.

8       Regarding equal protection of the laws.  This tracks with

9   the Title IX arguments.  Defendants favored the male victim,

10  subjected the Plaintiff to a discriminatory disciplinary

11  process, and it quite literally failed to protect the

12  plaintiff.

13      When they heard her protected complaint, they expelled and

14  then suspended her.  They stereotyped her and punished her

15  based on the exploitive recording produced by the male student.

16      This was inconsistent with their clearly established

17  obligation not to treat women differently than men in

18  connection with a state university action.  Dean Sermersheim

19  was explicit.  She had a right to fair process.

20      And, again, consistent with that, the evidence was that

21  both individual defendants acted with retaliatory animus, and

22  it was based on the discriminatory assumptions about the

23  Plaintiff derived from the sexually exploitive tape.  That, the

24  Defense felt, was dispositive.  That's not consistent with

25  Title IX.  That's not consistent with Title IX, particularly

```
 1   since, as the expert testified, as Nancy testified, as her
 2   boyfriend testified, she was incredibly traumatized during this
 3   time.  She was confused.  She was scared.  This is all on the
 4   report.  She didn't know what happened to her.  She blamed
 5   herself.  And she went to Purdue, and Purdue disciplined her.
 6       The remaining motions that the Defendant raised regarding
 7   the Title IX availability of compensatory damages, whether
 8   we're suing the university, whether liberty, interest, or --
 9   probably -- those have already been addressed by the Court.
10   The Court has ruled on them.  I think they're the law of the
11   case.  But just briefly, Title IX compensatory damages have not
12   been determined by the Supreme Court.  I understand there's
13   another judge that said that case must mean that there's no
14   Title IX compensatory damages.  But unlike the statutes at
15   issue in the Cummings case, Title VI and the Rehabilitation
16   Act, there's a long, long line of Supreme Court precedent that
17   establishes compensatory damages in Title IX cases.  The
18   Supreme Court is going to have to explicitly overrule those
19   cases before the Plaintiff's claim on the Title IX damages.
20   Regardless of that, the compensatory damages are also still
21   available under the 1983 claims.
22       Regarding the property interest and the liberty interest,
23   my client testified that Purdue expelled her mid-semester and
24   retained, I think, almost $5,000 of her money that she paid.
25   That's her property.  They deprived her of that property
```

1    without due process.

2        Secondarily, she also testified that she is under a

3    continuing liberty impairment because the discipline is hanging

4    over her head.  She's going to have to disclose it in

5    connection with her future law school applications.  The

6    Seventh Circuit has recognized stigma-plus as a reputational

7    harm.  This is even a lesser showing than stigma-plus because

8    there's a clear long-term continuing effect on her liberty by

9    Purdue's unlawful discipline of her, and the individual

10   defendants were the decision-makers at the highest levels of

11   Purdue operating to violate her constitutional rights.

12       Accordingly, her 1983 claims against both those individual

13   defendants should remain, and Defense's motion should be

14   denied.

15            **THE COURT:**  All right.  Thank you.

16            **MR. JEFFREY MACEY:**  Thanks.

17            **THE COURT:**  All right.  Mr. Harrison, you have one

18   minute.

19            **MR. HARRISON:**  Sure.

20       I would start out by saying that the Purdue investigators

21   gathered evidence regarding Ms. Roe's alcohol intake, as

22   indicated in the report.  And this report was relied on by both

23   decision-makers; Dean Sermersheim and Alysa Rollock, in

24   addition to other substantial evidence to evaluate

25   incapacitation and consent, as within the report and the other

1    evidence gathered during the investigation.

2        Mr. Lanza, he's not a defendant.  Talking about he's the

3    basis for gender discrimination, he is not a defendant in this

4    case.

5        On deliberate indifference about the medical records,

6    those were submitted by Ms. Roe four months later.  She had a

7    full opportunity to submit those materials.  The investigation

8    did not end when Mr. Lanza provided the audio recording.  In

9    fact, Ms. Roe met with investigators after they received the

10   audio recording so she could hear it.  The investigation

11   continued well on after receipt of the audio recording.

12       Ms. Roe was provided the opportunity to review the

13   preliminary report, where she would have seen the

14   inconsistencies identified by the investigators, and she

15   declined that opportunity.  If she would have gone to the

16   preliminary report opportunity, reviewed it, she could have

17   then provided feedback in the form of that SANE exam

18   documentation if she felt the need to do so.  But she did not.

19   She declined that opportunity.  And this opportunity was

20   afforded to her before the completion of the final report and

21   before the panel meeting.

22       Thank you.

23           **THE COURT:**  All right.  Thank you.

24       All right.  I'm going to take this under advisement for

25   about five minutes, and everyone wait right here, and I'll be

1   back with a decision.

2        (Recess taken at 9:14 a.m.)

3        (Proceedings resumed in open court, jury not present, at

4         9:24 a.m.)

5            **COURTROOM DEPUTY:**  All rise.

6            **THE COURT:**  Everyone may be seated.

7        Okay.  My ruling.

8        Plaintiff Roe has presented sufficient evidence for a

9   reasonable jury to find that Defendant Purdue University may

10  have violated Title IX in its application of its false

11  statement rule to Plaintiff Roe in its application of the

12  standard of incapacitation to Plaintiff Roe's report and that

13  she was denied reasonable notice and an opportunity to be heard

14  on the allegations of her misconduct.

15       A reasonable jury could also find that the individual

16  defendants may have acted maliciously and/or with reckless

17  disregards for her rights.

18       Emotional damages on the Title IX claim are not available

19  pursuant to the recent Supreme Court case, *Cummings v. Premier*

20  *Rehab Keller,* and *Doe vs. Purdue*, cases that have been referred

21  to here this morning, and my final jury instructions and

22  verdict forms will address the issue.

23       Okay.  That is my ruling on the motion for directed

24  verdict.

25       Are we ready with the first witness at 9:30, Mr. Kealey?

1      **MR. KEALEY:**  Yes, Your Honor.  Mr. Harrison will be

2   putting on that witness.

3          **THE COURT:**  Okay.  All right.  Anything else from

4   Plaintiff at this time?

5      **MR. JEFFREY MACEY:**  Nothing from the Plaintiff,

6   Your Honor.

7          **THE COURT:**  All right.  Mr. Kealey or Mr. Harrison?

8      **MR. KEALEY:**  We have just a brief pair of

9   stipulations between Mr. Macey and me --

10         **THE COURT:**  All right.

11     **MR. KEALEY:**  -- to eliminate the need for a

12   particular point in our case in chief.

13      The first stipulation is that the dorm video that has been

14   on screen and is in evidence as Defense Exhibit CC is, in fact,

15   a video that has Ms. Roe on it, that that is her in the video.

16         **THE COURT:**  Okay.

17     **MR. KEALEY:**  And, second, that the photograph that I

18   showed in opening statement and that I will use again in

19   closing statement, although I'm not proposing to move it into

20   evidence, it's just an aid to testimony, that that photograph

21   is a photograph of Ms. Roe.

22         **THE COURT:**  Okay.  Is that just going to be

23   recognized by the witnesses, or do you want me to read

24   something to the jurors or say something to the jurors on the

25   point?

1          **MR. KEALEY:**  Well, I assume the Court recalls the

2   photo I'm talking about --

3          **THE COURT:**  Correct.  Absolutely.

4          **MR. KEALEY:**  The one I put on the magnet board.  I

5   didn't want any doubt or concern in my closing remarks about

6   whether that is, in fact, an authentic photograph of Ms. Roe,

7   and so that's why I asked Mr. Macey to stipulate to that.

8          **THE COURT:**  Okay.  All right.  So it's not something

9   I have to talk to the jury; it's just not something that's

10  contested in the case; is that correct, Mr. Macey?

11         **MR. JEFFREY MACEY:**  Yes, Your Honor.  We're not going

12  to pull out a, "Wait, that wasn't Nancy on the video."  We're

13  not going to do that.

14         **THE COURT:**  All right.  Then I accept that

15  stipulation.  We'll certainly be looking for it if for some

16  reason it comes up in some of the argument because that's --

17       Anything else?

18         **MR. KEALEY:**  Nothing else.

19         **THE COURT:**  All right.  Thank you all.  I'll be back

20  out in a few moments.  We'll find out if all the jurors are

21  here yet.

22       (Recess taken at 9:27 a.m.)

23       (Proceedings resumed in open court at 9:34 a.m.)

24         **COURTROOM DEPUTY:**  All rise.

25         **THE COURT:**  Every one may be seated.

---

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

1      All right.  Ready, Mr. Harrison?

2           **MR. HARRISON:**  Yes, Your Honor.

3           **THE COURT:**  Mr. Kealey, are you ready to control the

4      mechanisms for the screens?

5           **MR. KEALEY:**  I do not have either the training or the

6      benefit of youth that Mr. Harrison does for technology.  So

7      we'll all buckle up and hope for the best.

8           **THE COURT:**  All right.  We'll let Mr. Harrison go

9      back to the controls if he needs to.  Okay.

10          Okay.  Are we ready, Mr. Macey?

11          **MR. JEFFREY MACEY:**  Yes, Your Honor.

12          **THE COURT:**  All right.  You may bring the jurors in,

13     please.

14          (Jury in at 9:35 a.m.)

15          **THE COURT:**  Everyone be seated.  Good morning, ladies

16     and gentlemen of the jury.

17          **THE JURY:**  Good morning.

18          **THE COURT:**  Anyone have any problem adhering to the

19     Court's previous admonishments?

20          (The jury collectively responded non-affirmatively.)

21          **THE COURT:**  Very well.  We'll begin with the Defense

22     case.

23          Mr. Harrison.

24          **MR. KEALEY:**  Thank you, Your Honor.  The Defense

25     calls Megan Skiba.

SKIBA - DIRECT

```
 1          THE COURT:  When you get there, remain standing when
 2   you get up to the top by the chair, and then raise your right
 3   hand.
 4          (The oath was duly administered.)
 5          THE WITNESS:  I do.
 6          COURTROOM DEPUTY:  Thank you.  Please be seated.
 7          THE COURT:  And adjust -- You're good, I think, with
 8   the mic.  You don't have to speak right up into it, but yeah,
 9   that's about good.  All right.  Thank you, ma'am.  Okay.
10                 MEGAN SKIBA, DEFENSE WITNESS, SWORN
11                        DIRECT EXAMINATION
12   BY MR. HARRISON:
13   Q.   Good morning.
14   A.   Good morning.
15   Q.   Please tell us your name.
16   A.   My name is Megan Skiba.
17   Q.   Where do you live?
18   A.   I live in West Lafayette, Indiana.
19   Q.   What is your occupation?
20   A.   I am an extension educator on 4-H for Tippecanoe County.
21   Q.   How long have you worked there?
22   A.   I've been there about three months.
23   Q.   Where did you attend high school?
24   A.   I attended high school at William Henry Harrison High
25   School in West Lafayette, Indiana.
```

SKIBA - DIRECT

1  Q.   When did you graduate?

2  A.   **I graduated in 2014.**

3  Q.   What did you do next?

4  A.   **I then attended Purdue University.**

5  Q.   What years did you attend Purdue?

6  A.   **I attended Purdue from 2014 to 2018.**

7  Q.   What did you study at Purdue?

8  A.   **I studied public relations and communication.**

9  Q.   Where did you live while you were at Purdue?

10 A.   **At Purdue, the first two years I lived in Windsor Hall,**

11 **and then the second two years I lived in Harrison Hall.**

12 Q.   Why did you live in Harrison Hall your junior and senior

13 year?

14 A.   **I lived in Harrison Hall because I served as a resident**

15 **assistant in the hall.**

16 Q.   And where specifically within Harrison Hall did you serve

17 as a resident assistant your junior year?

18 A.   **My junior year, I was on the eighth floor of the south**

19 **side, which was the female side.**

20 Q.   Are you suggesting there were multiple sides to

21 Harrison Hall?

22 A.   **So there were two wings to Harrison Hall.  So there was**

23 **the north side that had male students in it and then the south**

24 **side, which had female students, and both sides had eight**

25 **floors.**

SKIBA - DIRECT

1    Q.    Okay.  So during the 2016-2017 academic year, you were an
2    RA on Harrison Hall, Floor 8 South?
3    A.    **Yes.**
4    Q.    What type of residents lived on your floor?
5    A.    **So my floor, I had 80 -- 80 -- I had 50 residents, and**
6    **they were all female.  Mostly underclassmen.**
7    Q.    Can you explain to the jury what you did as a resident
8    assistant.
9    A.    **Yes.  So a resident assistant -- resident assistants are**
10   **spread out throughout the residence halls, and you typically**
11   **have about 50 residents that you help oversee.**
12        **And so as an RA, there's different aspects to the job.**
13   **The top priority is relationship-building.  So getting to know**
14   **your residents and talking with them and building those**
15   **relationships.  Another part of the job is programming, so**
16   **providing events for residents to meet one another and**
17   **educating them on certain topics that help them in college.**
18   **And then I would say the last part would be crisis response.**
19   **So when a crisis or a problem arises in the hall, being able to**
20   **step in and helping with problem-solving and figure out the**
21   **situation from there.**
22   Q.    Did you receive any sort of training that helped you
23   determine when a resident required medical assistance because
24   of alcohol?
25   A.    **Yes.  So as a resident assistant, we went through about**

SKIBA - DIRECT

1    two to three weeks of training.  A portion of that training was

2    spent on crisis response, and a section of that training

3    involved medical response related to alcohol.

4    Q.   What would make you determine a resident-required medical

5    assistance because of alcohol?

6    A.   **So they taught us in training that we were -- we were not**

7    **medical professionals, so if we approached a situation, to call**

8    **911 and get EMS there to evaluate the situation.  But they**

9    **educated us on certain characteristics that would advise us to**

10   **then call 911 for medical assistance.  And so some of those**

11   **characteristics included, like, the inability to stand,**

12   **unconsciousness, vomiting.  Those were some of the signs we**

13   **were taught to look for, and if we saw some of those**

14   **characteristics, to call 911.**

15   Q.   Did you come to know a Nancy Roe?

16   A.   **Yes.**

17   Q.   How so?

18   A.   **She was one of the residents on my floor, so one of the 50**

19   **residents.**

20   Q.   And she was a resident during the 2016-2017 academic year?

21   A.   **Yes.**

22   Q.   Was there ever a time you were woken up in the middle of

23   the night by Ms. Roe?

24   A.   **Yes.**

25   Q.   Can you explain that?

1    A.   So it was five years ago.  Could not tell you the time of

2    night.  But in the middle of the night, I woke up to knocking

3    on my door.  And so I got out of bed.  I looked through the

4    peephole and saw that it was Nancy, so I proceeded to open the

5    door.

6         And when I opened the door, Nancy proceeded to ask me if I

7    could let her into her residence hall room because she was

8    locked out.  And I then advised her to go to the front desk at

9    Harrison Hall to retrieve her spare key, which was regular

10   university policy.

11        And then once she agreed to that, she started walking down

12   the hallway back to the elevators, and then that's when I

13   proceeded to close my door.

14   Q.   Based on your observations, did you believe Ms. Roe

15   understood your instruction that she needed to go down to the

16   office to request a key?

17   A.   Yes.

18   Q.   At the time of this interaction, did you know if Ms. Roe

19   had a boyfriend?

20   A.   Yes.

21   Q.   How did you know she had a boyfriend at that time?

22   A.   I would say I knew that information -- obviously, Nancy

23   lived in Harrison that year, and her boyfriend at the time also

24   lived in Harrison Hall.  And so I would see them together

25   throughout the hall and the lobby and on the floor.  And I did

1   **talk to both of them at different times.**

2   Q.   If a man had accompanied Ms. Roe when she knocked on your

3   door on the early morning, would you have been able to

4   recognize that man -- would you have been able to recognize if

5   that man were her boyfriend?

6   A.   **Yes.**

7   Q.   During your interaction with Ms. Roe when she knocked on

8   your door in the early morning, did you see her stumble?

9   A.   **No.**

10  Q.   Did you see Ms. Roe slur her words when she talked to you?

11  A.   **No.**

12  Q.   Did you see her vomit?

13  A.   **No.**

14  Q.   Based on your training and observations of Ms. Roe, did

15  you believe she needed medical attention?

16  A.   **No.**

17  Q.   Based on your observations, did you think there was any

18  need for you to help Ms. Roe any further?

19  A.   **No.**

20  Q.   Ms. Skiba, on the overhead, I am showing you Defendant's

21  Exhibit B, which has been admitted into evidence.  Have you

22  seen this message before?

23  A.   **Yes.**

24  Q.   Is this a text message you received from Ms. Roe later

25  that same week that she knocked on your door in the early

1   morning?

2   A.   **Yes.  It was over the app GroupMe.**

3          MR. HARRISON:  I have no further questions -- One

4   moment.

5       (Brief pause while counsel inaudibly conferred.)

6   BY MR. HARRISON:

7   Q.   When Ms. Roe knocked on your door that morning --

8          THE COURT:  You have another question?

9          MR. HARRISON:  I do have another question, Your

10  Honor.  I'm sorry.

11         THE COURT:  You may ask.

12         MR. HARRISON:  I didn't confer with my co-counsel.

13  Q.   When Ms. Roe knocked on your door that morning, was she

14  alone?

15  A.   **That was five years ago, but I believe she was alone.**

16         MR. HARRISON:  I have no further questions,

17  Your Honor.

18         THE COURT:  All right.  Thank you.

19      Cross-examination.

20         MR. JEFFREY MACEY:  One second here.

21      (Brief pause.)

22                       <u>**CROSS-EXAMINATION**</u>

23  BY MR. JEFFREY MACEY:

24  Q.   Good morning, Ms. Skiba.  My name is Jeff Macey, and I'm

25  Nancy Roe's attorney.

1    A.   **Good morning.**

2    Q.   We've never met before, have we?

3    A.   **No.**

4    Q.   Ms. Skiba, I wanted to ask you something.  I'm going to

5    put up what's already been -- It's page 13 of what's already

6    been admitted as Defendant's Exhibit I.  Can you see that

7    document?

8    A.   **Yes.**

9    Q.   Okay.  And it purports to be a summary of a witness

10   interview you gave.  Do you recognize this document?

11   A.   **I haven't seen the document, so this is my first time**

12   **seeing it.**

13   Q.   Okay.

14   A.   **But -- Yeah.**

15   Q.   Did you review this at all before you came to testify

16   today?

17   A.   **No.**

18   Q.   Okay.  So were you going just based on your memory?

19   A.   **Yes.**

20         **MR. JEFFREY MACEY:**  Okay.  Okay.

21   (Brief pause.)

22   I've got a backseat driver.

23   Q.   Ms. Skiba, I wanted to draw your attention to the

24   document.  This is just what you testified to.  It's the night

25   of the 17th, late in the evening, and Ms. Roe was at your

1    door; correct?

2    A.   **Yes.**

3    Q.   And coming to ask you for a key was against the rules; is

4    that correct?

5    A.   **I wouldn't say against the rules.**

6    Q.   But you weren't allowed to give her a key?

7    A.   **Yes.**

8    Q.   Didn't make sense that she would come and ask you to let

9    her in her room; correct?

10   A.   **I would say that it was out of -- not exactly normal, but**

11   **I would say it was a quite common occurrence for residents to**

12   **come to my room to ask for keys, just because we lived on the**

13   **eighth floor, and so a lot of residents would ask me if I could**

14   **let them in instead of them going downstairs.  So I would say**

15   **that it was not the first time that a resident had knocked on**

16   **my door and asked me to do that.**

17   Q.   Okay.  Okay.  When you were talking to the investigators,

18   did you tell them that Ms. Roe was not quite herself?

19   A.   **This interview was five years ago, so I don't exactly**

20   **remember everything that happened in the conversation.  So I**

21   **can't necessarily, like, confirm that other than if it's in the**

22   **report.**

23   Q.   Okay.  So you don't have any reason -- You don't have any

24   memory now that what you told them wasn't true then; right?

25   A.   **Right.**

1    Q.   You were telling the investigators the truth?

2    A.   **Yes.**

3    Q.   Okay.  And you don't have any reason to believe that they

4    wrote down something that wasn't what you told them?

5    A.   **I wouldn't think so, but. . .**

6    Q.   Okay.  Now, you were Ms. Roe's RA the entire 2016-2017

7    school year; correct?

8    A.   **Yes.**

9    Q.   Okay.  In the fall of 2016, you were involved in assisting

10   Ms. Roe with a suicide attempt; isn't that correct?

11   A.   **Yes.**

12   Q.   Okay.  And she had taken too much prescription medication;

13   is that correct?

14   A.   **I would say, in that instance, I don't know the specific**

15   **details.  So the incident happened on a different floor of the**

16   **hall, and I was brought into the situation following, once the**

17   **EMS had already transported her.  So I more so assisted in**

18   **helping the RA file the report, but I wasn't the one**

19   **necessarily directly responding.**

20   Q.   Did you talk to her about why she attempted suicide in

21   2016?

22   A.   **I don't believe we ever had a direct conversation about**

23   **that.**

24   Q.   Were you aware that it was related to a previous assault

25   she had undergone at Ball State University?

1   A.   **I don't believe so.**

2          **MR. JEFFREY MACEY:**  I don't have any further

3   questions.

4          **THE COURT:**  Are you sure?

5          **MR. JEFFREY MACEY:**  Positive.

6          **THE COURT:**  Mr. Harrison, anything?

7          **MR. HARRISON:**  All right.  No further questions,

8   Your Honor.

9          **THE COURT:**  All right.  Thank you.

10      Ma'am, you may step down.  Thank you.

11      Defense, next witness.

12          **MR. KEALEY:**  Thank you, Your Honor.  Defense calls to

13   the stand Christina Wright.

14          **THE COURT:**  Please raise your right hand, Ms. Wright.

15      (The oath was duly administered.)

16          **THE WITNESS:**  I do.

17          **COURTROOM DEPUTY:**  Thank you.  Please be seated.

18          **THE COURT:**  All right.  You may proceed.

19          **MR. KEALEY:**  Thank you, Your Honor.

20          **CHRISTIE WRIGHT, DEFENSE WITNESS, SWORN**

21                   **DIRECT EXAMINATION**

22   BY MR. KEALEY:

23   Q.   Good morning.  Please tell us your name.

24   A.   **My name is Christie Wright.**

25   Q.   And where do you live?

1   A.   **I live in Fowler, Indiana, in Benton County.**

2   Q.   And where do you work?

3   A.   **I work at Purdue University.**

4   Q.   And what is your current position?

5   A.   **I'm currently the director of the Office of Institutional**

6   **Equity.**

7   Q.   How long have you been working in or with the Office of

8   Institutional Equity?

9   A.   **I've been working with the Office of Institutional Equity**

10  **since the fall of 2016.**

11  Q.   And going a little further back in your professional

12  background, please tell us a little bit about your training and

13  education since college.

14  A.   **So I graduated from college in 2001 from Butler**

15  **University, and then I went to law school in Indianapolis at --**

16  **I think it's now called the Robert H. McKinney Indiana**

17  **University School of Law.  It was referred to as Indiana**

18  **University Indianapolis at the time.**

19       **I graduated from there in 2004.  And do you want me to**

20  **keep going?**

21  Q.   So you've been practicing law since 2004?

22  A.   **Yes.**

23  Q.   What are the responsibilities of your position at Purdue

24  as director of the Office of Institutional Equity?

25  A.   **So the Office of Institutional Equity is one branch of the**

WRIGHT - DIRECT

1   Office of Vice President for Ethics and Compliance.  I like to

2   explain my office as having three main areas that I oversee.

3   We're responsible for equal opportunity, equal access and

4   hiring.  So we have oversight of the faculty search and

5   screening process.

6        I'm also the university's ADA coordinator, so I have

7   oversight of all the equal access accommodations/accessibility

8   matters on campus.

9        And then the third branch is more of the discrimination

10  and harassment work.  So we are responsible in my office for

11  dealing with the university's equal opportunity/equal access

12  and affirmative action policy, the university's anti-harassment

13  policy, and the university's Title IX harassment policy as well

14  as the amorous relationships policy on occasion.

15       And so as the university's Title IX coordinator, I also am

16  responsible for responding to incident reports that we receive.

17  So I have staff in my office who send outreach and resources

18  when we receive reports of incidents of discrimination or

19  harassment, things like relationship violence, sexual violence,

20  stalking.

21       So we send those outreach letters to people.  We ask them

22  if they want to meet with our office to learn about options

23  that they have for investigations or other supportive measures.

24  And then we also, of course, do investigations.  So informal

25  complaints and formal complaints.

WRIGHT - DIRECT

1        That informal process is more like a mediation.  The

2   formal process is what it sounds.  It's more formal.  And it's

3   like the investigation that we were -- have been talking about

4   in this case.

5   Q.   Did there come a time in April of 2017 when the Office of

6   Institutional Equity received a report through Purdue's

7   internal reporting process relating to Ms. Roe and sexual

8   assault?

9   A.   Yes.  In early to mid April-- so I think it was a few days

10  after the alleged assault --we received an incident report from

11  university residences indicating that they had received

12  information that Ms. Roe had been sexually assaulted, which

13  prompted outreach and resources from our office to Ms. Roe.

14  Q.   Let's talk for a moment about the outreach and resources.

15       Are the outreach and resources in that situation part of

16  your office's function and mission?

17  A.   Yes, they are part of our function and mission, and

18  they're also part of our responsibilities under Title IX.  So

19  making sure that we are addressing complaints of Title IX

20  harassment, that we are remediating the effects of those

21  incidences, and that we're also preventing the recurrence

22  of it.

23       So that outreach and resource function is crucial to that.

24  We track all of the reports that we get.  We monitor them.  We

25  look for, you know, are we getting repeat reports from -- you

1    know, involving the same respondent or the same location on

2    campus, are we having our problem in a certain area on campus.

3        And so we track all of those reports that come in, and we

4    do the outreach and resources to make sure everyone is aware of

5    what their options are and ways that we can support them and

6    help keep them on track academically at the university.

7    Q.   So in the case of the report about Ms. Roe, the outreach

8    and resources you're describing were outreach to Ms. Roe and

9    ensuring resources to Ms. Roe as needed?

10   A.   Yes.  So the -- It's a standard letter that we tend to

11   send out saying that we received information about an incident

12   that may have involved -- and we list, you know, something that

13   it could have endangered their safety, and rattle off a list

14   of, you know, sexual assault, relationship violence, stalking.

15   We don't identify specifically what the information we

16   received was.

17       We give them a link to the policy that might be at issue.

18   So in this case, there's a link in the outreach to the

19   anti-harassment policy, and then we attach a resource guide,

20   which lets them know resources available on campus and invites

21   them to come in and talk to our office about supports that we

22   can provide.

23       We also give them contact information for the Center for

24   Advocacy Response and Education, which is CARE, which is a

25   confidential resource.  We also tell them if they would like to

1    bring a confidential advocate or another support person for a

2    meeting with our office, that they are permitted to do that.

3    Q.    Does that outreach and resource function of the Office of

4    Institutional Equity continue on as needed throughout the steps

5    that follow?

6    A.    **Yes.  So regardless of whether an impacted party proceeds**

7    **with a formal investigation or not, we will provide support to**

8    **those students, faculty, or staff.**

9          **Students specifically, a lot of students want support in**

10   **the form of academic accommodations, and so that involves**

11   **reaching out to faculty members, either specific requests for**

12   **delayed deadlines for assignments or exams.  Maybe it's a**

13   **general notice to faculty saying that they're working with our**

14   **office and that they're not asking for anything specific at**

15   **this time but that we may reach out in the future.  We do that**

16   **routinely in these cases because they may be fine at a certain**

17   **point, but the cases ebb and flow over time.**

18         **So there are pinpoints in an investigation that might make**

19   **it more difficult for either the complainant or respondent**

20   **going through the process, so things like an interview with our**

21   **office, the preliminary report review, the panel meeting.**

22   **Those can be points where their stress level or ability to**

23   **focus on their academics may change, and so it's not uncommon**

24   **at all for us to reach out throughout the course of an**

25   **investigation or the course of a year or longer on behalf of**

1   the students to get them those support services.

2       The one year anniversary of an assault is another timeline

3   point where students often will reach back out and say they're

4   struggling particularly at this time, so we'll reach out to

5   their instructors and ask for accommodations.

6   Q.   In connection with the report we're discussing involving

7   Ms. Roe, did investigation steps commence?

8   A.   Yes.  So Ms. Roe -- Not Ms. Roe, sorry.  Ms. Meyers was

9   the university investigator who first met with Ms. Roe.  She

10  sent that initial outreach to Ms. Roe inviting her to meet with

11  our office.

12      She then also asked another staff member in our office to

13  try to ascertain the identity of the individual in the

14  residence hall footage.  So we took steps to go to the

15  residence hall and see if there was any footage from that

16  evening that might show the two individuals that were involved

17  in the incident.

18      And I should probably back up and clarify that the

19  incident report that we initially received did not contain the

20  name of the respondent.  It only contained Ms. Roe's name.

21      So we reached out to the residence hall to try to get that

22  footage, reviewed the footage to try to ascertain the name or

23  the identity of the other individual in the footage, and then

24  reached back out to Ms. Roe, letting her know that we had

25  identified the individual involved and that we wanted to meet

1    with her to get her input on a university investigation of the

2    allegations.

3    Q.    You mentioned Ms. Meyers.  Was she an investigator in the

4    Office of Institutional Equity?

5    A.    **Yes.  So at that time, Ms. Meyers was a Title IX**

6    **specialist for the university, and her primary responsibilities**

7    **were managing that outreach and resources function, and then**

8    **she was also an investigator for the university.**

9    Q.    Referring to Defense Exhibit I, the university

10   investigator's report, on the front line is identified

11   Ms. Meyers, the person you're referring to; correct?

12   A.    **Correct.**

13   Q.    And then also you?

14   A.    **Yes.**

15   Q.    And the two of you worked as a team on this investigation?

16   A.    **Yes.**

17   Q.    I'd like now to turn to the steps of the investigation and

18   look at them in a little more detail.

19        In an investigation such as this one, are witness

20   interviews part of the investigation?

21   A.    **Yes.**

22   Q.    Describe generally the process of organizing and pursuing

23   witness interviews in an investigation such as this one.

24   A.    **Okay.  So the first step would be to meet with the**

25   **impacted party or the complainant and gather information from**

1    them, and that would depend on whether, you know, they have

2    filed a formal complaint first or if it's just in a response to

3    outreach.

4        So if they filed a formal complaint, assuming it was

5    moving forward to a full investigation, the first person to

6    interview would be the complainant.

7        In a case like this, where we had an incident report and

8    we were outreaching and we had invited her to come in and talk

9    to us about an investigation, the same type of thing happened.

10        So Karen had met with Ms. Roe and completed an initial

11    interview with her to gather more information that would form

12    the basis of allegations against Mr. Lanza.

13        And with a university-initiated investigation like this, a

14    notice of allegations is prepared and then sent out with a

15    complaint initiation notice to both the complainant and the

16    respondent.

17        Because we would have already interviewed Ms. Roe at that

18    point, the next person to interview in a typical investigation

19    would be the respondent.

20        So we would want to meet with the complainant and the

21    respondent first and then go and interview witnesses.  And

22    witnesses are either people -- We typically ask the parties to

23    identify witnesses that they wish us to interview, and we

24    typically will ask them to share just a brief amount of what

25    they think that they could provide information on so we could

1    make a decision about whether we believe they have relevant

2    information and should interview them.

3         We may also identify additional witnesses from either, you

4    know, an RA who submits an incident report, or maybe we get

5    text messages from somebody and there's a new name in there.

6    So we may add people to that list of people to interview.

7         And then we go about scheduling meetings with them and

8    interviewing those witnesses.

9    Q.   So in the investigation report, Defense Exhibit I, on

10   screen is a section entitled "Interviews and Document Review."

11   The first two listed interviews are Ms. Roe and Mr. Lanza.

12        And putting on screen the next 10 individuals that you

13   interviewed -- that you and Ms. Meyers variously interviewed.

14        And can you describe generally how you went about

15   assembling this list in this investigation.

16   A.   Right.  So we talked to the parties about who may have

17   seen them the night of the incident.  So anybody who interacted

18   with them.  We had a timeline initially from Ms. Roe about, you

19   know, what they did that evening.  And so we tried to identify

20   who may have interacted with them before, during, and after the

21   incident.  And these are people whose names were provided to us

22   or that we learned about through the course of the

23   investigation.

24   Q.   So all of these 12 listed names are people who were

25   actually interviewed?

1   A.   **Correct.**

2   Q.   And were some of them interviewed more than once?

3   A.   **Yes.**

4   Q.   Which ones were interviewed more than once?

5   A.   **Ms. Roe and Mr. Lanza were interviewed more than once.**

6   Q.   And then further down in the same page is a list of the

7   information that you gathered and reviewed.  Mr. Lanza's

8   response to the complaint, the Harrison Hall videos and

9   still-shot from April 18, 2017.

10       You've been in the courtroom when video from Harrison Hall

11  has been shown.  Is that video from the same video that you

12  collected listed in No. 2 there?

13  A.   **Yes, it is.**

14  Q.   And then you have a list of people from whom you collected

15  messages.  Were those text messages and emails?

16  A.   **Yes.  I don't specifically recall any emails.  I believe**

17  **text messages, messages through different social media apps.**

18  Q.   Are the text messages that you collected included in the

19  report?

20  A.   **I don't believe that all of the messages that we received**

21  **were included in the report, but the text messages that we**

22  **believed were relevant to the investigation were attached to**

23  **the report as appendices.**

24  Q.   So if somebody wanted to see those text messages that you

25  received and culled through and found to be relevant, they

1    could look at the investigation report?

2    A.    **Correct.**

3    Q.    In No. 8 and 9, you list out two written statements, one

4    from Alex Goshert and one from Paul Cheron.  What is a written

5    statement?

6    A.    **So these written statements, these individuals prepared**

7    **written statements before they met with our office.  I'm not**

8    **quite sure why.  I don't know if they were trying to just**

9    **document what they remembered; in case there was an**

10   **investigation later, it would be documented, or if they thought**

11   **that they could just give us that and avoid meeting with our**

12   **office.  But we don't do that.  We make them sit and let us ask**

13   **them questions.**

14        **But they did provide those written statements that they**

15   **had prepared, and then we went ahead and interviewed them.**

16   Q.    And then listed No. 10 is the audio recording that you

17   obtained from -- that you received that Mr. Lanza supplied to

18   you; correct?

19   A.    **Yes.**

20   Q.    Is this amount of investigative effort, this list of

21   witnesses and this type of evidence collection, the standard

22   methodology for the Office of Institutional Equity where there

23   is an investigation launched like this one?

24   A.    **Yes.**

25   Q.    I want to talk for a moment about the format of the

1    report, and then we'll take a look at some sections of the

2    report.

3        So the next section in the report begins under the heading

4    "Summary of Facts," and this section of the report is a

5    chronological narrative of all the information that you

6    gathered; right?

7    A.   **Yes.  So we interviewed the parties and the witnesses, and**

8    **then we take that information, and we try to synthesize it, for**

9    **lack of a better word, and put it in time order, usually**

10   **chronologically if possible, to just walk through all of the**

11   **facts that we've been able to gather in the case.**

12   Q.   And so you gather all the facts and you compile them as

13   facts separate from the exercise of deciding what the Office of

14   Institutional Equity thinks of those facts?

15   A.   **Correct.  The summary of facts section is just the facts**

16   **as they've been provided to us by the different party without**

17   **any kind of analysis or opinion of those facts.**

18   Q.   So what's on screen is page 5 of the investigation report,

19   and then if we jump ahead to page 19 of the investigation

20   report, page 19 of the investigation report is the last of the

21   facts section where you summarized the facts on the report to

22   Ms. Skiba that we just heard about when she was testifying;

23   correct?

24   A.   **Yes, that's correct.**

25   Q.   So approximately 14 single-spaced pages of facts compiled

1    in this report?

2    A.   **Yes.**

3    Q.   So the first section of your fact compilation was the

4    party itself, and this was the party at Acacia Fraternity on

5    Monday night; right?

6    A.   **Yes.**

7    Q.   And would you please offer us an overview of the

8    information that you gathered about the party itself.

9    A.   **So from various different people, we learned that there**

10   **was a party at Acacia.  I believe that there was a private**

11   **function.  It ended at a certain time, and then it opened up to**

12   **a broader party at around 10:00; but still, there was a list to**

13   **be able to get in the party, and that Ms. Roe and her boyfriend**

14   **went to the party that evening, where they consumed alcohol,**

15   **talked with friends, played drinking games.**

16   Q.   Okay.  And so on this page that we're looking at here, you

17   had spoken to the individuals who were at the party about the

18   amount of alcohol that Ms. Roe had consumed; correct?

19   A.   **Correct.**

20   Q.   Why was that relevant?  Why were you trying to gather that

21   information?

22   A.   **So in any sexual assault case that we have, we have to**

23   **look to see whether there was consent.  And when making that**

24   **determination about consent, we always have to analyze whether**

25   **there was incapacitation, and one way that a person can be**

```
 1    incapacitated is by alcohol consumption.

 2         And so many of these cases involve alcohol, and so that's

 3    usually the first thing that we're trying to identify from

 4    individuals, if we're talking about a party or a function that

 5    they've been to, is, how much did they drink that night, how

 6    much did other people see them drink that night, how were they

 7    presenting to people, you know, what were people who saw them

 8    in realtime saying, because we can't go back in time ourselves

 9    and be there to know.  And so we ask the people who were

10    present that night.

11         Ms. Roe told us in her interview that she had consumed

12    approximately two and three-quarters cans of beer and five Solo

13    cups of wine.  That's also the same amount that her boyfriend

14    or roughly the same amount that her boyfriend said she had

15    consumed.

16    Q.   So in the middle of the page that's on screen, there's a

17    paragraph talking about both Ms. Roe's self-description of how

18    she acts when she has had -- when she'd been drinking a lot.

19    A.   Mm-hmm.

20    Q.   And she says that, "Others have told her that she gets

21    very talkative and social; she gets floppy and cannot keep

22    herself up or moves around a lot, or runs and skips."  Do you

23    see that?

24    A.   Yes.

25    Q.   So this is what Ms. Roe told you people have told her;
```

1  right?

2  A.  **Yes.  This is what Ms. Roe told us that people have told**

3  **her about what she's like when she drinks.  It was not her**

4  **description of how she was that night, but just in general,**

5  **this is how she presents when she's been drinking.**

6  Q.  So one of the things that people have told her and that

7  she relayed to you is that she can have a lot to drink and

8  still run and skip?

9  A.  **Correct.**

10  Q.  Continuing on in the report's summary of events that

11  happened at the party based on witnesses who were there,

12  there's a paragraph that begins right here (indicating).  Could

13  you please just read that paragraph for us.

14  A.  **"Lanza left the group to get another drink, and Roe**

15  **followed him.  Lanza did not notice her following him until he**

16  **reached the bar.  Lanza was behind the bar when Roe grabbed him**

17  **and started to kiss him.  Lanza was drunk at this point, and he**

18  **returned the kiss.  Another fraternity member, Abrahamson, saw**

19  **Roe following Lanza, so he followed Roe.  Abrahamson walked in**

20  **as Lanza was pushing Roe away from him.  Lanza told Abrahamson**

21  **that he did not initiate the kiss.  Lanza decided to remove**

22  **himself from the situation and went to his room.  He finished a**

23  **cup of wine and went to bed."**

24  Q.  Is this paragraph a compilation of information that you

25  obtained from interviews of Lanza and Abrahamson?

1    A.   **Lanza, Abrahamson, and then there were other individuals**

2    **that we interviewed that had information regarding that, I**

3    **believe.**

4    Q.   So if we go to the next paragraph, some of those others

5    are listed; correct?

6    A.   **Yes.**

7    Q.   Okay.  So the others that you interviewed about this

8    juncture in the party included Alex Goshert and Andrea Martin?

9    A.   **Yes.  We interviewed Alex Goshert, Andrea Martin.  He's**

10   **not mentioned -- I guess he is later in the paragraph, Kyle**

11   **Hansen who was dating Andrea Martin at the time.**

12   Q.   So in this paragraph, you write in the report that

13   Abrahamson saw Roe and Lanza making out, he asked him what they

14   were doing, at which point they stopped.  And then could you

15   read the next two sentences for us, please.

16   A.   **"Roe then started kissing Hansen, and Martin, who was**

17   **dating Hansen at the time, slid her arm in between them to**

18   **break it up.  Roe then kissed Abrahamson, and he pushed her**

19   **away."**

20   Q.   The next section of your report is entitled "Lanza's

21   Bedroom at Acacia," and in this part of your report, you state

22   that others who were present provided the following

23   information.  "According to Goshert," could you go ahead and

24   read that paragraph for us that begins, "According to Goshert."

25   A.   **"According to Goshert, Roe asked him where Lanza's bedroom**

1    was located.  He told her, 'Chris went to bed.  Just leave him
2    alone for the night.'  She was insistent, and they started
3    walking up the stairs.  Once they got up the first flight,
4    Goshert told her, 'Chris already went to bed.  He's asleep.
5    You're not going to get into his room.'  She then told Goshert,
6    'If you show me where Chris' room is, I'll make out with you.'
7    She pushed him against the wall and started making out with
8    him.  He said, 'Okay.', and walked up to the second floor,
9    where they ran into another fraternity member, Francis
10   Jagiella.  Jagiella asked where they were going.  Roe, Goshert,
11   and Jagiella then went to Lanza's room."
12   Q.   And all of the names that are in this paragraph are people
13   that you interviewed; correct?
14   A.   **Correct.**
15   Q.   You state in this paragraph that she was insistent and
16   they started walking up the stairs?
17   A.   **Yes.**
18   Q.   Meaning a group, including Roe herself?
19   A.   **Correct.**
20   Q.   So Ms. Roe, with whatever amount of alcohol that she had
21   consumed, was going up the stairs of the Acacia fraternity
22   house?
23   A.   **Correct.  My recollection of interviews is that she was**
24   **walking up the stairs following them and didn't need any**
25   **assistance in walking up the stairs.**

1   Q.   So the next paragraph refers to getting to Lanza's room,

2   that Lanza climbed out of his bed in his boxers.  Can you

3   please read for us the sentences that follow on that paragraph.

4   A.   **After "boxers"?**

5   Q.   Yes.

6   A.   **{As read:}  Roe approached him and started to touch him.**

7   **She tried to push him onto a futon.  Lanza asked what was going**

8   **on and told Roe -- and was told that Roe needed to leave and**

9   **wanted Lanza to walk her home.  Lanza dressed and asked where**

10  **Porche was.  Roe told him that Porche was vomiting and others**

11  **were taking care of him.  Lanza and Roe left Acacia without**

12  **speaking with Porche.**

13  Q.   So when you write that Lanza asked what was going on and

14  was told that Roe wanted Lanza to take -- to walk her home, are

15  you saying here that the request for Lanza to walk her home was

16  Roe's request?

17  A.   **Correct.**

18  Q.   In other words, it wasn't that the fraternity members

19  chose Lanza to walk her home; it was that Roe chose Lanza to

20  walk her home?

21  A.   **We were informed by witnesses and Mr. Lanza that Ms. Roe**

22  **specifically asked for him to walk her home.**

23  Q.   You write in the same paragraph that Lanza dressed and

24  asked where Porche was and that Porche was vomiting and others

25  were taking care of him.

1    That information came from all the people that you

2  interviewed about this juncture in the evening?

3  A.   **Correct, and Mr. Porche also informed us that he had been**

4  **vomiting.**

5  Q.   Continuing on to the next page, which is under the heading

6  "Traveling from Acacia to Harrison Hall," you write here that

7  Lanza reported that Roe was an 8 in terms of her level of

8  intoxication, she was not stumbling as they walked, and she was

9  supporting Lanza as they held hands.

10    A little further down in the same paragraph, you relate

11  the evidence you collected about their discussion while they

12  were walking.  Could you please read that text from there to

13  the end of the paragraph.

14  A.   **"While they were walking, Roe was telling Lanza what type**

15  **of sexual things she wanted to do with him and what she was**

16  **into, like calling people 'Daddy.'  Once they arrived, Lanza**

17  **was going to leave her at the door of the residence hall, but**

18  **she wanted him to walk her to her room."**

19  Q.   Lanza was going to leave her at the door of the residence,

20  but she wanted him to walk her to her room, that was

21  information you received from Lanza?

22  A.   **That's correct.**

23  Q.   The next paragraph discusses information from your

24  interview with Porche, with Mr. Porche, who says that he tried

25  to call Ms. Roe, tried to call Mr. Lanza.  And then please read

1   the sentence that begins, "He sent Roe a text message."

2   A.   **"He sent Roe a text message stating that he had the keys**

3   **to her dorm room.  Later, Roe sent Porche a text message**

4   **stating that she got back to her room safely."**

5   Q.   The next paragraph then switches to a different part of

6   the same juncture in the evening, talking about somebody named

7   Goshert walking Mr. Porche home.  Who was Goshert?  Just to

8   remind us, please.

9   A.   **Alex Goshert was one of the Acacia fraternity members who**

10  **was at the party.  I believe he was one of the sober monitors**

11  **for the party.**

12  Q.   Was he one of the people that you interviewed?

13  A.   **Yes.  He had walked Mr. Porche home that evening.**

14  Q.   And you summarize in this paragraph some of the

15  conversation between Mr. Goshert and Mr. Porche.

16       So you write here that, during the walk home, Porche

17  expressed concern that Roe would cheat him on him by having

18  sexual intercourse with Lanza.  That's information that you

19  received from your witness interviews?

20  A.   **Correct.  From Alex Goshert.**

21  Q.   Then go ahead, please, and read the next few sentences in

22  this paragraph.

23  A.   **"Porche was worried because Roe was really 'into Lanza.'**

24  **Goshert reported having told Porche not to worry and that**

25  **someone other than Lanza had walked Roe home.  At the time,**

1    he," Goshert, "believed that Abrahamson had walked Roe home.

2    Porche called Roe several times during their walk, but Roe

3    initially did not answer the phone.  It was not until they

4    reached Porche's dorm that Roe finally answered Porche's call

5    on speakerphone.  Roe told Porche that Abrahamson, not Lanza,

6    had walked her home."

7    Q.   The next section of your report then switches to the

8    arrival at Harrison Hall and describes in the first paragraph

9    that, when they arrived at Harrison Hall, "Lanza told her to

10   talk to her RA and started to leave.  Roe stopped him and had

11   him wait in a stall in the woman's restroom.  There was a

12   female in the shower, and Lanza did not want to leave, so he

13   waited for Roe to return."  Do you see that?

14   A.   Yes.

15   Q.   Where did you get that information?

16   A.   We received that information from Mr. Lanza.

17   Q.   So there has been testimony from Ms. Skiba this morning

18   that, when Ms. Roe went to see her RA, that she was alone?

19   A.   Correct.

20   Q.   You were here in the courtroom for that testimony?

21   A.   Correct.

22   Q.   And do you have an understanding as to where Mr. Lanza was

23   at the time that Ms. Roe went to see Ms. Skiba?

24   A.   Yes.  From our investigation, my understanding is that

25   Ms. Roe was alone when she went to Ms. Skiba's room, and at the

1    time Mr. Lanza was hiding in the women's restroom.

2    Q.   The next paragraph talks in a little more detail about the

3    Harrison Hall video and describes what information you garnered

4    from your review of that video.

5         Please just go ahead and read that paragraph in full

6    for us.

7    A.   {As read:}  The Harrison Hall lobby video camera captured

8    a still-shot of Roe and Lanza walking into the lobby at 2:19

9    a.m. on Tuesday April 18, 2017.  There is a video from that

10   time also.  The video shows the two of them walking across the

11   lobby toward a secured door.  As they were walking, Roe reached

12   over to touch Lanza with her harm.  They then stopped to

13   embrace and kiss.  She then swiped them both into -- sorry --

14   that she swiped them into the secured area, and he held the

15   door and followed her.  They were both walking fine without

16   stumbling or swaying.

17   Q.   All of the information in that paragraph came out of your

18   viewing of the video?

19   A.   Yes.  One of the reasons we get that video footage is also

20   just to establish a timeline, so it's helpful to have an

21   independent -- like, this is actually what time they got to the

22   residence hall, to kind of build a timeline back from the

23   beginning of the party.  And, yes, that is what the video

24   showed.

25   Q.   The next section of your report is entitled "In Roe's Room

1    at Harrison Hall."  And this part of your report covers

2    approximately two full pages.  I don't propose to go into any

3    detail here.  I just want to verify that the information that

4    you were presenting in this part of your report is information

5    that you assembled from interviews with both Ms. Roe and

6    Mr. Lanza?

7    A.   **Yes.  And we typically separated out when there's a**

8    **dispute, so that heading there saying there's a dispute**

9    **regarding what occurred will present, you know, what she,**

10   **like -- her information about the incident and then his**

11   **information about the incident so that you can read the**

12   **narrative of what each person said happened in the room**

13   **separately.**

14   Q.   So early in the investigation, Ms. Roe had said that she

15   remembered nothing after seeing Ms. Skiba; correct?

16   A.   **Correct.**

17   Q.   In the paragraph that's on screen here, the paragraph that

18   begins, "Roe stated that," could you please read the first two

19   sentences for us, please.

20   A.   **"Roe stated that, at first, she did not recall what**

21   **happened with Lanza.  She reported that some of the details**

22   **came back to her once she was asked specific details by the**

23   **SANE nurse on Thursday April 20th, 2017."**

24   Q.   So April 20th, 2017 was actually before Ms. Roe

25   submitted her report to the RA that came through Purdue

1    reporting; right?

2    A.   **Correct.**

3    Q.   So already as of Thursday, April 20, 2017, Ms. Roe was

4    reporting recollections of some details of her time with

5    Mr. Lanza in her dorm room?

6    A.   **Correct.**

7    Q.   Earlier in this case, we looked on screen at some text

8    messages from the latter part of their time together and

9    immediately afterward.  So I direct your attention to the

10   paragraph that begins, "According to Lanza, after they had

11   intercourse."  Do you see that paragraph there?

12   A.   **I do.**

13   Q.   Okay.  And so this paragraph summarizes that they

14   exchanged phone numbers and that they then texted with each

15   other; correct?

16   A.   **Correct.  They exchanged phone numbers, and they texted**

17   **with each other both immediately after the incident and through**

18   **Thursday morning.**

19   Q.   So you state Roe and Lanza both provided to investigators

20   the messages they exchanged that evening and the next day, and

21   you quote one of those text messages; right?

22   A.   **Correct.**

23   Q.   Ms. Roe didn't ever dispute to you that these were text

24   messages she exchanged with Mr. Lanza, did she?

25   A.   **She did not.**

1   Q.   The next section in your report is entitled "The next

2   Morning, Tuesday, April 18."

3       So this is just a matter of hours after the 3:44 a.m. text

4   message exchange that we just looked at; right?

5   A.   **Correct.**

6   Q.   Okay.  The paragraph on screen that begins, "On Tuesday,

7   April 18, Isabelle Ortt texted Roe."  Do you see that

8   paragraph?

9   A.   **Yes.**

10  Q.   Was Isabelle Ortt one of the people who you interviewed

11  for the investigation?

12  A.   **Yes.  Isabelle Ortt was one of Ms. Roe's friends.**

13  Q.   Please go ahead and read the first two paragraphs of

14  this -- the first two sentences of this paragraph.

15  A.   **"On Tuesday April 18, 2017, Isabelle Ortt texted Roe to**

16  **ask how the previous night had gone.  Roe informed her that she**

17  **had a lot to drink Monday night and made out with several**

18  **people, including Lanza."**

19  Q.   So this is what Ms. Roe told Ms. Ortt?

20  A.   **Correct.**

21  Q.   The morning after?

22  A.   **Correct.**

23  Q.   That she remembered making out with several people,

24  including Lanza?

25  A.   **Correct.**

1    Q.    And that that was information she volunteered to Ms. Ortt

2    after Ms. Ortt had just asked how the evening had gone?

3    A.    **Correct.**

4    Q.    The next section of the report is entitled "Porche's

5    meeting at Acacia."  Would you just summarize in general terms

6    what your investigation turned up about that meeting.

7    A.    **So several witnesses, including Mr. Porche, shared with us**

8    **that members of Acacia had reached out to Mr. Porche the day**

9    **after the Monday night party, letting them know that they had**

10   **concerns, that there was a problem, and that so they called**

11   **Mr. Porche over to the Acacia house.  He went the afternoon of**

12   **Tuesday the 18th.  While he was there, they informed him that**

13   **Ms. Roe had kissed or made out with several members of the**

14   **fraternity, including Mr. Lanza.**

15   Q.    The next section of your report is entitled "Tuesday

16   Afternoon in Roe's Dorm Room."  And you quote at some length a

17   text exchange to Ms. Roe and Mr. Lanza.  I'm not going to ask

18   you to read for us everything in this text exchange, but I want

19   to go down toward the latter part of this sequence to the text

20   that begins with Mr. Lanza saying:  Still want hang out today.

21         Do you see that?

22   A.    **Yes.**

23   Q.    And Ms. Roe responds:  As long as you're fine dealing with

24   me looking ratchet and hung over.  Haha.

25         Did you have an understanding from this text message

1    sequence about whether this was an agreed-upon get-together

2    between Ms. Roe and Mr. Lanza?

3    A.    **Yes.  So throughout the course of our investigation, we**

4    **understood that they had made plans together on Monday evening**

5    **after they had had sexual intercourse to meet up the next day**

6    **and to have sex again, that Mr. Lanza reached out to her by**

7    **text message the following day and asked if she still wanted to**

8    **hang out and she said yes; and then he did, in fact, go over to**

9    **her room again, and they had sex again.**

10   Q.    The next section of the report is entitled "Party at

11   Acacia" that evening of Tuesday evening, a short section.

12         Let's go ahead and move forward to Wednesday, which is the

13   next section of the report, Wednesday, April 19.

14         In this section of the report, you describe a number of

15   communications involving Ms. Roe and Ms. Ortt, Ms. Ortt and

16   Mr. Lanza, Ms. Roe and Mr. Porche.

17         Can you summarize for us this series of conversations that

18   your investigation turned up.

19   A.    **Yes.  So we learned in the investigation that Mr. Lanza**

20   **and Ms. Ortt, they were lab partners, I believe, that they had**

21   **class or something that afternoon, and they had a conversation**

22   **about what had happened between Mr. Lanza and Ms. Roe on Monday**

23   **night.  And Mr. Lanza told Ms. Ortt that Ms. Roe had wanted to**

24   **have sex with him but he had told her no.**

25         **Ms. Ortt then relayed that information to Ms. Roe, and**

1    Ms. Roe told her that they had had sex on Monday night.

2         Ms. Ortt's version of that was a little different.  We

3    detailed that in the report.  It wasn't clear in meeting with

4    Ms. Roe what time -- if that was at the party that evening or

5    in the afternoon that they had had that conversation.  But Ms.

6    Ortt recalled the conversation occurring at the party that

7    evening, so back at Acacia on Wednesday night.

8         She said that Ms. Roe asked her if they could speak

9    privately, and she told her at that time that she and Mr. Lanza

10   had had sex on Monday night and again on Tuesday, that she felt

11   guilty about it because she knew that Ms. Ortt was interested

12   in or had a thing for Mr. Lanza, and concerned that her

13   boyfriend would break up with her.

14        And then throughout the party then, so after Ms. Roe

15   disclosed that to Ms. Ortt, Ms. Ortt then went over to

16   Mr. Lanza at the party and confronted him, since he had lied to

17   her earlier in the day to say that they had not had sex.

18        And they had a conversation in which he admitted that they

19   had had sex the night before, and then Ms. Ortt left the party.

20        From there, Mr. Lanza confronted Ms. Roe about having told

21   Ms. Ortt what happened.  Ms. Roe and Mr. Porche then left the

22   party, and when they were walking home, she then told Mr.

23   Porche that she had had sex with Mr. Lanza on Monday night and

24   Tuesday afternoon.

25   Q.   So in the series of communications that you've just

1   summarized, first, Ms. Ortt learned about the sex; right?

2   A.   **Mm-hmm.**

3   Q.   Then Ms. Ortt had a conversation with Mr. Lanza about the

4   sex; right?

5   A.   **Yes.**

6   Q.   And once Ms. Ortt knew about the sex, Mr. Lanza knew about

7   the sex, three of the four of them, Roe, Ortt, and Lanza knew

8   about the sex, and the one who didn't was Mr. Porche?

9   A.   **Correct.**

10  Q.   And so the sex that had occurred between Roe and Lanza was

11  at that point barely secret from Mr. Porche; right?

12  A.   **Right.  We received a text message as a part of our**

13  **investigation in which Ms. Roe -- And I'm paraphrasing.  Have**

14  **to have you pull the text message up.  But said basically that**

15  **she knew at that point that she needed to tell Mr. Porche.**

16  Q.   Because if she didn't tell him, he would find out some

17  other way?

18  A.   **Correct.**

19          **MR. JEFFREY MACEY:**  Objection, Your Honor.  I'm

20  sorry.  Can we -- That's a leading question.  I don't think it

21  summarizes the evidence that was just offered.

22          **THE COURT:**  It is a leading question.  I'll order the

23  question stricken.

24  **BY MR. KEALEY:**

25  Q.   At this point in your investigation, learning about this

1   round robin of communications amongst these four individuals on

2   Wednesday, what was the perception on the part of you as an

3   investigation team with Ms. Meyers about what you were

4   turning up?

5   A.   **We were just trying to piece it all together.  So having**

6   **not been involved in the incident and just tasked with**

7   **investigating, we were just pulling all the pieces together and**

8   **trying to figure out, you know, what happened, what happened in**

9   **what order, who was where, when, and just trying to make sense**

10   **of the night.**

11   Q.   Just a moment ago, you referred to:  I'd have to see the

12   text message.

13        Is the text message that's here on screen -- Roe sent Ortt

14   the following message, is that the text message you're

15   referring to?

16   A.   **It is.**

17   Q.   Could you go ahead and just read that text message for us.

18   A.   **Roe texted Ms. Ortt the following message:  Chris came up**

19   **to me and was, like, what the -- Can I just say "the F" --**

20   Q.   Yeah.

21   A.   **-- since we're in court?**

22        **{As read:}  I was like what the F did you tell Izzy, and I**

23   **was like:  Why did you lie to everyone?  So I knew I had to be**

24   **honest and suck it up even though it sucks, and Porche is**

25   **probably going to leave me.**

1  Q.   Those are Ms. Roe's words in a text message to her friend,

2  Ms. Ortt?

3  A.   **Yes.**

4  Q.   The next section is the final sections of your report;

5  covers Thursday, April 20th, and your interview with

6  Ms. Skiba.  I want to now go to the compilation at the back of

7  the report.  So at the back of the report is something called

8  the "Table of Appendices."  By the back of the report, I guess

9  the back of the report is about three or four times as thick as

10 the front of the report.  Can you please just describe to us

11 what this "Table of Appendices" is.

12 A.   **Yes.  So we interview all of the witnesses who are listed,**

13 **and then we prepare summaries of their witness interviews; and**

14 **a summary page is appended to the back of the report.**

15      **When we meet with parties, we tell them that they will**

16 **see -- witnesses when we interview them, we let them know, too,**

17 **that a summary of their interview will be prepared and provided**

18 **to both parties so that everyone knows up-front that everything**

19 **that they share will be seen by the other parties and they'll**

20 **know who said what.**

21      **And so those summaries are Word documents that we type up**

22 **as a summary of the information that they shared to us in the**

23 **investigation.**

24      **So that would be -- I'm sorry.  My eyes.  One through, it**

25 **looks like, 10 are witness summaries.  That will help because**

1   I'll just look there instead of trying to focus here.

2        Eleven, 12, 13, and I can't see below that, are text

3   messages that were provided that we believe were relevant to

4   the investigation.

5        Mr. Kealey, if you could push down, I could see the other

6   appendices.  Thank you.

7        Same with 14 and 15, are messages.  Sixteen and 17 are

8   those written statements we talked about earlier.  Eighteen, we

9   provided the audio recording as an appendix, and then also

10  Appendix 18 was Lanza's report -- response to the preliminary

11  report.  So he had reviewed the preliminary investigation

12  report and had made notes on the body of the report itself that

13  were incorporated into the final report, but then also a copy

14  of the report that he wrote on was attached to the report as an

15  appendix.

16  Q.   So all of the details that were distilled down into that

17  summary of facts that we've just worked through between pages

18  and 5 and 19, all of the details are in these summaries at the

19  back in the appendices?

20  A.   Correct.

21  Q.   I want to, for a moment, go to Appendix 17, the written

22  statement -- Excuse me.  Sixteen.  The written statement of

23  Alex Goshert.  So this is Appendix 16, and Appendix 16 is a

24  written statement of Mr. Goshert, who was a fan of small print.

25  So we'll try to expand it the best we can.

WRIGHT - DIRECT

1      First, I want to just jump to the bottom of this document.

2   Down here is his signature, and there's a date.  You mentioned

3   earlier that there were statements just prepared and provided

4   to you that -- Is this one of those statements?

5   A.   **It is.**

6   Q.   Did Mr. Goshert provide this to you?

7   A.   **He did.**

8   Q.   Did he prepare this on his own initiative?

9   A.   **He prepared it not on my initiative.**

10  Q.   And date on here is shown as April twenty-- Perhaps it's

11  five or six of 2017, depending on whether that's a five or a

12  six.  That's approximately one week after the Acacia party;

13  right?

14  A.   **Correct.**

15  Q.   He writes here, beginning at the top of the screen, about

16  the period "after you {Chris} went to bed."  Do you see that?

17  A.   **At the -- Is it at the very top?  "Later on after you**

18  **[Chris] went to bed"?**

19  Q.   Yes.

20  A.   **Yes.**

21  Q.   That, "She [Nancy] went behind the bar with Andrew and

22  started making out with Andrew.  Kyle is the one who

23  interviewed then, tapping Andrew on the shoulder and being

24  like, 'Dude, stop.'"  Do you see that?

25  A.   **Yes.**

1  Q.  These were all people that were at the party, and some of
2  the names here are fraternity members; right?
3  A.  **Yes.**
4  Q.  So then he goes on, and he summarizes in some detail what
5  he saw step-by-step.
6       And I'm going to jump down a couple paragraphs.  There are
7  two paragraphs talking about going upstairs to Chris' room.
8  Are these two paragraphs part of the source information that
9  was summarized in your description of that point in the evening
10 that we looked at earlier?
11 A.  **Yes.  This document and then our interview with him.**
12 Q.  He says in the next paragraph that, "We [Alex Nancy] saw
13 Trey in the hallway and he asked what we [Alex Nancy] were
14 doing, and I said 'She [Nancy] wants to know where Chris' room
15 is."  Do you see that?
16 A.  **Yes.**
17 Q.  So this is information that was sourced to you by
18 Mr. Goshert in his written statement; right?
19 A.  **Yes.**
20 Q.  Did anybody ever contradict that Ms. Roe made her way
21 upstairs, trying to find Mr. Lanza's room?
22 A.  **No.**
23 Q.  He then goes on to describe at the end of his statement
24 that he walked her boyfriend, Matt, back to Matt's room.  And I
25 would like you to -- if you can, if your eyes are up to it with

1  the small print, just go ahead and read for us that short

2  paragraph?

3  A.  **"I walked her boyfriend [Matt]"?**

4  Q.  Yes.

5  A.  **"I walked her boyfriend [Matt] back to his [Matt] dorm"**

6  **room -- "dorm" -- sorry -- "and while we [Alex, Matt] were on**

7  **the way back he [Matt] was really worried about his girlfriend**

8  **[Nancy] 'cheating on me,' [Matt] with Chris because I know**

9  **she's really 'into him,' [Chris] and asked me if I 'could get**

10 **ahold of Chris.'  I tried to call, but got no answer [from**

11 **Chris]."**

12 Q.  I'd like to talk to you about the interviews you had with

13 Ms. Roe.  How many interviews did you say you had with Ms. Roe?

14 A.  **There were two interviews completed.**

15 Q.  The first one was by Ms. Meyers?

16 A.  **That's correct.**

17 Q.  And the second one was by both of you?

18 A.  **That's correct.**

19 Q.  And at the second one, Ms. Roe also had a support person

20 with her?

21 A.  **Yes, that's correct.**

22 Q.  And between the first interview and the second interview,

23 you had received from Mr. Lanza the audio file?

24 A.  **Yes.**

25 Q.  And one of the reasons you had the second interview was to

1    talk with Ms. Roe about the audio file?

2    A.    **Yes.  Ms. Roe had also provided additional text messages**

3    **and information, that we wanted to give her an opportunity to**

4    **provide any information about that she wanted to provide and**

5    **then also to play the audio recording for her.**

6    Q.    And to see what information or what she would have to say

7    about the audio recording?

8    A.    **Yes.**

9    Q.    Describe how you went about that interview, please.

10   A.    **The second interview?**

11   Q.    Yes.

12   A.    **So Ms. Meyers and I met with Ms. Roe and her support**

13   **person, Kasey Richardson, who's a support person from CARE.  We**

14   **let her know that we received the additional information she**

15   **had provided to us.  We asked her if she wanted to provide any**

16   **additional information, any commentary on the text messages**

17   **that she had provided.**

18   **    We then -- I believe she asked us if we had been able to**

19   **get the recording from Mr. Lanza.  We told her that we had and**

20   **that we had it prepared for her to play.**

21   **    We record all of our interviews, and so we were recording**

22   **on one recorder, and we had the file on another recorder, ready**

23   **to go for her, and told her that we would give her privacy with**

24   **her support person, if she wished, to review and listen to the**

25   **recording.  We didn't make her listen to it.  And we didn't**

1  stay in the room with her while she listened to it with her

2  support person.

3      We gave her instructions on how she could start the

4  recorder and where Ms. Roe's office was -- not Ms. Roe --

5  Ms. Meyers' office was, so that when they were finished

6  listening to the recording and discussing it amongst

7  themselves, that they could come and get us if they had any

8  additional information that they wanted to share.

9      And so we left the room.  They did come and get us.  We

10 went back in.  I had stopped the initial recording, and we had

11 taken that recorder with us, and so we went back in the room,

12 and we started a second recording for the second part of our

13 interview and asked her what she wanted to share with us about

14 the recording that she had just listened to.

15     She did tell us that they did, in fact, listen to the

16 recording.  Do you want me to --

17 Q.   Keep going.

18 A.   Keep going.

19     She told us that she didn't remember anything that was on

20 that recording.  And then I recall her focusing her attention

21 on the fact that he had recorded her without her knowledge and

22 consent and asking us something along the lines of, "Isn't that

23 a policy violation?"

24     And we said that yes, if somebody records somebody without

25 their permission, that that would be sexual exploitation.

1      We then went on to talk to her about Ms. Ortt.  We had

2   been having difficulty getting ahold of Ms. Ortt.  Turns out

3   she was studying abroad at the time, and so we talked in some

4   detail about the text messages, I believe, that Ms. Roe had

5   provided.

6   Q.   Okay.  And have you shared with us in general terms

7   everything that Ms. Roe told you after she listened to that

8   audio file?

9   A.   **Yes.**

10  Q.   Just that she didn't remember the part of the evening

11  that's on that audio file?

12          **MR. JEFFREY MACEY:**  Objection, Your Honor.  That's

13  leading.

14          **THE COURT:**  It's leading.  You can ask another

15  question, then.

16          **MR. KEALEY:**  Sure.

17  Q.   Other than telling you that she didn't remember the part

18  of the evening that was on the audio file, did she have

19  anything else to say about the contents of the audio file?

20  A.   **She -- Not specifically about the audio file, but I do**

21  **remember that she had asked us if we had received video -- I**

22  **think it was a video that Matt Porche was going to provide to**

23  **our office that showed her state of intoxication on another**

24  **occasion.**

25      **She did tell us that that video would show the voice that**

1    she has when she's been drinking, and I believe that she

2    mentioned saying that it was similar to the voice in the

3    recording.  So she was asking us if we had received that

4    information from Mr. Porche.  We had not received it at that

5    point, but we did follow up with Mr. Porche about that after

6    the fact, and I believe she was going to follow up with him,

7    as well.

8    Q.    And did you ever receive that?

9    A.    We did.

10   Q.    Okay.  The next and last section of the main body of the

11   report is entitled "Conclusion," and has a section that's

12   headed "Credibility."  And you summarize some thoughts on what

13   a credibility determination is.  Is this a standard part of the

14   investigation reporting process?

15   A.    Yes.  So this part of the report from this until the end

16   before the appendices is the analysis section, so this is where

17   we take all the facts we've gathered in the investigation, we

18   apply the policies to those facts, and then make

19   recommendations to the decision-maker about whether we, as

20   investigators, believe that there's a policy violation in the

21   case.

22         In every case, we make a credibility determinations where

23   credibility is an issue.  It's at issue in almost every case,

24   but not all of them.

25         And we make credibility determinations about both the

1  **complainant, the respondent; and if there's any credibility**

2  **concerns with witnesses, we would address them in this section**

3  **of the report as well.**

4  Q.   So in the credibility section of the report, you have a

5  lengthy paragraph about Ms. Roe, and then also similar-length

6  paragraph extending over to the following page about Mr. Lanza.

7  So you evaluated the credibility of both of them based on the

8  evidence you had collected?

9  A.   **Yes.**

10 Q.   Please summarize for us, in your own words, which, of

11 course, are also on screen-- those are your words --how you

12 went about thinking about the credibility of Ms. Roe.

13 A.   **So we looked at all of the information that we were able**

14 **to gather in the investigation, so statements from different**

15 **parties and witnesses and the documentary evidence of text**

16 **messages, the video footage, the recording.**

17 **     And then also we looked at things like how we came to get**

18 **the information that we got.  And so one factor would be how**

19 **forthcoming individuals are with information that's provided.**

20 **In this case, Ms. Roe did not disclose anything about the**

21 **Tuesday sexual encounter with Mr. Lanza in her first interview.**

22 **She didn't talk about that at all until later.**

23 **     We also looked at the contention that she was**

24 **incapacitated as compared to the video footage that we had of**

25 **her walking through the lobby, swiping her card access key.**

1    There's some overlap in this analysis between the

2    incapacitation analysis.  But being able to interact with her

3    RA, navigate back down to the lobby, get the key, navigate back

4    upstairs, retrieve him from the bathroom; inconsistencies in

5    accounts between what she shared with us and what other parties

6    were able to share.  So we looked to see whether information is

7    corroborated by other witnesses or where there may be points at

8    which they're not corroborated or inconsistent.

9        And so an example that we cited in here is when she had

10   told Ortt, Ms. Ortt, that she had sex with Lanza.  She

11   expressed guilt and a concern that Mr. Porche would break up

12   with her, but she did not recount it that way when she told

13   investigators.

14       So when she told investigators, she just told us that she

15   told Ms. Ortt -- that she had told Ms. Ortt that they had had

16   sex.  She didn't mention anything about saying that she felt

17   guilty about it or that she felt like Mr. Porche was going to

18   break up with her.  So we felt as though Ms. Roe presented

19   information to us only in a light that painted herself

20   favorably and that she left out information that would portray

21   her negatively.

22   Q.   The very last sentence, second-to-last sentence in this

23   paragraph, "When speaking with investigators, Roe stated that

24   when she told Porche what had happened with Lanza, she could

25   not recall what happened and was very confused."

WRIGHT - DIRECT

1          Do you see that sentence?

2     A.   **Yes.**

3     Q.   Now, in the sequence of conversations that you're

4     describing here, the conversation with Ms. Ortt in which she

5     expressed guilt preceded the conversation with Mr. Porche in

6     which she told him she could not recall what happened and was

7     very confused; right?

8     A.   **Correct.  And then she did not mention to Ms. Ortt that**

9     **she didn't know what happened until after she talked to**

10    **Mr. Porche.**

11    Q.   Now, on the same page, you have a summary on the top of

12    the credibility based on your investigation of evidence from

13    and about Mr. Lanza.  Can you please summarize, in your own

14    words, as you have on screen, but just to help us with this

15    paragraph, what you're describing here.

16    A.   **Yes.  So in our investigation, we received text messages,**

17    **and one of the text messages was a text from Mr. Lanza to**

18    **Andrea Martin, where she was asking him or telling him, you**

19    **know, don't do anything with Ms. Roe.**

20         **And he said essentially-- I'm paraphrasing --that he was**

21    **walking her home and that she was vomiting.  So we had spent an**

22    **amount of time in the investigation talking to different people**

23    **to try to ascertain whether or not Ms. Roe had, in fact, thrown**

24    **up that evening, including asking Ms. Roe about it in her**

25    **follow-up interview.**

1    She could not recall having vomited and had no reason to
2    believe that she had vomited that night.  And so, you know, a
3    part of the investigation is trying to make sense of that text
4    message.  So why is there a text message there saying she's
5    vomiting if she's not vomiting.  And then obviously, when we
6    asked Mr. Lanza about it and he said that she had not vomited,
7    then that would raise a concern for the investigators about the
8    accuracy of the information we were getting.

9    And so we noted in our credibility determination that
10   there is a text message that he sent that said that she was
11   vomiting, but that he had relayed to us that she was not
12   vomiting and that he had hadn't offered an explanation for
13   that.  So we noted that as something that could impact his
14   credibility, but we also weighed that against the other
15   information that we gathered in the investigation.

16   The other witnesses were able to corroborate the other
17   evidence and documents and video that we had as well as the
18   fact that Mr. Lanza made multiple statements to investigators
19   that made him look bad.  So he shared information with us that
20   did not paint him in a favorable light but did so because he
21   was being honest about what had happened in the encounter.  And
22   so we determined that that weighed in favor of his credibility
23   in the matter.
24   Q.   It's been suggested in this case that Purdue did not
25   completely follow through on analysis of Ms. Roe's

1   self-description as incapacitated.  Do you agree with that

2   characterization?

3   A.   **I don't agree with that at all.**

4   Q.   In your report, you have a section right after the

5   credibility discussion entitled "Incapacitation."

6        Can you please describe in your own words the role that

7   your incapacitation analysis performed in the overall

8   investigation and what you wrote and what you concluded.

9   A.   **Right.  So we look at incapacitation.  So in determining**

10  **whether there's consent at all, one of the prongs of that is**

11  **incapacitation.  And so that's usually the first step, right?**

12  **So we have to talk about whether somebody had the capacity to**

13  **consent before we would look to see whether they did, in fact,**

14  **consent.**

15  **In some cases, there's no alcohol or drugs or sleep**

16  **involved, so we don't have to go through that analysis, but in**

17  **this case we did.  And so the first paragraph there is the**

18  **definition of "incapacitated" from the policy.**

19  **And then we look at what evidence have we gathered in the**

20  **investigation that would help us understand whether or not**

21  **somebody was incapacitated.**

22  **We took as true what Ms. Roe and Mr. Porche described to**

23  **us as the amount of alcohol that she consumed, and that was**

24  **approximately five large Solo cups of wine and almost three**

25  **beers over a four-hour time span.**

1           We looked at how she presented to people at the party, how
2    she presented -- you know, what those witnesses were able to
3    describe in regard to their interactions with her, because
4    alcohol affects everyone differently.  So just saying how
5    many drinks somebody has, we always ask people who were
6    interacting with them what they recall about how they were
7    presenting.
8           And then we also looked at the video footage that we had
9    of her because that's a realtime snapshot of right at the time
10   of the incident.  So we looked to see how she was walking.  She
11   was able to walk unassisted.  She wasn't stumbling.  She wasn't
12   swaying.  She walked on a clear path across the lobby.
13          We also analyzed and looked at the information we had from
14   the reports to our office and interviews with people like
15   Ms. Skiba about the steps she took.  So she understood that she
16   didn't have a key to her room.  She understood she needed to be
17   let into her room.  She went to her RA to try to get a key.
18          I believe that she did not want her RA to see her with Mr.
19   Lanza at that time, so she hid him in the bathroom and left him
20   there while she talked to her RA to get a key.
21          She went down to the front desk and interacted with front
22   desk staff and signed out a key to her room.  She went back
23   upstairs to the eighth floor to her room.  She retrieved
24   Mr. Lanza from the restroom.
25          All of those things, the text message that she sent after

1    to Mr. Lanza in response to him getting home, all of those

2    things factored into our analysis of whether or not she was

3    intoxicated at the time or incapacitated at the time.

4    Q.    You have, in the central part of this paragraph, a

5    comment, "It is likely that she may have blacked out and that

6    she does not recall the entire evening."  Do you see that?

7    A.    Yes.

8    Q.    So how did the likelihood that there was a blackout factor

9    into your analysis of incapacitation?

10   A.    So we frequently have cases where one party will say that

11   they have blacked out and that they don't remember a part of

12   the evening.  And my understanding and training on blackouts is

13   that it is a function of drinking a large amount of alcohol in

14   a short amount of time and how that affects the encoding of

15   memory.  It doesn't mean that, in the moment, you're

16   incapacitated.  They're not synonymous with each other.

17        You could be incapacitated and have blackouts of memory,

18   but that doesn't mean that, in the moment, you are

19   incapacitated.

20        And so, again, we acknowledge that she has asserted that

21   she has blacked out during parts of the evening; and if she, in

22   fact, consumed that much alcohol, we can see that it's possible

23   that she had been -- had blackouts of memory from that evening.

24   Q.    Let me just clarify or explore a couple of terms you just

25   used.  So they could be intoxicated.  Intoxication could

1    produce a blackout, and in some cases intoxication plus

2    blackout does not equal incapacity?

3    A.   **Correct.**

4    Q.   And you concluded in this case that intoxication plus

5    blackout for some part of the evening did not equal incapacity?

6    A.   **Correct, because she was exhibiting a high level of**

7    **executive functioning.  So she's understanding what's going on**

8    **around her.  So that who, what, when, where, why, how analysis.**

9    **So she's problem-solving, for lack of a better word.**

10        **She knows she doesn't have her key.  She's taking steps to**

11   **get let into her room.  She's taking steps to avoid having**

12   **people see her with somebody who's not her boyfriend at the**

13   **time.  She's navigating on her own from the eighth floor down**

14   **to the lobby and back.  In video footage, she doesn't need**

15   **assistance in walking.**

16        **And so, you know, again, it's an indication of her**

17   **intoxication level, whether she's able to walk without**

18   **stumbling or swaying.  Nobody is holding her up while she's**

19   **walking.**

20        **All of those things, to us, showed that she did have the**

21   **ability to engage in that high level executive decision-making,**

22   **understanding, rationalizing kind of functioning that would not**

23   **be possible if you were incapacitated.**

24   Q.   Ms. Wright, just a few more questions.

25        Did there come a time when you completed your preliminary

1    draft of the report or, as you sometimes call it, the

2    preliminary report?

3    A.    **Yes.**

4    Q.    Please describe, in the way your office does the

5    investigation and puts together the report or at least the way

6    it was done at this time, what the preliminary report has.

7    A.    **So at that time, we had a preliminary report review.  We**

8    **don't have that.  Our process is different now.  But at the**

9    **time, once we were done with our investigation, we would**

10   **prepare a preliminary investigation report.  That is all of the**

11   **facts that we gathered.**

12        **So up and to that section that was marked "Conclusion"**

13   **that I described as kind of where the analysis section started.**

14   **So it would be all of the fact-based information, a summary of**

15   **the facts, that chronological summary, and then all of the**

16   **witness summaries and the appendices to the report.  Those are**

17   **all provided to the parties to review.**

18        **So at the time, we did an in-person paper review of that**

19   **information, we would provide the parties with notice.  Well,**

20   **they -- So backing up, with the initiation of the**

21   **investigation, they get a timeline that lets them know**

22   **benchmarks, including when the end of the investigation period**

23   **was and when the preliminary report would be made available.**

24        **So they're invited to come into our office for a seven-day**

25   **period at that time to review the report.  So we make the**

1    report available.  They can come in by themselves or with a

2    support person anytime during that seven-day period to review

3    the report.

4        It's their opportunity.  It's the first and only time they

5    get to see that information.  So it's the first time they would

6    get to see what all of the witnesses had to say about the case,

7    so in this case, what their friends said about the party and

8    the interactions.

9        They have an opportunity to provide feedback to that

10   report, and we share with them during their initial interview

11   more information about the preliminary report review.

12       So what we usually would tell them is something like, "The

13   report will be made available to you for a seven-day period in

14   our office.  It's your opportunity to review what the parties

15   and the witnesses have shared, your opportunity to provide

16   written feedback.  It's your opportunity to tell us if we've

17   gotten something wrong or to correct something in the report or

18   to clarify something.  So if there's a new piece of information

19   you weren't aware of before and you want to provide any

20   information about that, that's your chance to do so, and also

21   your opportunity to tell us if we've missed something in terms

22   of you needing to interview this additional witness, or 'Had I

23   known so-and-so was going to share this information, I would

24   have told you this and asked you to interview this person.'"

25       And so that was the purpose at the time of the preliminary

1    **report review, was to give them an opportunity to do that**

2    **before we finalize our investigation report.**

3            **MR. KEALEY:**  Your Honor, I believe H is already

4    admitted.

5            **MR. HARRISON:**  Yes.

6            **MR. KEALEY:**  We have Defense Exhibit H ready to put

7    on screen.

8            **THE COURT:**  All right.

9    **BY MR. KEALEY:**

10   Q.   So, Ms. Wright, on screen is Defense Exhibit H, a letter

11   on the letterhead of Office of Institutional Equity, dated

12   July 3rd, 2017, addressed to Ms. Roe's Purdue email address.

13   And it begins, "Dear Ms. Roe:  The investigator's preliminary

14   report will be ready to review Monday, July 10, 2017."

15       Do you see that?

16   A.   **Yes.  And I stand corrected.  That is a five calendar day**

17   **review, not a seven-day.  I think Vice President Rollock**

18   **testified that our processes have changed over time.  So it**

19   **looks like it was a five calendar day review.**

20   Q.   So this letter is the notice to Ms. Roe of the opportunity

21   to review the report that you just described?

22   A.   **Yes.**

23   Q.   Did Ms. Roe take advantage of that opportunity?

24   A.   **No, she did not.**

25   Q.   After the preliminary report review window passes and the

1    report becomes final, we've heard testimony about a panel

2    meeting step in the process.  You're familiar with that step?

3    A.    **I am.**

4    Q.    And you're aware that there was a panel meeting about this

5    matter, this investigation?

6    A.    **Yes.**

7    Q.    Okay.  And did you attend that panel meeting?

8    A.    **I did.**

9    Q.    And what was the reason you were attending the panel

10   meeting, and what did you do when you were there?

11   A.    **So at every panel meeting, the complainant and the**

12   **respondent are invited to participate at separate times, and**

13   **then they also invite -- I don't know how much of an invitation**

14   **it is to the investigators.  We are invited to participate as**

15   **well.  The investigators are called to every panel meeting to**

16   **answer any clarifying questions that the decision-maker and the**

17   **panel members might have.**

18       **And so the purpose of us attending is, again, to kind of**

19   **give our impression of the case, answer any questions that they**

20   **might have, and share any additional information that we think**

21   **the panel needs to know.**

22   Q.    After the panel meeting, then there came a point in the

23   process where Ms. Roe was given an opportunity to submit

24   information on the question of false statement violations and

25   was provided your email address for that purpose.  Did you get

1  re-involved at all in trying to get information from Ms. Roe at
2  that point?
3  A.   **Yes.  On the last day that Ms. Roe had been given to**
4  **submit additional information, Dr. Sermersheim had reached out**
5  **to me because she had not received any additional information,**
6  **and she asked that I reach out to Ms. Roe and ask her if she**
7  **planned to submit any additional information.  In response to**
8  **my email, Ms. Roe provided me with the appeal documentation**
9  **that she had submitted with her original appeal, and then I**
10 **provided that information to Dr. Sermersheim.**
11 Q.   So the only information you received was information that
12 Purdue had already received?
13 A.   **Correct.**
14 Q.   She came forward with no more information than had been in
15 her first appeal?
16 A.   **That is correct.**
17 Q.   Just by way of finishing up the timeline, if you will, of
18 this process as it involves your office, there did come a time
19 when a decision was made on suspension.  And did your office
20 remain involved as a resource to Ms. Roe at that point in the
21 process?
22 A.   **I can't recall specifically if -- if after she was**
23 **suspended.  But throughout the investigation and that appeal**
24 **process, I know that we were actively involved with Ms. Roe.**
25 Q.   For example, for getting withdrawals from her courses, was

1    there any assistance provided by OIE?

2    A.   **Yes.  So in the time period of the decision in the panel**

3    **meeting and the appeals, I had moved into Ms. Meyers' role as**

4    **the Title IX specialist in the office, so I took over**

5    **responsibility for supportive measure requests.**

6        **And during the time period between that appeal period --**

7    **I'm not exactly sure on the date.  I would have to look at my**

8    **records -- but Ms. Roe had reached out regarding wanting to**

9    **withdrawal with no record from a couple of her courses in the**

10   **fall semester, and I facilitated the withdrawal from those**

11   **classes.**

12       **MR. KEALEY:**  Thank you, Ms. Wright.  I have no

13   further questions.

14       **THE COURT:**  All right.  Thank you, Mr. Kealey.

15   Let's take a 15-minute break.  All rise.

16   (Jury out at 11:25 a.m.)

17       **THE COURT:**  Anything else, Mr. Macey, at this point?

18       **MR. JEFFREY MACEY:**  No, Your Honor.

19       **THE COURT:**  Mr. Kealey?

20       **MR. KEALEY:**  No, Your Honor.

21       **THE COURT:**  When we come back, then, Mr. Macey,

22   Plaintiff can cross-examine.  How long do you think?

23   (Brief pause.)

24   Well, don't even estimate.

25   (Recess taken at 11:25 a.m.)

```
 1          (Proceedings resumed in open court, jury not present, at
 2       11:46 a.m.)
 3               COURTROOM DEPUTY:  All rise.
 4               THE COURT:  You may be seated.
 5       Now that you've had a moment to think about it, do you
 6   have an idea?
 7               MR. JEFFREY MACEY:  It's going to go through lunch,
 8   I'm pretty sure.
 9               THE COURT:  I know that.  I'm just wondering about
10   what time because we want to know what time to send them for
11   lunch.
12               MR. JEFFREY MACEY:  I would estimate an
13   hour-and-a-half.
14               THE COURT:  So can I ask, Mr. Kealey, do you think
15   you'll have another witness?
16               MR. KEALEY:  No.
17               THE COURT:  Okay.  So you do not believe you'll
18   recall the Plaintiff, Ms. Roe?
19               MR. KEALEY:  Not as things stand right now.
20               THE COURT:  Okay.  So we'll have cross and then
21   redirect and recross, whatever we need.  Then lunch is
22   provided.  I'm told the jurors are -- It will be a little
23   later, but we started a little later.
24       So what I'm going to do is, I'm going to send them to
25   lunch for about 45 minutes.  We'll take lunch.  I hopefully
```

1   will have the jury instructions for counsel to look at those.

2   But then I'll bring the jurors back, and I'll dismiss them then

3   so the Defense can rest at that point.

4       Some of the jurors will want to eat.  Some won't want to

5   eat, I presume, if I were to tell them they could leave right

6   after.  I don't want to have half the jurors leave and half the

7   jurors not leave, because they should stay together as long as

8   they're in the building.  So I don't want to have four jurors

9   having lunch or two jurors having lunch and then seven leaving.

10      So in order to avoid that, we'll let them all have lunch,

11  which is most appropriate anyway.  Then we'll come in, and

12  we'll do the Defense rests, or if you want to, you can rest

13  even before, and then I'll have them come in, and I'll just

14  dismiss them for the day, and we'll give them the time schedule

15  for today.  Okay?

16          **MR. JEFFREY MACEY:**  Just to clarify, so that means

17  we're going to do the whole cross before the lunch?

18          **THE COURT:**  Yes.  My intent would be to finish with

19  the witness before lunch, and then lunch will take place.

20          **MR. JEFFREY MACEY:**  Okay.

21          **THE COURT:**  Is that okay with the Plaintiff?

22          **MR. JEFFREY MACEY:**  Yes.

23          **THE COURT:**  With the Defense?

24          **MR. KEALEY:**  Yes.

25          **THE COURT:**  Can I bring the jurors back in,

1    Plaintiff?

2              **MR. JEFFREY MACEY:**  Yes.

3              **THE COURT:**  Defense?

4              **MR. KEALEY:**  Yes.

5         (Jury in at 11:50 a.m.)

6              **THE COURT:**  Everyone may be seated.

7         All right.  Cross-examination, Mr. Macey.

8              **MR. JEFFREY MACEY:**  Thank you, Your Honor.

9                         **CROSS-EXAMINATION**

10   BY MR. JEFFREY MACEY:

11   Q.   Good afternoon -- Well, what is it?  Almost afternoon is

12   right.

13   A.   **Good afternoon.**

14   Q.   My name is Jeff Macey, and I represent Nancy Roe.

15        And we actually met before; correct?

16   A.   **Yes.**

17   Q.   And I took your deposition in this case way back on

18   February 3rd, 2020; do you remember that?

19   A.   **Yes.**

20   Q.   Okay.  Okay.  I wanted to ask you questions about the

21   report, the investigative process, and the finding regarding

22   incapacitation, and I wanted to start with a couple things that

23   you had said when Mr. Kealey was asking you questions.

24        One thing that stuck out to me:  You testified that Nancy

25   Roe didn't give you information that made her look bad.  Do you

1    remember saying that?

2    A.   **Yes.**

3    Q.   Okay.  Now, Ms. Roe provided the investigators the

4    complete set of texts with Christopher Lanza after her first

5    meeting with the investigators; correct?

6    A.   **She provided that after her first interview, yes.**

7    Q.   Okay.  And in those texts, she and Mr. Lanza -- I think,

8    in fact, Mr. Kealey showed you that it was information that you

9    believed that confirmed that they had planned to meet the next

10   day; correct?

11   A.   **Correct.**

12   Q.   Okay.  And those texts showed the communications that you

13   looked at that night, from the night of April 17th; correct?

14   A.   **Correct.**

15   Q.   Okay.  Ms. Roe also provided the investigators the

16   complete Facebook message string between Christopher Lanza and

17   her boyfriend, Matt Porche, after the first investigators'

18   meeting; correct?

19   A.   **Yes.  She provided those all after her first interview.**

20   Q.   Okay.  So was what you were saying to Mr. Kealey that she

21   didn't provide the information that made her look bad before

22   her first interview?

23   A.   **What I was saying was that, in considering all the**

24   **information that she's provided, that she seemed to omit**

25   **information that would have made her appear in a negative light**

1   at points at which it was important, in my estimation, for her

2   to have provided that information.

3   Q.   But I think you've already acknowledged that the texts

4   from Christopher Lanza put her in a negative light; correct?

5   A.   **Correct.**

6   Q.   And she provided those; correct?

7   A.   **Not immediately.**

8   Q.   But she provided them voluntarily?

9   A.   **She did.**

10  Q.   And nobody asked her for them or subpoenaed them; correct?

11  A.   **We don't have subpoena power in my office, so we didn't**

12  **subpoena anything.  But we did ask her to provide any text**

13  **messages.**

14       **So it's routine in our investigations to ask parties and**

15  **witnesses if they have any text messages from the evening.**

16  **Again, that's a piece of information, contemporaneous evidence,**

17  **that would help us establish a timeline or establish**

18  **information that's relevant.  So we did ask her for all of her**

19  **messaging.**

20  Q.   And she voluntarily provided them, and they were complete?

21  A.   **She did.**

22  Q.   Okay.  Now, the Christopher Lanza and Matt Porche texts

23  weren't from that evening; correct?

24  A.   **No, they were not from the night of incident.**

25  Q.   And she voluntarily provided those, and they were

1    complete; correct?

2    A.   **Yes.**

3    Q.   And those were the ones Mr. Kealey has shown several times

4    in the trial, where Mr. Lanza is describing in graphic detail

5    the events of that night; correct?

6    A.   **Yes, and mentions that there's a recording.  Yes.**

7    Q.   And Ms. Roe provided that to you; correct?

8    A.   **Yes.**

9    Q.   And she also provided all her texts with Izzy Ortt from

10   the following week; correct?

11   A.   **That's correct.**

12   Q.   Okay.  So when you said that she didn't provide you any

13   information that made her look bad, that wasn't accurate;

14   correct?

15   A.   **I think that she omitted information from her interview**

16   **that makes her look bad.**

17   Q.   Okay.  So that's what you were trying to say?

18   A.   **Yes.**

19   Q.   Okay.  Now, in connection with your testimony, you

20   referred to the investigator's report extensively; correct?

21   A.   **Yes.**

22   Q.   And in that investigator's report, you listed the

23   witnesses that you interviewed; correct?

24   A.   **Yes.**

25   Q.   And you asked Nancy Roe to provide you -- or not you.  It

```
 1   was you and Karen Meyers?

 2   A.   Yes.

 3   Q.   I know you guys, I think, as Mr. Kealey established, were

 4   doing this together?

 5   A.   Correct.

 6   Q.   Okay.  So if it's okay, I'm going to say "you" when I mean

 7   you and Ms. Meyers.  Okay?

 8   A.   That makes it easier on me, too.

 9   Q.   Okay.

10   A.   Thank you.

11   Q.   Good deal.

12        So she provided you a list of names that she wanted you to

13   talk to; correct?

14   A.   I don't recall specifically who would have been on her

15   list, but it would be typical for us to ask for a list of

16   people to interview.  Yes.

17   Q.   And she asked you to interview Professor Ashley Albrecht,

18   who was the professor in the morning class that she had to

19   leave to vomit on the morning of the 18th; correct?

20   A.   I don't recall specifically, but I -- I don't doubt that

21   she may have asked for us to interview her.

22   Q.   And you didn't interview her?

23   A.   No.

24   Q.   And she asked you to interview Matt Porche's RA, and his

25   first name is Paneet?
```

1    A.   **I believe that that's the individual -- I'd have to look**
2    **at the report, but I feel like that is maybe the individual who**
3    **submitted an incident report.**
4        **I think, if my memory serves me, which is -- might not be**
5    **a hundred percent accurate, but I think Ms. Skiba had referred**
6    **information to that individual, who submitted the report that**
7    **triggered the outreach from our office.**
8    Q.   Right.  I think -- And also Paneet had submitted a
9    previous incident report in connection with Ms. Roe's suicide
10   attempt from the previous fall; correct?
11   A.   **Correct.  So when we make decisions about who we're going**
12   **to interview, we look to see whether they have relevant**
13   **information to the allegations we're investigating.  And so**
14   **Ms. Roe's suicide attempt in the fall semester wouldn't have**
15   **any bearing on the assault allegations in the April of 2017**
16   **time frame.**
17   Q.   And I'm just going to call him Paneet.  I apologize to
18   Paneet in absentia.  But Paneet also was present during the
19   videos that Mr. Porche sent you on a previous occasion where
20   Ms. Roe was blacked out and talking and chatting; correct?
21   A.   **Correct.  So we did not believe that those videos were**
22   **relevant to this matter because whether she was incapacitated**
23   **or intoxicated on another occasion would not show whether she**
24   **was incapacitated or intoxicated on this occasion.**
25   Q.   In fact, despite the fact that she submitted them as

1  evidence in connection with this, the investigators didn't even

2  include it in their report; correct?

3  A.   **We include the -- the information in the report that we**

4  **believe is relevant to the case.  And as I mentioned, we did**

5  **not believe that her intoxication level on another occasion had**

6  **any bearing at all on whether she was intoxicated or**

7  **incapacitated on this occasion.**

8  Q.   I think you addressed that in a footnote?

9  A.   **Correct.**

10  Q.   "Porche provided three audio recordings of Roe on

11  occasions when, according to Porche, she was intoxicated.  The

12  investigators did not find the tapes to be probative in regard

13  to the allegations against Lanza"?

14  A.   **Correct.**

15  Q.   Okay.  So the only information that we're seeing today and

16  that you testified to the jury is information that you wanted

17  in this report; correct?

18  A.   **We're reviewing the report.**

19  Q.   Right.  And it's a report where you made the decision what

20  information to include and what information to exclude?

21  A.   **Right.  And we noted in the report information that had**

22  **been provided to us and why we didn't include it in the**

23  **investigation.**

24  Q.   You did not, in fact, interview Paneet in connection with

25  Ms. Roe's allegations; correct?

1    A.    **We had no information to show that he interacted with her**
2    **that evening.**
3    Q.    So that's no?
4    A.    **No.**
5    Q.    Okay.  Now, Ms. Roe also asked you to interview Madeline
6    Harris, who was a friend who lived next door.  Do you remember
7    that?
8    A.    **I do not recall, but, again, I don't deny that if you say**
9    **that she asked us to -- that she asked us to.**
10   Q.    Wouldn't the information about what happened in her room
11   that night, wouldn't her next door neighbor have relevant
12   information about that?
13   A.    **I don't have any reason to believe that her next door**
14   **neighbor had any information at all that would have been**
15   **relevant to that.  Nobody indicated that she interacted with**
16   **either of the parties.**
17   Q.    The investigators report isn't limited to the evening of
18   the 17th, though; correct?
19   A.    **It is not.**
20   Q.    In fact, it details a series of interactions that occurred
21   the entire next week?
22   A.    **Correct.**
23   Q.    Okay.  And Ms. Roe asked you to talk to her friend who she
24   spent time with that week, and you didn't do so; correct?
25   A.    **We did not interview her, no.**

1    Q.    I'm going to show you from the report Appendix 13, and

2    these are messages between Nancy Roe and Izzy Ortt; correct?

3    A.    **Yes.**

4    Q.    And Ms. Ortt was a friend of Roe, but also had had some

5    type of relationship, more than friends, with Mr. Lanza;

6    correct?

7    A.    **That's my understanding, yes.**

8    Q.    And I think you testified that the morning after the

9    party, Ms. Roe texted Ortt that she had hooked up with a lot of

10   guys and she didn't understand?

11   A.    **I believe that's information that Ms. Roe provided to us**

12   **in our interview.**

13   Q.    But it wasn't something she told Ms. Ortt?

14   A.    **I believe that she told us that she told Ms. Ortt that.**

15   Q.    But it's not in the texts; correct?

16         We're just going to show.

17         In fact, this first text does not come from Ms. Roe on

18   Tuesday, but comes after the confrontation that you described

19   between Mr. Lanza and Nancy and Izzy on the following Wednesday

20   night; correct?

21   A.    **Yes.**

22   Q.    Okay.  So this text was sent, the first one in here, on

23   Thursday; correct?

24   A.    **Correct.  I don't think that the appendices -- or appendix**

25   **is all of the text messages that they ever sent to each other,**

1    but without seeing the whole -- this is the appendix to the

2    report and contains relevant text messages.  I don't know if

3    there was another text message or not.  I believe that the part

4    of the report you reference was a summary of the information

5    that we had gathered.

6    Q.   Okay.  But I think you just told me that anything

7    probative you put in the report; correct?

8    A.   We certainly try to, yes.

9    Q.   Okay.  And after approximately Thursday, after Ms. Ortt

10   was aware of Ms. Roe's sexual assault on Monday night and her

11   encounter with Mr. Lanza on Tuesday, Ms. Roe told Ms. Ortt:

12   The first time, I don't remember much at all; correct?

13   A.   Yes.

14   Q.   And then she says that she remembered, "having to get my

15   key from the front desk, and then I remember him on top of me

16   in my room.  Like I told you, I'm pretty sure he didn't use a

17   condom.  And then I woke up in the morning."  Correct?

18   A.   Yes.

19   Q.   Now, she was sure he didn't use a condom because she

20   discovered later that she had a vaginal discharge with semen in

21   it; correct?

22   A.   I believe that she had a vaginal discharge that she

23   believed was semen, and I don't have any reason to doubt that

24   it was semen.

25   Q.   Okay.  And these were in the texts provided to the

1   investigators.

2       She told Ms. Ortt, "I'm not going to" -- that she's not

3   going to press charges, "but I don't think I can talk to him

4   right now.  I literally just reported my rape at Ball State

5   yesterday, and I can't handle doing this all over again."

6       Were you aware during the investigation that she was in

7   the process of reporting a rape at Ball State even prior to the

8   events of the night of April 17th?

9   A.  **Yes.**

10  Q.  Okay.  Did that affect, in any way, your judgment of her

11  demeanor and actions that week?

12  A.  **Well, I don't know that the specific fact that she had**

13  **been assaulted at Ball State or that she was filing a charge in**

14  **and of itself; but my training has informed me that victims of**

15  **trauma respond in various different ways, some of which may not**

16  **seem normal to people who have never experienced trauma or who**

17  **aren't trained on the effects of trauma.**

18  Q.  And this is, again, from the report.  This is Izzy's text

19  to Ms. Roe, and she's referring to Chris Lanza here; correct?

20  A.  **Yes.**

21  Q.  And she says, "I know he's a liar, but I might be able to

22  get something we don't already know."

23      Did you see that information in connection with the

24  investigation?

25  A.  **Yeah.  So at this time, Ms. Ortt was in the middle of**

1    **communicating with Mr. Lanza, and Ms. Roe kind of in the middle**

2    **of everything.  And I think she was angry with him for having**

3    **lied to her when she initially talked to him about the**

4    **encounter and he said that they had not had sex.**

5    Q.   So he had lied to Ms. Ortt.  Did you consider that in your

6    credibility determination?

7    A.   **Yes.**

8    Q.   And then Ms. Ortt informs Ms. Roe that the general gist

9    she got from him -- that's Chris Lanza -- "last night was that

10   it was consensual.  I don't know if you believe him at all or

11   if that makes you feel any better.  But I can get an actual

12   what happened when for you since you blacked out for some of

13   it."  Do you see that?

14   A.   **I do.**

15   Q.   And, again, you think you said this in response to

16   Mr. Kealey, but whether or not -- to you, whether or not she

17   was blacked out had no impact on the incapacitation analysis;

18   correct?

19   A.   **I don't think that I said that it had no impact on the**

20   **incapacitation analysis.  I think what I said is that you can**

21   **be -- you can have blackouts and not remember things.  But at**

22   **the moment, that doesn't necessarily mean you're incapacitated**

23   **in the moment.**

24   Q.   So it's relevant to the analysis?

25   A.   **Yes.**

1   Q.   But the investigators never made a finding about what

2   Ms. Roe remembered when; correct?

3   A.   **We noted in the report that Ms. Roe had varying moments**

4   **where she said, "I don't remember from this point forward," or**

5   **"from this point forward," but she had asserted that she**

6   **blacked out and didn't remember parts of the evening.**

7   Q.   And I think I asked you at your deposition if you made a

8   determination about -- as part of your report about what

9   Ms. Roe remembered from that evening.  Do you remember that

10  question?

11  A.   **Yes.**

12  Q.   And you told me, "I don't think we made any recommendation

13  or determination about what she did or did not remember"?

14  A.   **Correct.  I think it's impossible for me to say what she**

15  **does and does not remember.**

16  Q.   And there are significant portions of that night she

17  doesn't remember?

18  A.   **There's significant portions she says she does not**

19  **remember.**

20  Q.   Well, now you're saying "she says" now?

21  A.   **Correct, because you just asked me if we made any**

22  **determinations, and I said I don't think that it's possible for**

23  **me to know what she does and does not remember.  All I can**

24  **relay is what she has told us she does and does not remember.**

25  Q.   So you made a finding that she made false statements in

1    connection with this investigation without determining what

2    portions of the evening she could and could not remember?

3    A.    **The university made a decision that, based on the**

4    **preponderance of the evidence, we believe that she had falsely**

5    **reported sexual assault.  And so the university, not the**

6    **investigators.**

7         **And you've heard from the decision-makers in this case.**

8    **They decided, on the preponderance of the evidence, that they**

9    **believed that she did remember, and so, therefore, her report**

10   **of sexual assault was a false report.**

11   Q.    I'm sorry.  You said that the decision-makers made a

12   decision that she did remember?

13   A.    **No.**

14   Q.    Oh, okay.  Okay.

15   A.    **No.**

16   Q.    I'm sorry.  It didn't matter to the decision-makers what

17   she remembered and didn't remember?

18   A.    **No.  What I said was -- Should I repeat what I said?**

19   Q.    Yeah.  I wasn't trying to trip you up.

20        **THE WITNESS:**  Judge, do you want me to repeat it

21   or --

22        **THE COURT:**  There was a question about the answer.

23   Do you want me to reread the answer?

24        **MR. JEFFREY MACEY:**  Yes.  Could you?

25        **THE WITNESS:**  Sorry.

```
 1              THE COURT:  No, that's okay.

 2         Is it okay with the Plaintiff if I read the question and

 3    the answer?  Is it okay with the Defense if I read the question

 4    and the answer?

 5              MR. KEALEY:  Yes.

 6              MR. JEFFREY MACEY:  Yes, Your Honor.

 7              THE COURT:  All right.

 8         (Record read by the Court:

 9         "QUESTION:  So you made a finding that she made false

10    statements in connection with this investigation without

11    determining what portions of the evening she could and

12    could not remember?

13         "ANSWER:  The university made a decision that, based

14    on the preponderance of the evidence, we believe that she

15    had falsely reported sexual assault.  And so the

16    university, not the investigators.

17                   And you've heard from the decision-makers

18    in this case.  They decided, on the preponderance of the

19    evidence, that they believed that she did remember, and

20    so, therefore, her report of sexual assault was a false

21    report.

22         "QUESTION:  You said that the decision-makers made a

23    decision that she did remember?")

24              THE COURT:  And that's the part.

25    \\\
```

1  BY MR. JEFFREY MACEY:

2  Q.   Okay.  So I didn't mishear you.  She did -- you just --

3  A.   **Yes, that they believed that she does -- my understanding**

4  **of their decision is that they believe that she does, in fact,**

5  **remember but is saying she doesn't remember.**

6  Q.   Okay.  But the investigators themselves made no finding

7  about what portions of the evening she remembered and didn't

8  remember?

9  A.   **The investigators make recommendations, not findings.  So**

10  **I don't make any findings.  But we made a credibility**

11  **determination based on whether we believe that she was**

12  **providing credible information about what she remembered or did**

13  **not remember.**

14      **I think that's part and parcel of the credibility**

15  **determination, and it's certainly part of what Ms. Meyers and I**

16  **discussed when we talked about whether we believed that she had**

17  **made false statements or a false report in this case.**

18  Q.   And this is the credibility finding from the

19  investigation; correct?

20  A.   **Yes.**

21  Q.   Okay.  "We are informed that individuals who experience

22  trauma may have difficulty remembering all or a portion of the

23  traumatic event, and that recall may increase over time."

24      That's accurate; right?

25  A.   **I hope so.  We put that in almost every report when we're**

1  **talking about credibility.  So, yes, I believe that that's an**

2  **accurate statement.**

3  Q.   Okay.  So that's boilerplate language?

4  A.   **Yes.**

5  Q.   Oh, okay.  "However, even considering these possible

6  limitations, we have significant concerns regarding Roe's

7  credibility."  Okay?  And then here's -- You testified to this

8  with Mr. Kealey.

9       One:  The video shows she's walking, and it undermines her

10  contention that she was incapacitated.

11      That's one concern about the credibility; correct?

12  A.   **Yes.**

13  Q.   Two:  The audio from Lanza's recording undermines her

14  contention that she was incapacitated.  Do you see that?

15  A.   **Yes.**

16  Q.   Three:  Roe was exhibiting clear thinking during the

17  recorded discussion.  Do you see that?

18  A.   **Yes.**

19  Q.   Okay.  Four:  In accounts Roe provided Porche and Ortt as

20  compared with the information she provided the investigators,

21  there are inconsistencies.  Correct?

22  A.   **Yes.**

23  Q.   Five:  When Roe told Ortt that she had sex with Lanza, she

24  expressed guilt and a concern that Porche would break up with

25  her.  Roe did not recount her conversation with Ortt in that

1  manner when speaking with investigators.  Do you see that?

2  A.  **Yes.**

3  Q.  "Roe's account of her discussion with Porche on Wednesday

4  evening varies from Porche's recollection"; do you see that?

5  A.  **Yes.**

6  Q.  "Porche reported to investigators that Roe told him, 'I

7  cheated on you with Lanza'"?

8  A.  **Yes.**

9  Q.  That's still part of seven.  I think I'm up to six or

10  seven.

11      Eight:  When speaking with investigators, Roe stated that

12  when she told Porche what happened with Lanza, she could not

13  recall what happened and was very confused.  Do you see that?

14  A.  **Yes.**

15  Q.  Nowhere in there is a finding about what Ms. Roe

16  remembered from that night and didn't remember from that night;

17  correct?

18  A.  **Correct.**

19  Q.  And so when you told me at your deposition that you made

20  no findings about what she remembered and didn't remember, that

21  was accurate; correct?

22  A.  **Yes.  I think I told you that we don't make -- I don't**

23  **make findings.**

24  Q.  Okay.  But there's no analysis in this whole section about

25  her credibility about what she remembered and didn't remember?

1   A.   **That's correct.**

2   Q.   And, again, in the texts she provided with Izzy Ortt, she

3   provided to the investigators, she said, "I wanted to let you

4   know I got a rape kit, and I have bruising on my neck and in my

5   throat."

6        And you saw this during your investigation; correct?

7   A.   **Yes, and she described it to us in her interview.**

8   Q.   And she did.  She told you she went and got a SANE exam;

9   correct?

10  A.   **That's correct.**

11  Q.   And yet, you never obtained the SANE exam as part of your

12  investigation; correct?

13  A.   **Correct.**

14       **So there's a couple of things.  One is that --**

15            THE COURT:  The question was already answered.  If he

16  wants to follow up, he can ask a follow-up.

17            THE WITNESS:  Okay.  Sorry.

18            THE COURT:  Thank you.

19  BY MR. JEFFREY MACEY:

20  Q.   These texts to Ms. Ortt are from the Thursday-- Sorry, I'm

21  just going to show you the chain --following the assault;

22  correct?  So this is 2074.  I just want to get you oriented

23  about the timing of these.  2074.

24       The next one --

25  A.   **I'm sorry.  Could you go back real quick?  I was trying to**

1   look at the date and time.

2   Q.   I skipped a page.  Here we go.

3         THE COURT:  When you say 2074, you mean the page on

4   the bottom?

5   BY MR. JEFFREY MACEY:

6   Q.   The page right there, 2074.

7   A.   **So this is Thursday evening?**

8   Q.   Thursday evening.

9   A.   **Okay.  Thank you.**

10  Q.   And it's after she obtained the rape kit; correct?

11  A.   **Yes.**

12  Q.   Okay.  She told Izzy Ortt that Thursday.  She explained

13  Tuesday by saying, "I did what I did last year.  If I take

14  control of the situation, then makes it okay and he's not

15  hurting me."  And she told Izzy Ortt that on Thursday; correct?

16  A.   **Correct.**

17  Q.   And that was what she told you, as well; correct?

18  A.   **She may have told us that in her follow-up interview, but**

19  **she didn't mention the second sexual encounter with him during**

20  **her initial interview with us.**

21  Q.   Okay.  But she did provide these texts immediately

22  thereafter; correct?

23  A.   **I don't think it was immediately after her interview, but**

24  **she did provide them.**

25  Q.   And all the witnesses to the case that she told you about

1    in that initial interview -- Matt Porche, Isabelle Ortt, Chris

2    Lanza, even -- they all knew she had had sex Monday night in

3    the dorm room when she was blacked out and Tuesday during the

4    day; correct?  They all knew that?

5    A.   **I don't know that they knew that she was blacked out.**

6    Q.   Okay.  But they --

7    A.   **They knew that they -- I believe that, by the time we met**

8    **with them, that yes, that those individuals all knew that they**

9    **had had sex on Monday night and then again on Tuesday**

10   **afternoon.**

11   Q.   That was not -- That was not hidden from you; correct?

12   A.   **I believe it was hidden from us.  I believe that when she**

13   **met with the investigators -- with Karen, to talk about whether**

14   **the university was going to initiate an investigation into a**

15   **sexual assault that occurred, she knew she had had sex with him**

16   **the next day, and she didn't mention anything about it,**

17   **including that she did it to take control of the situation**

18   **after having lost control the night before.**

19   Q.   I thought you told me that victims of sexual assault

20   process things in different ways and do things that you

21   wouldn't consider reasonable if you weren't a victim of sexual

22   assault?

23   A.   **I agree with that statement.**

24   Q.   And this is the other text to Izzy Ortt, and this is from

25   the Thursday.  "I have choke marks on my neck from him."  Do

WRIGHT - CROSS

1    you see that?

2    A.    **I do.**

3    Q.    Now, under Purdue's policy, consent must be to every

4    sexual activity; correct?

5    A.    **Correct.**

6    Q.    You don't just consent to one and then anything that

7    happens that night goes; correct?

8    A.    **That's correct.**

9    Q.    And my client wasn't able to tell you what she did and

10   didn't consent to because she had no memory, correct, of that

11   encounter?

12   A.    **She says she has no memory of that encounter.**

13   Q.    And you didn't make a finding or any kind of

14   recommendation about what she did and didn't remember; right?

15   A.    **I did not.**

16   Q.    And then on Thursday, April 27th, this is the end of the

17   text chain.  This is the following week; correct?

18   A.    **Yes.**

19   Q.    And Ms. Roe had gone home; correct?

20   A.    **I don't recall.  I don't have any reason to believe that**

21   **she hadn't gone home, but I don't recall that specifically.**

22   Q.    Okay.  And she's updating Ms. Ortt that, "The last few

23   days have been rough, and I'm trying to figure out what I want

24   to do about everything."

25           And then Ortt says, "You mean reporting to the

1    university-wise?"  And then she says, "You're being really rave

2    btw," and then she says "*brave"; correct?

3    A.   **Yes.**

4    Q.   So 10 days after the event, Izzy Ortt isn't calling

5    Ms. Roe a liar; correct?

6    A.   **I don't believe so, no.**

7    Q.   She's not mad at Ms. Roe; correct?

8    A.   **I don't know if she's mad at her or not.**

9    Q.   Well, she called someone brave.

10   A.   **She doesn't appear to be mad, but I don't -- I don't know.**

11   Q.   On page 7 of the report, 2024, the investigators are

12   recounting Mr. Porche's testimony; correct?

13   A.   **Yes.**

14   Q.   And it says that:  Porche reported that the group played

15   Kings for about an hour-and-a-half, until approximately

16   1:00 a.m.  Lanza then joined their table and suggested that the

17   group play a drinking game called "To the Governor."  I

18   think -- Were you here when Mr. Porche defined that?

19   A.   **I was.**

20   Q.   I've never heard of it.

21   A.   **I don't know that I still understand it, but yes.**

22   Q.   Well, it sounds really fun.  But he said they played this

23   drinking game until approximately 2:00, and he and Roe drank

24   heavily and quickly.  Do you see that?

25   A.   **Yes.**

1   Q.   Porche estimated that, in total for the night, Roe drank

2   one-and-a-half beers and six Solo cups of wine.  Do you see

3   that?

4   A.   **Yes.**

5   Q.   And, in fact, Ms. Roe wasn't really able to estimate how

6   much she drank that night because her memory of the end of the

7   party was lacking; correct?

8   A.   **But she did in her interview estimate how much she drank.**

9   Q.   Okay.  Was it based on what she had spoken to with Matt?

10   A.   **I would assume so because their numbers match, but I don't**

11   **know that for a fact.**

12   Q.   {As read:}  He described Roe's behavior during "To the

13   Governor" as loopy and floppy and stated that she could not sit

14   up straight.  Roe was slurring her speech.  He reported that

15   when she is blackout drunk, she often speaks in a childish,

16   toddler-like voice.

17        Do you have any reason to dispute that?

18   A.   **I do not.**

19   Q.   You referred also on this page to this encounter with

20   Lanza, where Ms. Roe abducted Lanza out of his room and made

21   him walk her home.

22        I wanted to just point out here that, {As read:} Lanza

23   asked what was going on and was told that Roe was -- Roe needed

24   to leave.  She needed to leave because she was so drunk at the

25   party that the fraternity was worried; correct?

1   A.   **I don't know that that's what that says.  I know that her**
2   **boyfriend was staying and that she needed to get home.  I don't**
3   **disagree that they probably were concerned about her, and they**
4   **expressed being concerned about her attending parties going**
5   **forward the next day.**
6   Q.   Because she was so drunk that night, they met with her --
7   {As read:}  I met with Matt Porche the next day to talk about
8   how drunk Nancy Roe was the previous night?
9   A.   **I don't think it's disputed that she was drunk.**
10  Q.   Okay.  And, in fact, she was walking around -- according
11  to them, because Ms. Roe doesn't remember and Mr. Porche wasn't
12  there, according to them, she was walking around, trying to
13  make out with everybody; correct?
14  A.   **I think he was there.  He just wasn't present when that**
15  **happened.**
16  Q.   Yeah.  But isn't it correct that was the testimony that
17  she was --
18  A.   **That she had kissed several people, yes.**
19  Q.   That she was walking around, grabbing people and kissing
20  them; right?
21  A.   **Yes.**
22  Q.   Doing things that just totally seemed irrational?
23  A.   **I don't know that "irrational" is the word I would choose.**
24  Q.   Okay.  What word would you choose?
25  A.   **I don't -- I don't know Ms. Roe outside of this**

1    investigation, so I have no -- I didn't place any judgment on

2    her behavior.  It certainly -- I would say it seems unusual.  I

3    don't know if I would say it's irrational.

4    Q.   Her behavior that night was definitely unusual.  I think

5    all the witnesses agree with that; correct?

6    A.   **I don't know that we talked to them about that specific**

7    **question.**

8    Q.   We'll look.

9         And Porche walked home that night with Goshert; correct?

10   A.   **Yes.  We were told during the investigation that Porche**

11   **was heavily intoxicated and that he needed somebody to walk him**

12   **home.**

13   Q.   And Mr. Porche was drinking beer the whole night; correct?

14   A.   **I believe so.  I don't know if he had wine or if he had,**

15   **like, wine and beer or just beer, but if I -- if you made me**

16   **tell you which one, I would say beer.**

17   Q.   Okay.  And he was so intoxicated, that he had trouble

18   walking home?

19   A.   **Yes.**

20   Q.   And the fraternity sent someone with him because it's part

21   of the sober monitor arrangement; correct?

22   A.   **I think it's part of the sober monitor arrangement in this**

23   **particular case.  These were his friends and a fraternity he**

24   **was looking to join, so -- I don't know that we ever**

25   **differentiated the -- or asked the specific reason, like, was**

1    it because he needed a sober walk home or because they wanted

2    to see him get home safely as a friend.  In any event, somebody

3    walked him home.

4    Q.    And Goshert gave you a written statement, and you

5    conducted a witness interview with Goshert; correct?

6    A.    **Correct.**

7    Q.    And Goshert is one of Chris Lanza's best friends; correct?

8          (Brief pause.)

9    A.    **I'm sorry.  I'm skimming.  If you say so, I assume so.**

10   Q.    {As read:}  Goshert met Lanza through Acacia.  They went

11   on spring break together and hang out often.  Goshert looks up

12   to Lanza, and the two are good friends.  Do you see that?

13   A.    **Yes.**

14   Q.    Did you conduct -- make a credibility determination on

15   Alexander Goshert?

16   A.    **I believe that we found that the witnesses, in general,**

17   **provided credible information, or if we didn't specifically**

18   **denote any issues with witnesses, then that's the general**

19   **concern -- or the general state of opinion, I guess, that we**

20   **have on the witnesses, is, we mark if there are concerns with**

21   **credibility.**

22   Q.    And there were no concerns about Goshert's credibility?

23   A.    **We did not have any concerns about his credibility, no.**

24   Q.    And Goshert told you that he was with Porche when Porche

25   called Roe and she answered the call on speakerphone?

1    A.    **Correct.**

2    Q.    And Porche denied that this happened; correct?

3    A.    **Correct.**

4    Q.    And in connection with her appeal, Ms. Roe submitted call

5    records that showed that there had been no connected call that

6    night between her and Mr. Porche; correct?

7    A.    **She presented phone records that they say they talked to**

8    **somebody who said that the numbers mean what they say they**

9    **mean.  I don't -- I'm not an expert on phone records, so I**

10   **don't know that for sure, but. . .**

11   Q.    Well, did you go and ask somebody?

12   A.    **We did not.**

13   Q.    Okay.  So you didn't have any reason to disbelieve what

14   Ms. Roe and Mr. Porche were telling you?

15   A.    **The phone records were not provided to the investigators.**

16   Q.    Sure.  But I think you mentioned she submitted them in

17   connection with her appeal and --

18   A.    **Correct.**

19   Q.    -- she transmitted that, tht information, to you after she

20   transmitted it to Vice President Rollock; correct?

21   A.    **For me to hand on to Dr. Sermersheim.**

22   Q.    And no one asked to verify their story proved by the

23   cellphone records that there had been no completed call that

24   night; correct?

25   A.    **I think the phone call was one factor of many, and they**

1    **could compare what the investigators had compiled in the report**
2    **versus the records and what Ms. Roe had indicated in her appeal**
3    **documents and consider, from her perspective or what she**
4    **asserted was -- you know, they could make a decision about**
5    **whether they believed a call had or had not occurred.**
6    Q.   Okay.  But if the call did not occur -- as it appears it's
7    undisputed, because Mr. Porche and Ms. Roe testified that it
8    didn't and provided documents.  If it did not occur, then
9    Goshert was lying; correct?
10   A.   **I don't know that the records show that it didn't happen.**
11   **It shows calls from him to her, but -- But, yes, following your**
12   **line of questions, I presume that it would mean that Alex**
13   **Goshert was lying.**
14   Q.   And that Chris Lanza was lying; correct?
15   A.   **Correct.**
16   Q.   And that seems like a big deal to me in this case.
17          **MR. KEALEY:**  Your Honor, that's not a question.
18   **BY MR. JEFFREY MACEY:**
19   Q.   Does it seem like a big deal to you in this case if
20   Chris Lanza was lying?
21   A.   **I think that that would be one factor that would be**
22   **weighed, and there were many other pieces of evidence.  I don't**
23   **think that there was much emphasis at all placed on that**
24   **alleged phone call in our analysis of the evidence.**
25   Q.   Would you disagree that Ms. Roe was not aware of that

1   phone call or the allegation that such a phone call occurred

2   until she saw the final investigator's report?

3   A.   **I'm not quite sure in the timeline, like, when she would**

4   **have seen the final report.**

5   Q.   Right.

6   A.   **So I don't know if I can answer your question on that.**

7        **We didn't provide the final report to parties, and so for**

8   **her to have gotten -- The way our process was back then, for**

9   **her to have seen the whole final report would have come**

10  **through, like, a records request through the Office of Legal**

11  **Counsel, and I don't have any information on whether that did**

12  **or didn't happen.**

13  Q.   Let's unpack that.

14  A.   **Okay.**

15  Q.   The first interview she had was with just Karen Meyers;

16  correct?

17  A.   **Correct.**

18  Q.   And there was no -- Obviously, at that point, there was no

19  evidence where somebody from the fraternity was claiming that

20  there had been a phone call made to Porche's phone at that

21  time; correct?

22  A.   **No.  So at that initial interview stage and initiating an**

23  **investigation, we take the allegations as true from the**

24  **complainant's perspective.  We don't interview anyone else or**

25  **do any investigation at all to determine whether to move**

1    forward with an investigation.

2    Q.   Okay.  So that's a "no"; right?

3    A.   **Correct.**

4    Q.   Okay.  Then, now, you testified to the meeting where you

5    had Ms. Roe and her support person, Kasey Richardson, and

6    Ms. Meyers was there, and it's recorded?

7    A.   **Yes.**

8    Q.   And during that meeting, you played the recording for her,

9    and you asked her about the sex with Chris Lanza the next day;

10   correct?

11   A.   **Correct.**

12   Q.   And nowhere in that meeting did you tell her that there

13   had been a phone call from Matt Porche to her that night that

14   she answered on speakerphone; correct?

15   A.   **I don't recall specifically.  I -- I don't think that we**

16   **did.  But she would have an opportunity to review.  We don't**

17   **tell them every single fact that we've gathered in the**

18   **investigation in a meeting.**

19        **In fact, it's not terribly common to go back and do a**

20   **follow-up interview unless there are loose ends or things that**

21   **we want to make sure a party hears.**

22        **Because they get that preliminary report review, they get**

23   **an opportunity to review all of the facts that we've gathered**

24   **and an opportunity to respond to that.  And so, oftentimes,**

25   **that's the mechanism for letting them see everything that we've**

1  gathered and provide feedback to that.

2  Q.   Right.  Right.  So while the investigation is going,

3  you're not reaching back out and asking Ms. Roe to identify and

4  address every piece of evidence; correct?

5  A.   **Correct.**

6  Q.   Okay.  And you already testified that there was a

7  preliminary report review that was sent to Ms. Roe; she had

8  five days to come and look at the preliminary report; correct?

9  A.   **There was a notification letting her know on the 3rd that**

10  **the review would start, I think, the 10th; and then the**

11  **review period was a five-day period.**

12  Q.   It was a five-day period.  And then she didn't exercise

13  that?  I don't think anyone has disputed that.

14  A.   **Correct.**

15  Q.   Then after that, the next time she sees the interview is

16  in the panel hearing -- or sees the investigator's report is

17  the panel hearing; correct?

18  A.   **No, I don't believe that that's accurate.**

19  Q.   Okay.  When did she see the investigator's report?

20  A.   **In our process at the time then-- again, it has changed**

21  **now --the parties got to see the preliminary investigation**

22  **report; but we did not provide parties with a copy of the final**

23  **investigation report with the analysis and the recommendations**

24  **from the investigators.**

25  Q.   Okay.  So she never even actually saw the investigation

1   report at all until after the result -- after that panel

2   hearing, she could request it later; correct?

3   A.   **No, I don't know.  She could have submitted a request to**

4   **the Office of Legal Counsel for the report before the hearing.**

5   **I don't know if she did or did not do that.**

6   Q.   Okay.  But prior --

7   A.   **I'm not involved.  I'm not involved in records requests,**

8   **so I don't know what they do give or don't give, and they**

9   **redact because of FERPA and all of those things.  And so I**

10  **really honestly have no idea if she requested or received a**

11  **report before the panel meeting.**

12  Q.   Okay.

13  A.   **Sorry.**

14  Q.   It's okay.  I have all day, but I'm not sure everybody in

15  here does, so I'm just going to ask that you just answer the

16  questions.

17         **MR. KEALEY:**  Your Honor, I'm going to move to strike

18  that.  It's gratuitous.

19         **THE COURT:**  Let's strike that comment.  If you want

20  to limit the answer of the witness, ask me.

21         **MR. JEFFREY MACEY:**  Okay.

22         **THE COURT:**  But only after you've asked the question.

23  You can cut the witness off and then ask me to limit it to the

24  question.

25         **MR. JEFFREY MACEY:**  Okay.  I'm going to start doing

1    that now.

2              **THE WITNESS:**  That's fine.

3              **MR. JEFFREY MACEY:**  Okay.

4              **THE WITNESS:**  I apologize.

5              **THE COURT:**  Just try to answer only --

6              **THE WITNESS:**  Okay.

7              **THE COURT:**  -- what is asked.  And if there's

8    something else that you think needs to be added, then your

9    lawyer will have -- not your lawyer, but the counsel for the

10   Defense will have the opportunity to redirect.

11             **THE WITNESS:**  Okay.

12             **THE COURT:**  And then he'll bring that in.

13             **THE WITNESS:**  Okay.

14   **BY MR. JEFFREY MACEY:**

15   Q.   Okay.  Prior to the final investigation report, we've

16   acknowledged, she didn't review the preliminary report.  Prior

17   to that final report or the panel hearing, Ms. Roe was not

18   aware that an allegation -- she could not have been aware that

19   an allegation had been made that she had a phone call with

20   Mr. Porche that night while she was with Mr. Lanza; correct?

21   A.   **I think I'm tracking your question.  And I think that**

22   **that's correct.**

23   Q.   Okay.  Once she became aware of that, she submitted

24   records in connection with her appeal to show that that phone

25   call did not happen; correct?

1   A.   **Yes.  I believe that that's what she was doing.**

2   Q.   And, in fact, her testimony was that she didn't remember,

3   but Matt Porche's testimony was that he never reached her that

4   night; correct?

5   A.   **Correct.**

6   Q.   And after she provided, in connection with her appeal, the

7   evidence from her and Mr. Porche that the phone call did not

8   take place, the university, your office, as far as you know,

9   took no action to investigate the credibility of that

10  statement; correct?

11  A.   **The credibility of what statement?**

12  Q.   That there had been a phone call connected between her and

13  Mr. Porche that night.

14  A.   **My office didn't do any additional investigation.**

15  Q.   Okay.  And you would agree with me that that is a pretty

16  damning piece of evidence, that she is with Mr. Lanza on the

17  phone with her boyfriend at the time, and it makes her look

18  really bad?  You would agree with me about that; correct?

19  A.   **I don't know that I think that it's a damning piece of**

20  **evidence.  No.**

21  Q.   Okay.  It's included in your report?

22  A.   **Correct.**

23  Q.   And, in fact, Lanza testified about it.  It got its own

24  paragraph.  You see that?

25  A.   **I see one of many paragraphs, yes.**

1    Q.   Okay.  But the evidence the first time she had to rebut

2    this, she and Porche showed that it wasn't true; correct?

3    A.   **I can't say whether those records say what she said it**

4    **said.**

5    Q.   Right, because you never made an investigation of it;

6    correct?

7    A.   **I was never asked to make an investigation of it.**

8    Q.   So you were never asked to make an investigation of her

9    appeal?

10   A.   **No.**

11   Q.   She sent you those records in connection -- Ms. Rollock

12   asked her to send things that she wanted to be considered, she

13   sent them to you, and you took no action on what she sent you

14   in connection with her appeal?

15   A.   **I received the information from her after I emailed her**

16   **and asked for it, and I provided it to Dean Sermersheim, as I**

17   **was directed to do.**

18   Q.   So you were never directed to take another look and see if

19   Ms. Roe --

20   A.   **The investigation was never reopened.**

21   Q.   Okay.  Okay.  I just want to show you Mr. Goshert's

22   written statement.  And this is odd, but I think I figured out

23   what happened.

24        It looks like, in fact -- So you see what I'm talking

25   about here, the written statement of Alex Goshert?  Do you see

1    that?

2    A.   **The whole thing?**

3    Q.   Yeah.  I mean, just so we're on the same page about --

4    A.   **Yes, I see his written statement.**

5    Q.   Zooming in, it's interesting, because the brackets, you

6    have people's names in brackets and then pronouns next to them.

7         So it says, "When you [Chris] were working bar that night,

8    she [Nancy] kept getting up to see you [Chris] at the bar,

9    mentioning you [Chris] by name."  Do you see that?

10   A.   **Yes.**

11   Q.   Is that because Chris was -- It appears this statement was

12   actually being given to Chris Lanza; correct?

13   A.   **Yes.**

14   Q.   And it was by Alex Goshert, one of his best friends;

15   correct?

16   A.   **I don't know if he's his best friend, but yes.**

17   Q.   He looks up to him?  Correct?

18   A.   **That's what he said.**

19   Q.   And the fraternity, they're brothers; right?

20   A.   **Yes.**

21   Q.   So Mr. Lanza took this testimony from Mr. Goshert and then

22   had Mr. -- How did it get transmitted into a written statement?

23   A.   **I honestly have no idea.**

24   Q.   Okay.  It's something Mr. Lanza provided to you; correct?

25   A.   **I can't recall if we got them specifically -- There were**

1    two witnesses that provided them.  I can't recall if Mr. Lanza
2    gave them to us or if those witnesses gave them to us.  I could
3    go back and look, but I don't remember.
4    Q.   Okay.  But it's clear that, from the use of "you"
5    throughout this -- "I think it was Trey who knocked on your
6    door.  You eventually came down."  Do you see that?
7    A.   **Yes.**
8    Q.   It's clear this statement was initially given to
9    Chris Lanza; correct?
10   A.   **Yes.**
11   Q.   And it's part of the defense that he prepared; correct?
12   A.   **Yes.  There were text messages showing that, throughout**
13   **the week, there was some conversation, and he had been made**
14   **aware that she may report to the university.**
15   Q.   And he had conversations with his other brothers to
16   prepare for that report; correct?
17   A.   **I don't know that "prepare" is -- I don't know if he was**
18   **preparing or because of the information he was given.**
19   Q.   Well, they were discussing the events, and he was
20   recording statements --
21   A.   **Correct.**
22   Q.   -- to provide to you; correct?
23   A.   **Correct.**
24   Q.   In fact, as part of those discussions with his brothers,
25   he played at least one of them, the tape he recorded of my

1    client; correct?

2    A.   **Correct.**

3    Q.   You testified that Ms. Roe decided to get a key from her

4    RA; correct?

5    A.   **Yes.**

6    Q.   But Chris Lanza told you that he told her to talk to her

7    RA; correct?

8    A.   **Yes.**

9    Q.   And, in fact, you mention:  The time frame was very

10   important.  The video camera captured a still-shot of Roe and

11   Lanza walking into the lobby at 2:19 a.m.  Do you see that?

12   A.   **Yes.**

13   Q.   If you look at page 9 of the report, you'll see texts

14   between Lanza and Martin.  And is Andrea Martin or "Andraya"

15   Martin?

16   A.   **I believe it's "Andraya," but I don't know if that --**

17   Q.   And Andrea Martin was checking in with Mr. Lanza to see if

18   Ms. Roe was okay; correct?

19   A.   **My recollection of her interview was that she wasn't**

20   **checking in to see if Ms. Roe was okay, because she had just**

21   **met Ms. Roe that night, that she was checking in on Mr. Lanza.**

22   Q.   And what was she worried Mr. Lanza was going to do?

23   A.   **I assume hook up with Ms. Roe.**

24   Q.   Now, in this text, she says, "Is she okay?"  So she is

25   checking on Ms. Roe there; correct?

```
1   A.   A few lines earlier, he says she's puking.
2   Q.   Okay.  That's right.  Now, he sent that at 2:29 a.m.;
3   correct?
4   A.   Correct.
5   Q.   So he was already in Ms. Roe's dorm at that time; correct?
6   A.   Correct.
7   Q.   And, in fact, he may have been in the woman's restroom at
8   that time?
9   A.   Correct.
10  Q.   Is it possible that he was with Ms. Roe in the women's
11  restroom and she was throwing up at that time?
12       MR. KEALEY:  Objection to the form of the question,
13  Your Honor.  Calls for speculation.
14       MR. JEFFREY MACEY:  She investigated the case.
15       THE COURT:  It's cross-examination.  I'll allow the
16  question.
17  A.   We have no information in the investigation to show that
18  that happened.
19  BY MR. JEFFREY MACEY:
20  Q.   Because Ms. Roe doesn't remember; right?
21  A.   Ms. Roe says she doesn't remember.
22  Q.   All right.  We have the investigation now.  Here's the
23  information.  Mr. Lanza is texting that night that he's there.
24  We've seen the video of him taking her into the dorm prior to
25  this.  And he's telling someone that she's puking everywhere.
```

1   That's information that she was puking in the women's restroom;

2   isn't that correct?

3   A.   **I suppose.**

4   Q.   And my client is at a massive disadvantage in this case

5   because she doesn't remember what happened that evening;

6   correct?

7   A.   **I disagree with your assessment.**

8   Q.   Of what?  Whether she remembered or whether she's at a

9   disadvantage?

10          **THE COURT:**  Well, that was a very compound and -- It

11  made a lot of assumptions.  I'm going to order that question

12  stricken.

13          **MR. JEFFREY MACEY:**  Okay.

14          **THE COURT:**  You can ask another question.

15          **MR. JEFFREY MACEY:**  Okay.

16          **THE COURT:**  It's not fair to the witness to answer a

17  question like that.

18          **MR. JEFFREY MACEY:**  Okay.

19  Q.   I wanted to run through the witnesses that you spoke to

20  then about the events.

21       You spoke to Matt Porche; correct?

22  A.   **Yes.**

23  Q.   You spoke to Andrea Martin -- "Andraya" Martin.  Apologies

24  to Andrea in absentia.  You spoke to her that night -- or about

25  the night; correct?

1    A.   **Correct.**

2    Q.   And she was close friends -- I guess she described herself

3    as a friend of Acacia Fraternity, meaning she knows a lot of

4    the brothers in the house, is on the list for their parties;

5    correct?

6    A.   **And was dating Kyle Hansen.**

7    Q.   Okay.

8    A.   **Yeah.**

9    Q.   So she's friends with the Acacia brothers.

10        You talked to -- I'm sorry.  Andrew Abrahamson, who was an

11   Acacia brother; correct?

12   A.   **Yes.**

13   Q.   You talked to James Borders, who was an Acacia brother?

14   A.   **Yes.**

15   Q.   And we've already talked about Mr. Goshert; correct?

16   A.   **Yes.**

17   Q.   He was an Acacia brother and looked up to Chris Lanza;

18   correct?

19   A.   **That's what he said.**

20   Q.   Paul Cheron, he was an Acacia brother; correct?

21   A.   **Yes.**

22   Q.   And Trey Jagiella was an Acacia brother; correct?

23   A.   **Yes.**

24   Q.   And, in fact, Mr. Jagiella is the individual that Lanza

25   played the recording for?

1    A.    **I believe so, yes.  He was the fraternity president at the**
2    **time.**
3    Q.    And then you talked to Lanza, and you talked to Roe?
4    A.    **Mm-hmm.**
5    Q.    And then you talked to Megan Skiba, who we heard from
6    earlier; correct?
7    A.    **Yes.**
8    Q.    And Emily Vian wasn't actually present for any of this;
9    correct?
10   A.    **No.  There were some text messages related to the**
11   **incident.**
12   Q.    Right.  But all the witnesses there at the party the night
13   were Ms. Roe and Mr. Porche and then a friend of Acacia's,
14   that's one, and then -- one, two, three, four, five brothers
15   and Mr. Lanza, six; correct?
16   A.    **It was a party at Acacia, and James Borders was**
17   **Mr. Porche's friend.**
18   Q.    But Ms. Roe didn't remember what had happened, and
19   Mr. Porche was himself intoxicated and kept out of the picture
20   while whatever was happening with Ms. Roe was happening;
21   correct?
22   A.    **I don't know that he was kept out of the picture.**
23   Q.    He was out of the picture?
24   A.    **He was not present.**
25   Q.    Okay.  And so all the testimony about what happened at

```
 1   Acacia and about how Mr. Lanza got Ms. Roe home came from the

 2   brothers; correct?

 3   A.   And Ms. Roe.

 4   Q.   And Ms. Roe?

 5   A.   Yes.

 6   Q.   To the extent she remembered?

 7   A.   Correct.

 8   Q.   The one thing that Mr. Porche testified to-- and I just

 9   wanted to show it because we went over it --was that he called

10   Roe approximately 10 times and called Lanza one time, but

11   neither of them answered their phone; correct?

12   A.   Yes.

13   Q.   And that directly contradicted the evidence we talked

14   about earlier about Roe getting on the phone with Porche while

15   she was with Lanza; correct?

16   A.   I'm not trying to be difficult.  I just -- I'm not -- I

17   don't know what those phone records mean.  And so there's phone

18   records that show calls were made -- I believe there were about

19   10 calls that match what he shared.

20       Whether any of those calls went through or didn't go

21   through, I don't know.  I mean, you've provided information

22   from them that say that, you know, one minute means it didn't

23   go through and two minutes to voicemail.  I have no way of

24   saying yes or no to that.

25   Q.   And I think we've already established that you didn't
```

1    check?

2    A.   **Correct.**

3    Q.   Interesting piece of information is that Porche testified

4    that he sent Roe a text message stating that he had the keys to

5    her dorm room -- Sorry.

6         "Later, Roe sent Porche a text message stating that she

7    got back to her room safely"; correct?

8    A.   **Yes.**

9    Q.   In the investigator's report, that text doesn't exist;

10   correct?

11   A.   **That's what Mr. Porche shared with us --**

12   Q.   Okay.

13   A.   **-- happened.**

14   Q.   So we don't know what time he got that text back from

15   Ms. Roe?

16   A.   **Correct.**

17   Q.   Okay.  And Porche told the investigators about

18   accompanying Ms. Roe to get a rape kit done; correct?

19   A.   **Correct.**

20   Q.   And, in fact, Mr. Porche was the one who encouraged her to

21   get a rape kit done; correct?

22   A.   **Correct.**

23   Q.   And Porche told you that, when Roe came out of the

24   examination, she was "shocked, nervous and scared"; correct?

25   A.   **Correct.**

 1   Q.   And he told you that the first thing she said was that she
 2   did not know that she had bruising on her neck and she also had
 3   swelling and scratches in her throat that prevented her from
 4   eating solid foods for the remainder of the weekend.
 5        Did you dispute Mr. Porche's contention that Ms. Roe was
 6   injured when she went in to see the SANE exam nurse?
 7   A.   **I think we took as true that she had suffered injuries.**
 8   Q.   Did you make a determination about whether she consented
 9   to being injured?
10   A.   **There was evidence in the form of an audio recording that**
11   **included a statement that she likes it rough, and so bruising**
12   **and scratching would be consistent with that information.**
13   Q.   Because she said that on the audio recording, the medical
14   evidence didn't matter; is that correct?
15   A.   **It wasn't that the medical evidence didn't matter.  The**
16   **medical evidence doesn't say whether it was consensual or not**
17   **consensual.**
18   Q.   If she was shocked, nervous, and scared coming out of the
19   nurse's office, does that indicate one way or another whether
20   it was consensual?
21   A.   **I think that that exam is a highly invasive exam, and I**
22   **would expect somebody to be in a state like that leaving a SANE**
23   **exam.**
24   Q.   So it was your opinion that it was the exam itself rather
25   than what the nurse discovered?

WRIGHT - CROSS

1    A.    **I don't think that I made a specific conclusion about what**
2    **it was.  I just wouldn't be surprised that somebody would**
3    **present that way after an exam like that.**
4    Q.    Ms. Wright, your participation in this investigation
5    occurred in May of 2017; correct?  It began?
6    A.    **It began, yes.**
7    Q.    Okay.  And at that time, you were a -- I guess a retained
8    part-time investigator for Purdue?
9    A.    **I was an outside investigator, yes.**
10   Q.    Okay.  And at that time, I think you had attended some
11   on-the-job training?
12   A.    **Correct.**
13   Q.    But you had maybe two days of ATIXA training prior to the
14   investigation, or was that after the investigation?
15   A.    **The ATIXA training that you're referencing happened, I**
16   **think, in January or February of that year, but I also had**
17   **years of legal training.**
18   Q.    Well, I think when I asked you about that, you didn't do
19   sexual assault cases as a lawyer?
20   A.    **I did not do sexual assault cases as a lawyer, no.**
21   Q.    So I think you mentioned earlier you had some training
22   about trauma on how victims respond to assault?
23   A.    **Correct.**
24   Q.    Okay.  But that was after this?
25   A.    **No.**

1    Q.    Okay.  Was that part of the ATIXA training?

2    A.    **That would have been part of the ATIXA training and some**

3    **other trainings I had done, yes.**

4    Q.    Okay.  And the ATIXA training, I think, was a two-day

5    training; correct?

6    A.    **Correct.**

7    Q.    And we've talked about ATIXA a few times in here?

8    A.    **Correct.**

9    Q.    And ATIXA is -- I guess they train investigators at

10   Purdue; correct?

11   A.    **They don't -- I don't think that that's an accurate way to**

12   **phrase that, no.**

13   Q.    How would you phrase that?

14   A.    **They offer trainings, and that's one of many types of**

15   **trainings we have investigators do.  Different organizations**

16   **offer different trainings, and ATIXA offers trainings.**

17   Q.    And ATIXA describes "incapacitation" as a situation where

18   decision-making function faculties are dysfunctional.  You were

19   in here when we heard this definition; correct?

20   A.    **I was in here, yes.**

21   Q.    And that a person can be stark naked, demanding sex, but

22   if they're incapacitated at the time and that is known or

23   should be known, any sexual activity that takes place is

24   misconduct; you heard that testimony, correct?

25   A.    **If I recall correctly -- Was that from your expert's**

1   report?

2   Q.   Yes.

3   A.   **Is that the ATIXA definition or your expert?**

4   Q.   The ATIXA.  She was relying on the ATIXA definition.

5   A.   **Is that the ATIXA definition?**

6   Q.   Yeah.  It's the -- Well, I can't testify to it.  Is that

7   surprising?  Is that definition surprising to you?

8   A.   **It would be surprising to me that a definition of a term**

9   **would include an example.  That's why I'm asking.**

10  Q.   Okay.  That's fair.  I think it's the explanation of

11  "incapacitation."

12  A.   **Okay.**

13  Q.   Would you think that that's an appropriate explanation of

14  how to understand incapacitation?

15  A.   **That if they're stark naked, lying in bed, begging for**

16  **sex, and the person knew or should have known, is that --**

17  Q.   Yes.  Any sexual activity that takes place is misconduct.

18  A.   **If they knew or should have known that they were**

19  **incapacitated while that was happening, then I would agree**

20  **that, yes, they shouldn't be engaging in that conduct.**

21  Q.   And it doesn't matter if the person who is incapacitated

22  is expressing verbal consent at that point; correct?

23  A.   **If the person knew or should have known.**

24  Q.   Well, I'm not talking about whether it was misconduct.

25  I'm talking about whether or not the person was incapacitated.

1    A.    **I don't understand your question.  I'm sorry.**

2    Q.    No, it's fine.  It's a very complicated issue.

3          So the "incapacitation," whether the person knows or

4    should have known that the individual is incapacitated, the

5    individual can be incapacitated whether anybody knows whether

6    or not they're incapacitated; correct?

7              **MR. KEALEY:**  I don't understand the question --

8              **THE WITNESS:**  I don't --

9              **MR. KEALEY:**  -- Your Honor, so --

10             **THE WITNESS:**  I'm having trouble --

11             **MR. KEALEY:**  -- I'm not sure the question is

12   intelligible.

13             **THE COURT:**  Why don't you ask the question again.

14   BY MR. JEFFREY MACEY:

15   Q.    Incapacitation is about the victim's state of mind;

16   correct?

17   A.    **Correct.**

18   Q.    And it doesn't matter how they're perceived; it's whether

19   the consent is in their state of mind; correct?

20   A.    **I think it does matter how they're perceived in terms of**

21   **our analysis.  But I think that incapacitation, as I understand**

22   **it, is relating to that mental function, the ability to**

23   **understand, you know, to have awareness of what's going on, the**

24   **"who," the "what," the "where," the "why."  And so I'm not -- I**

25   **don't understand what your question was.**

1    Q.   Right.  So I think what I said was that would you agree,

2    when we started this -- was that verbal consent by itself does

3    not indicate that an individual is not incapacitated; correct?

4    A.   **Like simply saying, like, "Yes, I want to have sex"?**

5    Q.   Yes?

6    A.   **Like, just that statement?  I don't think that that alone,**

7    **you could make a decision about whether somebody was**

8    **incapacitated or not just because they say, "I want to have sex**

9    **with you."**

10    Q.   Whether someone can walk, does that make it -- if someone

11    can walk, does that mean, by definition, they're not

12    incapacitated?

13    A.   **I don't think that whether they can walk in and of itself**

14    **shows they are or are not incapacitated.**

15    **As an investigator, I would want to know how -- how are**

16    **they walking:  Are they walking unassisted?  Are they walking**

17    **fine?  Are they stumbling?  Are they swaying?**

18    **So the mere fact they are walking doesn't tell me enough**

19    **to know in and of itself.**

20    Q.   And the amount of alcohol someone has drunk is important

21    to the analysis of "incapacitation"?

22    A.   **Correct.**

23    Q.   And, in fact, their blood alcohol content is important to

24    the analysis of "incapacitation"?

25    A.   **I don't know that I agree with you a hundred percent that**

1   the blood alcohol content percentage in and of itself would

2   tell you.  I mean, I think it certainly could tell you.

3   Q.   It's an important thing to understand; correct?

4   A.   I think understanding how much somebody drank and how

5   they're presenting and how -- you know, what activities they're

6   engaging in, all those things, I think that a percentage

7   alcohol by volume for you might be different than it is for me.

8   We might present differently.  It might affect our mental

9   ability differently.

10       And so just the number, in and of itself, I don't think,

11   would be, you know, like, yes, I can tell for sure.  Certainly,

12   if it's a huge number, then maybe you can say yes, but. . .

13   Q.   If the blood alcohol content is a huge number?

14   A.   Correct.

15   Q.   How long was Mr. Lanza alone by himself in the women's

16   restroom?

17   A.   I do not know.

18   Q.   Mr. Lanza could have left at that point and gone home;

19   correct?

20   A.   Correct.

21   Q.   He had already made a decision by that point to have

22   sexual intercourse with Ms. Roe; correct?

23   A.   I don't know what they decided that they were going to do.

24   I presume that they had decided that they were going to have

25   sexual intercourse.

1  Q.   How about Chris Lanza; when did he decide?

2  A.   **I don't know.**

3  Q.   Well, we've heard a lot of testimony about Ms. Roe

4  stashing Mr. Lanza in the room and taking him out of his room

5  in his boxer shorts and forcing him to walk her home, but

6  there's nothing in the report about what Mr. Lanza wanted to do

7  that night.

8  A.   **Yes, there is.**

9  Q.   Right.   It's a finding -- When did you find that Mr. Lanza

10  decided to engage in sexual activity with Ms. Roe?

11  A.   **I don't know that we made a specific statement about when**

12  **he decided to engage in sexual intercourse with her.   But I**

13  **don't believe -- and I'd have to look at the report to tell you**

14  **exactly where it is.   But my memory is that there's a**

15  **statement, perhaps on the walk home, where he said he**

16  **essentially knew it was a bad idea because Porche was going to**

17  **rush the fraternity or whatever, but she was flirting with him**

18  **and he thought, for lack of a better word, like, "What the**

19  **heck.   I'm going to" -- There's something in the report about**

20  **that, that there was point on the walk home, I believe,**

21  **where --**

22  Q.   It was before he was in the dorm; right?

23  A.   **Correct.**

24  Q.   So she didn't stash him in the bathroom; he was hiding in

25  the bathroom; right?

1   A.   **I think that they both were fine with him being in the**
2   **bathroom.  We can call it "stashing."  We can call it "hiding."**
3   **He was in the bathroom.**
4   Q.   And if someone had seen him with a visibly drunk
5   19-year-old trying to accompany her into her room, somebody may
6   have stopped him; correct?
7   A.   **I don't -- I don't think there's any evidence that he**
8   **didn't accompany her into her room.**
9   Q.   Right.  But I think you were testifying earlier that he
10  didn't want to be at the door with Megan Skiba -- with Nancy
11  Roe at Megan Skiba's door.  And isn't one reasons he didn't
12  want to be with Nancy Roe at Megan Skiba's door was because
13  Nancy Roe was intoxicated and Ms. Skiba would have stopped him
14  from going in with Ms. Roe?
15  A.   **No.  I don't believe that that's accurate at all.  I**
16  **believe that he wasn't at the door because Ms. Skiba knew**
17  **Ms. Roe's boyfriend, and they didn't want her to be seen with**
18  **somebody other than her boyfriend going into her room.**
19  Q.   Why do you think that's the reason instead of my reason?
20  I think --
21  A.   **Because there's no evidence to show that she was**
22  **intoxicated to a point that Ms. Skiba was concerned about**
23  **anything.**
24       **And I don't know that it's the role of RAs at Purdue**
25  **University to -- to stop people from engaging in behavior if**

1    they're willingly engaging in it.

2         There's no evidence --

3    Q.   That's --

4    A.   There's no evidence that --

5              THE COURT:  All right.  I think you've answered the

6    question.

7              THE WITNESS:  Okay.

8    BY MR. JEFFREY MACEY:

9    Q.   That's the question, isn't it.  Right?  Whether Ms. Roe

10   was engaged in willing behavior.

11        Ms. Skiba didn't say she wasn't intoxicated; right?

12   Ms. Skiba said Roe was not quite herself; correct?

13   A.   Correct.

14   Q.   Ms. Skiba said Roe -- Skiba had told her to go down to the

15   office, it took Roe a moment, and then she apologized for a

16   minute; correct?

17   A.   Yes.

18   Q.   Because she was confused, Ms. Roe was confused; correct?

19   A.   I don't think that there's anything there that says she

20   was confused.

21   Q.   Because these are your words.

22        But isn't the inference from this, that it took Roe a

23   moment and she apologized for a minute, that when Roe was at

24   Ms. Skiba's door, she was visibly confused?

25   A.   I don't think so.  I mean, those are my words, but they're

WRIGHT - CROSS

1    from our interview of Ms. Skiba, and she didn't say that

2    Ms. Roe was confused.

3    Q.    Okay.

4    A.    **We quoted what she said.  She said, "She was not quite**

5    **herself."**

6    Q.    You quoted her, "She was not quite herself."  She said

7    this was not Roe's normal behavior.  She stated typically Roe

8    is more straightforward.  Typically, she said, she's trained to

9    determine when a resident requires medical assistance.  We

10   heard that already.  She said Roe was "kind of

11   comprehending her"?

12           **MR. KEALEY:**  That's not a question, Your Honor.

13   That's just testimony.

14   **BY MR. JEFFREY MACEY:**

15   Q.    Didn't she?

16   A.    **Yes.**

17           **THE COURT:**  The form was in a question.

18   **BY MR. JEFFREY MACEY:**

19   Q.    Skiba told you that Roe was only "kind of comprehending

20   her"?

21   A.    **Correct, and we included all of that in our report.**

22   Q.    And if an RA sees a man with an intoxicated woman, a

23   19-year-old who is only "kind of comprehending" the RA, doesn't

24   the Purdue RA have an obligation to intervene?

25   A.    **No.**

WRIGHT - REDIRECT

1    Q.    No.

2            **MR. JEFFREY MACEY:**  I don't have any further

3    questions.

4            **THE COURT:**  All right.  Redirect?

5            **MR. KEALEY:**  I do have just a little bit, Your Honor.

6            **THE COURT:**  All right.

7                        <u>**REDIRECT EXAMINATION**</u>

8    **BY MR. KEALEY:**

9    Q.    From Defense Exhibit I, Ms. Wright, paragraph -- Looked at

10   it once or twice in this case, and then the summary of the

11   interview of Witness Porche.

12          I want to direct your attention to the paragraph that

13   begins, "Porche reported that he spent the remainder of

14   Thursday with Roe," this paragraph right here.  Do you see

15   that?

16   A.    **Yes.**

17   Q.    So that Thursday is the Thursday after the Monday?

18   A.    **Correct.**

19   Q.    So it's about three full days later?

20   A.    **Correct.**

21   Q.    And Mr. Porche told you that he was trying to convince

22   Ms. Roe to have a rape kit done?  That's what he told you?

23   A.    **Yes.**

24   Q.    That the rape kit was his idea?

25   A.    **Correct.**

1    Q.    Ms. Roe never you that she initiated getting a rape kit

2    done, did she?

3    A.    **No.**

4    Q.    And Mr. Porche told you the first thing that Ms. Roe said

5    to him after she came out of the examination was that she did

6    not know that she had bruising on her neck?

7    A.    **Correct.**

8    Q.    And that's what you wrote down in the interview?

9    A.    **Yes.**

10    Q.    So three days had gone by, and looking in the mirror every

11    morning, Ms. Roe had not noticed any bruise on her neck?

12    A.    **As far as I know, no.**

13    Q.    As far as you know, it took a nurse pointing out to her

14    that there's a bruise on her neck for her to notice a bruise on

15    her neck?

16    A.    **Correct.**

17    Q.    And the only other thing that you were told about that

18    report -- which was not provided to you, was it?

19    A.    **It was not provided to me, no.**

20    Q.    The only other thing you were told about that report was

21    through Mr. Porche, who told you that Ms. Roe had trouble

22    swallowing for the remainder of the weekend; right?

23    A.    **That's the remainder -- That's the rest of what Mr. Porche**

24    **had told us about the report.  I believe Ms. Roe had told us**

25    **some information about the report in her interview.**

1    Q.    So the remainder of the weekend would be that she had

2    trouble swallowing from Thursday to Sunday or something like

3    that?

4    A.    **Correct.**

5    Q.    No trouble swallowing on Tuesday, none that was reported

6    to you?

7    A.    **No, not that I'm aware of.**

8    Q.    No trouble swallowing on Wednesday, at least none that was

9    reported to you?

10   A.    **Correct.**

11   Q.    Let's take a quick look at Plaintiff's Exhibit 10.  This

12   is the second appeal submission from Ms. Roe.  You're generally

13   familiar with this document?

14   A.    **I am.**

15   Q.    You've heard a lot of challenges today to your

16   investigation.  Would you agree with me most of the challenges

17   you've just heard today were not challenges that were presented

18   in this document?

19   A.    **Correct.**

20   Q.    In fact, between the time you finished your report more

21   than five years ago until today, has anybody, Ms. Roe or

22   anybody on her behalf, ever sent to you a document saying, "We

23   quarrel with your report, Ms. Wright"?

24   A.    **I have not received anything directly, no.**

25   Q.    "Here's our evidence that we think you should include in

1    your analysis," nothing like that?

2    A.    **The only thing I received from Ms. Roe after our**

3    **investigation was complete were the documents that I forwarded**

4    **onto Dr. Sermersheim.**

5    Q.    Which was basically the SANE exam?

6    A.    **And I -- I think the phone records were attached to it as**

7    **well.  I'm not a hundred percent sure.**

8    Q.    So taking a look at Plaintiff's Exhibit 10, this is

9    Ms. Roe speaking in her own voice.  She quarrels with the

10   investigation and conclusion, saying, "Lanza stated that the

11   sex was mostly initiated by me, except I had bruising on my

12   neck and in my throat from him being rough."  That was the word

13   she used; right?

14   A.    **Yes.**

15   Q.    So she characterized her recollection of the sexual

16   interaction she had with Mr. Lanza as "rough"?

17   A.    **Yes.**

18         **MR. KEALEY:**  Nothing further.

19         **THE COURT:**  Thank you.  Any recross?

20         **MR. JEFFREY MACEY:**  Just briefly.

21                       RECROSS EXAMINATION

22   BY MR. JEFFREY MACEY:

23   Q.    Mr. Kealey was referring to the appeal that Ms. Roe

24   submitted to you -- or submitted to Vice President Rollock and

25   then submitted to you, as you testified earlier; right?

1    A.    **I'm not sure I follow.**

2    Q.    Exhibit 10, he was showing, would be the appeal with the

3    SANE exam?

4    A.    **If -- Can I answer?**

5    Q.    Yeah.

6    A.    **I can try to answer.  I think it's the appeal to Vice**

7    **President Rollock that never came to me.**

8    Q.    I thought you earlier you testified you reached out to

9    Ms. Roe, and then she transmitted it to you?

10   A.    **So in -- after -- I'm trying to keep them straight.  After**

11   **the first appeal and Vice President Rollock's letter, she**

12   **directed that any additional information be provided to me and**

13   **a deadline for Dr. Katie's -- Dr. Katie Sermersheim's review,**

14   **right?  And so Dr. Sermersheim asked me to reach out to Nancy**

15   **to see if she was going to submit any additional information.**

16   **She did, and I forwarded that to Dr. Sermersheim.  Her appeals**

17   **to Vice President Rollock went directly to Vice President**

18   **Rollock.**

19   Q.    Sure.

20   A.    **Sorry.**

21   Q.    I think we're on the same page.

22   A.    **Okay.**

23   Q.    But what she submitted to you included the SANE exam;

24   correct?

25   A.    **To forward to Dr. Sermersheim?**

1   Q.   Well, I'm asking what she sent to you?

2   A.   **I believe -- without seeing it exactly, I believe it**

3   **contained the SANE exam and the phone records.**

4   Q.   And the phone records?

5   A.   **I believe so, yes.**

6   Q.   And you've testified that you didn't reopen the

7   investigation on the phone records; right?

8   A.   **I can't reopen an investigation on my own.  Nobody**

9   **directed me to reopen an investigation.  I was asked to get**

10   **documents and send them, and I did.**

11   Q.   Okay.  So the fact that Ms. Roe never took issue with your

12   report -- Well, she did take issue, but you're not authorized

13   to do anything about it; correct?  She sent you the phone

14   records, and you weren't authorized, I think you just

15   testified?

16   A.   **Correct.**

17   Q.   Okay.  On the document that Mr. Kealey was showing you

18   from the investigation report is, actually Porche suggested

19   that Roe speak with Kasey Richardson at CARE; correct?

20   A.   **Porche told us that he wanted her to report to law**

21   **enforcement, to reach out to CARE.  She didn't want to do**

22   **either.  He met with CARE without her and then went and talked**

23   **to her and told her that he thought she should get a rape kit.**

24   Q.   Well, actually, Richardson told Porche to convince Roe to

25   have a rape kit done; correct?

1    A.    **I believe that's what he told us.**

2    Q.    Right.  So he told you that Richardson, Purdue's CARE

3    employee, told him to convince Roe to do that, and Porche told

4    you that he and Richardson and CARE believed that Roe would

5    later regret it if she did not immediately report the sexual

6    assault; correct?

7    A.    **Is --**

8    Q.    It's right there.

9    A.    **Yes.**

10          **MR. JEFFREY MACEY:**  Okay.  I don't have any further

11    questions.

12          **THE COURT:**  Anything else, Mr. Kealey?

13          **MR. KEALEY:**  No, Your Honor.

14          **THE COURT:**  Okay.  Let's take an hour break for

15    lunch.  It's now 1:30.

16       All rise.

17       (Jury out at 1:30 p.m.)

18       You may step down.

19          **THE WITNESS:**  Thank you.

20          **THE COURT:**  Be seated.

21       Let's wait for just a few minutes, and I should be able to

22    have jury instructions and verdict forms to you.  If I won't

23    have them within three to five minutes, I'll let you know that.

24          **MR. KEALEY:**  Your Honor, can we show that I will

25    report to you at the end of the lunch hour?

1          THE COURT:  I'm sorry.

2          MR. KEALEY:  Are we taking a lunch break now?

3          THE COURT:  Correct.

4          MR. KEALEY:  Right.  Can the record show that, at the

5     end of the lunch break, I will confirm to you that we are

6     resting?  I just want to go through our exhibits during the

7     break --

8          THE COURT:  Yes.

9          MR. KEALEY:  -- and be sure there's no housekeeping.

10         THE COURT:  That would be great.

11         MR. KEALEY:  Okay.

12         THE COURT:  And that's kind of why I thought we would

13    leave open anyway.

14         MR. KEALEY:  Yes.

15         THE COURT:  Okay.  I didn't want you to go run off to

16    a restaurant.  The jurors are going to go down to the

17    cafeteria, so don't go in the cafeteria.

18       All right.  They're in the back.  By the time you get back

19    the jury instructions and we're done, then you can at least go

20    in the cafeteria and get food and then bring it back up here or

21    in the hallway, but don't go in the cafeteria.  They'll be in

22    the back of the cafeteria, but don't go in the cafeteria and

23    eat.  So yeah.  That's great.  But let me see if I'm able to

24    give this to you now.  I think it's better to give them to

25    you -- the earlier, the better.  Okay.

 1          (Recess taken at 1:32 p.m.)

 2          (Proceedings resumed in open court, jury not present, at

 3           2:28 p.m.)

 4              **COURTROOM DEPUTY:**  All rise.

 5              **THE COURT:**  You may all be seated.

 6       You know, it occurs to me there are two with hard drive

 7   video -- Well, one is a video, and one is an audio.  What I've

 8   done is load them into a computer, have my tech people load

 9   them into a computer, and then the tech person and Sue show the

10   jurors how they access them just by hitting the buttons.  And

11   when the jurors get the evidence, they also then know those two

12   items of evidence are there available for them to play as they

13   wish.

14          (Brief pause.)

15       Maybe father Barry Macey should answer the question, or

16   Jeff, are you okay?

17              **MR. JEFFREY MACEY:**  No.  That's fine with us,

18   Your Honor.

19              **THE COURT:**  The hay fever or allergin went extra

20   high, like, yesterday, so I think everyone sort of feels that.

21       Is that fine, then, Mr. Kealey?

22              **MR. KEALEY:**  Yes, Your Honor.

23              **THE COURT:**  Okay.  Then, Sue, that's what we'll do.

24   We'll get those exhibits to Kevin tonight.  Tomorrow morning

25   we'll have them, and then you and Kevin immediately go back

1   with the evidence, and you'll show them how to play it.

2       Okay.  Mr. Kealey, you had brought up the evidence.  Do

3   you believe everything is straightened out?

4           **MR. KEALEY:**  Yes.

5           **THE COURT:**  Okay.  Is that right, then, Mr. Macey?

6   You were able to look at that?  Everything that's admitted is

7   in order, and you worked that out with Sue?

8           **MR. JEFFREY MACEY:**  Yes.  Yes, Your Honor.

9           **THE COURT:**  Okay.  And there's no objection, then,

10  from the parties that I send all the exhibits back with the

11  jurors, of course?

12      Mr. Macey?

13          **MR. JEFFREY MACEY:**  No, Your Honor.

14          **THE COURT:**  Mr. Kealey?

15          **MR. KEALEY:**  No.

16          **THE COURT:**  All right.  I see that there's been

17  additional instruction that -- Were you able to access those,

18  Mr. Kealey?

19          **MR. KEALEY:**  I have been able to access it, yes.

20          **THE COURT:**  So you have a copy of it?

21          **MR. KEALEY:**  Well, I have an electronic copy of it.

22  I don't have a hard copy.

23          **THE COURT:**  Can we print him a copy?  Print two

24  copies, one for Mr. Harrison, as well.

25      So are the jurors are back?

1              **COURT SECURITY OFFICER:**  They're still finishing up

2     their lunch.  Wherever you're ready, Your Honor.

3              **THE COURT:**  No, that's okay.

4        So the Defense rests?

5              **MR. KEALEY:**  On our case in chief, yes.

6              **THE COURT:**  You rest your case in chief.

7        Are there going to be any rebuttal witnesses?

8              **MR. JEFFREY MACEY:**  No, Your Honor.

9              **THE COURT:**  Okay.  Mr. Kealey, do you want to rest in

10    front of the jury, or is it okay for you to rest now?

11             **MR. KEALEY:**  It's okay to rest now.

12             **THE COURT:**  Okay.  If it's all right with the

13    parties, I think it's just appropriate, as soon as the jurors

14    are done, or we can bring them in now, tell them that they may

15    leave and then come back and we'll start at 9:00 tomorrow.

16        Then what we should be doing is starting immediately at

17    9:00 with closing argument, and then we'll work on the jury

18    instructions the rest of the afternoon as much as we need.

19        Okay.  Is that fine, then, Mr. Macey?

20             **MR. JEFFREY MACEY:**  Yes, Your Honor.

21             **THE COURT:**  Is that fine, Mr. Kealey?

22             **MR. KEALEY:**  Yes, Your Honor.

23             **THE COURT:**  Did they bring them in?

24             **COURT SECURITY OFFICER:**  Yes.  They're lining them up

25    right now.

1          **THE COURT:**  Okay.  Great.  I'm going to tell them

2     we're done with the evidence, the evidence is complete.

3          (Jury in at 2:33 p.m.)

4          **THE COURT:**  Everyone may be seated.

5          Okay.  Ladies and gentlemen of the jury, the evidence has

6     been completed.  Counsel indicates to me that there is no more

7     evidence to present before the jury, so we are going to break

8     for the day and return tomorrow at 9:00 for the closing

9     arguments promptly at 9:00.

10         So tomorrow you can let your families know that you will

11    be hearing the case.  You know, that you can let people know if

12    you need to or make arrangements, that tomorrow will be the

13    deliberation day and we don't know how long that will go.  I

14    have no control over that.  So tomorrow, we will do the

15    deliberations, closing arguments and deliberations.

16         So the admonishment.  This will be the last time.  The

17    rest of the time, you'll come back, and you'll be together.

18    But mind the admonishment.  Do not discuss the case with

19    anyone.  Do not formulate any opinions.  Do not do any research

20    or looking on your own.

21         Have a very nice day.  Appreciate your attentiveness.

22    Thank you.

23         (Jury out 2:35 p.m.)

24         **THE COURT:**  All right.  Everyone may be seated.

25         Besides this proposed jury instruction, I take it the

```
1    parties accept my jury instructions and my verdict form,
2    blanket?  No.  Okay.
3              MR. JEFFREY MACEY:  Judge, if you give us that one,
4    maybe.
5              THE COURT:  Okay.  I'm going to actually take a look
6    at this.  So let me give you about five more -- Can we come
7    back at about quarter till and be ready to discuss the jury
8    instructions?  Plaintiff?
9              MR. JEFFREY MACEY:  Yes.
10             THE COURT:  Defense?
11             MR. KEALEY:  Yes.
12        Okay.  When we discuss the jury instructions, they're much
13   different than what I was given, but I wasn't given anything
14   that was really consistent enough from side to side, you know,
15   to formulate it correctly.  So if you're going to suggest
16   changes and make objections and have some suggestions, stay
17   within the format as best you can, as I've tried to follow.
18   That's just the better way, and we'll talk about that.
19        Okay.  Thanks.
20        (Recess taken at 2:37 p.m.)
21        (Proceedings resumed in open court at 3:00 p.m.)
22             THE COURT:  Okay.  Plaintiff, have you had enough
23   time to go through the proposed final jury instructions?
24             MR. JEFFREY MACEY:  Yes, Your Honor.
25             THE COURT:  All right.  Defense?
```

1           **MR. KEALEY:**  Yes, Your Honor.

2           **THE COURT:**  All right.  How about if I just go

3     through them one at a time.

4         Any objection to Court's final proposed number 1.

5         Plaintiff?

6           **MR. JEFFREY MACEY:**  No objection, Your Honor.

7           **THE COURT:**  Defense?

8           **MR. KEALEY:**  No objection.

9           **THE COURT:**  Okay.  Court's final instruction

10    number 2?  Plaintiff?

11          **MR. JEFFREY MACEY:**  No objection, Your Honor.

12          **THE COURT:**  Defense?

13          **MR. KEALEY:**  No objection.

14          **THE COURT:**  Court's final instruction number 3?

15        Plaintiff?

16          **MR. JEFFREY MACEY:**  No objection, Your Honor.

17          **THE COURT:**  Defense?

18          **MR. KEALEY:**  No objection.

19          **THE COURT:**  Court's final instruction number 4?

20        Plaintiff?

21          **MR. JEFFREY MACEY:**  No objection, Your Honor.

22          **THE COURT:**  Defense?

23          **MR. KEALEY:**  No objection.

24          **THE COURT:**  Court's final instruction number 5?

25        Plaintiff?

1          **MR. JEFFREY MACEY:**  No objection, Your Honor.

2          **THE COURT:**  Defense?

3          **MR. KEALEY:**  No objection.

4          **THE COURT:**  Court's final instruction number 6?

5     Plaintiff?

6          **MR. JEFFREY MACEY:**  No objection, Your Honor.

7          **THE COURT:**  Defense?

8          **MR. KEALEY:**  No objection.

9          **THE COURT:**  All right.  Court's final instruction

10    number 7?  Plaintiff?

11         **MR. JEFFREY MACEY:**  No objection, Your Honor.

12         **THE COURT:**  Defense?

13         **MR. KEALEY:**  No objection.

14         **THE COURT:**  Number 8 is in italics.  It's the limited

15    purpose of evidence.  Does the Plaintiff believe that's

16    necessary?

17         **MR. JEFFREY MACEY:**  I don't think we did this, so no.

18         **THE COURT:**  Okay.  The Defense agree with that?

19         **MR. KEALEY:**  We do.

20         **THE COURT:**  So we do not need 8.

21    Number 9, any objection?

22         **MR. JEFFREY MACEY:**  No objection, Your Honor.

23         **THE COURT:**  Defense?

24         **MR. KEALEY:**  No objection.

25         **THE COURT:**  Ten, any objection to direct and

1    circumstantial?  Plaintiff?

2          **MR. JEFFREY MACEY:**  No objection, Your Honor.

3          **THE COURT:**  Defense?

4          **MR. KEALEY:**  No objection.

5          **THE COURT:**  And then 11, any objection?  Plaintiff?

6          **MR. JEFFREY MACEY:**  No objection, Your Honor.

7          **THE COURT:**  Defense?

8          **MR. KEALEY:**  No objection.

9          **THE COURT:**  12, any objection?  Plaintiff?

10         **MR. JEFFREY MACEY:**  No objection, Your Honor.

11         **THE COURT:**  Defense?

12         **MR. KEALEY:**  No objection.

13         **THE COURT:**  All right.  13?  Plaintiff?

14         **MR. JEFFREY MACEY:**  No objection, Your Honor.

15         **THE COURT:**  Defense?

16         **MR. KEALEY:**  No objection.

17         **THE COURT:**  14?  Plaintiff?

18         **MR. JEFFREY MACEY:**  No objection, Your Honor.

19         **THE COURT:**  Defense?

20         **MR. KEALEY:**  No objection.

21         **THE COURT:**  15?  Plaintiff?

22         **MR. JEFFREY MACEY:**  No objection.

23         **THE COURT:**  Defense?

24         **MR. KEALEY:**  No objection.

25         **THE COURT:**  16?  Plaintiff?

```
 1              MR. JEFFREY MACEY:  No objection.

 2              THE COURT:  Defense?

 3              MR. KEALEY:  No objection.

 4              THE COURT:  All right.  17?  Plaintiff?

 5              MR. JEFFREY MACEY:  No objection.

 6              THE COURT:  Defense?

 7              MR. KEALEY:  No objection.

 8              THE COURT:  And then 18, I don't believe that the --

 9     if evidence admitted only as to fewer than all claims, that

10     that necessarily would apply.  So is that necessary, Plaintiff.

11              MR. JEFFREY MACEY:  I don't believe so, and without

12     that, I don't object, so --

13              THE COURT:  Without that, you don't object to that.

14        Defense?

15              MR. KEALEY:  Well, I don't think we have any evidence

16     that was offered only as to one claim and not another, do we?

17              THE COURT:  No.

18              MR. KEALEY:  So I think the highlighted language

19     is --

20              THE COURT:  Is not needed?

21              MR. KEALEY:  Not needed.

22              THE COURT:  Okay.  And 18 without the highlighted is

23     okay with the Defense as well?

24              MR. KEALEY:  Yes.

25              THE COURT:  And then 19, preponderance and beyond a
```

```
 1   reasonable doubt difference.  Any objection from Plaintiff?
 2           MR. JEFFREY MACEY:  No objection.
 3           THE COURT:  Defense?
 4           MR. KEALEY:  To 19, no objection.
 5           THE COURT:  Okay.  20, any objection?  Plaintiff?
 6           MR. JEFFREY MACEY:  Sorry.  Let me just -- No
 7   objection.
 8           THE COURT:  Defense?
 9           MR. KEALEY:  Yes, we have objections to instruction
10   number 20.
11           THE COURT:  All right.  Is there something that you
12   would offer curative that would address your problem with it,
13   Mr. Kealey?
14           MR. KEALEY:  Yes.  But first, I think I need to
15   explain the concern.
16           THE COURT:  Okay.
17           MR. KEALEY:  The first paragraph is not objected to.
18       The second paragraph, in particular, "Plaintiff Roe claims
19   that university applied its false statement rule against her
20   differently," is not objected to.
21       The third paragraph, "If you find that Plaintiff Roe has
22   proved by a preponderance of the evidence that Defendant Purdue
23   University treated her differently because of her gender," is
24   not objected to.
25       The remaining language in number 20 is -- Well, there's no
```

1   page number here, but on that page, it appears to be directed

2   to Plaintiff's retaliation claim.  And this language, in our

3   view, has serious nonalignment with controlling case law.

4       We have to bear in mind that all of Title IX is an

5   intentional tort.  The private right of action requires

6   intentionality on the part of the defendant.  That is a

7   universal and a retaliation claim under Title IX, is an

8   intentional tort the same as any other claim under Title IX.

9       So we had proposed language requiring that there be a

10  showing of retaliatory intent; and that language was supported

11  by citations that we presented to the Court, and those

12  citations expressly require that a claimant asserting a

13  retaliation claim show that, even to get past summary judgment,

14  show that the defendant had -- possessed and acted upon a

15  retaliatory motive.

16      The citations for that I'm happy to talk through.  If the

17  Court would like specific quotations, I can provide them.

18      There is nothing in instruction number 20 that speaks at

19  all to a retaliatory motive on the part of Purdue University.

20  That's our first objection.

21      Our second objection is that the act of submitting a

22  complaint of assault is not automatically protected activity

23  and the easiest way I can illustrate that in plain language is

24  that, if somebody fabricated an intent -- a complaint of

25  assault and submitted it, surely, surely, it is not retaliatory

1    to address the fabrication.

2         The language that is in here starts down that road by

3    acknowledging in the third paragraph that Defendant Purdue

4    University asserts that it disciplined Plaintiff Roe because it

5    determined that her complaint of assault was not made in good

6    faith.  That is an accurate statement of that part of our

7    contention, but it is not followed through in the following

8    paragraph.

9         In the following paragraph, there's no mention of any good

10   faith requirement or any mention of any retaliatory intent.

11        The following paragraph says, "If you find that Plaintiff

12   Roe proved by a preponderance of the evidence that Defendant

13   Purdue University suspended her from school because of that

14   complaint of sexual assault, then you must find that Defendant

15   Purdue University violated Title IX."

16        This sentence starts with the conclusion -- the question

17   of whether the complaint of sexual assault is a good faith

18   complaint, is dropped from this statement.  The question of

19   whether the university was addressing bad faith and whether the

20   university was retaliating against a good faith complaint is

21   dropped from this statement, so that this statement is, in

22   effect, a strict liability rule that any discipline of any

23   complaint of sexual assault, without exception, is Title IX

24   retaliation according to this sentence.  And that, of course,

25   is not what the law says.

1          The language that we submitted addresses this problem.  We

2    submitted language that calls out to the jury the retaliatory

3    intent requirement and calls out the fact that, as the

4    Department of Education has stated in its regulations, having

5    and applying a rule against false statements is, as a matter of

6    law, not retaliation unless the complaint was not good faith.

7          We've provided that citation as recently our motion for

8    judgment on the pleadings yesterday.  I'm happy to re-provide

9    it right now and to share with the Court.

10         We have more to say on the following page with respect to

11   the "deliberate indifference" part of this instruction, but

12   I'll pause here because of my really, frankly, very grave

13   concerns about the defectiveness of this retaliation

14   instruction.

15         **THE COURT:**  All right.  Mr. Macey?

16         **MR. JEFFREY MACEY:**  We're not arguing that any

17   complaint of sexual assault is, you know -- Mr. Kealey is

18   correct that the complaint has to be good faith.  So what I

19   would propose in response to his concern is -- In the second

20   paragraph there, it says, "If you find that Plaintiff Roe has

21   proved by a preponderance of the evidence that Defendant Purdue

22   University suspended her from school because of," and then you

23   just replace that with "a good faith complaint of sexual

24   assault," "then you must find that Defendant Purdue University

25   violated Title IX."  So just replace -- Strike the word "that"

```
 1    and insert "a good faith" in front of "complaint," and I think
 2    that solves all the problems for that.
 3              THE COURT:  Mr. Kealey?
 4         MR. KEALEY:  It says nothing about retaliatory
 5    intent.  The jury has to make an affirmative finding that the
 6    complaint was a good faith complaint, and they need to make an
 7    affirmative determination that the decision-makers possessed
 8    retaliatory intent for a good faith complaint.  Both are
 9    mandatory elements of a retaliation claim.
10              THE COURT:  What if it read, "If you find that
11    Plaintiff Roe has proved by a preponderance of the evidence
12    that Defendant Purdue University suspended her with retaliatory
13    intent from school because of a good faith complaint of sexual
14    assault, then you must find that Defendant Purdue University
15    violated Title IX"?
16              MR. KEALEY:  May I confer with my client for a
17    moment?
18              MR. JEFFREY MACEY:  Can I just weigh in before?
19              THE COURT:  Yes.
20              MR. JEFFREY MACEY:  The language that's used here
21    from the Court's instruction tracks identically the Seventh
22    Circuit pattern instruction on retaliation; and in the Seventh
23    Circuit's pattern instruction the word "retaliatory intent"
24    doesn't appear.
25              THE COURT:  Well, what it --
```

1   **MR. JEFFREY MACEY:**  I think "retaliatory intent" is

2   covered by the term "because," right?  "Because."  And

3   Defendant's contention is, "Hey, we didn't discipline the

4   Plaintiff because of the complaint.  We disciplined her because

5   she made a false statement."  But that's, you know, the

6   "because" language does that.

7       On retaliatory intent, I think we're sort of inserting two

8   hurdles here that I'm not sure -- that may, in fact, confuse

9   the jury.

10      **THE COURT:**  Well, it would say that it suspended

11  her -- Yeah.  "Because of" is what is -- is used rather than

12  retaliatory intent.

13      **MR. KEALEY:**  Well, let me put it this way.  What if

14  there was no retaliatory intent?  The word "because" does not

15  substitute or distinguish between retaliatory intent and lack

16  of retaliatory intent.

17      This is a quote from the *Doe vs. Columbia College Chicago*

18  case we cited in our proposed instruction.  "A Title IX claim

19  fails if the Plaintiff has not alleged some retaliatory motive

20  connecting the protected activity to the adverse action."  That

21  ruling from 2017 is by Judge St. Eve, who, of course, now sits

22  on the Seventh Circuit.

23      **MR. JEFFREY MACEY:**  Let me know when you're ready.

24      **THE COURT:**  Yeah, I'm ready.

25      **MR. JEFFREY MACEY:**  Okay.  The pattern instruction

1    doesn't have anything about retaliatory intent.  I don't

2    understand how a defendant could discipline someone who makes a

3    good faith complaint because of that complaint, because of that

4    good faith complaint, without having retaliatory intent.  The

5    cause is the good faith complaint.  It's presumed in that.

6    We're adding sort of an additional element that is already

7    presumed, and I do think that that confuses the jury

8    particularly, since the pattern instructions don't have this

9    language.

10          **THE COURT:**  The way this reads, the pattern, you

11    know, what I have here, "If you find that Plaintiff Roe has

12    proved by a preponderance of the evidence that Purdue

13    University suspended her from school because of a good faith

14    complaint of sexual assault," that is a correct statement of

15    law.  I mean, that, in and of itself, if they prove they

16    suspended her because of a good faith complaint of sexual

17    assault.

18          **MR. KEALEY:**  I don't think it is, Your Honor, because

19    you need both intents.  You need the intent of the complaint,

20    and you need the intent of the disciplinarian.  And that quote

21    that I just shared from the *Columbia College* case makes that

22    clear.  "A Title IV claim fails if the Plaintiff has not

23    alleged some retaliatory motive connecting the protected

24    activity to the adverse action."

25          The protected activity is a good faith complaint.  The

1    retaliatory motive is the motive of the defendant.  All

2    Title IX claims fail unless there is an actionable intent on

3    the part of the defendant.

4        So to answer the Court's pending question, your proposed

5    language is acceptable to us, "suspended her with retaliatory

6    intent from school because of a good faith complaint of sexual

7    assault."  That language works.

8            MS. SOEHLING:  Your Honor, do you prefer I caret that

9    in between "suspended her from school" or after "school"?

10           THE COURT:  It should say "suspended her from school

11   with retaliatory intent."

12           MR. KEALEY:  That's acceptable to us.

13           THE COURT:  That would be where that would go.

14       What is the problem -- I mean, from the Plaintiff's

15   perspective, if -- It basically is the same argument whether I

16   put the words "with retaliatory intent" or not, because

17   basically the only way you are suspending someone for making

18   the complaint is retaliating for making the complaint.  So the

19   way I had it written, I thought it broke it down to the

20   simplest denominator to get to the end.

21       If you put in the word "with retaliatory intent," well,

22   obviously, the argument would have to be they were retaliating

23   because she made -- they suspended her, not because there was a

24   false statement, but because she made an allegation of sexual

25   assault that they didn't agree with.  So they were retaliating.

1    That's what your argument is.  So what I'm trying to do -- I'm

2    going to rule one way or the other, but I'm trying to get an

3    agreement with regard to this issue.

4            **MR. JEFFREY MACEY:**  I understand that.  I think the

5    issue, though, is looks like -- it seems like an additional

6    element.  The point of having a protected activity is, once you

7    exercise your rights to protected activity -- And I agree with

8    Mr. Kealey; it's got to be good faith.  But once you exercise

9    that right, you're protected.  The Defendant can't punish you

10   because you engaged in that protected activity.  Right?  And

11   that's just presumed.

12       The fact that it's presumed seems to indicate, well, there

13   has to be an additional showing other than that they -- you

14   know, Ms. Roe was punished because of it.  That's just not an

15   accurate statement of law.

16           **MR. KEALEY:**  Your Honor, there can be all kinds of

17   scenarios where somebody engages in protected activity and the

18   defendant is not trying to retaliate against them.  They can

19   come forward in good faith with erroneous information.  And

20   there can be confusion.  There can be misunderstanding.  There

21   can be a lot of things.

22       What a "retaliation claim" is, by definition, is a claim

23   that requires a retaliatory act; and I think the Court has

24   addressed that with this proposed edit.  We cannot be afraid of

25   the "R" word in this instruction, since that's the name of the

1   claim.  It's a retaliation claim.  If we don't have the "R"

2   word in there, we're not equipping the jury with an important

3   clarifying phrase.

4        So the edit that is on our screen, I think, is perfectly

5   sound, and I endorse it.

6        **MR. JEFFREY MACEY:**  I have another suggestion when

7   you're ready, Your Honor.

8        **THE COURT:**  Yes, Mr. Macey.

9        **MR. JEFFREY MACEY:**  Instead of adding the language

10  about retaliatory intent, what if we just say, "If you find

11  that Plaintiff Roe has proved by a preponderance of the

12  evidence that Defendant Purdue University retaliated against

13  her because of a good faith complaint of sexual assault, then

14  you must find that Defendant Purdue University violated

15  Title IX"?  So we would replace "suspended her from school" to,

16  "retaliated against her."

17       **THE COURT:**  Does that work?

18       **MR. KEALEY:**  We agree to that.

19       **THE COURT:**  So say it again, Mr. Macey.

20       **MR. JEFFREY MACEY:**  Yes.  So we would replace the

21  language that says "suspended her from school" and replace it

22  with "retaliated against her."  So the whole sentence would be,

23  "If you find that Plaintiff Roe has proved by a preponderance

24  of the evidence that Defendant Purdue University retaliated

25  against her because of a good faith complaint of sexual

1    assault, then you must find that Defendant Purdue University

2    violated Title IX."

3            **THE COURT:**  Agreed, Plaintiff?

4            **MR. JEFFREY MACEY:**  Agreed.

5            **THE COURT:**  Agreed, Defense?

6            **MR. KEALEY:**  Yes.

7            **THE COURT:**  Okay.

8            **MR. KEALEY:**  So the remainder of number 20,

9    Your Honor, on the following page, there has been no evidence

10   adduced -- and, to my hearing, not any argument -- that Ms. Roe

11   be suffered any denial of educational opportunity because

12   Purdue failed to prevent harassment of her.

13       You know, put more simply, there's never been a contention

14   here that Purdue failed to protect her from Christopher Lanza

15   on the night of -- the Monday night of the Acacia party.

16       So the giveaway phrase is official decision to not take

17   action to prevent harassment.  There's no contention here that

18   we failed to prevent any harassment of her.  And, therefore,

19   why would the jury be tasked with addressing that question?

20           **THE COURT:**  So point me exactly where you're at.

21           **MR. KEALEY:**  Sure.

22           **THE COURT:**  The second page of 20?

23           **MR. KEALEY:**  The second page of 20 in the second

24   paragraph.

25           **THE COURT:**  In the second paragraph.

1      **MR. KEALEY:**  Well, it's really just one long

2  sentence.  But the punchline is, you know, is the phrase

3  "prevent student-on-student harassment."  The only harassment

4  that she ever alleged was a single incident between her and

5  Christopher Lanza.  She's never alleged that Purdue should have

6  prevented it.  She never alleged that she was exposed to future

7  harassment by him, or anybody else, for that matter.  So this

8  contention, this burdens the jury with something that's not, in

9  fact, an issue in this case.

10      **THE COURT:**  Plaintiff?

11      **MR. JEFFREY MACEY:**  Your Honor, under the *Davis vs.*

12  *Monroe County Board of Education* case, the defendant had an

13  affirmative duty to remedy sexual harassment.  Defendant can't

14  contend that suspending my client and, therefore, removing her

15  from the situation satisfied that duty.

16      **MR. KEALEY:**  There is no duty under Title IX to find

17  Christopher Lanza responsible for sexual assault.  The duty

18  that is being referred to here, the reasonable response

19  obligation, is an obligation to protect the student's

20  educational opportunity from a pending or imminent risk of

21  harassment.

22      It's not backward-looking.  It's not about whether anybody

23  was punished for something that happened in the past.  It's

24  about today and tomorrow, not about yesterday.  This particular

25  part of Title IX, the deliberate indifference claim.

```
 1        So it's not about scoring the decision whether to punish
 2   Christopher Lanza because, whether he's punished or not, it has
 3   not been connected up to any loss of educational opportunity
 4   for Ms. Roe.  The day after the Acacia party, she was in
 5   school.  The semester after the Acacia party, she was in
 6   school.  She never contended then or since or in this courtroom
 7   that Christopher Lanza ever bothered her again.
 8        So that question is simply not at issue in this case.
 9             THE COURT:  Mr. Macey.
10        MR. JEFFREY MACEY:  As part of the standard, the
11   Supreme Court required schools -- federal funding recipients,
12   including Purdue, to, you know, respond to known peer
13   harassment in a manner that is not clearly unreasonable.
14   Suspending someone, you know, if we're right, as a result of a
15   complaint is clearly unreasonable.
16        If we want to change the language in the last sentence
17   from -- not the last sentence, but the last sentence of the
18   full paragraph there, where it says "prevent
19   student-on-student" harassment, to change it to "remedy
20   student-on-student harassment," that's fine with us, and we
21   would propose that.  But Purdue's obligation was to --
22             THE COURT:  It could be "to take action concerning
23   student-on-student harassment."
24             MR. JEFFREY MACEY:  Right.
25             THE COURT:  Instead of the word "prevent."
```

1      **MR. KEALEY:**  This cause of action is solely about

2   whether Purdue protected Ms. Roe from Mr. Lanza.  That's it.

3   The case law is very clear in that we cited the C.S. case,

4   which came out of the Seventh Circuit in May, which talks about

5   this question exhaustively.

6      The deliberate indifference cause of action is concerned

7   with whether the school is deliberately indifferent to a report

8   to an official of an actual or imminent risk of harassment.

9   It's a risk of harassment.  And Ms. Roe has never alleged that

10  Purdue left her at risk of harassment by Christopher Lanza.

11      **THE COURT:**  Mr. Macey.

12      **MR. JEFFREY MACEY:**  The deliberate difference

13  standards require a process to remedy student-on-student sexual

14  harassment and assault, and I don't think the Defendant can get

15  out of its obligation by disciplining the person who made the

16  complaint.  That's not remedying it.

17      There's no requirement in "deliberate indifference"

18  that -- The challenge in "deliberate indifference" is to the

19  school's processes, which is what we're challenging here; and,

20  instead of remedying it, it disciplined my client.

21      **MR. KEALEY:**  Your Honor, maybe I could put this in a

22  clarifying way.  If the Plaintiff wanted Christopher Lanza

23  disciplined, they could have done a number of things.  They

24  could have demanded that this Court determine whether Mr. Lanza

25  was, because he hadn't been suspended, putting Ms. Roe at risk.

1    They could have demanded that Purdue take steps such as keeping

2    him away from her.   They could have demanded other remedies to

3    protect her from harassment by him.

4        They have never asked this Court to do anything about

5    Mr. Lanza.   They're not going to ask this jury to do anything

6    about Mr. Lanza.   This case, from beginning to end, has never

7    been about solving the Christopher Lanza problem at

8    Purdue University.

9        The Plaintiff herself conceded on the stand that there was

10   insufficient evidence that he had sexually assaulted her for

11   Purdue to act on that proposition.

12       So this is a really stray path to send the jury down.   At

13   a minimum, it's a waste of their time and I think, frankly,

14   highly confusing, because there's nothing in this case law that

15   says Purdue, in order to satisfy Title IX, had to discipline

16   Christopher Lanza.

17       **MR. JEFFREY MACEY:**   We're not arguing they had to

18   discipline Mr. Lanza.   They shouldn't have thrown my client out

19   of school.

20       **THE COURT:**   But that is, jury instruction number 20,

21   the first two -- you know, the first five paragraphs talk

22   exactly about that.   And then when we get to the second page,

23   we start talking about the deliberate indifference count as a

24   count.

25       **MR. JEFFREY MACEY:**   But I think the problem is that

1    the first page, the false statement rule against her

2    differently than against male students, it's a Defendants'

3    instruction.

4        But the problem with deliberate indifference, if you don't

5    recognize deliberate indifference, then you don't acknowledge

6    that Title IX posed an obligation on Purdue to give my client

7    as process, and that's the deliberate indifference standard.

8        What's confusing to the jury is that the Defendant keeps

9    saying, "Well, you have to prove you treated her complaint

10   differently because she's a woman than a male," but no, no.

11   Title IX says that we recognize gender discrimination in

12   schools occurs when students assault each other.

13       The school's obligation kicks in in remedying that.  If

14   the school doesn't remedy the gender discrimination of the

15   assault, the gender-based assault, then the school is

16   deliberately indifferent.  And in this case, instead of

17   remedying the gender-based assault, the school disciplined my

18   client.

19            **MR. KEALEY:**  It's a bait-and-switch, Your Honor.

20   Those are just completely unrelated concepts.

21       If Ms. Roe wanted Purdue to do something about Mr. Lanza,

22   she could have said, "Keep him away from my classes.  Keep him

23   away from my dorm.  Keep him away from me.  Because I need to

24   be able to go to school in peace."  She could have said all

25   that.

 1          What she asked for, instead, amounted to, "I want you to

 2     punish him.  I want retribution."  That's not a remedy for

 3     educational opportunity.

 4          As the Court pointed out, as a criminologist, retribution

 5     is a different cat.  Retribution is where the objective is

 6     punishment.  Deliberate indifference is where the objective is

 7     protecting Ms. Roe's educational opportunity.

 8          **MR. JEFFREY MACEY:**  That's just inaccurate.  My

 9     client just filed a report about what happened to her.  She

10     didn't demand -- She followed the school's reporting process.

11     And the remedy was that she got kicked out.

12          **THE COURT:**  In actuality, her boyfriend at the

13     time --

14          **MR. JEFFREY MACEY:**  Yeah.

15          **THE COURT:**  -- almost was the one that filed the

16     report, or at least --

17          **MR. JEFFREY MACEY:**  The Court ruled on our -- the

18     Defendants' motion for summary judgment.  They rejected the

19     argument the Defendant is making right now.

20          **THE COURT:**  I'm going to take that under advisement

21     so we can move along.  So we can get to the Court's final

22     instruction number 21.

23          Plaintiff.

24          **MR. JEFFREY MACEY:**  We do object.  The end of the

25     first sentence.  I keep saying "first sentence" -- Maybe it is

1    the first sentence.  The end of that first paragraph, where it

2    says, "and that the suspension deprived her of the opportunity

3    to remain enrolled at Purdue University."

4        As she alleged, additionally, that Purdue retained her

5    property by collecting money for the classes and then

6    suspending her and then also deprived her of a liberty interest

7    going forward; i.e., she has a disciplinary mark on her record

8    that she's going to have to talk about in future career plans.

9    So we would propose that the suspension deprived her of her

10   liberty and/or property.

11            **THE COURT:**  Okay.  All right.  Defense?

12            **MR. KEALEY:**  All three of those forms of alleged

13   protected interests are incorrect.

14       The Seventh Circuit has squarely held in *Doe vs. Purdue*

15   that there's no constitutionally protected liberty or property

16   interest in Ms. Roe's opportunity to remain enrolled at

17   Purdue University.

18       The Seventh Circuit has also held in the 2022 decision

19   that we cited in both our motion for judgment on the pleadings

20   and in our comments to the proposed instructions that a tuition

21   refund claim is not available under 1983 because it is a

22   contract claim, and a contract claim is not a constitutional

23   interest.

24       The stigma-plus cause of action, which was alluded to by

25   counsel just now, the contention that somebody's discipline has

1    a stigmatizing effect on their occupational liberty is simply

2    outside this case.  It has never been pled, never been argued,

3    and is not in the pretrial order as a contention.

4         It does not belong in this instruction.

5              **THE COURT:**  All right.  Anything else?  Any other

6    objections to 21 from the Defense?

7              **MR. KEALEY:**  No, sir.

8         I will just point out that the "remained enrolled at

9    Purdue University" also appears in the second paragraph.  So

10   that --

11             **THE COURT:**  Correct.

12             **MR. KEALEY:**  That defect is a concern to us in both

13   places.

14             **THE COURT:**  So how would you have it read?

15             **MR. KEALEY:**  Our view is we didn't deprive Ms. Roe of

16   any constitutionally protected interest.

17             **THE COURT:**  Correct.

18             **MR. KEALEY:**  And I'm preserving that objection on the

19   record right now.  I don't think this instruction should be

20   given at all because the Plaintiff has not adduced at trial any

21   evidence of deprivation of any constitutionally protected

22   property or liberty interest.

23             **THE COURT:**  All right.  How about 22?  Plaintiff?

24             **MR. JEFFREY MACEY:**  No objection, Your Honor.

25             **THE COURT:**  Defense?

 1          **MR. KEALEY:**  No objection, Your Honor.

 2          **THE COURT:**  23?

 3          **MR. JEFFREY MACEY:**  No objection, Your Honor.

 4          **THE COURT:**  Defense?

 5          **MR. KEALEY:**  No objection.

 6          **THE COURT:**  24?

 7          **MR. JEFFREY MACEY:**  No objection, Your Honor.

 8          **THE COURT:**  Defense?

 9          **MR. KEALEY:**  No objection, Your Honor.

10          **THE COURT:**  And then 25.  Plaintiff?

11          **MR. JEFFREY MACEY:**  No objection, Your Honor.

12          **THE COURT:**  Defense?

13          **MR. KEALEY:**  A limited objection.

14      In the bullet items that appear in the third paragraph,

15  the proposed instructions were submitted on Monday night, when

16  we were, of course, only midway through -- less than midway

17  through the Plaintiff's case in chief.

18      Since then, the Plaintiff rested without adducing any

19  evidence that she incurred any medical care or treatment as a

20  result of the alleged 1983 and Title IX violations.

21      So the first bullet, I think, should just be deleted

22  because it does not refer to anything in the record.

23          **THE COURT:**  Plaintiff?

24          **MR. JEFFREY MACEY:**  I don't object to that.

25          **THE COURT:**  Anything else, Defense?

1      **MR. KEALEY:**  Nothing else on 25.

2      **THE COURT:**  26?  Plaintiff.

3      **MR. JEFFREY MACEY:**  No objection, Your Honor.

4      **THE COURT:**  Defense?

5      **MR. KEALEY:**  The same issue appears in the second

6  bullet at the bottom of 26.  There's a reference to medical

7  care for which there was no evidence; and, therefore, I submit

8  that bullet item should be deleted.

9      **THE COURT:**  Plaintiff?

10      **MR. JEFFREY MACEY:**  No objection.

11      **THE COURT:**  So that would be the second bullet on the

12  first page of 26.

13      **MR. KEALEY:**  And then continuing on in 26, on the

14  next page, the second bullet on the next page -- Actually, both

15  bullets on the next page, the Plaintiff adduced no evidence of

16  any economic loss other than tuition and no evidence of any

17  loss of wages, salary, profits, and earning capacity.

18      So I submit that the second bullet should be deleted, and

19  the first bullet, I think, would be more helpful to the jury if

20  it specifically referred to her tuition claim.

21      **THE COURT:**  So how would you read the first bullet on

22  that page?

23      **MR. KEALEY:**  "Economic loss in the form of tuition

24  due to the discipline."

25      **THE COURT:**  "Economic loss due to the discipline" --

1            **MR. KEALEY:**  "Economic loss in the form of tuition."

2            **THE COURT:**  All right.  Defense, if that were to read

3    "economic loss in the form of tuition due to the discipline

4    Plaintiff Roe suffered," and then "cost of replacement

5    education" eliminated?

6            **MR. KEALEY:**  Right.

7            **MR. JEFFREY MACEY:**  I think that improperly narrows

8    what she testified to.  I think she testified both to the loss

9    she had at Purdue and then also the value of the -- or the cost

10   of the education she incurred at the University of Oregon, and

11   she also testified to the delay in her career.  So I think that

12   has to be part of the instruction.

13           **THE COURT:**  Okay.  So, "Economic loss in the form of

14   tuition due to the discipline Plaintiff Roe suffered and the

15   cost of replacement education"?

16           **MR. JEFFREY MACEY:**  And future -- I guess that's the

17   next one.

18           **THE COURT:**  Yes, because the next one is what talks

19   about future --

20           **MR. JEFFREY MACEY:**  Okay.  As long as there's -- Can

21   I say that's okay as long as the next one addresses her

22   testimony?

23           **THE COURT:**  All right.  Well, let's look at the next

24   one.

25       Defense, do you have a problem with the next one?

```
 1          MR. KEALEY:  There is no evidence from which the jury

 2   could ascertain anything about wages, salary, profits, and

 3   earning capacity.  So simply stating that it has taken her

 4   seven years to earn a BA degree is not an assertion of a loss

 5   of wages, salary, profits, or earning capacity.

 6          THE COURT:  Plaintiff?

 7          MR. JEFFREY MACEY:  I think the jury, under the -- if

 8   we presume the jury is properly instructed by the second

 9   paragraph of this instruction, which explains it must be based

10   on evidence and not speculation or guesswork, I think if we

11   just include any, you know, future career earnings, then we

12   could presume that the jury has been properly instructed and it

13   must be based on the evidence.

14      And she testified she's interested in a career in law and

15   had -- her education has been delayed by two years due to the

16   discipline.  And, you know, Defendants are well within their

17   rights to argue about what that means, but I don't think that

18   means the jury shouldn't be able to consider the effect that

19   this has had on her future earnings.

20          THE COURT:  Okay.  Let's move to 27.  I'll come back

21   to that as well.

22      Plaintiff?

23          MR. JEFFREY MACEY:  No objection, Your Honor.

24          THE COURT:  Defense?

25          MR. KEALEY:  No objection.
```

```
 1              THE COURT:  28?

 2              MR. JEFFREY MACEY:  No objection, Your Honor.

 3              THE COURT:  Defense?

 4              MR. KEALEY:  No objection.

 5              THE COURT:  Plaintiff, 29?

 6              MR. JEFFREY MACEY:  No objection, Your Honor.

 7              THE COURT:  Defense?

 8              MR. KEALEY:  No objection.

 9              THE COURT:  Plaintiff, 30?

10              MR. JEFFREY MACEY:  No objection.

11              THE COURT:  31 -- or Defense?

12              MR. KEALEY:  No objection.

13              THE COURT:  Is there any objection to any of the

14      other ones from the Plaintiff?

15              MR. JEFFREY MACEY:  No, Your Honor.

16              THE COURT:  From the Defense?

17              MR. KEALEY:  No.  Our next objections are concerning

18      the verdict form.

19              THE COURT:  All right.  Let's hear with the verdict

20      form, as well.  Then I'm going to go make modifications and

21      come back in.

22              MR. JEFFREY MACEY:  Just to remind, that we did offer

23      a retaliation one that we proposed.

24              THE COURT:  Then it is the one that you had offered.

25              MR. JEFFREY MACEY:  Yeah.  And I -- I don't know --
```

1    Do you want me to explain it now?

2            **THE COURT:**  Yes.

3        **MR. JEFFREY MACEY:**  I think there are two reasons.

4        One is, in Ms. Wright's testimony today, there was a lot

5    of evidence about whether Plaintiff had proven to the

6    investigators that Mr. Lanza had assaulted her.  But the

7    testimony was also clear that the Defendant had not made any

8    determination about her memory of that night.

9        I think, given the other instructions, it may confuse the

10   jury if the jury thinks she should have had to prove that Lanza

11   assaulted her in order for her complaint to be protected.

12       So I would ask that that instruction be given so it's

13   clear to the jury that, even if her complaint was ultimately

14   found unsubstantiated, she still had the right to bring it.

15       And I think the instruction we offered is particularly

16   important due to the amendments we made to the retaliation

17   instruction at the Defendants' request.

18           **THE COURT:**  All right.  Defense?

19       **MR. KEALEY:**  I find the proposed alternate

20   instruction completely bewildering, and I can't understand it.

21   And if I can't, I'm sure the jury can't.

22       I think it's just an unnecessary instruction.  If we carry

23   over into the Court's proposed instruction the language that we

24   had ended up agreeing on as a revision to number 20, then the

25   jury will be able to see in this list that there are a variety

1    of different theories of relief that the Plaintiff is bringing,

2    and they're stated in the alternative.

3        It says we find in favor of the Plaintiff with respect to

4    A or B or C, and then the key conjunction is, "or that,"

5    "Defendant Purdue University's method of determining should be

6    subject to discipline," so there's no ambiguity here that they

7    have to find anyone on this list in order to find another on

8    this list.  It's already clearly stated in the alternative.

9        There are other problems with the alternate instruction

10   proposed by the Plaintiff.

11       A retaliation claim is still a discrimination claim.  The

12   private right of action under Title IX is entirely under the

13   umbrella of discrimination.

14       So a retaliation is just a specie of discrimination --

15   Retaliation claim is just a specie of a discrimination claim,

16   and to say that one is distinct from the other is really

17   confusing.

18       **THE COURT:**  If they suspended her because of the

19   complaint, then that's basically what we're saying in

20   instruction 20 already.

21       **MR. JEFFREY MACEY:**  Yes, though I think what

22   Defendant is arguing is that we're going to have to show

23   that -- They're using the term "retaliation," which, I think,

24   is appropriate.  But what also is appropriate, and I think the

25   testimony today was awfully misleading, is that she had a right

1   to make a good faith complaint and doesn't have to prove -- she

2   didn't have to prove her complaint.

3       In fact, the complaint didn't have to be substantiated to

4   give her the right to make that complaint, and I think that's

5   an important concept for the jury, particularly given the

6   evidence that was put in today.

7           **MR. KEALEY:**  Your Honor, that's just argument.  I

8   have no qualm with Mr. Macey making that argument, but it's

9   just argument.  I think we solve this problem in instruction

10  number 20.  I think the Court is exactly right.

11          **THE COURT:**  What I fear from the reading is this is

12  that, when you read it, it sounds like -- You have to really

13  read it very carefully; and, you know, it continually sounds

14  like, if they suspended her because she made a complaint of

15  sexual assault.  Well, they did suspend her because she made a

16  complaint of sexual assault.

17      And your claim is that they suspended her because she made

18  a complaint of sexual assault in good faith, and their claim is

19  that she made a complaint of sexual assault and they believe

20  that she was lying.

21      But if you say they suspended her because she made a

22  complaint of sexual assault, they did suspend her because she

23  made a complaint of sexual assault, and they thought she was

24  being untruthful.

25      And yours is saying that -- It basically, to me, is saying

1    the same thing as what we're already going through with the

2    retaliated against her because of her complaint, because of

3    that good faith complaint.  It seems to be saying the same

4    thing.

5         **MR. JEFFREY MACEY:**  Well, nothing in our new language

6    here on "retaliated against her because of a good faith

7    complaint" explains what that is.  Right?  So this instruction

8    explains what a "good faith complaint" is.

9         She's got to prove that she had a good faith belief that

10   she was the victim of sexual assault and reported this

11   university officials.

12        **MR. KEALEY:**  I think that's just argument, Your

13   Honor.  That's a -- a type of good faith behavior, and whether

14   that's a sufficient description of "good faith behavior" is a

15   factual question for the jury.  But good faith is ultimately a

16   jury question, and Mr. Macey can argue his version of good

17   faith, and we'll argue our version of it.

18        **THE COURT:**  All right.

19        **MR. JEFFREY MACEY:**  If you don't mind --

20        **THE COURT:**  Mr. Macey, yes --

21        **MR. JEFFREY MACEY:**  One second, Your Honor.  I think

22   this does come from the pattern.

23        It comes from a subsection on 3.02.  The pattern

24   instruction, if we look at (c), in many cases, the question of

25   what -- This is from the pattern instructions 3.02,

1    Retaliation.

2         "In many cases, the question of what constitutes a

3    protected activity will not be contested."  Well, that's not

4    true in this case.

5         "Where it is, however, the instruction should be revised

6    as follows:"  Plaintiff claims that, you know, there was an

7    adverse -- adverse action by Defendant because of protected

8    activity.  "To succeed in this claim, Plaintiff must prove two

9    things by a preponderance of the evidence:"

10        The protected activity was based on a reasonable, good

11   faith belief.  This does not require, however, plaintiff to

12   show that belief was correct, and the defendant would not have

13   suspended plaintiff if she had not engaged in protected

14   activity.

15        That's where we're developing this from.  There's no

16   instruction on what a "good faith belief" is in these current

17   instructions, and there are legal standards for that.  So our

18   proposal is that we define that for the jury.

19             **THE COURT:**  Does this define "good faith belief"

20   or --

21             **MR. JEFFREY MACEY:**  I think it explains the fact that

22   is -- I think it explains -- Frankly, I think it clearly

23   explains the issue in the case, and I think there's a lot of

24   confusion about the issue in the case presented by the

25   testimony.  I think this clearly states it.

1        **THE COURT:**  All right.  Anything else, Mr. Kealey, on

2   that?  I'm going to take that under advisement as well.

3        **MR. KEALEY:**  On the Plaintiff's alternate

4   instruction?

5        **THE COURT:**  Yes.

6        **MR. KEALEY:**  Nothing further from us on it.  I do

7   have a little bit more on the Court's existing verdict forms.

8        **THE COURT:**  Yes, on the verdict forms.

9        **MR. KEALEY:**  Yes.

10       **THE COURT:**  All right.  Verdict, Purdue University,

11  the first one.  That's the first one I've got.

12       **MR. KEALEY:**  Right.  You want to hear first from me

13  or Mr. Macey on this?

14       **THE COURT:**  Mr. Macey?

15       **MR. JEFFREY MACEY:**  I'm not going to object to this.

16       **THE COURT:**  Okay.  Mr. Kealey.

17       **MR. KEALEY:**  Yes.  So in the first paragraph there,

18  the language that it suspended her because of her complaint of

19  sexual assault should be modified to conform to our now

20  agreed-upon number 20.  So our agreed-upon number 20 is -- it's

21  being written in, so I'll just pause for a moment -- Because of

22  her good faith complaint, I believe it is.

23       **THE COURT:**  "Retaliated against her" --

24       **MR. KEALEY:**  "Because of a good faith" --

25       **THE COURT:**  "That it retaliated against her because

 1   of a good faith complaint."

 2          **MR. KEALEY:**  Right.

 3          **MS. SOEHLING:**  Say that again really slow.

 4          **THE COURT:**  "It retaliated against her."

 5          **MR. KEALEY:**  And then in this same paragraph, the

 6   remainder of the paragraph after that is the deliberate

 7   indifference issue that the Court has taken under advisement,

 8   so that it treated the claim with indifference and was

 9   equivalent of a decision not to take action to prevent

10   student-on-student harassment.  That's the deliberate

11   indifference cause of action that, we submit, is simply not in

12   the evidence and, therefore, does not require a determination

13   by the jury and should be deleted.

14          **THE COURT:**  Okay.

15      (Defense counsel inaudibly conferring.)

16          **MR. KEALEY:**  Well, let's go ahead and flag that now.

17      You want to go ahead and share that observation, Joe?

18          **MR. HARRISON:**  Yes, Judge.  We just noticed Ms. Roe's

19   real name appears in the caption on all of the proposed

20   instructions and verdict forms.

21          **THE COURT:**  Correct.

22          **MR. HARRISON:**  We weren't sure about that.

23          **THE COURT:**  Yes.  And I have a question about that

24   too.  How do I publish the verdict forms if they have her name

25   on them?  And the instructions.

1      **MR. JEFFREY MACEY:**  Can we publish them with that

2  redacted, Your Honor?

3      **THE COURT:**  So the motion would then be to publish

4  them redacted, but since they're being sent back to the jury,

5  they've got the name of -- which is the caption of the case.

6  Is that fine with the Defense?

7      **MR. KEALEY:**  Yes.

8      **MR. JEFFREY MACEY:**  Yes, sir.

9      **THE COURT:**  Then that answers the question I was

10  going to have to ask.  Very good, Mr. Harrison.

11      **MR. HARRISON:**  I think your first verdict form omits

12  "United States District Court" on the top.

13      **COURTROOM DEPUTY:**  That one, we got.

14      **MR. KEALEY:**  Young eyes are a blessing, I have

15  to say, you know.

16      **THE COURT:**  So the verdict with regard to

17  Katherine Sermersheim?

18      **MR. KEALEY:**  We would point out the same as we have

19  in the instructions, that the phrase "opportunity to remain

20  enrolled at Purdue University," which appears in both of the

21  first two paragraphs, A and B, is not, under *Doe vs. Purdue*, a

22  constitutionally protected property interest; and, therefore,

23  we object to those two provisions on that ground.

24      That, of course, also appears in the Rollock verdict form.

25      **THE COURT:**  All right.  Anything else?

1      **MR. HARRISON:**  On question 2 of the Rollock verdict

2   form:  We, the jury, unanimously find in favor of Plaintiff,

3   Nancy Roe, with respect to -- I believe it should say "her"

4   instead of "its."  That would track question 2 on the

5   Sermersheim verdict form.

6          **THE COURT:**  I'm sorry.  Where are you at?

7      **MR. HARRISON:**  On the Rollock verdict form, question

8   2a:  We, the jury, unanimously find in favor of Plaintiff,

9   Nancy Roe, with respect to -- It says "its" on mine, but I

10  think it should say with respect to "her" claim.  And that

11  would track 2a on the Sermersheim verdict form.

12         **THE COURT:**  Right.  Okay.  There's something else

13  wrong there too, because these should look exactly the same

14  because the only thing changed is the name, unless Sermersheim

15  is just pushing it farther into the -- Okay.  That is okay.

16     Anything else from the Defense?

17         **MR. KEALEY:**  No, nothing else on those two verdict

18  forms.

19         **THE COURT:**  Plaintiff?

20         **MR. JEFFREY MACEY:**  I agree with the Defendant that

21  it shouldn't say deprived Plaintiff, Nancy Roe, of the

22  opportunity to remain enrolled at Purdue University.  Again, I

23  would propose that it deprived -- It simply say deprived

24  Plaintiff, Nancy Roe, of liberty and/or property.

25         **THE COURT:**  Defense?

```
 1              MR. KEALEY:  May I have a moment to internally confer

 2    on that?

 3              THE COURT:  Sure.

 4         (Defense counsel inaudibly conferring off the record.)

 5              THE COURT:  Okay.  So read it how you would have it

 6    read, the last sentence.  "The suspension deprived."

 7              MR. JEFFREY MACEY:  "Deprived Plaintiff, Nancy Roe,

 8    of" -- I guess maybe we should say "of her liberty and/or

 9    property."

10              MR. KEALEY:  So two comments.  The proposed edit,

11    "her liberty or property," is preferable to the Defense over

12    the existing phrase, "opportunity to remain enrolled at Purdue

13    University."

14         I would just like the record to show that we continue to

15    object to any instruction or verdict that refers to

16    "deprivation of liberty or property" because, we contend, she

17    has not adduced any evidence of any constitutionally protected

18    liberty or property.

19              THE COURT:  Okay.  So the Plaintiff would like me to

20    change it to "her liberty and/or property"?

21              MR. JEFFREY MACEY:  Yes, Your Honor.

22              THE COURT:  Okay.  Anything else, Plaintiff?

23              MR. JEFFREY MACEY:  We've gone through them all.

24              THE COURT:  Pardon?

25              MR. JEFFREY MACEY:  Have we done all the verdict
```

1   forms?  I think we have.

2          **THE COURT:**  Yes.  It's just the three.

3          **MR. JEFFREY MACEY:**  Then I don't have anything else.

4          **THE COURT:**  Anything else from the Defense?

5          **MR. HARRISON:**  Looking back on final jury instruction

6   number 21, mapping that up with the language that was just

7   discussed about the "opportunity to remain enrolled at Purdue

8   University."

9          **THE COURT:**  Correct.  To mirror it, we would take out

10  "the opportunity to remain" -- "deprived her of her liberty

11  and/or property."

12          **MR. HARRISON:**  Both paragraphs?

13          **MR. KEALEY:**  Still showing our general objection, but

14  assuming our general objection is overruled, then we would

15  prefer the language be consistent between this instruction and

16  the verdict form.

17          **THE COURT:**  Mr. Macey?

18          **MR. JEFFREY MACEY:**  I don't have anything further on

19  the verdict forms.

20          **THE COURT:**  I mean, are you fine with that?  I'm

21  changing 21 to "deprived of her liberty and/or property," in

22  the first paragraph, and then the second paragraph, the fourth

23  line down, "deprived Plaintiff, Roe, of her liberty and/or

24  property."

25          **MR. JEFFREY MACEY:**  Yes, Your Honor.  I'm fine with

```
 1   that.
 2            THE COURT:  All right.
 3            MR. JEFFREY MACEY:  Thanks.
 4            THE COURT:  Anything else?
 5            MR. JEFFREY MACEY:  Nothing from the Plaintiff.
 6            THE COURT:  Let me see what trouble I can get into
 7   going back and taking all this into account.  I'll be back as
 8   soon as possible.  If it's going to be more than 20 minutes,
 9   I'll let you know.
10       (Recess taken at 4:30 p.m.)
11       (Proceedings resumed in open court at 5:00 p.m.)
12            COURTROOM DEPUTY:  All rise.
13            THE COURT:  Everyone can be seated.
14       Let me just -- you'll see them yourself, the things that
15   we talked about already.  So the Court's instruction number 19
16   that you just received, which would have been 20 and now it's
17   19 because we took out an instruction, I made the changes that
18   we agreed upon.  I'm leaving in everything that appeared on the
19   second page.  I did change the word from "prevent"
20   student-on-student harassment in the last sentence of the
21   second-to-the-last paragraph to the word "remedy"
22   student-on-student harassment.
23       I'm not going to give Plaintiff's additional instruction.
24       On 20, I made the changes that we talked about,
25   suspension, deprived her of liberty and/or property.
```

1      On 24, which was our 25, I took out the bullet point and

2   just made that sentence, "You should consider economic loss

3   suffered by Plaintiff, Roe, due to the discipline and cost of

4   replacement education."

5      I also then eliminated the bullet point that appeared at

6   the bottom of original 26.  On 25.  It was the old 26.  I

7   eliminated the bullet point, and then I changed "economic loss

8   in the form of tuition due to discipline Plaintiff Roe suffered

9   and the cost of replacement of the -- "the cost of replacement

10  education," and I'm leaving in the last bullet point.  It must

11  be proved, but I'm leaving it in.

12     And I think that's all of the changes.  I'm pointing out

13  what we've done.  The court reporter, as you just heard me

14  talk, is going to be here tomorrow at 8:30.  So if you

15  have additional -- Look at them.  I'm going to review them more

16  carefully tonight.  But other than typos, if you have any other

17  objections, you can put them on the record.  You can go on the

18  record to the court reporter.  Just tell her you want to go on

19  the record with objections to the instructions.

20     And then with the verdict forms, I have modified the

21  verdict forms as we were speaking about so that they were

22  consistent with the changes in the instructions.  And, again, I

23  will more carefully go over them, but other than typos, you've

24  got what will be the verdict forms.  If you have any objections

25  to those, then you can make those, as well, to the record so

1    that you can make a record on your objections.

2        Any objection to proceeding in that manner from the

3    Plaintiff, Mr. Macey?

4            **MR. JEFFREY MACEY:**  No, Your Honor.  I did have one

5    more thing after this part but --

6            **THE COURT:**  Okay.  Mr. Kealey?

7            **MR. KEALEY:**  No objection to proceeding in that

8    manner.  I, too, have one more thing after this part.

9            **THE COURT:**  Great.  No, that's fine.

10       All right.  Mr. Macey.  Maybe you have the same thing.

11           **MR. JEFFREY MACEY:**  Possibly.  So I just noticed that

12   the Order came through denying the Defendants' motion for

13   judgment as a matter of law, and I just wanted to raise the

14   fact that I do believe one of those was granted, which was the

15   compensatory damages on the Title IX claim.

16           **MR. KEALEY:**  I think you may mean the emotional harm

17   damages.

18           **THE COURT:**  The emotional harm damages.

19           **MR. JEFFREY MACEY:**  Yeah.  I just wanted to raise

20   that so it's in the record that that was granted.

21           **THE COURT:**  It is covered by the jury instructions as

22   if it was granted as well.

23           **MR. JEFFREY MACEY:**  Yes.  I just want to make sure I

24   have a record -- have a ruling that I could object to if it

25   comes to that.

1              **THE COURT:**  That's fine.  Okay.  Then yes, that was

2    granted.  We'll fix the record.

3              **MR. JEFFREY MACEY:**  Okay.  Thank you.

4              **THE COURT:**  All right.  Mr. Kealey.

5              **MR. KEALEY:**  And mine is related but different.

6    Understanding that, I believe, the Plaintiff is not putting on

7    any rebuttal to our case in chief, we, as, perhaps, a

8    formality, renew our Rule 50 motion to the extent it was

9    previously denied on the same basis as documented in the

10   written version of that motion last night.

11             **THE COURT:**  All right.  And I'll deny that.

12       Anything else, Mr. Kealey?

13             **MR. KEALEY:**  Not today.

14             **THE COURT:**  Okay.  So we'll see everyone at 9:00.

15   Jurors will be here, ready for closing argument.

16             **MR. JEFFREY MACEY:**  Did we talk about how long we get

17   for closings?

18             **THE COURT:**  Very good.  There is always something

19   else.  No, this is fair.

20       How long do you need, from the Plaintiff?

21             **MR. JEFFREY MACEY:**  Forty-five minutes.

22             **THE COURT:**  Okay.  Forty-five minutes okay for the

23   Defense?

24             **MR. KEALEY:**  Yes.

25             **THE COURT:**  Okay.

1      **MR. JEFFREY MACEY:**  He said 90.  I just said no.

2      **THE COURT:**  I pretty much let everyone do what they

3  need to do, but we may have had to cut that off.  The jurors

4  might have.

5      All right.  Everyone be safe.  Have a nice day.

6                          * * *

7                  CERTIFICATE OF REPORTER

8      I, Angela Phipps, RMR, CRR, certify that the

9  foregoing is a true, complete, and accurate transcript of the

10  record of proceedings in the above-entitled matter, before

11  Magistrate Judge John E. Martin, on September 22, 2022.

12

13  Date:  June 24, 2023      S/Angela Phipps, RMR, CRR
                              Official Court Reporter
14                            for the U.S. District Court

15

16

17

18

19

20

21

22

23

24

25